**EXHIBIT 9**

michael buckley                    Nell McCallum & Associates

Page 1

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

QUINTON BROWN, RAMON          )
ROANE, ALVIN SIMMONS,         )
SHELDON SINGLETARY,           )
GERALD WHITE, JASON GUY,      )
AND JACOB RAVENELL,           )
INDIVIDUALLY AND ON           )
BEHALF OF THE CLASS THEY      )
SEEK TO REPRESENT,            )
                              )
         PLAINTIFFS,          )
                              )  CASE NUMBER:
VS.                           )
                              )  2:0422005-12
NUCOR CORPORATION AND         )
NUCOR STEEL BERKELEY,         )
                              )
         DEFENDANTS.          )

------------------------------------
ORAL AND VIDEOTAPED DEPOSITION OF
MICHAEL R. BUCKLEY, PHD
NOVEMBER 22, 2006
------------------------------------

    ORAL AND VIDEOTAPED DEPOSITION OF MICHAEL R.
BUCKLEY, PHD, produced as a witness at the instance of
the Defendants, and duly sworn, was taken in the
above-styled and numbered cause on the 22nd of November,
2006, from 8:28 a.m. to 12:33 p.m., before Kevin J.
Bruzewski, CSR in and for the State of Texas, reported
by machine shorthand, at the law offices of Alaniz &
Schraeder, 2500 City West Boulevard, Suite 1000,
Houston, Texas, pursuant to the Federal Rules of Civil
Procedure and the provisions stated on the record or
attached hereto.

NMA
Compressed
Transcript

michael buckley                    Nell McCallum & Associates

---

**Page 2**

APPEARANCES

FOR THE PLAINTIFFS:
    MR. ROBERT L. WIGGINS, JR.
    Wiggins, Childs, Quinn & Pantazis, PC
    1400 Southtrust Tower
    Birmingham, Alabama 35203

FOR THE DEFENDANTS NUCOR CORPORATION AND NUCOR STEEL
BERKELEY:
    MR. CARY A. FARRIS
    MR. MARC R. PATTON
    MR. MARK LINCOLN
    Alaniz and Schneider, LLP
    2500 City West Boulevard, Suite 1000
    Houston, Texas 77042
    (281) 833-2200

ALSO PRESENT:
    Mr. R. Richard Jeanneret
    Mr. Jerry Cook, Videographer

---

**Page 3**

INDEX
                                        PAGE
Appearances...................................... 2
Stipulations.................................... 4
MICHAEL R. BUCKLEY, PHD
    Examination by Mr. Farris.................. 4

Signature and Changes......................... 178

Reporter's Certificate........................ 179

EXHIBITS

NO.  DESCRIPTION                        PAGE
 1   A copy of Amended Notice of Videotape    5
     Deposition for Possible Use at Trial to
     Michael R. Buckley, PHD

 2   A copy of contents of folder          11

 3   A copy of Preliminary Expert Report of  20
     Michael R. Buckley
 4   A copy of a Nucor job posting          82

---

**Page 4**

PROCEEDINGS
    VIDEOGRAPHER: Okay. Today's date is November 22, 2006. We're on the record at 8:28 a.m.
    COURT REPORTER: Stipulations for the record?
    MR. FARRIS: Federal Rules and South Carolina local rules?
    MR. WIGGINS: Yes.

    * * * * * * *

MICHAEL R. BUCKLEY, PHD,
a witness herein, called by the Defendant, having been first duly cautioned and sworn, as hereinafter certified, was examined and testified as follows;

EXAMINATION
BY MR. FARRIS:
    Q. Good morning, Dr. Buckley.
    A. Morning.
    Q. I'm Cary Farris. I'll be taking your deposition today.
    A. Morning.
    Q. Would you state your full name for the record, please?
    A. Michael Ronald Buckley.

---

**Page 5**

    Q. Okay. Great. And did you receive a subpoena for your deposition today?
    A. I sure did.
    Q. Okay.
    A. Yes.
    Q. I'm going to show you this and ask you if that's the subpoena you received and the notice?
    A. That is.
    MR. FARRIS: Okay. Could we get that marked, please?
    MR. WIGGINS: We want to note -- well, go ahead.
    (Exhibit No. 1 marked.)
    MR. WIGGINS: We want to note for the record that we are making the same objections to the Defendant's subpoena as they made to the Plaintiffs' subpoena on the same types of items.
    MR. FARRIS: On the reports, past reports transcripts --
    MR. WIGGINS: Right. Right.
    MR. FARRIS: -- that kind of thing?
BY MR. FARRIS:
    Q. Okay. Let's go ahead and you can have that copy and --
    A. Thank you.

---

2 (Pages 2 to 5)

michael buckley                    Nell McCallum & Associates

Page 6

1  Q. -- take a look at it. And let's see what you
2  brought with you today in response to the subpoena.
3      Did you bring any documents with you?
4  A. I brought a number of documents, just some
5  handwritten notes to myself, copies of some -- some of
6  the reports that have been done, my report,
7  Dr. Jeanneret's report, couple notes -- and notes to
8  myself.
9  Q. Okay. So the handwritten notes are things that
10 you used in preparing your report?
11 A. They are.
12 Q. Okay. And did you not produce them with your
13 report; right?
14 A. I did not.
15 Q. Okay.
16 A. Did not.
17 Q. So you're producing them today for the first
18 time?
19 A. Absolutely.
20 Q. Okay.
21 A. Yes.
22 Q. Why did you not produce them with your report?
23 A. These are -- these are items that I've used for
24 today, not that I've used for the report that I
25 produced. The report that I produced earlier for

Page 7

1  you-all is just what it is, it's the report. I sat down
2  and I wrote the report, and you have a copy of that.
3  Q. So none of the items that you brought today
4  were used in drafting your report?
5  A. I don't think so. I don't think so. Not in
6  drafting my first report.
7  Q. Okay. When you say your first report, what do
8  you --
9  A. My preliminary report, the report you have a
10 copy of.
11 Q. Do you plan on filing a second report?
12 A. If asked I shall.
13 Q. Okay. But you haven't started drafting one
14 yet?
15 A. I have not.
16 Q. Okay. Let's just go through this subpoena list
17 real quick --
18 A. Yeah.
19 Q. -- and make sure that we have everything
20 covered. We asked first for a complete copy of your
21 file including any documents basically that you have in
22 your file pertaining to this lawsuit.
23     Did you bring all of that?
24 A. You know, on instructions of Mr. Wiggins, the
25 only thing -- the only thing I had other than that were

Page 8

1  depositions and --
2  Q. Which depositions?
3  A. The deposition that I read in preparation for
4  my first report.
5  Q. The ones you listed in your --
6  A. That's right.
7  Q. -- report?
8  A. That's right.
9  Q. Okay. So everything else you've --
10 A. I have.
11 Q. -- brought with you?
12 A. I have.
13 Q. Okay. Second item was any and all
14 correspondence and documents you have provided to
15 plaintiffs or plaintiffs' counsel.
16 A. I believe so.
17 Q. Have you brought any correspondence?
18 A. Just -- there have just been emails about
19 travel times and those kind of things.
20 Q. Okay. And that --
21 A. And I have not brought a copy of those.
22 Q. Okay. Do you have a copy available of those?
23 A. I will have -- if you would like one, I would
24 certainly be glad to send you one.
25 Q. Okay. And you said that all of these are

Page 9

1  scheduling type issues?
2  A. Yes, absolutely, hotel, travel time, that
3  kind --
4  Q. No other kinds of correspondence?
5  A. No. No.
6  Q. Okay. Number 3 was any and all correspondence
7  and documents provided to you by plaintiffs or
8  plaintiffs' counsel.
9      You brought anything that the lawyers have
10 provided to you?
11 A. I have. I have.
12 Q. And what have you brought in response to that?
13 A. Just -- again, just the -- I mean, you're more
14 than welcome to have a copy of anything. It's the
15 report from -- in fact, it's not from my attorney or
16 from the attorney, it's from -- it's Professor
17 Jeanneret's -- or Dr. Jeanneret's response to my initial
18 report.
19 Q. Okay. We're going to need to get this whole
20 thing marked --
21 A. Yeah.
22 Q. -- as a bulk exhibit.
23 A. Great.
24 Q. Do you have a copy of it or do you need
25 somebody to --

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

michael buckley                    Nell McCallum & Associates

Page 10

1    A. I'm -- I'm going to let you copy it, if that's
2    okay.
3        Q. Okay. Great.
4            MR. WIGGINS: Okay. We emailed the
5    compendium thing that you sent us night before last.
6    You can ask him, but I don't think it all came through
7    for him, but --
8            THE WITNESS: Yeah. You know, some of it
9    was --
10           MR. WIGGINS: When you emailed us, we
11   emailed --
12           THE WITNESS: It all didn't come through,
13   some came through. And in addition, I was told there
14   would be more that was forthcoming and I didn't receive
15   it. I had to leave yesterday to come here.
16           MR. FARRIS: Well, we can -- we can talk
17   about that off the record --
18           THE WITNESS: Yeah.
19           MR. FARRIS: -- and get that to you.
20           THE WITNESS: That's great.
21           MR. FARRIS: So can we go ahead and mark
22   this, then. Let's just -- that whole manila folder,
23   please.
24           THE WITNESS: Great.
25           MR. FARRIS: And we'll take a look at it on

Page 11

1    break.
2            THE WITNESS: Great.
3            (Exhibit No. 2 marked.)
4    BY MR. FARRIS:
5        Q. No. 4 was a complete copy of any and all
6    reports prepared by you or anyone on your behalf which
7    relate in any way to plaintiffs' allegations?
8        A. I haven't prepared a report for today.
9        Q. Okay. Just the --
10       A. Just some written notes.
11       Q. You have some written notes for today --
12       A. I do.
13       Q. -- but you don't have any --
14       A. No.
15       Q. -- type written --
16       A. No.
17       Q. -- items for today?
18       A. No, I do not.
19       Q. The next item was copies of any and all drafts
20   of reports that relate to this lawsuit?
21       A. No, I just did a -- you know, I just sat at my
22   desk and did it and you have a copy of it.
23       Q. Did you keep any initial drafts of the report?
24       A. I have the final draft. I have the finished
25   report and I just sat down and did it.

Page 12

1        Q. Okay.
2        A. I didn't do it over a number of different days.
3    It was done over a real compact period.
4        Q. Did you have a initial draft that you gave to
5    your attorneys to review?
6        A. You know, I sent a draft on a Friday when it
7    was due. I made one correction on it because there was
8    a typo in it and apparently -- apparently another one
9    and -- but that's it.
10       Q. Okay. The next item is No. 6, all documents in
11   your possession or control that plaintiffs or you will
12   rely upon in plaintiffs trial in this case or in your
13   testimony.
14           Are there any other documents out there
15   that you plan to use in your testimony in the future in
16   this case?
17       A. Just some standard items like the uniform
18   guidelines, but other than that, I --
19       Q. Okay. Well, let's -- let's list the standard
20   items just to make sure we know exactly what it is.
21           You're going to have the uniform
22   guidelines?
23       A. Uh-huh.
24       Q. Any other standard items?
25       A. Gosh. You know, probably I'd -- I would look

Page 13

1    at some -- some information -- some more information
2    about job analysis. I went to Auburn University in
3    Alabama. I took a course from Junior Field who is a
4    well-known person in human resource selection. I would
5    more than likely reread major portions of his book and
6    probably bring those along.
7        Q. Okay. When you said other job analysis
8    information, are you just referring to text or are
9    you --              .
10       A. Yes. It's just a textbook.
11       Q. Okay.
12       A. It's just a textbook.
13       Q. So there is no other information out there that
14   you plan to use related specifically to this case?
15       A. You know, there are some standards by SIOP
16   (phonetic) that I would look at. There are some
17   standards by -- some educational standards. Those are
18   just rather standard.
19       Q. What about things specific to this case, are
20   there any documents or --
21       A. Oh, I will look at some journals. You know,
22   I'm a university professor. One of my responsibilities
23   is to read the journals and be current on those. I'll
24   read the current journals and see if there is anything
25   that pertains to the case.

4 (Pages 10 to 13)

michael buckley                    Nell McCallum & Associates

Page 14

1    Q. Okay. But aside from journals and text and
2  things that are written by outside people, is there any
3  documents in this case that you still intend to rely
4  upon?
5    A. None that I anticipate, but again, that might
6  change. It's --
7    Q. Okay. All right. The next item is No. 7, a
8  complete copy of all written or recorded statements
9  taken by you.
10        Any written or recorded statements?
11    A. No, none at all.
12    Q. Did you ever talk to the plaintiffs, the named
13  plaintiffs in this case?
14    A. I have not. Have not.
15    Q. Okay. The next item is copies of all
16  photographs taken by you or on your behalf?
17    A. Oh, I stay away from photographs.
18    Q. All right. So none there.
19        The next item is a complete copy of all
20  notes, records or journals or like or similar documents
21  made by you or someone on your behalf?
22    A. You know, just to -- in fact, I have some of
23  them here that I've been thinking of all along. It's
24  all -- it's all basically here, which you are more than
25  welcome to look at. It's kind of just some things

Page 15

1  that --
2    Q. Okay.
3    A. -- that I've been through.
4    Q. All right. The name, address and telephone
5  number of each and every person whether employed by
6  Nucor Steel Berkeley or not who has been consulted in
7  any way to plaintiffs' allegations of discrimination or
8  otherwise has discoverable knowledge about same.
9        Did you consult with anyone?
10    A. I have not.
11    Q. Okay. The next item No. 11, any and all
12  additional documents not produced under the requests
13  above that relate in any way to your knowledge or
14  opinions relating to this lawsuit.
15    A. You know, there may be a journal article or
16  two, but nothing -- nothing that's not readily
17  available.
18    Q. Okay. Do you know specifically any journal
19  articles that you might rely upon?
20    A. That I might, no, but I anticipate that I will.
21    Q. Okay. But any authors or specific journals
22  that you would consult?
23    A. Well, there are -- you know, I look at some of
24  the folks who have done work in job analysis. I'm
25  especially fond of a young man named Chad Van Ideking

Page 16

1  who is a researcher in Florida State University whom I
2  think has done some really good research on
3  interviewing, who I think is a really pretty good
4  source.
5    Q. Any specific journals that you would typically
6  would use?
7    A. The journals I typically use are -- they range
8  from the scholarly journals in management to the
9  practitioner journals in management. Like, for example,
10  I read on a regular basis Personnel Psychology. I've
11  written articles for publication in Personnel
12  Psychology, have published and rejournal of applied
13  psychology on a relatively frequent basis. A lot of it
14  has gotten a little bit far field from the things I'm
15  interested in. Academy Management Review, Academy
16  Management Journal, Public Personnel Management. I
17  mean, there's just a slew of things.
18        One of my -- one of my major tasks is I am
19  primarily a university professor is to keep up with the
20  current literature. I pride myself on doing that
21  quite --
22    Q. Okay. The last item is any and all texts
23  referenced or materials reviewed in preparation of your
24  report and testimony in this case. Let's talk about the
25  text first.

Page 17

1        Did you review any texts?
2    A. You know, I just looked at Junior Field. It's
3  called Gatewood and Field, Human Resource Selection --
4  Human Resource Selection.
5    Q. Okay.
6    A. You know, again, as a student who attended
7  Auburn University, Junior was -- Dr. Field was one of my
8  professors. I respect him quite well. I think it's a
9  very -- a very good resource for anybody whose
10  interested in human resource selection processes.
11    Q. Is that the only text that you have reviewed in
12  drafting your report?
13    A. You know, I may have looked at another text or
14  two, but I don't notice. I don't remember. I don't
15  recall. I may have looked at Wayne Cascio, C-A-S-C-I-O.
16  It's called Applied Psychology and Personnel Management
17  published out of Reston, Virginia. Kind of another --
18  another seminal reference that -- that I think we use in
19  the behavioral sciences.
20    Q. Okay. So the Gatewood and Field text and the
21  Cascio text are the only ones specifically --
22    A. Yeah, the only ones I can recall.
23    Q. -- that you can recall? Okay.
24    A. I -- you know, again, I read a lot of textbooks
25  though, I must tell you. I teach principles in

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

michael buckley                    Nell McCallum & Associates

| Page 18 |
| --- |

1  management and so I read textbooks on principles in
2  management. Some are good, some are not so good. I
3  tried to keep up with human resource management text
4  because human resource management is my primary area of
5  interest --
6     Q. Okay.
7     A. -- so....
8     Q. All right. Now, as to materials you reviewed
9  in preparation of your report, did you bring any of
10 those with you today?
11    A. Yeah. Just -- just what's -- just what's in
12 here which is -- which is Dr. Jeanneret's response to my
13 initial report.
14    Q. Okay. And in your -- in your report, you
15 stated that you look at a number of different
16 depositions and you said you have not brought those with
17 you today?
18    A. I have not brought those with me today.
19    Q. Okay. Any other materials that you have looked
20 at at all in preparing your report?
21    A. For preparing my report a couple weeks back?
22    Q. Correct.
23    A. Oh, gosh, not that I can recall.
24    Q. Okay.
25    A. Not that I can recall.

| Page 19 |
| --- |

1     Q. All right. We can move on past that then.
2     A. But I must tell you, I look at a lot of things.
3  I mean, it's not -- you know, I mean, you try to look at
4  things that are for a lot of things. I mean, I -- I
5  hate to think I provided you an exhaustive list because
6  I may not have, but there are things that I read in
7  preparation for my duties as a college professor that
8  may have been applicable, too.
9       For example, the Van Ideking reference that
10 I read is about panel interviewing. And I read that not
11 in preparation for this, but in preparation for a paper
12 that I have under review at Personnel Psychology that
13 I've just submitted a little while ago.
14    Q. Okay. I understand that you may have reviewed
15 some other academic type materials.
16      What about specific materials in this case,
17 any other depositions or documents?
18    A. None that I can recall, no.
19    Q. Okay. Let's go ahead and introduce your report
20 as an exhibit here. Do you have a copy of it here with
21 you --
22    A. I sure do.
23    Q. -- or do you need a copy?
24    A. No, I have a copy. Thank you.
25    MR. FARRIS: Okay. Let's introduce that as

| Page 20 |
| --- |

1  Defense 3, I guess.
2     (Exhibit No. 3 marked.)
3  BY MR. FARRIS:
4     Q. And let's go to Page 22. That's actually the
5  last page of your CV.
6     A. You know, and I don't have that with me, but I
7  certainly can recall. I certainly can recall.
8     Q. You can look at that.
9     A. Okay, great. Thank you.
10    Q. Sure. All right. You'll see there that you
11 have listed several items under consulting and
12 management development?
13    A. Uh-huh.
14    Q. The first thing there that you listed is expert
15 witness in gender discrimination case and then you list
16 some dates after that; is that correct?
17    A. Absolutely, yes.
18    Q. And you did not list any specific names of
19 cases there?
20    A. You know, what I'm asked to do on a regular
21 basis, I guess, is to consider some depositions and what
22 -- what my expert opinion is regarding those
23 depositions, and that's what this is in response --
24 that's what this represents.
25    Like, for example, the last one -- and

| Page 21 |
| --- |

1  there is -- there's really never get so far where
2  there's a name for the case. The last thing I looked at
3  in terms of gender discrimination was a situation in
4  Oklahoma City which was alleged to be sexual harassment.
5  And I read those depositions and reported to the
6  attorneys. Nathan Waley is the young man's name. I
7  reported to him that I believe that there was some
8  pretty compelling evidence that the environment had had
9  a number of sexual harassment issues associated with
10 them.
11    Q. How did you determine you -- that there were
12 these significant issues?
13    A. They came and talked to me and explained to me
14 what the situation was like. I read some of the
15 complaints that were -- that were made by the
16 plaintiffs. And what I told the attorney was that I --
17 well, interestingly, what the attorney said he would
18 like me to consider as an expert is if I would -- the
19 situation as they describe it is in which one it wasn't
20 -- it's kind of a Bay situation where profanity, where
21 off-color jokes, et cetera, were part of the status quo.
22 And what he wanted to see if I would be able to say is
23 that because of the situation, because of the behavior
24 of those in the situation that that would minimize any
25 kind of problems that they had with sexual harassment.

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

michael buckley                    Nell McCallum & Associates

**Page 22**

1  And I said I don't think that's something I feel
2  comfortable saying.
3        He wanted to say that, you know, we're in a
4  coarse society so perhaps the level of discourse has
5  been ratcheted downward and I just said I don't think
6  that's something I would be comfortable talking about.
7        Q. Okay. Are you aware that the Federal Rules of
8  Civil Procedure require you to list specific case names
9  in which you've either testified or been deposed in the
10  preceding four years before this case?
11        A. Yeah, I am not aware nor have I testified nor
12  have I been deposed in the last four years.
13        Q. Okay. All right. Well, let's go through this
14  list then --
15        A. Sure. Gosh.
16        Q. -- and see what exactly you have done. In the
17  racial discrimination cases, you list 2004, 2003, 2002?
18        A. Uh-huh.
19        Q. Those would have been in the last four years --
20        A. They were.
21        Q. -- but he did not give any testimony?
22        A. Did not give a deposition. In fact, I believe
23  in one of them I wrote -- I've written a report.
24        Q. Do you remember which one it was?
25        A. It was for the Great Plains Coca-Cola Bottling

**Page 23**

1  Company -- oh, gosh, maybe in 2002. I'm just not -- I'm
2  just not sure. I don't keep a lot of this stuff. I
3  don't -- if you saw my office, you would perhaps
4  understand why. I just don't keep a lot of this stuff
5  unless it went any further.
6        Q. So you did a report in that case and you think
7  it was in 2002?
8        A. Yeah. I did a report for the attorney. And
9  basically the report -- the report based on a number of
10  complaints and I think I read some depositions, was that
11  some racial discrimination had occurred. And again,
12  what this attorney said, well, the relationship between
13  the plaintiff and the defendant, does that -- does that
14  make any difference. Well, I said, I don't feel
15  comfortable talking about that question. It's somebody
16  that needs -- is much more familiar with the situation
17  needs to determine that.
18        But what I have basically -- what happened
19  was, the individual made a sexual discrimination
20  complaint -- I'm sorry, a racial discrimination
21  complaint, reported to the organization. The
22  organization then tried to engage in some remedial
23  activity to take care of the issue, but he came in on a
24  -- he came in on a Monday and before they got a chance
25  to try to rectify the situation, he quit claiming he

**Page 24**

1  wanted punitive damages. And what my -- what I -- the
2  idea what I wrote about was that basically, you know,
3  the organization as soon as they found out about it
4  tried to engage in remedial action, tried to make him
5  whole, he just didn't allow it to happen.
6        Q. So you wrote a report for the defendants in
7  that case?
8        A. I think I wrote a report for the defendants,
9  that's right.
10        Q. Okay.
11        A. It was the Great Plains Coca-Cola Bottling
12  Company.
13        Q. That was in 2002. What --
14        A. I believe so.
15        Q. The one you have listed, you have 2004 listed.
16        Do you recall what you did in --
17        A. You know, to tell you the truth, I don't recall
18  right offhand.
19        Q. What about 2003?
20        A. 2003, it was a similar type of racial
21  discrimination case which racial -- racial terms were
22  used. And it's my opinion that when that happens,
23  damage is done. Now, what the -- the amount of the
24  damages is something for someone else to determine.
25        Q. Okay. Then was that the only one that you did

**Page 25**

1  in 2003?
2        A. That was. That was.
3        Q. And in 2002 the only one you did was the Great
4  Plains?
5        A. That's right. That's right.
6        Q. What about '99, do you recall that one?
7        A. Do not. Do not.
8        Q. Okay. Do you remember if it was more than one
9  case or was it --
10        A. You know, typically for me I don't do a lot.
11  Most of these would represent just one case.
12        Q. Okay. 1997?
13        A. You know, just don't remember.
14        Q. Okay. Any -- do you remember any of these
15  other ones, '91 through '95?
16        A. You know, it's interesting. We -- behavioral
17  science researchers talk of something called Zygarnic
18  effect. And Zygarnic effect basically says as soon as
19  we no longer have a need for information, we're
20  motivated to forget it. I remember a lot of the things
21  I've done that were referred to the research I've done,
22  but these are not things that I keep copies of nor do I
23  probably keep in my short-term memory.
24        Q. Okay. Well, these ones that you don't recall,
25  you may recall a little bit about them, do you remember

7 (Pages 22 to 25)

michael buckley                    Nell McCallum & Associates

| Page 26 | Page 28 |
|---|---|

**Page 26**

1  what percentage of them you did for the defense and what
2  percentage for the plaintiffs?
3      A. You know -- you know, I don't. I don't really
4  remember. And -- but my policy is frankly that when I
5  give an opinion on these, I don't -- I testify on no
6  one's behalf. I mean, what I'm doing is testifying to
7  what I believe to the best of my knowledge and
8  information that I have, the facts in the case so....
9      Q. How do people approach you to take those
10  assignments?
11      A. I'll just -- I'll get a call or, you know, I
12  know some -- there are some lawyers that I know they'll
13  -- you know, what do you do, I do this. And just as a
14  professional you normally get some.
15      Q. Were any of these cases for Wiggins Childs or
16  for Mr. Wiggins?
17      A. No, no, no.
18      Q. Okay.
19      A. I never met Mr. Wiggins until this morning.
20      Q. Okay. Have you ever testified or been deposed
21  as an expert witness?
22      A. I have testified. I've never been deposed.
23  I've testified in court in Tulsa -- Tulsa, Oklahoma.
24      Q. Okay. When was that?
25      A. Oh, my. It's -- it's quite a number of years

**Page 27**

1  back. I can't remember the exact year.
2      Q. Do you recall what kind of case it was?
3      A. I do. It was an age discrimination case.
4      Q. Age discrimination?
5      A. Age discrimination, yes.
6      Q. Were you testifying for the plaintiffs or the
7  defendants?
8      A. I was testifying to the facts, but I was -- I
9  was hired by the defendants -- defendant's attorneys.
10      Q. Was it a state law case or a federal?
11      A. Federal law.
12      Q. It was federal?
13      A. Title 7 case.
14      Q. And in that Title 7 case, do you recall if it
15  was allegations of intentional discrimination?
16      A. Well, it was -- yes, it was, in fact. The --
17  the plaintiff in the case was a 41 year old white male
18  who -- he tried to demonstrate through the use of
19  statistics that there were a -- that the age
20  distribution had changed in the organization. He then
21  -- he then -- he got some performance appraisals that
22  weren't very good, they kind of went down. He was then
23  terminated. He claimed it was based on his age.
24      Q. So did he make some adverse impact claims in
25  that case?

**Page 28**

1      A. No. His claim was -- I'm trying -- I'm trying
2  to remember why the case was brought. There was some
3  prima facia evidence, I just don't remember what it was.
4  And I think -- I think, if I recall, it was the
5  distribution -- the age distributions that the -- that
6  the distribution of the age -- the age of the -- the
7  average age in the company had gone from 40 plus to well
8  under 40.
9      Q. Okay. So you've never testified or given a
10  deposition in a race discrimination case?
11      A. Have not.
12      Q. Okay. And you've never been deposed prior to
13  today?
14      A. Have not prior to today.
15      Q. Okay. That one case in which you have
16  testified as an expert witness, were you qualified as an
17  expert witness in that case?
18      A. I sure do believe so. I'm quite familiar with
19  the Age Discrimination and Employment Act and the
20  litigation surrounding age discrimination.
21      Q. Okay. And I guess I phrased my question wrong.
22      A. That's okay.
23      Q. What I meant was did the Court qualify you as
24  an expert witness in that case?
25      A. God. That's a -- I don't know.

**Page 29**

1      Q. Okay.
2      A. I don't know.
3      Q. Did you -- did you file an expert witness
4  report?
5      A. I did not. All I did was went and -- went to
6  Tulsa one morning and testified in court.
7      Q. Do you recall if the defense attorneys
8  designated you as an expert witness in that case?
9      A. I believe they may have. I'm just not sure. I
10  just don't recall.
11      Q. Do you recall if there was any kind of argument
12  over whether you --
13      A. Oh, absolutely.
14      Q. -- were qualified to --
15      A. Absolutely there was.
16      Q. -- serve as an expert?
17      A. As soon as I -- as soon as I was called and sat
18  down, the defense attorneys made an objection.
19      Q. Okay.
20      A. And what that was -- what it was, I don't
21  recall. I just sat there rather patiently until --
22      Q. Okay.
23      A. -- it was determined what the next step would
24  be.
25      Q. In that case, did the -- was there any

8 (Pages 26 to 29)

michael buckley                          Nell McCallum & Associates

## Page 30

1  disqualification of you as an expert?
2      A. No, there was not.
3      Q. Okay.
4      A. I was allowed to give testimony.
5      Q. Okay. And so all you did was just that one
6  day's testimony?
7      A. That's right.
8      Q. Did you conduct any kind of analysis in that
9  case?
10     A. You know, I did, in fact. I looked at -- I
11  looked at the age distributions. And if you're familiar
12  with the law, at least my reading of the law, indicates
13  to me that in age discrimination cases, it's really
14  difficult to bring -- to show a prima facia case based
15  on the age of the work force.
16          And what happened with this organization --
17  it was a bank -- it was a credit union in Bartlesville,
18  Oklahoma. And what they did is they have -- they just
19  started a new credit card processing -- a credit card
20  processing part when credit -- this is before credit
21  cards, I guess, became real lucrative.
22          So what they did is they hired a lot of
23  people to do that. Well, who do you typically hire when
24  you hire people to -- for entry level jobs? Well,
25  typically you hire people who are quite a lot lower than

## Page 31

1  -- for you. You don't hire executive vice presidents to
2  run the credit card. And that was my -- was basically a
3  part of my -- my testimony was basically that I didn't
4  think the age discrimination -- the age distributions
5  were supportive of that claim, and also, what I looked
6  at were reasonable -- were there reasonable factors
7  other than age on which this human resource decision was
8  made. And in my judgment, there was. There was some
9  performance evaluation data that had shown that this
10  individual's performance had -- had been evaluated, not
11  -- decreased -- he just wasn't doing very well and had
12  been counseled. And I was asked as well because one of
13  the -- one of the areas I do claim some expertise in is
14  performance evaluation. My master's thesis is consumer
15  performance evaluations and the legality of issues
16  concerning performance evaluation.
17          I also basically looked at their
18  performance evaluation form, I remember. It wasn't a
19  very good form, I didn't think, but -- and I can't
20  recall why, but I think that they did a good job
21  communicating to the individual the -- the fact that his
22  performance wasn't nearly as good as it should have been
23  and some remedial actions he should have taken.
24     Q. Okay.
25     A. So....

## Page 32

1      Q. Have you ever testified regarding a validation
2  study?
3      A. Have not.
4      Q. Have you ever testified regarding adverse
5  impact in a case?
6      A. Have not. Have not.
7      Q. Okay. Have you ever testified about the job
8  relatedness of a company's --
9      A. Have not had to.
10     Q. -- procedures?
11     A. Have not had to.
12     Q. Okay. And you said that this is the first case
13  you've ever worked on for Mr. Wiggins?
14     A. It sure is, yes, sir.
15     Q. Okay. What percentage of your income comes
16  from your work as a consultant or as an expert witness?
17     A. A relatively small percentage. I feel
18  uncomfortable talking about salaries, but my university
19  salary is --
20          MR. WIGGINS: It's up to you.
21  BY MR. FARRIS:
22     Q. Yeah. I don't need to know --
23     A. That's okay.
24     Q. I don't need to know your exact salary. Just a
25  guess was --

## Page 33

1      A. My university salary is about a $197,000 a year
2  as the JC Penney endowed chair. My outside consulting
3  is -- typically ranges between 8 and $10,000.
4      Q. Okay. And that's per year?
5      A. That's right. That's right.
6      Q. Okay.
7      A. You know, some more, some less.
8      Q. Okay.
9      A. Some more, some less.
10     Q. And how were you approached in this case about
11  acting as an expert witness.
12     A. I was contacted by -- by Ben DeGweck. A good
13  friend of mine -- John Veres is a good friend of mine.
14  I went to school with John at Auburn University. So
15  John suggested that I would be a person who might be
16  qualified to look at these issues.
17     Q. Did John Veres contact you about acting as an
18  expert in this case?
19     A. No, he didn't contact me. He said he had given
20  my name to Wiggins and Childs, I believe is the name of
21  y'all's law firm. Yeah.
22     Q. Okay.
23     A. John didn't make any arrangements for me. John
24  didn't make any arrangements for me. He just gave the
25  attorneys my name.

9 (Pages 30 to 33)

michael buckley                    Nell McCallum & Associates

**Page 34**

1    Q. Did you talk to John Veres about this case?
2    A. You know, a little bit; more in general. You
3  know, John and I are college -- are university chums.
4  We talk about many different things, families, what do
5  you think about this, you know -- you know, if I have a
6  human resource issue.
7        John had a human resource issue at work
8  recently about a termination he needed to make. He
9  called me about it. I said, here's what I think you
10  need to do and --
11    Q. Okay.
12    A. -- those kind of issues.
13    Q. What did you discuss specifically about this
14  case with Mr. Veres?
15    A. He just told me that he had done some work for
16  them in the past, that they were, you know, an honest
17  and upright group and that if I was interested, they
18  would be in touch with me.
19    Q. Okay. And then Ben DeGweek contacted you?
20    A. Yeah. Ben DeGweck, I think, was the person who
21  sent me some -- sent me some -- sent me the initial slew
22  of depositions.
23    Q. Okay. And that's what you received initially
24  is the depositions?
25    A. That's what I received and yes. Yes.

**Page 35**

1    Q. Did you ever receive any other documents from
2  Wiggins Childs?
3    A. God, not that I can recall. Just those
4  depositions.
5    Q. Did you ever --
6    A. Just a series of depositions.
7    Q. I'm sorry.
8        Did you ever ask for any other documents
9  from them?
10    A. I did not. I did not.
11    Q. Okay.
12    A. I did not.
13    Q. All right. Let's talk about Nucor Burkeley --
14    A. Yes, please.
15    Q. -- the defendant in this case.
16    A. Sure.
17    Q. Are you aware about the different departments
18  at Nucor Berkeley?
19    A. You know, somewhat. I wouldn't consider myself
20  anywhere near an expert on that as, for example,
21  Dr. Jeanneret is. I --
22    Q. So are you familiar with what each department
23  does? For instance, what they manufacture?
24    A. It would be difficult for me to go through each
25  one and tell how different they are. I have no

**Page 36**

1  experience working in a steel plant.
2    Q. Okay.
3    A. So it would be difficult. It would be
4  difficult for me.
5    Q. Do you know the names of the defendants?
6    A. Oh, gosh. Hot mill -- just a number of them
7  that I -- I can remember offhand. Not many that I have
8  committed to memory.
9    Q. Okay. Are you familiar with the different jobs
10  that are at issue in each of the different departments?
11    A. A little bit. A little bit familiar with the
12  jobs.
13    Q. Okay.
14    A. A little bit familiar with the jobs.
15    Q. Okay. When you say a little bit, what do you
16  mean there?
17    A. Somewhat. I mean, I've read through some of
18  the -- some of the information that's been given
19  especially that on Dr. Jeanneret's rebuttal to my -- to
20  my report.
21    Q. Okay. So just say --
22    A. But I don't consider myself an expert on these
23  -- you know, on the differences between these positions.
24  I don't believe that's what -- why I've been asked to
25  comment.

**Page 37**

1    Q. Okay. Are you familiar at all with the duties
2  of the various jobs in the different departments?
3    A. You know, some. Some, but again, I think that
4  I've not seen a lot of job related -- a lot of
5  information about these jobs. I've not been privy to a
6  lot of that information. Not a lot of that information
7  has been provided for me by -- by the defendant.
8    Q. And what about by Mr. Wiggins, did he provide
9  anything?
10    A. No. No.
11    Q. Okay. Did you ask for any of that stuff?
12    A. You know, I think I may have a little bit later
13  said, you know, this is information that we should have
14  gotten. Its -- I believe there is an affirmative
15  obligation on the part of the defendant according to the
16  uniform guidelines to present this information.
17    Q. If some of this information had been available,
18  would you have reviewed it?
19    A. I would -- I would in -- if a -- if a job
20  analysis -- if information is provided, I certainly feel
21  competent and qualified to make -- to develop an opinion
22  whether it's a guidelines complaint -- whether it's
23  guidelines complaint work.
24    Q. Okay. Are you familiar with the promotions
25  process in the different departments?

10 (Pages 34 to 37)

michael buckley                    Nell McCallum & Associates

Page 38

1    A. Somewhat, just from what I read in the
2  depositions.
3    Q. Okay. Well, let's just take an example. Like
4  would you have specific enough knowledge to say how the
5  beam mill, for example, does promotions?
6    A. Well, as I think I may have said in my report,
7  a lot of what I looked at were based on the depositions.
8  You know, a lot of what I saw used were a number of
9  subjective -- a lot of subjective factors that were
10 combined in a fairly subjective fashion.
11       You know, I saw some of the -- I believe
12 it's on one of my -- it's in here. And I wish I had a
13 page number. I didn't page number these. But the
14 number of the different subset criteria, the number of
15 items missed on a written higher evaluation -- you want
16 me to read through these?
17   Q. Well, no. No. Actually, I just want to kind
18 of get an idea --
19   A. Yeah.
20   Q. -- what your knowledge about the --
21   A. Great.
22   Q. -- specific promotions processes.
23       And so do you know how they would do
24 promotions in the beam mill?
25   A. I think that from the information that I've

Page 39

1  read, I'm not sure that -- well, from the information
2  that I've read, I wouldn't be able to stand -- to sit
3  here and tell you what they do.
4    Q. Okay.
5    A. Tell you exactly what they do or go through the
6  step by step process.
7    Q. Okay. Could you name some of the specific jobs
8  at issue in this case?
9    A. Just the beam mill, hot mill. Again, I must --
10 you know, I've not been privy to a lot of the
11 information that --
12   Q. Okay. Well, those are the departments.
13   A. Yeah.
14   Q. Do you know the names of any of the specific
15 jobs?
16   A. Do not. Do not.
17   Q. Okay. You spoke about some subjective
18 factors --
19   A. Absolutely.
20   Q. -- that you looked at. Could you explain what
21 some of those subjective factors were?
22   A. Yeah. You know, I think the issue is that
23 there are subjective factors that are put together in a
24 relatively subjective fashion. I mean, there are some
25 factors that are objective and I think those are ones

Page 40

1  that are good. But again, they are put together without
2  any kind of -- any kind of methodology, any kind of
3  criteria suggested by the company.
4        In the behavioral sciences, what we call
5  those are implicit personality theories. In the absence
6  of information, people are asked to use their own
7  judgment. And we all have a different idea about what
8  constitutes good and bad behavior.
9    Q. Okay. Well, just as far as the subjective
10 factors, though, could you name a few specific examples?
11   A. Yeah. I mean, I think I could -- you know --
12 you know, one was a gut feeling that one talked about
13 which really stuck me as kind of -- kind of unusual.
14   Q. Okay. Any others?
15   A. Gut feeling.
16       Just, you know, we pick the best person.
17 We -- you know, based on how we feel about them. There
18 are things that I think I read a number of times in the
19 depositions.
20   Q. Do you think that picking the best person for
21 the job is an improper means for choosing someone?
22   A. Oh, absolutely not. Picking the best person
23 for the job is the -- is the optimum way provided one
24 uses job related criteria.
25   Q. You mentioned that there were some objective

Page 41

1  factors used.
2        Could you give some examples of those?
3    A. Yeah. I think there were safety records, work
4  attendance, those kinds of things.
5    Q. So then you're essentially testifying that it's
6  a combination of both objective and subjective factors?
7    A. Well, I think that that's probably a case that
8  could be made, I think. But my issue is more in the
9  subjectivity and the combination of the data.
10   Q. Okay. How did you acquire your knowledge about
11 the selection procedures used?
12   A. Basically on the depositions that I've read.
13   Q. Okay. And those that are listed specifically?
14   A. Those that are listed specifically, yeah.
15   Q. Let's add -- let's go to that list real quick
16 in your report and make sure we have all of those. It's
17 on -- as you said, your report is not page numbered.
18   A. Sorry. Sorry.
19   Q. That's all right. It's on Page 4.
20   A. Okay.
21   Q. Okay. And on this list, your source documents,
22 you said that you looked at the complaint?
23   A. Uh-huh.
24   Q. Right?
25   A. Absolutely.

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

michael buckley                    Nell McCallum & Associates

---

**Page 42**

1  Q. And then you looked at the employee handbook?
2  A. I did.
3  Q. And you looked at the deposition of Ladd Hall?
4  A. I did.
5  Q. Paul Ferguson?
6  A. I did.
7  Q. Al Smith?
8  A. Uh-huh.
9  Q. John Bell?
10 A. Uh-huh.
11 Q. William Roberson?
12 A. (Witness nods.)
13 Q. Meleah Barnhill?
14 A. Uh-huh.
15 Q. And Dave Sumoski?
16 A. I have.
17 Q. Who is Ladd Hall?
18 A. I believe he's the -- I believe he's the CEO.
19 Q. Okay. And what about Paul Ferguson, do you
20 know what his position is?
21 A. You know, these were just a series of managers
22 in different areas of Nucor. Now, as for being able to
23 say who was what, I don't know. I do remember Meleah
24 Barnhill appeared to me to be a -- the -- one of the
25 chief people in the human resources area.

---

**Page 43**

1  Q. Okay. What about William Roberson, do you
2  know?
3  A. You know, I just don't remember offhand.
4  Again, these were again, I believe, managers of -- in
5  the company.
6  Q. Okay. Let's go back to your -- the gut feeling
7  issue you said that was a subjective --
8  A. Sure is. Sure is.
9  Q. -- issue.
10        Do you recall what department that was in?
11 A. I do not, but I think it was made by -- you
12 know, in fact, instead of me having to think, I'll read
13 back. I believe it was in the Ferguson deposition.
14 Q. Okay.
15 A. And I'm not sure what department it was in.
16 Q. Do you recall seeing that in any other
17 departments?
18 A. No. I don't believe -- I don't believe I saw
19 that specific wording used.
20 Q. Do you recall what other factors were used
21 aside from the allegedly gut feeling used in --
22 A. Yeah.
23 Q. -- the --
24 A. Safety records, et cetera. How -- you know,
25 basically through your talks with people.

---

**Page 44**

1        Again, a lot of what I got was some
2  interpersonal issues that were involved that -- but it's
3  always hard to put a finger on those. I think that it
4  was just not very well defined in the depositions what
5  the selection program was.
6  Q. Okay. So you're not saying that the gut
7  feeling was the only thing that was used in that --
8  A. Oh, no. It wasn't the only one, but it
9  certainly is something that needs to not be in the
10 selection process.
11 Q. Okay. Since we're talking about the gut
12 feeling issue in the beam mill, did you analyze how the
13 beam mill does promotions versus what factors the hot
14 mill, for instance, looks at it?
15 A. Did not. Did not.
16 Q. Okay. All right. Anything else besides these
17 items that we've named off here that you looked at?
18 A. No, I don't believe so. I don't believe so.
19 Q. Okay. Do you know what specific jobs at the
20 mill are considered to be entry level positions?
21 A. No. No, I don't think I could name those.
22 Q. And do you know the difference between
23 production bonus jobs and ROA bonus jobs?
24 A. They are, I believe, the difference between
25 entry level jobs and management jobs. Production --

---

**Page 45**

1  jobs that have been a production basis versus jobs that
2  get paid based on what return on assets have been over
3  the course of a year.
4  Q. Okay. So it's your understanding it's either
5  -- management versus production?
6  A. Right. Right.
7  Q. And management would be the production bonus or
8  the ROA bonus?
9  A. It would be the ROA bonus, I believe.
10 Q. Okay. Did you conduct any kind of scientific
11 study in this case to support your contentions?
12 A. No. But I've given the whole issue of
13 subjectivity a lot of thought. I think that there is --
14 at least what I see is a lot of subjectivity involved in
15 the process.
16        You know, it's interesting is I was -- I
17 was reading the guidelines the last time -- and I'll
18 certainly give you a copy of this. This is from --
19 excuse me. It's 14B2 in the guidelines.
20        It says in view of possibility of bias and
21 subjective evaluations, supervisory ratings themselves
22 instructions to raters --
23        COURT REPORTER: Wait. Wait. Wait.
24        THE WITNESS: Oh, I'm sorry. I'm reading
25 too fast.

---

12 (Pages 42 to 45)

michael buckley                    Nell McCallum & Associates

1    COURT REPORTER: Slow it down.
2    THE WITNESS: I'm speaking in Northern.
3 I'm sorry.
4    A. In view of the -- in view of the possibility of
5 bias and subjective evaluations, supervisory rating
6 techniques and instructions to raters should be
7 carefully developed.
8    You know, and I've given a lot of thought
9 to the whole issue of subjectivity in the hiring
10 process. There's a -- there's a wonderful person named
11 Fisk at the University of -- University of Massachusetts
12 - Amherst who has done a lot of research on
13 subjectivity. And typically what happens basically in
14 situations where people are -- are having to make a lot
15 of subjective judgments, the -- she says basically that
16 in the early stages of the decision making many of the
17 decisions we make are automatic. They are not things
18 that we have a lot of -- you know, volitional control
19 over.
20    A good example. She's made a wonderful
21 statement. She says typically we're not in a position
22 to assert what we don't consider when we're hiring
23 people. We're only in a position to basically talk
24 about what we do consider.
25    Q. How does that apply specifically to, say, way

1 the beam mill does selection procedures?
2    A. Again, I think that there was a subjective
3 combination of a number of different factors with
4 relatively little guidance on how those criteria should
5 go together. The weighting of those criteria.
6    Q. And that was across the board or within a
7 certain department?
8    A. You know, again, I wouldn't want to talk common
9 about individually. I saw just that in general as a
10 practice that occurred.
11    Q. Okay.
12    A. Okay.
13    Q. Just a practice that occurred across the --
14    A. In general across the board, I think.
15    Q. All right. So is it your opinion that the
16 company selection methods are not valid?
17    A. You know, I've not had the information to -- to
18 make that judgment. With the information that I have,
19 the information that I've been privy to, I would come to
20 that conclusion.
21    Q. Okay. But the first part of your statement was
22 that you don't think you had enough information to make
23 that determination?
24    A. Well, with more information, I will -- I would
25 -- you know, I would be -- I would amend my report with

1 further information.
2    Q. Okay. But with the report that you have right
3 now that you're --
4    A. Oh, I believe that's it's not -- it's not a
5 valid procedure, no.
6    Q. Okay. Let's talk about that then. What --
7 what are you basing your opinion on that it's not a
8 valid procedure?
9    A. Basically that there was not a lot of
10 information presented about the jobs, the job analysis,
11 the procedure that was used, the criteria against which
12 things were validated.
13    I think a good quote -- I heard someone
14 make this quote, and I wish I could remember who. But
15 he said we're -- basically as behavioral scientists,
16 we're all figurative residents of the State of
17 Missouri -- show me. Show me.
18    Q. All right.
19    A. In fact, even the guidelines talk about how --
20 you know, the data -- this is the data that's necessary.
21 I mean, it's not what Buckley requires, it's what the
22 guidelines require.
23    Q. So you have a general sense that it's not
24 valid, but you can't point to specific things within the
25 department?

1    MR. WIGGINS: Objection to the form. That
2 doesn't -- it's not reflective of what his actual
3 testimony is.
4 BY MR. FARRIS:
5    Q. Okay. Well, then explain to me within each
6 department, for instance, specific examples of how the
7 process is not valid.
8    A. Well, I believe that in the absence of
9 information, it's that -- the only -- in the absence of
10 information about those jobs, the only conclusions I
11 could come to is that they are not job -- is that they
12 are not valid processes.
13    Q. Okay. But you had some information about how
14 the jobs are selected, did you not, in the depositions?
15    A. I did. I did a little bit.
16    Q. Okay.
17    A. Enough for me to know that they were consistent
18 in their subjectivity.
19    Q. So it's possible then that if you had had more
20 information, you might have found there to be valid
21 processes?
22    A. Possible. I guess that's an empirical question
23 as we say.
24    Q. Okay. Does one have to be an industrial
25 psychologist to perform a job analysis under the uniform

13 (Pages 46 to 49)

michael buckley                    Nell McCallum & Associates

Page 50

1  guidelines?
2      A. Gosh, no.
3      Q. Okay.
4      A. Not to my knowledge. The guidelines just say
5  basically what it -- what the -- what information needs
6  to be captured. I, in fact, did a number of job
7  analysis as a first year graduate student, so....
8      Q. Let's move on to your resume and talk a little
9  bit about your background here.
10     A. Great. Great. Great.
11     Q. You've been, according to your resume, the
12 director of the division of management --
13     A. Uh-huh.
14     Q. -- at the University of Oklahoma --
15     A. University of Oklahoma.
16     Q. -- since July of 1998?
17     A. That's right.
18     Q. Correct?
19     A. That's right.
20     Q. Do you make employment selections in your role
21 as the director of the division of management?
22     A. In conjunction with other faculty members, yes.
23     Q. Okay. So you do -- how often do you make
24 employment decisions?
25     A. On occasion. You know, hiring new faculty

Page 51

1  members, hiring people, hiring secretarial staff.
2      Q. Is it your responsibility as a director of the
3  department to ensure that you meet the uniform
4  guidelines when you make selection decisions?
5      A. Oh, absolutely.
6      Q. Okay. Well, let's talk about what positions
7  that you hire for. You hire, you said, for
8  administrative people?
9      A. Uh-huh.
10     Q. And then also faculty positions?
11     A. Uh-huh.
12     Q. Are those the only types of positions?
13     A. They are. They are.
14     Q. When you evaluate a candidate for, let's say,
15 for a faculty position, do you look at their work
16 history?
17     A. We sure do.
18     Q. Okay. Do you look at their training
19 background?
20     A. Their academic training.
21     Q. Okay. Do you use a structured interview
22 process when you interview these guys?
23     A. There's a series of questions that we ask.
24     Q. Okay. And is that individuals do the
25 interviews?

Page 52

1      A. You know, typically there are -- there are a
2  group interviews and individual interviews.
3      Q. Do every one of the individuals ask the same
4  questions of the -- of the candidates?
5      A. We all ask questions about the research.
6      Q. But do you have a set of written questions that
7  every interviewer uses?
8      A. Typically there are some questions that we --
9  that we have written down that we have talked about
10 beforehand, where they went to school, what their
11 research is like, you know, where they presented papers,
12 those kind of things.
13     Q. And do all the interviewers use those exact
14 same questions for every candidate?
15     A. Typically when we meet in a group we talk about
16 those with the candidate.
17     Q. Okay. But if you're doing an individual
18 interview, do you have a set list of questions that
19 every interviewer uses when they are individually
20 interviewing?
21     A. You know, I'm trying to think if there are --
22 no. But we all have -- we all do have questions that we
23 ask.
24     Q. Okay. What kind of qualifications do you
25 consider when looking at a potential faculty member?

Page 53

1      A. Terminal degree, the quality of the research
2  training that they have received.
3      Q. What about for the hourly people, the admin
4  people that you hire, what qualifications do you look
5  for then?
6      A. Past experience. And I must tell you that the
7  hiring that's done is not just -- is not -- I have never
8  hired anyone at the university. The university, they
9  are hired by the central administration at the
10 university just based on some suggestions usually made
11 by a committee that I'm typically a part of.
12     Q. Okay. So your role is just to make suggestions
13 and --
14     A. Just a member. That's right.
15     Q. -- and to interview people?
16     A. That's right.
17     Q. Do y'all use any type of preemployment tests?
18     A. No, but there are some issues. For example,
19 where they are their -- well, in fact, this would be
20 considered a test since most things you use for
21 selection are tests. Whether they finished their degree
22 or not, what area their degree is in, what kind of
23 courses they have taken over the course of their
24 training, how good are they at statistical analysis,
25 those kind of issues.

14 (Pages 50 to 53)

michael buckley                          Nell McCallum & Associates

## Page 54

1    Q. Okay. Of those things, how do you weight those
2  qualifications?
3    A. Well, the -- you want to talk about me
4  personally?
5    Q. Sure.
6    A. Me, personally, what I look at are, you know,
7  the quality of the training that they have received.
8    Q. But do you assign a specific weight to each one
9  of those selection criteria you look at?
10    A. Yeah. Well, do we have it written down
11  anywhere that there's a particular weight, the answer is
12  no.
13    Q. Okay. Would each interviewer use the same
14  weighting or is that up to the individual interviewer?
15    A. No. I think basically we all ask similar
16  questions and we all look for different things. And I
17  assume that that then when we get together we talk about
18  those issues, who's noticed what, what are some of the
19  areas they looked at and why they were -- why they
20  thought they were important.
21    Q. Okay. Did you perform ever a job analysis for
22  the positions you hired for at Oklahoma?
23    A. There are job analyses available for these.
24  They are updated. In fact, I know I had one updated a
25  little while ago for a clerical position in my -- jobs

## Page 55

1  change rather rapidly.
2    Q. Are you the one that creates or conducts the
3  job analysis?
4    A. I do not. It's a different area. It's the
5  human resources function at school.
6    Q. Okay.
7    A. At OU.
8    Q. Have you done any kind of adverse impact
9  analysis for your hiring decisions in the department?
10    A. I have not. That's not in my -- but we do
11  follow all the guidelines through the affirmative action
12  department, et cetera.
13    Q. Okay. So that's not your --
14    A. That's not my --
15    Q. That's not your responsibility?
16    A. That's right. They determine what -- they
17  certify whether the pool is an acceptable pool of
18  candidates.
19    Q. Okay. Do you retain any documents regarding
20  the job analysis or the -- your validation efforts?
21    A. No. They are kept in a centralized location.
22    Q. So you don't keep anything personally --
23    A. No, I don't keep them.
24    Q. -- in your department?
25    A. No, I don't keep them.

## Page 56

1    Q. Okay. Now, let's go through another part of
2  your resume. You talked about your consulting work.
3    A. Yeah. Okay.
4    Q. Again, I think it's on the last page --
5    A. Sure.
6    Q. -- if you want to flip to that.
7        I just want to go through a couple of these
8  items and see what you did for these companies?
9    A. Sure. Sure.
10    Q. For Fleming Companies, Inc., you said you
11  worked as a consultant --
12    A. I sure have.
13    Q. -- from 1992 to 1997?
14    A. Right. Quite a -- quite a number of years.
15  What I did for them was just reengineer the human
16  resources process, looked at a number of different
17  things, selection, recruitment. Just in general human
18  resource issues that I thought they could -- they could
19  implement to do a better job.
20    Q. So when --
21    A. Fleming, incidentally now is out of business
22  but....
23    Q. Okay. I'm sure no --
24    A. I'm hoping -- I'm sure that's not due to my --
25    Q. What does Fleming Company -- or what did they

## Page 57

1  do?
2    A. It was one on the largest food distribution
3  companies in the country. They basically -- when you go
4  in your store, you buy Best Value brands, Best Value is
5  Fleming. They used to just -- again, just a big
6  logistics operation.
7    Q. So the facility where you did this work for,
8  what was their exact function?
9    A. It was corporate. It was the corporate
10  headquarters up in Oklahoma City. It was headquartered
11  in Oklahoma City.
12    Q. Okay. So you didn't work in one of their
13  warehouses or distribution centers?
14    A. I did visit a number of their warehouses and
15  distribution centers just to kind of familiarize myself
16  with the jobs that they have.
17    Q. Okay. So you did do some sort of analysis, the
18  distribution type jobs?
19    A. Well, not in an analysis of the jobs, but just
20  wanted to more better understand what they -- what they
21  did so that I could -- I could kind of determine what
22  needed to be done for them from a human resources
23  standpoint. It was basically, you know, freelance.
24  Come and help us do this better, come help us reengineer
25  our human resource function so we can add value to

15 (Pages 54 to 57)

michael buckley                    Nell McCallum & Associates

---

Page 58

1  Fleming.
2      Q. Did you do any kind of job analysis for them?
3      A. I didn't personally do it --
4      Q. Okay.
5      A. -- but I suggested a number of occasions that
6  they needed to do that. Job analysis is something that
7  needs to be done quite often.
8          There's a fellow named Brumbeck who wrote
9  an article in the Seventies that talked about how --
10  since it is so imprecise, it needs to be done on a
11  relatively frequent basis.
12      Q. Did you do any kind of adverse impact analysis
13  for them -- for Fleming?
14      A. I did not. That's a different -- that's their
15  human resources function.
16      Q. Okay. Did you do a validation study for
17  Fleming?
18      A. I did not, but talked about some of their
19  selection -- some of the selection tests that they used.
20  Some I thought they were pretty good, some I thought
21  weren't very good.
22      Q. Okay. Let's see.
23      A. You know what, I'm just a human resource
24  generalist in terms of that. I think my expertise is in
25  knowing the human resource function, a number of

---

Page 59

1  different areas and hopefully can add value to a company
2  if they ask me to.
3      Q. So you would not consider yourself to be an
4  expert in validation studies?
5      A. I believe that I possess sufficient expertise
6  to make a judgment about validation issues.
7      Q. Okay. To make a judgment about them?
8      A. Yeah.
9      Q. What about to conduct a validation study?
10      A. Oh, I am -- I am confident that I can conduct a
11  validation study.
12      Q. Okay. Have you done one before?
13      A. Just in some research -- in some research where
14  I looked at some concurrent validation, see if this test
15  is related to this -- to performance at a certain point
16  in time. It's a part of criterion related validity.
17          There's a predictive and concurrent.
18  Predictive is I collect some data, save it, use it to
19  predict something later. Concurrent is where I collect
20  data, collect -- I collect like a predictor, a test or
21  something and relate it to some kind of outcome, job
22  performance, something like that.
23      Q. So you did that in a study at some point?
24      A. A research study that frankly wasn't very
25  successful.

---

Page 60

1      Q. Okay. When was that?
2      A. It was -- it's been within the past 10 years.
3  I -- you know, as you might be able to tell from my
4  vitae, I try to do a significant amount of research.
5  And those of us who do research understand that you --
6  Kevin Mosholder is a professor of mine from Auburn
7  University. It was great lesson for me as I was a
8  graduate student. If you'll spare me this for a moment.
9          He -- I went into his office one day and he
10  had four file cabinets of information. And he said, you
11  see that one file cabinet? I'm real proud of that. I
12  said, well, great, Kevin. You're a well-known scholar.
13  He said you see those other three file cabinets of
14  information? I said, yes. And he said, well, they are
15  the studies that just didn't work out the way I thought
16  they would. So sometimes it works out and sometimes it
17  doesn't in terms of research.
18      Q. Is that the only validation study you've done?
19      A. Probably.
20      Q. Okay.
21      A. Probably.
22      Q. Let's talk about your next one. You worked for
23  the City of Norman --
24      A. Worked for the City of Norman.
25      Q. -- from 1987 to the present?

---

Page 61

1      A. Uh-huh.
2      Q. What did you do for them?
3      A. Basically what I did is I ran an assessment
4  center for them to try to help them select their top
5  city managers. I think it was a city planner and a
6  finance director. And then I also ran an assessment
7  center where I just basically made some comments about
8  the managerial skills of those who were managers for
9  them at the time.
10          You know, an assessment center -- you may
11  or may not be familiar with it. It's just basically you
12  give a person a bunch of decisions to make and see how
13  they make them, do they -- how they delegate, how they
14  are prioritizing. Those are real important management
15  functions.
16      Q. So what -- so you were like looking at the
17  management jobs there?
18      A. Basically at management jobs there.
19      Q. And what kind of management jobs were they?
20      A. City level managers, you know, director of
21  finance, director of human resources, director of
22  planning, director of housing --
23      Q. Okay.
24      A. -- those kind of things. And it was just kind
25  of give them some advice on some developmental

---

16 (Pages 58 to 61)

michael buckley                    Nell McCallum & Associates

---

Page 62

1  activities that might help them become better managers.
2      Q. Okay. But you didn't do a validation study?
3      A. Did not do a validation study for them.
4      Q. Any job analysis?
5      A. Did not do a job analysis for them, but was
6  quite familiar with the job analyses that they had for
7  the positions that they asked me to make some managerial
8  suggestions with.
9      Q. All right. The next company you have down here
10 is one that you consulted for is the US Geological
11 Survey?
12     A. Yeah. This was when I was a graduate student.
13 I've been fortunate to work for a gentleman named John
14 Bernard and who I believe is the academic expert in the
15 country on performance evaluation. He had a number of
16 contracts with them which I assisted on and it was just
17 to basically look at their performance appraisal system,
18 whether they are doing a good job in performing its
19 appraisal, whether they are doing the appropriate
20 documentation of the systems that they use. If it's the
21 good -- if it fits in well with the jobs that they are
22 -- that they are using. You know, and basically it gave
23 me some training in some of the legal issues surrounding
24 performance evaluation and how to do a -- how to
25 implement a good performance appraisal system.

---

Page 63

1      Q. What jobs were you looking at there?
2      A. They range from entry level jobs to
3  professional jobs.
4      Q. And what kind of jobs were the entry level
5  jobs?
6      A. Oh, gosh. They were -- you know, they ranged
7  from people who did site visits for the geological
8  survey to higher level managers. It was the whole
9  spectrum of performance evaluation.
10     Q. Okay. And you did that as a graduate student?
11     A. I did that as a graduate student. I've also
12 done a number of other performance appraisal projects
13 for organizations.
14     Q. Did you do any validation studies for the
15 geological service?
16     A. Did not.
17     Q. How about any job analyses?
18     A. No, but looked at plenty of job analyses.
19     Q. Okay. All right. We're going to get into
20 these other Fortune 500 clients --
21     A. Yeah, go ahead.
22     Q. -- so we may want to flip the tape here.
23     A. Great.
24        MR. FARRIS: So, go off the record for a
25 second.

---

Page 64

1        VIDEOGRAPHER: Off the record at 9:24 a.m.
2  Ending Tape 1.
3        (Recess from 9:24 to 9:33 a.m.)
4        VIDEOGRAPHER: On the record at 9:33 a.m.
5  Starting Tape 2.
6  BY MR. FARRIS:
7      Q. Okay. I want to just go back briefly and your
8  selection of candidates at the University of Oklahoma.
9      A. Uh-huh.
10     Q. You said that you looked at their work
11 experience?
12     A. Uh-huh.
13     Q. And you'll look at their credentials?
14     A. They're academic credentials.
15     Q. Academic credentials?
16     A. Uh-huh.
17     Q. And you would perform an interview?
18     A. Uh-huh.
19     Q. And how do you combine all of those things
20 together to make a determination as to which candidate
21 you'll select?
22     A. They are combined by a committee, a committee
23 -- there's typically a hiring committee that combines
24 that information.
25     Q. How do they combine it?

---

Page 65

1      A. They combine it in a -- based on what they
2  believe to be the most important job parts of being a
3  university professor.
4      Q. Okay. And is that more of a subjective
5  decision as to what makes someone a good professor?
6      A. I think there's a lot of objective factors
7  associated with it like publication record which is an
8  object -- publication record is an objective indicator
9  of one's contribution to the scholarly literature.
10     Q. But is there some combination of both objective
11 and subjective factors?
12     A. Yeah, of course.
13     Q. Okay. And do you ever write down the exact
14 weight that you're giving to each one of the factors
15 that you use?
16     A. We talk about beforehand what's important to
17 us. Like, for example, does the person -- we're in need
18 of a person to teach entrepreneurship. Well, then that
19 would be one of the factors that we weigh highly.
20     Q. Okay. But do you write down how you've
21 weighted the factors?
22     A. Well, I think that they are -- yeah. Typically
23 it's written down what's more important. A number is
24 not associated with it, but it's written down.
25     Q. Okay. So there is no number or percentage

17 (Pages 62 to 65)

michael buckley                    Nell McCallum & Associates

Page 66

1   given to each one?
2       A. No.
3       Q. And do you retain those notes that you've
4   written down?
5       A. Typically we do for a short period of time.
6       Q. Okay. How long a period of time do you keep
7   them?
8       A. Oh, gosh. A month.
9       Q. Okay. And do you believe that this satisfies
10  the EEOC uniform guidelines?
11      A. I believe it's a competent selection procedure.
12      Q. Okay. But do you believe it satisfies the
13  uniform guidelines?
14      A. I believe it's based on a -- it's based on a
15  job analysis. You know, I haven't thought about it in
16  terms of that. I do think, though, that we are in
17  accordance with the uniform guidelines.
18      Q. Okay. So you do think the way you do it is in
19  accordance with the guidelines?
20      A. Well, I didn't say that. I have to sit down
21  and think about that a little bit more.
22      Q. So you've never analyzed then whether you're in
23  compliance with the uniform guidelines?
24      A. Not specifically, no.
25      Q. Okay. All right. Back to your resume --

Page 67

1       A. Great.
2       Q. -- on the consultant jobs that you've done, you
3   said that you've consulted for a number of other Fortune
4   500 clients?
5       A. I sure have.
6       Q. That you're not at liberty to discuss because
7   of confidentiality agreements.
8           About how many other clients are there?
9       A. I'd probably say 10.
10      Q. Okay. 10.
11          And how long a period of time is that over?
12      A. That's over -- that's over my career.
13      Q. Okay.
14      A. I'm not a person with a large client base
15  so....
16      Q. Okay. And you have confidentiality agreements
17  with all 10 of these clients?
18      A. Well, just that I won't talk of -- you know,
19  for profit organizations don't typically want people
20  talking about what they do for them and I -- I abide by
21  that.
22      Q. Okay. Well, let's -- we can at least talk in
23  generalities about it?
24      A. Yeah, that's right.
25      Q. Have you done validation studies for any of

Page 68

1   these 10 clients?
2       A. I've looked at selection procedures and whether
3   I thought they were job related or not, whether I
4   thought that they were -- that they were tapping the
5   factors that were important based on the job analysis.
6       Q. Okay. But have you ever done a scientific job
7   analysis?
8       A. I have not had -- oh, a job analysis?
9       Q. Yes.
10      A. Yes. I think so, for managerial positions.
11      Q. Okay. And what did you do when you conducted
12  the scientific job analysis?
13      A. Well, you go in and talk to a number of people
14  who are in there, you get people who perform the job,
15  people who interact with the person who performs the
16  job. You know, when you do job analysis, the correct
17  way to do job analysis, at least based on my training,
18  is that job analysis is done from a number of different
19  sources. It's never a single source issue. Because of
20  the imprecision involved with job analysis, it has to be
21  done often, with multiple corroborations, multiple --
22  multiple data points. Flieshman -- I'm sorry.
23  Levine -- Ed Levine is a big job analysis person from
24  the University of South Florida and he's written an
25  article about how most -- in a survey of 93 job

Page 69

1   analysis, he -- basically 80 of them, I believe, or 83
2   -- it's a large number, basically says that you need to
3   use a number of different sources. It's an Academy of
4   Management Journal article from 1989, I think.
5       Q. Of these Fortune 500 clients, how many did you
6   do this specific job analysis for?
7       A. One.
8       Q. One of them?
9       A. Uh-huh.
10      Q. And in that case, what jobs were you looking
11  at? What kinds of jobs?
12      A. Again, mainly managerial jobs.
13      Q. Okay.
14      A. And it was a management succession issue, who
15  should go -- who should go next, you should.
16      Q. How many different types of jobs were you
17  looking at?
18      A. Oh, gosh. Gosh. Usually a very small amount,
19  two probably.
20      Q. Okay. Two jobs.
21          And how did you go about conducting the job
22  analysis for those two jobs, what exactly did you do?
23      A. I looked at a number -- again, I looked at a
24  number of different sources of information, people who
25  perform that job, people who interact with the person

18 (Pages 66 to 69)

michael buckley                    Nell McCallum & Associates

## Page 70

1  who performs that job, what supervisors thought that job
2  should be, what subordinates thought that job should be.
3      Q. Do you have a list of --
4      A. Just a number of different -- different data
5  points.
6      Q. Did you have a list of data points that you
7  would ask each of these people?
8      A. I don't know if I had a specific list, but, you
9  know, always try to get corroborating data. One of the
10 things I've been trained as always find corroborating
11 data. Single source data is not good data.
12     Q. Did you document your job analysis?
13     A. Absolutely, I did.
14     Q. How did you document it?
15     A. I just wrote it out who I talked to, what the
16 timing was, what the -- you know, the uniform
17 guidelines, I think, go through what needs to be
18 included in that, where it is, what is done, criticality
19 of the tasks, those kind of issues.
20     Q. And you did all of those things based on --
21     A. I believe I did a lot of them, yes.
22     Q. What about validity studies for these ten
23 Fortune 500 clients, did you do any --
24     A. Have not.
25     Q. Okay. And you said that in your role at

## Page 71

1  Oklahoma University that you have never conducted a job
2  analysis?
3      A. I never had conducted a job analysis done by a
4  different part of the organization that I'm a part of.
5  It's done by the human resources people.
6      Q. So what other job analysis have you done
7  besides this one for the unnamed Fortune 500 Company?
8      A. Oh, I've done a number of job analyses. In
9  fact, early in my career -- my first -- my first
10 graduate school appointment was a Case Western Reserve
11 University in Cleveland, Ohio. And I was -- one of the
12 ways that I made my money was to -- to go and do job
13 analyses. I was only at Case Western for one year.
14     Q. Okay. And aside from that, what other job
15 analyses have you done?
16     A. Some managerial job analyses. I talked with
17 people about jobs but never really -- only on those
18 occasions have I done the nuts and bolts of a job
19 analysis.
20     Q. Okay. Let's -- I just want to make sure I know
21 what the nuts and bolts are of the job analysis.
22     A. Yeah.
23     Q. Can you just describe to me like the first step
24 that you do when you go in to conduct a job analysis?
25     A. Yeah. I'd look at whatever I could that gives

## Page 72

1  me information about that job. I would call that person
2  and say, listen, I'm coming to talk to you about your
3  job. I want you to bring some supporting information to
4  tell me what you do. I'd talk to other people who are
5  -- who interact with that person. I talk with
6  supervisors, I talk with subordinates, I talk with other
7  folks, just a whole assortment of information. Again, I
8  think the most competent way to collect job analysis
9  information is to collect it from a number of different
10 sources, not -- again, it's just been drilled into me,
11 single source data is not the best data.
12     Q. So these other sources you said you would look
13 at some information that the company would provide to
14 you about the jobs?
15     A. Sure. There is company provided information,
16 there is information provided by the individual doing
17 the job.
18     Q. What kinds of company provided information
19 would you --
20     A. Just the job analysis that they have, any kind
21 of job descriptions, job specifications that they
22 possess at that time.
23     Q. Okay. So you would look at job descriptions.
24 What about job postings?
25     A. You know, not a lot of job postings. Not a lot

## Page 73

1  of lot of job postings.
2      Q. If they had job postings, is that something you
3  would want to see?
4      A. It's something that you could look at it. It's
5  something you could look at.
6      Q. Is it in the past if you were conducting a job
7  analysis, is that something you would have asked for?
8      A. I may have. I may have.
9      Q. Okay.
10     A. But it's not the most important information to
11 me I don't think.
12     Q. Okay. In your work as a consultant, how much
13 of your time is spent working as a consultant? How much
14 time percentage on an annual basis?
15     A. Oh, a small amount. Small amount.
16     Q. Like what's a small amount?
17     A. Gosh. If my income is 200 K, my consulting
18 income is 10 K, very small amount.
19     Q. But it --
20     A. My primary duties are as university professor.
21     Q. But timewise, could you -- could you describe?
22 I know you've described it monetarily, but --
23     A. That's two weeks.
24     Q. Two weeks a year?
25     A. Yeah.

19 (Pages 70 to 73)

michael buckley                    Nell McCallum & Associates

**Page 74**

1   Q. About?
2   A. Yeah.
3   Q. Okay.
4   A. Again, my primary duties are as a professor at
5   the University of Oklahoma.
6   Q. Okay. In the matters of employment
7   discrimination litigation, what fields do you consider
8   yourself to be an expert in?
9   A. You know, I -- I think I've been trained in the
10  number of areas surrounding employment litigation,
11  adverse impact, affirmative action, those kinds of
12  issues and it's mainly from my teaching
13  responsibilities, to make students aware what these
14  issues are.
15  Q. Do you consider yourself to be a expert in
16  adverse impact calculations?
17  A. I know something about them. I know a
18  considerable amount about that.
19  Q. Do you have some statistical training that --
20  A. I have statistical training, quite a bit of
21  statistical training.
22  Q. Do you have the kind of statistical training
23  that you would consider to qualify yourself as an expert
24  in making adverse impact calculations?
25  A. Yeah, I'm not sure it's what I feel most

**Page 75**

1   comfortable doing and it's not what I've been asked to
2   do in this case, but it's a -- I've got a pretty good
3   statistical background.
4   Q. Have you done adverse impact calculations in
5   the past?
6   A. On some hypothetical data that I've had for
7   students, et cetera. I've looked at some for some
8   organizations to see some discrimination -- if they are
9   some discrimination issues.
10  Q. But for these organizations you've looked at in
11  the past, have you conducted any actual adverse impact
12  calculations on your own?
13  A. I have not.
14  Q. Okay. And have you ever testified with regard
15  to adverse calculations?
16  A. Have not. Have not.
17  Q. Okay. Would you agree that the American
18  Psychological Association's standards for educational
19  and psychological testing are typically viewed as an
20  authoritative source in your field?
21  A. Absolutely, and they are.
22  Q. What about the principles for validation and
23  use of personnel selection procedures?
24  A. That's by SIOP?
25  Q. By SIOP.

**Page 76**

1   A. They were.
2   Q. Is that also an authoritative --
3   A. They are.
4   Q. -- text?
5        Okay. Let's go back to your report,
6   Page 4.
7   A. Yeah. Here. Just get a drink here if I can.
8   Q. Sure.
9   A. Okay.
10  Q. Your source documents, again, we've already
11  gone through this. This is the complete list of the
12  documents that you reviewed.
13  A. Uh-huh. Okay. Where are you at?
14  Q. Page 4, which is the source documents --
15  A. Okay. That's --
16  Q. -- in your report. In your report.
17  A. No, I don't have the full report. I just have
18  what I've written.
19  Q. Yeah. I think we gave you the full copy.
20  A. Did you give me a copy?
21  Q. Yeah.
22  A. Okay.
23  Q. You can look at that one. So the very
24  beginning on Page 4.
25  A. Okay. Good. Yeah. Go ahead.

**Page 77**

1   Q. Okay. So you -- you said these are the only
2   items that you reviewed --
3   A. They are.
4   Q. -- correct?
5        Let's go to Page 5 of your report.
6   A. Page 5, okay.
7   Q. Let me find what I'm looking for here. We'll
8   come back to Page 5.
9   A. Yeah, that's fine.
10  Q. Let's ask about some of these things.
11  A. Yeah.
12  Q. Did you review any Nucor Berkeley job
13  descriptions prior to drafting your report?
14  A. I did not.
15  Q. Okay. Why didn't you review them?
16  A. I believe that the uniform guidelines that
17  there is an affirmative obligation on the -- on y'all's
18  part to provide those to me to make a judgment about
19  those.
20  Q. If those have been provided to your attorney,
21  would you have wanted to review them?
22  A. If asked, I would. I think they are important
23  documents.
24  Q. Do you know if your attorney sent them?
25  A. Sent them to me.

20 (Pages 74 to 77)

michael buckley                    Nell McCallum & Associates

Page 78

1    Q. Or if your attorneys had them in their
2  possession?
3    A. I would assume that if they had them, they
4  would have sent them to me.
5    Q. Okay.
6    A. I mean, that's a question more appropriately
7  asked, I believe, to them.
8    Q. Okay. But you didn't ask them for any job
9  descriptions?
10    A. Did not.
11    Q. And is it your job as an expert to review all
12  of the available materials in making your decision?
13    A. It's my job to evaluate the material that I
14  have -- that I have access to. At least it's my belief
15  it's an affirmative obligation for that to be provided
16  -- for that to be provided by the --
17    Q. Do you think that you can make a competent
18  opinion on whether a company's selection procedures are
19  valid just by looking at deposition testimony?
20    A. I think it gives you some pretty good
21  information on what the selection procedure has been
22  like, yes. I think there is some --
23    Q. Is that typically what you have done in the
24  past when conducting an analysis of one of your clients?
25    A. Well, I would --

Page 79

1        MR. WIGGINS: Objection to form. Those are
2  two -- that's a compound question.
3  BY MR. FARRIS:
4    Q. All right. Well, let's take it one at a time.
5        In the past when you've done your work as a
6  consultant, had you ever performed a job analysis based
7  solely on deposition testimony?
8        MR. WIGGINS: Object to form.
9    A. Yeah. I'm not sure I understand what that
10  means.
11  BY MR. FARRIS:
12    Q. Well, have you ever used deposition testimony
13  in the past when doing your work for a consultant as a
14  consultant?
15    A. Yes, I've looked at depositions before.
16    Q. Okay. But was that the only thing that you
17  looked at in that example?
18        Did you look at anything else besides
19  deposition testimony in that case?
20        MR. WIGGINS: Object to form. I'm not
21  sure --
22    A. Yeah, which case?
23        MR. WIGGINS: -- which case we're talking
24  about.
25  BY MR. FARRIS:

Page 80

1    Q. Okay. Well, the cases where you've used
2  deposition testimony in the past --
3    A. Yeah.
4    Q. -- let's go through those. Give me an example
5  of a case where you've used deposition testimony in the
6  past?
7    A. A sexual harassment case.
8    Q. Okay. When was it?
9    A. A little while -- a couple months back.
10    Q. Okay. And what did you examine in this case?
11    A. The complaint and some depositions taken by
12  some of the complainants.
13    Q. Did you conduct a job analysis in that case?
14    A. Didn't feel a need to.
15    Q. Did you conduct a validation study in the case?
16    A. Didn't feel a need to.
17    Q. Did you examine the company's selection
18  procedures in that case?
19    A. Did not.
20    Q. Let's talk about a case where you have examined
21  a company's selection procedures in the past.
22        Is there an example where you've examined a
23  company's selection procedures where you looked at
24  deposition testimony?
25        MR. WIGGINS: Objection to form. There is

Page 81

1  no predicate that there has ever been such a case. I
2  think you ought to establish if it exists, first.
3        MR. FARRIS: Well, I'm asking him if there
4  is a case where you've ever looked at deposition
5  testimony when examining a company's job selection
6  procedures.
7        MR. WIGGINS: Well, object to form. There
8  is no predicate laid that there is any case that -- any
9  case that had depositions.
10  BY MR. FARRIS:
11    Q. Okay. Well, I'm asking you, is there a case
12  where -- you've said that you have looked at cases in
13  the past where there were depositions?
14    A. Yes, I have.
15    Q. Correct?
16    A. Uh-huh.
17    Q. In any of those cases, were you examining the
18  selection procedures of the company?
19    A. Not that I can recall.
20    Q. So then never in the past have you examined a
21  company's selection procedures where there was
22  deposition testimony present?
23    A. Not that I can recall.
24    Q. Okay. If you had read job descriptions in this
25  case, do you think it might have changed your opinion in

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

michael buckley                    Nell McCallum & Associates

## Page 82

1    the case?
2        A. I think that's an empirical question. It's
3    hard to answer without seeing the information.
4        Q. Okay. But could it have changed your opinion
5    in the case?
6        A. It's hard to say without seeing the
7    information.
8        Q. Okay. Why don't we look at a job description.
9            (Exhibit No. 4 marked.)
10           MR. FARRIS: I'll introduce this as our
11   next exhibit.
12           MR. WIGGINS: You got another page?
13           MR. FARRIS: I got you one here.
14   BY MR. FARRIS:
15       Q. I've introduced a job posting for beam mill
16   furnace stocker from October of 2004; is that correct?
17       A. As far as I could see, yes.
18       Q. Have you ever seen this before?
19       A. I believe it may have been faxed to me
20   yesterday.
21       Q. Yesterday?
22       A. Yesterday, yeah.
23           MR. WIGGINS: Yeah. This is what you
24   emailed me yesterday --
25           THE WITNESS: Yeah.

## Page 83

1            MR. WIGGINS: -- that I objected to. It's
2    part of the compendium.
3            THE WITNESS: Right.
4            MR. FARRIS: No, this is a job posting that
5    has been produced in the case.
6            MR. WIGGINS: I understand that.
7            MR. FARRIS: It has a production number at
8    the bottom of it. This isn't prior to the compendium.
9    This is a job posting that's been produced to you in the
10   case.
11           MR. WIGGINS: This is -- this is one of the
12   parts of the compendium. If you look --
13           MR. FARRIS: This is a job posting that has
14   been produced in the case regardless of whether it's in
15   the compendium.
16           MR. WIGGINS: I'm just telling you that I
17   emailed it to him yesterday because you emailed it to me
18   yesterday.
19   BY MR. FARRIS:
20       Q. Okay. You, yesterday for the first time ever
21   you saw any job posting in this case; is that correct?
22       A. Yes, that's correct.
23       Q. Okay. Would you look at it now and look at the
24   qualifications listed there.
25           No. 1 is excellent safety attitude and

## Page 84

1    awareness; is that correct?
2        A. Uh-huh.
3        Q. And No. 2 is excellent oral and written
4    communication skills?
5        A. It is.
6        Q. No. 3 is teamwork oriented; 4, good
7    troubleshooting skills; 5, self motivated; 6, good work
8    ethic; 7, very cost and efficiency driven; 8, good work
9    and attendance record; 9, mechanically inclined; 10,
10   some computer skills; 11, knowledge of beam mill rolling
11   process a plus; 12, furnace and reheat furnace knowledge
12   a plus; and 13, willing to learn recorder and utility
13   position.
14       A. Uh-huh.
15       Q. Are these qualifications something that you
16   could use in conducting a job analysis?
17           MR. WIGGINS: Objection to that. Go ahead
18   and answer.
19       A. Well, it seems to me as though this may be
20   something that one could start from. There's a need for
21   considerably more information than this.
22   BY MR. FARRIS:
23       Q. But it is something that could be used as part
24   of forming a job analysis?
25       A. It's a -- it's the beginnings, much more is

## Page 85

1    necessary.
2        Q. But is this something that would be helpful in
3    determining whether a company has conducted a job
4    analysis?
5            MR. WIGGINS: Objection, form, and it's
6    asked and answered.
7    BY MR. FARRIS:
8        Q. You can go ahead and answer.
9        A. Repeat the question, please.
10       Q. Is this something that you think could be
11   helpful in conducting a job analysis?
12       A. It may well be. I'm -- it may well be, but I
13   believe there's a need for significantly more
14   information than this.
15       Q. Are you -- is there any requirement under the
16   uniform guidelines that job analyses be conducted in
17   conjunction with the development of selection
18   procedures?
19       A. I believe that to be the case.
20       Q. Okay. Where in the uniform guidelines is that?
21       A. I think doesn't 14 -- is it 14C and 15C. I
22   don't have a copy in front of me.
23       Q. Okay. So it's your understanding that's what
24   the uniform guidelines require?
25       A. That's correct.

22 (Pages 82 to 85)

michael buckley                          Nell McCallum & Associates

---

Page 86

1    Q. Okay. You said that you need considerably more
2  information than this.
3        What other information would you need?
4    A. Well, I need to know -- I need to know how this
5  information was collected, what's the basis of it,
6  what's the criticality of it. There's a number of
7  different factors that need to be confronted that are, I
8  believe, in 14 -- 14C, the technical -- the technical
9  accuracy.
10   Q. So are you testifying that the functions
11 described here don't accurately reflect what's actually
12 required for the job?
13   A. You're asking me to make a judgment that I'm
14 not at this time prepared to make.
15   Q. Okay. So you can't make that judgment?
16   A. Yeah.
17   Q. Is that correct?
18   A. Not on the basis of this piece of paper.
19 Considerably more information is necessary.
20   Q. Okay. From what you have in this case, can you
21 make a judgment that these qualifications do not reflect
22 what's done on the job?
23        MR. WIGGINS: Objection to form. That's
24 not the issue.
25 BY MR. FARRIS;

---

Page 87

1    Q. That's the question.
2    A. Yeah. I'm just not sure how I would answer
3  that question. I don't believe I can.
4    Q. Don't believe you can.
5        Okay. Have you developed your own
6  familiarity with jobs at Nucor Berkeley?
7    A. To the extent that I've looked at them through
8  the depositions.
9    Q. Do you know anything about the beam mill
10 furnace stocker position, for example?
11   A. Nothing specifically, no.
12   Q. Have you ever visited the facility?
13   A. Have not been asked to.
14   Q. Have you ever interviewed or observed any of
15 the employees?
16   A. Have not been asked to.
17   Q. Okay. Have you performed your own independent
18 job analysis of any of the specific jobs --
19   A. Have not.
20   Q. -- at Nucor Berkeley?
21   A. Have not.
22   Q. Okay. And do you know of any job functions of
23 this particular job that are not accurately described on
24 this job posting?
25   A. I would not be able to answer that with the

---

Page 88

1  information I have at my disposal.
2    Q. Did you review the plaintiffs' complaint in
3  this case?
4    A. You know, I believe that I have. I believe
5  that I have.
6    Q. It's not listed on your source materials, but
7  you did review it?
8    A. Gosh.
9    Q. I'm sorry. You did not review it or --
10   A. You know, I can't recall. I can't recall.
11   Q. Okay. You did review deposition testimony;
12 correct?
13   A. I certainly did, yeah.
14   Q. Did any of the deposition testimony that you
15 reviewed reveal that the job posting requirements were
16 based on a job analysis?
17   A. I know it was hard to ferret out when reading
18 the depositions where the job analysis was, if there was
19 any, who had it, where it was, job descriptions. A
20 common thread was that not many people were familiar
21 with where that information was or if it even existed.
22   Q. Okay. Did you review the Court's order of a
23 scope of discovery in this case?
24   A. I don't believe I have.
25   Q. And did you review any materials from the

---

Page 89

1  Sadler group?
2    A. Sadler group, have not.
3    Q. Okay. Did you review any of the job specific
4  tests at issue in this case?
5    A. I did not, but I did -- I did not. I did not.
6    Q. Did you --
7        MR. WIGGINS: Objection to form now on job
8  specific tests. I mean, that's assuming a lot that they
9  are job specific.
10 BY MR. FARRIS:
11   Q. Okay. Did you review any kind of tests in this
12 case?
13   A. Did not.
14   Q. Okay. Would those have been helpful in your
15 reaching your conclusions had you reviewed them?
16   A. I think with some significant information
17 associated with them.
18   Q. What kind of significant information?
19   A. Oh, how the test was developed, how the test
20 was related to something related to the job, those kinds
21 of issues.
22   Q. Do you know whether or not your lawyer had
23 copies of the tests that were used at Nucor Berkeley?
24   A. I'm not aware. I'm not aware.
25   Q. Did you ever ask him for those tests?

---

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

michael buckley                          Nell McCallum & Associates

Page 90

1    A. Did not.
2    Q. Okay. Did you review the report of Dr. Bradley
3    and Dr. Fox in this case?
4    A. You know, I've just looked -- I've just looked
5    through it. That's the report about adverse impact?
6    Q. Right. Right.
7    A. I just looked through it. That -- I read it,
8    but it's not an area in which I was asked to make a
9    judgment.
10    Q. Okay. So you haven't made any conclusion as to
11    whether there is adverse impact in this case?
12    A. Haven't been asked to.
13    Q. Was test development discussed in the
14    depositions that you reviewed?
15    A. Well --
16        MR. WIGGINS: Object to form as to -- if
17    you could specify which tests we're talking about.
18    BY MR. FARRIS:
19    Q. The tests that were used at Nucor Berkeley
20    during the selection procedures?
21    A. I don't recall much about test development in
22    the depositions I've read.
23    Q. Okay. Did you review the report of Dr. Fines
24    Welch in this case?
25    A. I have not.

Page 91

1    Q. Okay. Were you involved in any way in the
2    depositions in this case?
3    A. Were not.
4    Q. Okay. Did you give any questions to Wiggins
5    Childs to --
6    A. Have not.
7    Q. -- have asked during the depositions?
8    A. Have not.
9    Q. Do you think that it could have been helpful to
10    your analysis to have questions that were asked during
11    the depositions in the case?
12    A. Questions that were asked by...?
13    Q. Asked by Mr. Wiggins or by his firm?
14        I mean, some of the information that you
15    say you don't have, could you have gathered that through
16    deposition testimony if certain questions had been
17    posed?
18        MR. WIGGINS: I'm going to object to the
19    form. It assumes there is information that exists.
20    BY MR. FARRIS:
21    Q. Okay.
22    A. Seems to me that's for y'all to decide.
23    Q. Okay. So there's nothing that you would have
24    -- no questions that you had during the course of your
25    analysis that you raised to Mr. Wiggins, for instance?

Page 92

1    A. No. I was given -- I was given a set of --
2    set of depositions and asked to come to a conclusion
3    about those.
4    Q. Okay. And you never came up with any questions
5    about the selection process, for example?
6        MR. WIGGINS: Object. He wasn't hired at
7    that point. That's long ago.
8    BY MR. FARRIS:
9    Q. When you read the depositions in this case, did
10    you come up with any questions that would have helped
11    you to determine some of the information that you were
12    missing in this case?
13        MR. WIGGINS: Objection, that assumes there
14    is information missing.
15        MR. FARRIS: Well, he's testified already
16    that he thinks there's other information that could have
17    been provided to him.
18    BY MR. FARRIS:
19    Q. Is that correct?
20        MR. WIGGINS: No. No. Object to form on
21    that. You've suggested that there is something that
22    might exist and he says he doesn't know.
23        MR. FARRIS: Well, he's testified earlier
24    that if he had more information, he might have been able
25    to conduct his analysis more effectively.

Page 93

1        MR. WIGGINS: What he's testified if the
2    company had provided it, but we haven't shown that there
3    is any "it."
4    BY MR. FARRIS:
5    Q. Has it been your practice in the past when
6    you're working with clients to ask them questions about
7    the job selection process?
8    A. Absolutely.
9    Q. Okay. And did you do this in this case?
10    A. Did not.
11    Q. Is it your testimony that the selection
12    procedures at Nucor Steel Berkeley are not valid?
13    A. Based on the -- based on the information I
14    have, it would be difficult for Nucor to demonstrate
15    validity.
16    Q. Does that mean it's not possible for Nucor
17    Berkeley to demonstrate validity?
18        MR. WIGGINS: Objection, asked and
19    answered.
20        MR. FARRIS: That's not the same question,
21    Bob.
22    BY MR. FARRIS:
23    Q. You can go ahead and answer it.
24    A. Ask -- ask it again, if you would.
25    Q. Okay. Does that mean that it's not possible

24 (Pages 90 to 93)

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

michael buckley                    Nell McCallum & Associates

Page 94

1  that Nucor Berkeley selection procedures are valid?
2      A. It -- you know, that's a real difficult to
3  answer, I think. I would assume anything is possible.
4      Q. Okay. So, then your answer is, yes, it is
5  possible that they are valid?
6      A. No. It's difficult to answer and -- that's
7  difficult for me to answer in the absence of the data.
8      Q. What data are you talking about?
9      A. Data -- data related to jobs, job analysis
10  data.
11      Q. Okay. So if you had something like that
12  hypothetically, is it possible you could prove the
13  selection procedures are valid?
14      A. There's a possibility of that.
15      Q. Okay. If you had been hired, for instance, by
16  Nucor Steel Berkeley to act as an expert in this case,
17  do you think you could have gone in and conducted a job
18  analysis?
19      A. I wasn't -- I've not been hired by them.
20      Q. Yeah. But I'm talking hypothetically.
21          Do you think you could have gone in and
22  conducted a job analysis?
23      A. Oh, I feel competent to do that, yes.
24      Q. Okay. What about a validation study?
25      A. I certainly feel competent to do that.

Page 95

1      Q. Okay. What would you want from Nucor Steel
2  Berkeley had you been hired by them to conduct a job
3  analysis?
4      A. Well, I would want whatever job analysis
5  information they had. I would also like access to some
6  subjective matter experts. I'd like some information
7  based on the number of different sources that have been
8  in contact -- number of different corroborating sources
9  for that job to collect the job analysis information.
10      Q. Have you conducted your own independent
11  validation studies of any of the procedures used at
12  Nucor Steel Berkeley?
13      A. Have not. Have not.
14      Q. Is it your expert opinion that any of the tests
15  used for employee selection at Nucor Steel Berkeley are
16  invalid?
17          MR. WIGGINS: Objection, assumes there are
18  tests.
19  BY MR. FARRIS:
20      Q. The tests that are used at Nucor Steel Berkeley
21  have been provided to plaintiffs in this case.
22          If that were the case, are you making any
23  opinion about those tests?
24          MR. WIGGINS: Objection on that
25  representation. We know of no tests.

Page 96

1  BY MR. FARRIS:
2      Q. Okay. So you've never seen any tests --
3      A. I have not.
4      Q. -- in this case.
5      A. I have not.
6      Q. So you're not making any opinion as to whether
7  those tests are valid or not, if they exist?
8          You're not making an opinion at all about
9  the validity of any tests period in this case?
10      A. I believe in my -- in my written report, I
11  talked about one of the tests that was used that I think
12  from a human resource perspective wasn't used in a
13  particularly effective fashion.
14      Q. Okay. How did you examine that particular
15  test?
16      A. I did not examine the test particularly, just
17  examined the outcome related associated with the test.
18      Q. It's on Page 6 of your report if you want to
19  look at the bottom of the page.
20          You're talking about a locally developed
21  test?
22      A. Right. Right.
23      Q. From the Bell deposition?
24      A. Uh-huh. Uh-huh.
25      Q. Is it your opinion that that test is not valid?

Page 97

1      A. Again, I believe that the validity of that test
2  needs to be demonstrated. And while -- I believe the
3  validity of that test needs to be demonstrated.
4      Q. Okay. So you're not saying it's not valid?
5      A. Based on what I read, the individuals said that
6  it hadn't been examined by a professional source.
7      Q. Okay. But you didn't examine it either; right?
8      A. I didn't examine it, no.
9      Q. After you've read this deposition testimony
10  that said there was a locally developed test, did you
11  ask for a copy of that test?
12      A. Did not. Did not.
13      Q. Why not?
14          MR. WIGGINS: Again, I'm going to object.
15  It assumes this is, in fact, a test.
16          MR. FARRIS: Well, it's in his report
17  there's a locally developed test.
18          MR. WIGGINS: Yeah. But he's told you
19  earlier how he uses the word "test" and it's not the
20  same way that we use the word "test."
21          MR. FARRIS: He said that there was a
22  locally developed test and that it was used in the -- in
23  this and it was not -- it should have been evaluated by
24  a professional test --
25  BY MR. FARRIS:

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

michael buckley                     Nell McCallum & Associates

**Page 98**

1    Q. I think you're referring to a test like a
2  either a pen and paper or oral test; is that correct?
3        MR. WIGGINS: That's why I have objected.
4  You haven't established what you are talking about.
5  BY MR. FARRIS:
6    Q. What are you talking about when you talk about
7  that test?
8    A. I'm trying to remember. It was a test an
9  individual developed and administered on his own, at
10  least what my perception was in the depositions.
11    Q. Okay. And can you describe what kind of test
12  it was?
13    A. No. I don't think there is enough information
14  available.
15    Q. Okay. And you didn't ask for any copies of
16  that --
17    A. Did not.
18    Q. -- test?
19    A. Did not.
20    Q. Did you ever review any supervisor interview
21  notes in this case?
22    A. Did not.
23    Q. Do you know if plaintiffs' attorneys had copies
24  of those interview notes?
25    A. Do not.

**Page 99**

1    Q. Did you ask plaintiffs' attorneys for any of
2  those?
3    A. Did not.
4    Q. If you had reviewed interview notes in this
5  case, could it have affected your opinion in this case?
6        MR. WIGGINS: Objection. Let's show him
7  the interview notes if you want him to answer these
8  questions.
9    A. Yes. I would need to answer that question with
10  the information.
11  BY MR. FARRIS:
12    Q. Okay. Is it your testimony that Nucor Steel
13  Berkeley doesn't have sufficient documentation to show
14  whether the selection procedures are valid or not?
15    A. From what I've seen, yes.
16    Q. Okay. What do you base that opinion on?
17    A. I've been -- I have not received information
18  pertaining to a job analysis or at least not until
19  yesterday pertaining to job analysis that have been --
20    Q. And all the information you have received has
21  been from plaintiffs' lawyers; correct?
22    A. Correct.
23    Q. And all you received from them is deposition
24  transcripts.
25    A. Correct.

**Page 100**

1    Q. And the employee handbook, I think?
2    A. Correct.
3        MR. WIGGINS: No, no. We sent him the
4  compendium yesterday.
5        THE WITNESS: That's right. The ones --
6        MR. FARRIS: Yesterday.
7        MR. WIGGINS: As soon as you sent it to us,
8  we sent it to him.
9        THE WITNESS: Yeah.
10  BY MR. FARRIS:
11    Q. Okay. But nothing else besides those
12  materials?
13    A. No.
14    Q. You said you didn't retain any drafts of your
15  report; is that correct?
16    A. Do not.
17    Q. Okay. And is that report entirely your
18  original work?
19    A. Oh, yes. Yes.
20    Q. Okay. Have you developed any opinions in this
21  case which are not contained in your report?
22    A. No.
23    Q. Did plaintiffs' counsel ask you to do any
24  analysis which is not contained in your report?
25    A. No.

**Page 101**

1    Q. And did you on your own accord conduct any kind
2  of analysis --
3    A. Did not.
4    Q. -- that's not contained in the report?
5    A. Did not.
6    Q. Is there any analysis that you still plan to
7  do?
8    A. If asked.
9    Q. But is there anything specific in mind at this
10  point?
11    A. No. No.
12        MR. WIGGINS: We are going to, Cary, I want
13  you to know, ask him to look at the compendium. He
14  doesn't even have the whole thing yet.
15        MR. FARRIS: Okay.
16  BY MR. FARRIS:
17    Q. Did you consult with any other professors
18  during the process of forming your opinions in this
19  case?
20    A. No.
21    Q. Did you consult with anyone when drafting the
22  report?
23    A. No. No.
24    Q. Okay. Did anyone else help you in any way with
25  the report you drafted in this case?

26 (Pages 98 to 101)

michael buckley                    Nell McCallum & Associates

Page 102

1    A. No. No.
2    Q. And you said you read Dr. Jeanneret's report in
3  this case; right?
4    A. His report on my -- his report, I have.
5    Q. Right.
6    A. I have, yeah.
7    Q. Okay. What do you disagree with specifically
8  in his report, if anything?
9        MR. WIGGINS: Object to the form of the
10  question in terms of that's too broad, too much of a
11  narrative.
12  BY MR. FARRIS:
13    Q. Why don't we go through Dr. Jeanneret's report
14  and you tell me which of his conclusions on his -- it's
15  on the second page of his report.
16        It's on Page 5 of his report. Do you have
17  that in front of you?
18    A. Page 5, yes, I do. But I prefer if we could to
19  go through differently instead of going through each one
20  because there are points I believe that Professor
21  Jeanneret made -- or Dr. Jeanneret made that I believe
22  we disagree with -- we disagree on.
23    Q. Okay. So how would -- how are you suggesting
24  we go through it?
25    A. Well, I'll follow your lead, if you --

Page 103

1    Q. Okay.
2        MR. WIGGINS: And I want to make a general
3  objection, and I won't restate it each time, but we've
4  not prepared a rebuttable report to this as you know.
5        MR. FARRIS: Right.
6        MR. WIGGINS: And we haven't come prepared
7  to do a rebuttal report live and in person.
8        MR. FARRIS: I'm just asking him in general
9  what he disagrees with in this report.
10        MR. WIGGINS: Well, I mean, he'll tell you
11  what he knows, but we haven't done a systematic rebuttal
12  to this report.
13        MR. FARRIS: Yeah, but it's his --
14        MR. WIGGINS: The Court said don't do that.
15        MR. FARRIS: Yeah, but it's his job today
16  to testify as to what he -- you know, his opinions that
17  he's formed in the case.
18        MR. WIGGINS: And he's going to tell you
19  what he tells you, but it's just going to be, you know,
20  sort of fly by the seat of your pants sitting here in
21  the middle of a deposition. It's not systematic and
22  it's not in any way a rebuttal report.
23  BY MR. FARRIS:
24    Q. Okay. He found the Nucor Berkeley promotion
25  processes to be job related.

Page 104

1        Do you disagree with that?
2    A. Based on the information I received, yes.
3    Q. Okay. And that's based on the deposition
4  transcripts?
5    A. Yes.
6    Q. And the complaint -- or the employee handbook?
7    A. Uh-huh.
8    Q. Did you do any kind of scientific analysis of
9  the job relatedness of any of the --
10    A. Did not.
11    Q. Okay. He finds the promotion processes to be
12  content valid.
13        Do you agree or disagree with that?
14    A. Let's see. It is, again, off the -- where we
15  at? Which one?
16        MR. WIGGINS: Where we at?
17  BY MR. FARRIS:
18    Q. It's on the first bullet. It's the second one
19  here, content valid.
20    A. Again, I can't come to that conclusion based on
21  the information that I have.
22    Q. Did you conduct your own validity study?
23    A. Did not.
24    Q. And the documents that you looked at to
25  determine validity were the deposition transcripts --

Page 105

1    A. They were.
2    Q. -- and employee handbook?
3        Okay. And he found the promotion processes
4  to be different by department. Do you agree or disagree
5  with that?
6    A. I think that there were some that were
7  different. Again, I looked at my job to comment on them
8  as a whole.
9    Q. Okay. So you didn't look at department by
10  department?
11    A. Not specifically, no.
12    Q. Okay. So then it's possible that this
13  promotion processes were different from one department
14  to the next?
15    A. Possible.
16    Q. Okay. Did you find that when you were looking
17  through the deposition transcripts? Did you find that
18  the departments used different selection processes?
19    A. I did. I found some inconsistencies, some --
20  yes, some inconsistencies, some differences.
21    Q. Okay. He found the promotion processes to be
22  fair to all applicants?
23    A. Not what I was asked to make a judgment about.
24    Q. Okay. So you don't have an opinion as to
25  whether it's --

27 (Pages 102 to 105)

michael buckley                    Nell McCallum & Associates

**Page 106**

1    A. Don't have an opinion.
2    Q. -- fair to all applicants?
3        He found the promotion processes to be
4  compliant with the uniform guidelines?
5    A. I do not.
6    Q. Okay. And why do you find them not to be
7  compliant with the uniform guidelines?
8    A. Again, I believe under 14C and 15C the -- both
9  the technical requirements and the documentary
10  requirements haven't been fulfilled.
11    Q. Okay. So it's the violation in the uniform
12  guidelines that you found then is relating to the
13  documentation requirement?
14    A. It's -- I have not seen any.
15    Q. Okay. Is that -- but is that the only
16  violation of the uniform guidelines you found?
17    A. Off the top of my head, yes, it is.
18    Q. Okay. And again, to determine whether Nucor
19  Steel Berkeley complied with the uniform guidelines, you
20  examined the deposition --
21    A. That's right.
22    Q. -- transcripts --
23    A. Correct.
24    Q. -- and the employee handbook?
25    A. Correct.

**Page 107**

1    Q. Okay. Dr. Jeanneret found the promotion
2  processes to be consistent with professional principals.
3        Do you agree or disagree?
4    A. I believe we disagree.
5    Q. Okay. And on what do you base your
6  disagreement?
7    A. A number of different -- a number of different
8  things. Let me try to gather my thoughts here. You
9  know, I believe that the -- as I've said -- as I said in
10  my report and, you know, you have access to it as well.
11  That there is -- there's a lot of subjectivity involved
12  in the process and a lot of -- you know, not very much
13  -- not very much guidance by -- by the organization
14  about the interviewing process about those kinds of
15  things. I think there are a number of different things.
16        For example, one of the things I talked
17  about was my -- well, the one point issue. I think it's
18  a standard error of measurement issue. Dr. Jeanneret
19  saw it as a discrimination issue which is not what it
20  is, but it's a standard issue in terms of measurement.
21    Q. Which one point, I'm sorry, are you talking
22  about?
23    A. A decision that was made on a one point basis.
24  A person said if a person had a 60, they would be
25  different than a person who has a 61. I would argue

**Page 108**

1  with -- I would argue that -- I would argue that that's
2  not a -- that's not a competent way to select people.
3    Q. Okay. But you looked at the process as a
4  whole; correct?
5    A. I looked at --
6    Q. You didn't look at it by department?
7    A. Right. That's right. That's right.
8    Q. So by department you've made no opinion as to
9  whether they are consistent with the professional
10  principles, the selection procedures they use?
11    A. I've not been able to based on the information
12  I received.
13    Q. Okay. And you determined that Nucor Berkeley's
14  promotion processes are not consistent with professional
15  principles by looking again at the deposition
16  transcripts and --
17    A. That's right.
18    Q. -- the employee handbook.
19    A. That's right.
20    Q. What professional principles do you feel that
21  Nucor Steel Berkeley's promotion processes violate?
22    A. Well, I believe the accessibility information.
23  One of the things that I was surprised about when I read
24  the depositions is that no one knew of the existence of
25  or if there was, where it was kept. But even the -- I

**Page 109**

1  believe Ms. Barnhill.
2    Q. The existence of what? I'm sorry.
3    A. Of any kind of job descriptions, job analysis
4  information.
5    Q. Okay.
6    A. So....
7    Q. If Mrs. Barnhill did not know about the
8  specifics of job analysis information, does that mean
9  that none existed in the facility?
10    A. It means that she's not privy to it and one
11  would assume if she's a personnel official, that she
12  would be privy to that information.
13    Q. Is job analysis a technical term that's used or
14  is that a common term?
15    A. Oh, it's a rather common term.
16    Q. Okay. Is that something that you would expect
17  a department manager at an industrial facility to be
18  familiar with?
19    A. Oh, I sure would. I sure would.
20    Q. When you have done consulting work in the past,
21  did you ever explain what a job analysis was to the
22  clients you were consulting with?
23    A. Oh, absolutely.
24    Q. And did they already know what a job analysis
25  consisted of?

28 (Pages 106 to 109)

**Page 110**

1   A. Some do and some don't. Some do a good job on
2 job analysis and some don't do a very good job on job
3 analysis.
4   Q. Where would a department manager learn about
5 job analysis information? What source would they find
6 that in?
7   A. That's quite easily. Usually in the human
8 resources department.
9   Q. Okay. So usually the human resources
10 department would inform people of their job analysis?
11   A. Would have that kind of information available.
12   Q. Okay. Is there a generally available source
13 that is used in your field for definitions of job
14 analysis?
15   A. There is -- I mean, you find a definition of
16 job analysis anywhere, in many different sources,
17 textbooks.
18   Q. What source do you use primarily?
19   A. Oh, I use textbooks. I use the uniform
20 guidelines, I think are real specific about the -- what
21 the technical --
22   Q. Okay.
23   A. -- technical requirements are of job analysis.
24   Q. Let's go back to your report.
25   A. Yeah.

**Page 111**

1   Q. On Page 2, I believe. You said that -- it's on
2 the second page.
3   A. Okay. Second page.
4   Q. Second page of your report. I think it's on --
5   A. Okay. Right here?
6   Q. Here you go. Second page.
7   A. Good.
8   Q. Second sentence from the top. It says, Nucor
9 procedures can be characterized by the subjective
10 combination of factors that are themselves often
11 subjective in nature; is that correct?
12   A. That's correct.
13   Q. What is your definition of objective?
14   A. Objective are characteristics that are -- you
15 know, there are -- well, objective are characteristics
16 to which there is an objective answer, to which there's
17 a -- whether you're present or not is an objective
18 question.
19   Q. Whether you're what or not?
20   A. Present or not.
21   Q. Okay. What are some other examples of
22 objective questions?
23   A. The area of performance evaluation has
24 basically struggled with this for many years, the
25 difference between objective and subjective indicators

**Page 112**

1 of performance. And typically there aren't very many
2 objective performance indicators.
3   Q. Okay. So it's difficult to find an objective
4 indicator?
5   A. There are some, but there are not many.
6   Q. Okay. So you see more subjective indicators
7 then?
8   A. You sure do see subjective indicators.
9   Q. Okay. What about the fact of whether or not
10 you have been trained for a specific job, is that an
11 objective or subjective criteria?
12   A. Whether you've been trained or not?
13   Q. Uh-huh.
14   A. I believe you can answer that question
15 yourself. I mean, it's a -- whether a person has been
16 trained or not --
17   Q. Uh-huh.
18   A. -- seems to me to be a relatively objective --
19 but objective to the extent they were -- to the extent
20 that they were present at the training. Not objective
21 to the extent to how well the training has been done.
22   Q. Okay. But if they had training for a specific
23 job that would be objective?
24   A. It would be one. I'm not sure what it would
25 tell you, but whether you were present at the training

**Page 113**

1 or not, yes.
2   Q. Okay. What about the fact of whether or not
3 you have safety violations, would that be objective or
4 subjective?
5   A. An objective -- it would be kind of an
6 objective measure with the caveat that not a lot of --
7 sometimes safety is not reported. Sometimes safety
8 violations are not reported, sometimes they are not --
9   Q. Well, what if it is reported, would that be
10 objective?
11   A. It's a possibility.
12   Q. Okay. What's your definition of subjective?
13   A. We in the behavioral sciences have talked about
14 subjective measures for a long time. Subjective
15 measures are measures which there are not good objective
16 indicators of. Like if I were to ask what your
17 intelligence is, I can't -- there is not enough
18 objective indicator that I can use for that. It's
19 called an inferred construct. I would have -- I would
20 have to determine some way to measure that and infer it
21 from that measurement.
22   Q. Okay.
23   A. But one's leadership ability or one's ability
24 to innovate, those kind of things.
25   Q. Well, give me some other examples of what you

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

michael buckley                    Nell McCallum & Associates

## Page 114

1  would consider to be subjective.
2      A. I've given you two, leadership ability, ability
3  to innovate, teamwork orientation, self motivated, good
4  work ethic, mechanically inclined, possession of
5  computer skills.
6      Q. Explain to me why these are subjective.
7      A. Because there's not a real objective way to
8  measure those. I mean, how would I -- how would I
9  define team work oriented? Is it -- again, how would I
10  define it. And basically how I would define would
11  determine how it's measured. It's a difficult and not a
12  very objective indicator.
13     Q. Well, let's talk about teamwork then as a
14  specific example. Is there any objective ways you could
15  look at it to determine whether someone's team work
16  oriented?
17     A. There may be. I'm not familiar with any.
18  There may be.
19     Q. What about if someone has a bad discipline
20  record, is that something you could use as an objective
21  criteria to determine whether someone would be team work
22  oriented?
23     A. Without thinking about that, I'm not willing
24  to --
25     Q. So you don't have --

## Page 115

1      A. -- comment on that.
2      Q. You don't have an opinion on that?
3      A. No.
4      Q. Is work experience subjective or objective?
5      A. Oh, I think it's -- there are some parts of it
6  that are objective.
7      Q. Okay. Have you ever encountered an entirely
8  objective employment selection process?
9      A. No, it's difficult -- difficult to be
10  objective. Difficult to find objective indicators.
11     Q. Would you consider disciplinary history to be
12  objective or subjective?
13     A. You know, again, there's a difficulty in how
14  that's measured. A lot of times disciplinary problems
15  don't make it to the point of being recorded.
16     Q. What would make it objective?
17     A. Again, you're kind of asking me to speculate.
18     Q. Okay. Well, let's say if you have a --
19         COURT REPORTER: Just a minute.
20  BY MR. FARRIS:
21     Q. All right. We were talking about discipline.
22     A. Uh-huh.
23     Q. If the criteria is whether someone has a
24  suspension on the record or not, would that be an
25  objective criteria?

## Page 116

1      A. Seems to me it might be considered as such.
2      Q. Okay.
3      A. But again, I think you need to -- you need to
4  know more about how those are recorded. Not every
5  disciplinary activity is recorded by supervisors.
6      Q. Okay. But if you -- if that's your criteria
7  and you have one employee that has a suspension and one
8  employee does not, would that be objective?
9      A. I believe so.
10     Q. All right. What about attendance, could that
11  be considered an objective criteria?
12     A. Absolutely it is.
13     Q. What about job related tests?
14     A. Job related tests, if they have been
15  demonstrated to be job related and withstand scrutiny.
16     Q. And then they could be objective; is that
17  correct?
18     A. Well, I don't know if they could be objective,
19  but they could be good indicators.
20     Q. Okay.
21     A. Because, again, what you have is how do you --
22  how do you operationally define these constructs.
23     Q. If a selection procedure is subjective, is it
24  subject to a formal validity analysis?
25     A. Just because of its subjectivity?

## Page 117

1      Q. Well, no. Just if it's subjective, can you do
2  it, a validity analysis on it?
3      A. Oh, absolutely you can.
4      Q. How would you do that?
5      A. How would I accomplish it?
6      Q. Yes.
7      A. There's a number of different ways. I could do
8  -- I could do a content oriented validation or a
9  construct oriented validation.
10         You want me to go through the steps?
11     Q. Well, and let's -- give me an example and then
12  go through the steps. Let's say that -- let's say work
13  ethic is the subjective criteria you're looking at.
14     A. Uh-huh.
15     Q. How would you conduct a formal validity
16  analysis of that criteria?
17     A. Well, how would I look and see if that's a good
18  measure? Is that the question you're asking?
19     Q. Well, yeah. How would you do it?
20     A. What I would do is I would look and see --
21  there's a number -- there is a way to statistically do
22  it. I could look at other acceptable measures of work
23  ethic. See if this related to that in some way.
24     Q. Okay. So it's possible to do that then, to do
25  a validity analysis of that?

30 (Pages 114 to 117)

michael buckley                     Nell McCallum & Associates

## Page 118

1    A. There are some ways to look at those issues.
2    Q. Okay. And you've said before that there are
3  some objective measures used for personnel selection at
4  Nucor Steel Berkeley; is that correct?
5    A. I don't believe I said that. I said there are
6  some objective indicators that are -- there are some
7  subjective indicators.
8    Q. Okay. And you've said that you've never found
9  or rarely have ever found a purely objective system?
10   A. Difficult.
11   Q. Difficult to find?
12   A. Uh-huh.
13   Q. What about in this case, did you find a
14 combination of objective and subjective factors?
15   A. I found a combination of factors which I wasn't
16 really sure how they were put together. It seemed to me
17 as though there were a lot more operating in terms of
18 the weighting of these factors that were easily
19 determined.
20   Q. Did you find that Nucor Steel Berkeley used
21 entirely subjective factors?
22   A. No. I think in some situations then, as I have
23 said in my report, there were some objective criteria
24 thrown in with subjective criteria.
25   Q. Okay. Did the EEOC uniform guidelines forbid

## Page 119

1  the use of subjective selection procedures?
2    A. Do not.
3    Q. Let's go to Page 3 of your report.
4    A. Okay.
5    Q. Yeah, it's that page. You said -- it's the
6  last line of that page.
7    A. Okay.
8    Q. You say, I would suggest that the situation
9  indicated a lack of management controls at many levels
10 which resulted in a drift away from sound human
11 resources management practices; is that correct?
12   A. I did say that.
13   Q. How do you define management controls?
14   A. The -- you know, where is the data? Where is
15 the data is the question. I think that's an important
16 one. Or where is the data kept.
17   Like I saw a lack of management control
18 over any kind of job descriptions or job specifications
19 that when people were asked if they existed.
20   Q. Okay. So what would constitute management
21 control over job descriptions?
22   A. Just knowing where they are, having those --
23 having those accessible.
24   Q. What about if management had been involved in
25 drafting the job descriptions, would that be a form of

## Page 120

1  management control?
2    A. Perhaps.
3    Q. Okay. You still haven't defined management
4  controls. Do you have a definition of it?
5    A. You know, again, I don't think there's a
6  standard definition of it, but how much basic
7  responsibility does management take for the effective
8  management of human resources.
9    Q. Okay. Did the uniform guidelines define
10 management controls?
11   A. Not to my knowledge.
12   Q. Do the uniform guidelines require certain level
13 of management control?
14   A. Not to my knowledge.
15   Q. Are you testifying that there is no management
16 control at all at Nucor Steel Berkeley?
17   A. I'm testifying there that is a lack of
18 management control. I think that there should have been
19 much more control over a lot of the -- a lot of the
20 procedures that were used.
21   Q. Okay. And that's based on your review again of
22 the depositions --
23   A. Of the depositions.
24   Q. -- and the employee handbook?
25   A. Correct.

## Page 121

1    Q. If department managers review candidates for
2  employment selections, would that be a form of
3  management control?
4    A. Say it again. Ask again.
5    Q. If the department managers -- let's say as an
6  example, the beam mill department manager, if he reviews
7  candidates for selection decisions, would that be a form
8  of management control?
9    A. Could be. Could be.
10   Q. If there are training programs that are
11 designed by management for employees, would that be a
12 form of management control?
13   A. I believe that's an empirical question which
14 would best be answered the content of the training
15 program.
16   Q. Okay. But let's say that there is management
17 designs a cross-training program for specific jobs.
18 Isn't there some management controls since they are the
19 ones that designed it?
20   A. That's a smart training activity, I think, as I
21 would describe that. It's not management taking control
22 over a human resource practice at least.
23   Q. What do you mean by smart training activity?
24   A. It's just a good training activity for an
25 organization to engage in.

31 (Pages 118 to 121)

michael buckley                    Nell McCallum & Associates

### Page 122

1    Q. To have managers create a training program?
2    A. No, no, no, no, no. No, no, no, no.
3    Q. Okay. Explain. I'm not sure I understand what
4    you mean.
5    A. Let me go back. Here you ask me -- you need to
6    ask me again.
7    Q. Okay. If there are training programs that were
8    created by management, would that be a form of
9    management control?
10   A. Again, it's all according to what the --
11   according to the content of the training programs.
12   Q. Okay. Would it be some form of management
13   control?
14   A. Could be. Could be. Again, based on the
15   content of the training program.
16   Q. How about if a group meeting is held between
17   the department manager and his supervisors to discuss
18   candidates, would that be a form of management control?
19   A. It's some form of management control, but
20   again, I mean, I -- it's some form of management
21   control.
22   Q. And isn't that what you do, you've said at
23   Oklahoma University you meet with the other
24   professors --
25   A. That's right.

### Page 123

1    Q. -- to discuss --
2    A. That's right.
3    Q. -- the candidates?
4       So that's -- you think that's a sound
5    practice?
6    A. I think it's -- it in conjunction with many
7    other things may be considered a good practice.
8    Q. Okay. But what you do at Oklahoma University
9    when you meet with these candidates together, you
10   consider that to be part of a sound selection procedure?
11   A. When we meet with the candidate?
12   Q. No. When you meet together to discuss
13   candidates?
14   A. I do.
15   Q. Okay.
16      VIDEOGRAPHER: I have 30 seconds left on
17   this tape.
18      MR. FARRIS: Okay. We'll go ahead and
19   switch it.
20      VIDEOGRAPHER: Off the record at 10:32 a.m.
21   Ending Tape 2.
22      (Recess from 10:32 to 10:34 a.m.)
23      VIDEOGRAPHER: On the record at 10:34 a.m.
24   Starting Tape 3.
25   BY MR. FARRIS:

### Page 124

1    Q. We were talking about management controls,
2    Dr. Buckley. What about panel interviews in which
3    managements participates, would that be a form of
4    management control?
5    A. No, it's a good human resources practice.
6    Q. But it's not a form of management control?
7    A. No.
8    Q. Why is that?
9    A. I just don't -- I mean, again, it's a good
10   human resource practice.
11   Q. Well, what would you say then is a form of
12   management control?
13   A. Written policies and adherence to those
14   policies. Written policies by management.
15   Q. That's one form of management control?
16   A. That's one form of good management control.
17   Q. Okay. Do you have any other examples?
18   A. I think that's a good one, written policies and
19   adherence to it.
20   Q. That's the whole example that you can --
21   A. It's not the only example, but I think it's a
22   -- you know, management -- well --
23   Q. What about like safety meetings, for instance,
24   where a manager is in charge of a safety meeting, would
25   that be a form of management control?

### Page 125

1    A. That's a good -- that's a good human resource
2    activity.
3    Q. But not a form of management control?
4    A. A form of management control is the collection
5    of data. The dissemination of data, written policies,
6    ensuring adherence to written policies.
7    Q. So what if they have a -- management has
8    designed a written policy on safety, would that be a
9    form of management control?
10   A. I believe so, yeah.
11   Q. Okay. Let's talk about on your report --
12   A. Sure.
13   Q. -- Page 5.
14   A. Sure.
15   Q. And it's the very last sentence on the page and
16   going into the next page.
17   A. Uh-huh.
18   Q. You said that many managers and supervisors
19   consider a different subset of criteria from among, 1,
20   scores, the number of items missed on written hiring
21   evaluation; 2, work history slash job experience; 3,
22   technical skills; 4, attendance, safety records,
23   disciplinary records, 5, job performance; 6, cross
24   training and/or other job experiences; 7, job skills
25   listed on the job posting; 8, interview results; and 9,

32 (Pages 122 to 125)

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

michael buckley                    Nell McCallum & Associates

Page 126

1   numerous other idiosyncratic factors; is that correct?
2       A.  That's what it reads.
3       Q.  Okay.  Don't these different subsets of
4   selection criteria mean that there are differences in
5   the selection procedures used across the departments?
6       A.  No, not necessarily.  I mean, they could all be
7   used for one or they could -- you know, only a subset
8   could be used for some.
9       Q.  Well, if one is using part and another is using
10  a different part, wouldn't that be a different selection
11  procedure?
12      A.  It's just different factors perhaps in the
13  selection process which would have to be demonstrated by
14  the job analysis.
15      Q.  Okay.  But this -- you're testifying in your
16  report that managers and supervisors considered
17  different subsets of criteria; right?
18      A.  That's right.
19      Q.  Okay.
20      A.  That's right.
21      Q.  So doesn't that mean that they are using
22  different processes?
23      A.  Well, again, my problem with this is just the
24  subjective combination of these factors.  What's more
25  important, a competent job analysis would indicate to us

Page 127

1   which of this information is more important.  They're
2   not all -- they are not all unit weighted.
3       Q.  Okay.
4       A.  They are not all unit weighted.
5       Q.  But as far as department by department, did you
6   find that every department used the same exact selection
7   procedures?
8       A.  I found that there was a lot of subjectivity in
9   how these were used among the different managers.
10      Q.  Okay.  Well, that wasn't really my question.
11          What I was asking is if you found that each
12  department used the exact same set of selection
13  procedures?
14      A.  I don't remember that to be the case.
15      Q.  Okay.  Would you consider the factors that you
16  listed in this selection from your report to be
17  important factors to consider in making promotions
18  decisions?
19      A.  They may well be if demonstrated by job
20  analysis.
21      Q.  Okay.  So let's say scores on a written hiring
22  evaluation, that could be considered something important
23  to look at?
24      A.  Given the appropriate set of circumstances.
25      Q.  Okay.  What about work history and job

Page 128

1   experience?
2       A.  Given the appropriate set of circumstances.
3       Q.  And work history and job experience is
4   something that you've used as a criteria --
5       A.  It is.
6       Q.  -- at the university; correct?
7           Okay.  Technical skills, do you think it --
8       A.  In the right set of circumstances.
9       Q.  Attendance, safety records and disciplinary
10  records, that could be --
11      A.  In the right set of circumstances.
12      Q.  Okay.  And when you say in the right set of
13  circumstances, you mean that if it's -- that it could be
14  important to making a selection decision?
15      A.  If it's demonstrated in the job analysis.
16  Criteria aren't -- criteria aren't by themselves good
17  nor bad, it's how they are used.
18      Q.  Okay.  Job performance, same answer?
19      A.  Uh-huh.
20      Q.  And cross training and/or other job
21  experiences?
22      A.  Uh-huh.
23      Q.  Job skills listed on the job posting?
24      A.  Uh-huh.
25      Q.  Okay.  And then interview results?

Page 129

1       A.  Uh-huh.
2       Q.  Obviously numerous other idiosyncratic factors.
3   I'm not sure exactly what that means.
4       A.  Well, just in one example is gut feeling.  A
5   gut feeling is an idiosyncratic factor that --
6       Q.  Right.
7       A.  -- you know and again, we all have different
8   implicit personality theories.
9       Q.  And you said you saw that gut feeling possibly
10  being used in one department?
11      A.  Well, I saw it in a number of different
12  circumstances.  I can't recall them.
13      Q.  Well, where -- I thought in your report you
14  said it was one person, Paul Ferguson, who said that?
15      A.  Well, it may have been one but I think there
16  were others who said they used some idiosyncratic
17  factors.
18      Q.  But did anyone else say that they used gut
19  feeling?
20      A.  Not gut feeling, no.
21      Q.  Okay.  So other than No. 9, numerous other
22  idiosyncratic factors, numbers 1 through 8 are things
23  that could be under the right circumstances important to
24  making the selections --
25      A.  Under the right circumstances.

33 (Pages 126 to 129)

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

michael buckley                    Nell McCallum & Associates

## Page 130

1    Q. Okay. Have you used any of those factors in
2  the selection processes you've designed for clients in
3  the past?
4    A. Oh, absolutely.
5    Q. You used 1 through 8? Have you used all of
6  them at some point?
7    A. I'm kind of on the spot here. I know I have
8  used some. The ones I have used have been ones that
9  have been demonstrated through a competently conducted
10  job analysis.
11    Q. Well, let's ask. Have you ever used scores on
12  a written evaluations before as a selection criteria?
13    A. Surely.
14    Q. What about work history and job experience?
15    A. Surely.
16    Q. Technical skills?
17    A. Surely.
18    Q. Okay.
19    A. These can all be used.
20    Q. All of them?
21    A. These can all be used.
22    Q. But I'm asking if you've used them in the past?
23    A. If I've used them in the past? Some I have and
24  some I may not have. I'm not much experienced with
25  attendance, safety records, disciplinary records.

## Page 131

1    Q. You're not familiar with those?
2    A. Oh, I know exactly what they are.
3    Q. I mean, I know you're familiar with them?
4    A. Yeah.
5    Q. But you haven't used those in the past?
6    A. No. No.
7    Q. Why in the past have you not used safety
8  records as a selection criteria?
9    A. Haven't had the opportunity to do a selection
10  for a job that was really that had a safety issue
11  associated with it.
12    Q. Okay. So you haven't done selection criteria
13  for an industrial type job before?
14    A. Some lower level mechanical type jobs, but not
15  in a -- not in a steel plant, if that's what you're
16  asking.
17    Q. Well, but just industrial jobs in general,
18  manufacturing jobs, let's say?
19    A. No.
20    Q. Okay. And when you said lower level mechanical
21  type jobs, what were those?
22    A. Just tree planters, entry level position.
23    Q. For what kind of company?
24    A. Oh, gosh. This was in Washington State many
25  years ago. I just developed a little selection program

## Page 132

1  for the electric company there, WOPS, I think was their
2  -- was their acronym.
3    Q. Okay. Have you done any job analyses for
4  industrial clients in the past?
5    A. No.
6    Q. Have you done any job analyses for steel
7  clients in the past?
8    A. Have not. Have not.
9    Q. Have you done any job analyses for
10  manufacturing clients in the past?
11    A. Some, not a whole lot.
12    Q. Do you remember what the examples were?
13    A. I don't, but I remember, you know, as a
14  graduate student doing some for diversified products in
15  Opelika, Alabama.
16    Q. Before you went to school and became a
17  professor, did you ever work in a industrial or
18  manufacturing environment?
19    A. I did work for a very short period of time in a
20  factory.
21    Q. What was that? What kind of factory was that?
22    A. Oh, gosh. It was a lock company in California,
23  but it wasn't the kind of work which I was cut out for.
24  It was much too difficult.
25    Q. Hopefully none of us are.

## Page 133

1    A. Much too difficult for me so....
2    Q. What were you doing there?
3    A. I pulled a series of -- I pulled a pallet of
4  ingots from Point A to Point B and repeated.
5    Q. That does sound fascinating.
6    A. It was -- it was using a lot my skills so....
7    Q. Okay. We've talked about objectivity of some
8  of these factors, but the factors 1 through 8 in your
9  report, under the right circumstances could any of those
10  found to be objective?
11    A. Under the right circumstances, yes; but again,
12  interview results are not objective. I mean, there's a
13  difficulty in coming to an objective interview decision.
14    Q. Okay. That one was No. 8.
15    A. Right.
16    Q. What about -- we'll just go through them. What
17  about scores on written hiring evaluation, could that be
18  under the right circumstances found to be objective?
19    A. It would be difficult. Again, because that
20  whole issue of inferred constructs. Do we measure this
21  the same way, does mechanical skill mean the same to you
22  as it does to me.
23    Q. Okay. So it's possible that could be
24  subjective then?
25    A. Possible.

34 (Pages 130 to 133)

michael buckley                    Nell McCallum & Associates

---

**Page 134**

1  Q. Okay. What about work history and job
2  experience?
3     A. Probably objective.
4  Q. Probably objective?
5     Technical skills.
6  A. Objective -- well, again, it's all according to
7  how they are measured, what do you give a person to test
8  and if I say your -- well, it's all according to how
9  they were measured whether they could be determined to
10 be objective or not.
11 Q. So it could be subjective or objective?
12 A. That's right.
13 Q. Technical skills?
14 A. That's right.
15 Q. And then No. 4, attendance, safety records and
16 disciplinary records. I think we have kind of gone over
17 that.
18 A. Yeah, attendance is pretty much a slam dunk.
19 But safety records and disciplinary records oftentimes
20 have problems that people don't keep those closely or
21 don't -- you know, what I consider a safety violation is
22 not considered a safety violation by you.
23 Q. Job performance, No. 5, objective or
24 subjective?
25 A. Job performance is a truly subjective

---

**Page 135**

1  indicator --
2  Q. Okay.
3  A. -- so....
4  Q. And you said you've used that indicator
5  previously?
6  A. Sure have.
7  Q. Okay. Cross training and/or other job
8  experiences?
9  A. You know, probably there is some objective
10 measure -- objectivity there.
11 Q. Okay. And then last one before interview
12 results, which you said is probably subjective is that
13 job skills listed on the job posting, is that objective
14 or subjective?
15 A. You know, again, all according to how they are
16 measured. All according to how they are measured.
17 Q. Okay. So there is no way to just look at job
18 skills and tell whether it's objective or subjective?
19 A. No. Again, it's all according to how they are
20 measured.
21 Q. And what do you mean by it's according to how
22 they are measured?
23 A. Well, again, how they were operationalized.
24 How they are operationalized.
25 Q. How would you make it objective?

---

**Page 136**

1  A. A difficult question. Difficult question. If
2  I did that, I would write the book and make millions,
3  but a difficult issue, I think, in terms of, you know,
4  what are the skills that determine, what is the adequate
5  measure of these skills. I think the crux of the issue
6  is there's a measurement issue, how do we measure
7  constructs, how do we measure things.
8  Q. Have you done that before for a client or
9  Oklahoma University --
10 A. Have I --
11 Q. Have you had to factor such as for job skills
12 listed on a job posting or an application?
13 A. Not that I can remember. Not that I can
14 remember. Job skills meaning something you do with your
15 hands or something or not the kind of work that I'm
16 typically involved in with my duties at Oklahoma.
17 Q. You never mention Dr. Bradley or Dr. Fox's
18 statistical report in this case in your report; is that
19 correct?
20 A. Yeah, I wasn't asked to -- wasn't asked to come
21 to a conclusion about that.
22 Q. But you said you have read it?
23 A. I've looked through it.
24 Q. And was it after you drafted your report?
25 A. It's after I drafted my report.

---

**Page 137**

1  Q. Okay. So you didn't rely on their report in
2  drafting your report?
3  A. Did not. Did not.
4  Q. Did you independently verify any of their
5  statistical findings?
6  A. Wasn't asked to.
7  Q. Okay. Do you consider yourself an expert in
8  the type of statistical analyses they have conducted?
9  A. I have some expertise in that area. I think
10 I'm fairly well trained through with my education at
11 Auburn University in statistics.
12 Q. Okay. What kind of statistics training did you
13 receive?
14 A. Stigometric theory, univariate, multivariate
15 statistics, yeah.
16 Q. And you've said before you don't have an
17 opinion as to whether there's a statistically
18 significant adverse impact in this case?
19 A. Haven't been asked to make that judgment.
20 Q. Do you disagree with -- I don't remember if you
21 said you had read Dr. Welch's report?
22 A. I haven't read it.
23 Q. You have not. Okay.
24 A. Have neither received it nor read it.
25 Q. Okay. Isn't it true that the uniform

---

35 (Pages 134 to 137)

michael buckley                           Nell McCallum & Associates

## Page 138

1  guidelines only require validation studies if an
2  employer's practice cause an adverse impact?
3      A. According to my readings.
4      Q. So if there is no adverse impact, there is no
5  requirement that it be validated?
6      A. It's always good practice to have validated
7  selection instruments. And the guidelines basically
8  suggest that you should have validated selection
9  instruments in the event that something is challenged.
10     Q. But there is no absolute requirement that you
11 do it unless there's adverse impact?
12     A. My reading of the guidelines is that there is
13 no absolute, but that they suggest it's good data to
14 collect.
15     Q. Okay. Are you familiar with the four-fifths or
16 80 percent rule contained in the uniform guidelines?
17     A. Sure, I am.
18     Q. As a professional in industrial and
19 organizational psychology, have you ever relied upon the
20 80 percent rule to reach your professional conclusion?
21     A. I've looked at it in a different number of
22 hypothetical examples and classes --
23     Q. Okay.
24     A. -- to see how it -- to try to get students to
25 show how it works.

## Page 139

1      Q. Have you ever relied on it in a paper that you
2  have written?
3      A. You know, you're testing my memory. The paper
4  I wrote earlier in my career was a lot about legal
5  issues. I just don't remember the minutia of it.
6      Q. What about your -- you've written a lot of
7  journal articles I see from your CV?
8      A. Uh-huh.
9      Q. Did you rely on the four-fifths rule in any of
10 those articles?
11     A. None that -- no. No. No. None that I can
12 recall.
13     Q. Have you ever done any kind of demographic
14 studies?
15     A. Explain that more. What do you mean?
16     Q. We'll like using census data, for instance,
17 have you ever conducted any type of --
18     A. Yeah, stock analysis or something like that
19 or --
20     Q. Well, like availability analyses?
21     A. No, never had to, but I do use demographic. I
22 just finished a paper on relational demography in
23 interviewing -- in panel interviewing.
24     Q. Explain that.
25     A. It just means that the -- racial

## Page 140

1  composition of a panel, does that have a influence on
2  the decision that's made -- on the interview decision
3  that's made by that panel.
4      Q. So have you ever used census data in any way in
5  your --
6      A. Just a look at SMSA data in terms of
7  statistical metropolitan -- I forget what the acronym
8  means.
9      Q. Right.
10     A. You know, look at jobs in the area,
11 availability of people in the area, those kinds of
12 things. I have looked at those. Not in papers, but
13 I've looked at those in terms of my professional duties.
14     Q. Have you -- you said that you have some
15 statistical training?
16     A. Uh-huh.
17     Q. Have you ever used census data in relation to
18 any statistical study you conducted?
19     A. Not the type of data that I do -- type of
20 research that I do.
21     Q. Do you have any opinion as to whether it's a
22 sound practice to use census data and statistical
23 analyses?
24     A. It appears to me the question -- that it could
25 be used in appropriate situations.

## Page 141

1      Q. What would be inappropriate?
2      A. You know, I would -- you would have to give me
3  a situation and I would determine whether I thought that
4  was appropriate or not.
5      Q. Okay. What variables will you consider to be
6  important when conducting a demographic study using
7  census information?
8      A. What variables?
9      Q. Right.
10     A. It would seem to me the -- I'm sorry.
11 Basically the representation of different population
12 subgroups.
13     Q. The -- I'm sorry. The --
14     A. The representation of different population
15 subgroups.
16     Q. What about, you know, what counties you use,
17 would that be an important variable to look at?
18     A. Probably in some instances.
19     Q. What about job categories within the census
20 data, would that be important to examine?
21     A. I don't understand the question.
22     Q. Census data, as you know, I'm sure can be
23 broken down by job category; is that correct?
24     A. I'm not familiar enough with it to know that.
25     Q. Okay. So you're not familiar with the census

36 (Pages 138 to 141)

michael buckley                          Nell McCallum & Associates

---

**Page 142**

1  data on --
2          MR. WIGGINS: Occupational data.
3  BY MR. FARRIS:
4      Q. Are you familiar at all with that, with the
5  occupational data?
6      A. Probably not.
7      Q. Occupational codes?
8      A. No. Well, it's some but not much.
9      Q. Okay.
10      A. You know, again, not a big -- not a big area of
11  my research interest.
12      Q. What is your definition of an unstructured
13  interview?
14      A. An unstructured interview.
15      Q. Uh-huh.
16      A. An unstructured interview. I believe there is
17  fairly standard definitions of it. An unstructured
18  interview is where there is no agenda. You just go and
19  talk about whatever comes to mind.
20      Q. Okay. Did you review any deposition testimony
21  in this case in which managers or supervisors stated
22  that they had used written interview questions?
23      A. I think I did. I think it was in the Bell
24  deposition, if I remember correctly, but I'm not sure.
25      Q. Do written interview questions create some

---

**Page 143**

1  structure in the interview process?
2      A. If they are -- if -- they sure do. I mean,
3  there is -- a structured interview is an interview where
4  there's a definite set of questions that are asked of
5  all candidates.
6      Q. Did you review any deposition testimony in this
7  case that demonstrates structure in the interview
8  process at Nucor Steel Berkeley?
9      A. I think -- I think in some instances there was
10  some -- there was some structure. But, yes, I think in
11  some instances there was some structure.
12      Q. Can you recall any specific examples?
13      A. I'm trying to remember because I had written
14  something down here. You know, in Dr. Jeanneret's
15  report, he talked about the Bell definition -- the Bell
16  deposition. I'm sorry.
17          My issue with this is there is -- there is
18  no -- there is no writing down of questions anywhere.
19  You know, there has -- there needs to be some writing
20  down of questions, I believe, for it -- for this. The
21  reason why I believe is because without that written
22  down or some agreement on what the questions are,
23  there's a lot of room for some interpretation. If I was
24  to tell this gentleman something in his ear, so and so
25  about X and have him pass it on to everybody else, by

---

**Page 144**

1  the time it gets around the room, the message is a real
2  not -- is a quite a lot different.
3      Q. So if you write down the interview questions,
4  that creates some structure in the process?
5      A. Well, if they are written down and they are --
6  and the same questions are asked to the same -- to the
7  individuals.
8      Q. Okay. So, in that case, there would be
9  structure in the interview process if they are written
10  down and all the same questions are asked of each
11  individual?
12      A. That's right. That's right.
13      Q. Okay. What about if after the interview is
14  over and the supervisors get together and discuss the
15  results of the interviews, would that lend some
16  structure to the process?
17      A. Well, interesting that you would ask that
18  because an article that Dr. Jeanneret cited Campion, et
19  al in '97. Basically what their group is moving toward
20  an element of structure is the inclusion of panels -- is
21  the inclusion of aggregation of data so....
22      Q. What do you mean by a panel?
23      A. A panel interview, an interview done by -- you
24  know, when people get together and discuss the --
25      Q. Well, by a panel interview, do you mean you

---

**Page 145**

1  have three people in one room interviewing one
2  candidate?
3      A. Three people at one time, but it's more than
4  that.
5      Q. Well --
6      A. It's more than that.
7      Q. What else would it be?
8      A. Then there is some discussion about some of the
9  -- some of the issues that are involved.
10      Q. You're talking about after the actual interview
11  is done?
12      A. Yes. Oh, yes.
13      Q. Okay. You're definition of a panel interview
14  then is you have to have more than one person conducting
15  the actual interview?
16      A. Absolutely. In fact, some recent research
17  talks about how four is a good number.
18      Q. Okay. And if you do something along those
19  lines then you have a more structured interview process
20  you would say?
21      A. No. But you have a better -- you have a better
22  interview process, I believe. I think a woman named
23  Pulakos has done some research and she says that it's
24  important to have issues discussed after the interview
25  because it reduces -- it increases the accountability of

---

37 (Pages 142 to 145)

michael buckley                    Nell McCallum & Associates

Page 146

1  the interviewers and, in addition, leads to more
2  accuracy in interview decisions.
3      Q. Okay. So you're talking about then the
4  discussion after the interview?
5      A. Yes.
6      Q. Okay. So if you do that kind of discussion
7  after the interview --
8      A. Both. I mean, the panel interviews both. It's
9  the panel interviewing with more than one person at one
10 time and the discussion afterwards that --
11     Q. Okay. But there are two separate things;
12 right? I mean --
13     A. They are. They are separate things that are
14 considered in the panel.
15     Q. Okay. And both of those parts of that process
16 would create more structure in the interview process?
17     A. I think they are helpful in terms of the
18 structure.
19     Q. Okay.
20     A. They're items in addition to structure that
21 should be considered.
22     Q. And you -- what would those items be?
23     A. Well, there again, a panel interview should be
24 -- I think what we're -- my reading of the literature
25 indicates to me that I think most people would agree and

Page 147

1  I consider myself, frankly, an expert on interviewing.
2  That I would think that most people would say that the
3  most optimal form of interviewing now is a structured
4  panel interview.
5      Q. Okay. How often do you see a structured panel
6  interview process in the clients that you represent?
7      A. Not very often at all.
8      Q. And is it required under the uniform
9  guidelines?
10     A. Not -- only under competent human resource
11 practice, in my opinion.
12     Q. Okay. But it's not specifically required by
13 the guidelines?
14     A. I don't believe they address that.
15     Q. And at OU do you do a panel interview?
16     A. We sure do.
17     Q. For every candidate that comes in?
18     A. For the candidates who come for faculty
19 positions, yes.
20     Q. Okay. What about for the administrative
21 positions, do you conduct panel interviews?
22     A. We do, in fact.
23     Q. For in each instance?
24     A. In my experience, it's only been one. I mean,
25 I've only hired one clerical person over the years.

Page 148

1      Q. And how did you conduct the interview in that
2  situation?
3      A. Three of us on a committee talked and asked a
4  predetermined group of questions to a number of
5  different candidates then afterwards discussed -- after
6  each of those interviews, discussed the candidate then
7  got together and discussed the overall -- the entire
8  group of candidates.
9      Q. Okay. And do you think that was a sound human
10 resources practice?
11     A. I think it's a sound practice, yeah.
12     Q. Have you examined the interview processes used
13 at Nucor Berkeley?
14     A. From what I could see on the depositions,
15 that's all I was able to.
16     Q. That's all you were able to?
17     A. Uh-huh.
18         MR. FARRIS: I want to take a break.
19         VIDEOGRAPHER: Off the record at 10:58 a.m.
20         (Recess from 10:58 to 11:26 a.m.)
21         VIDEOGRAPHER: On the record at 11:26 a.m.
22 BY MR. FARRIS:
23     Q. Okay. Back to the structured interview issue.
24 That's what you were discussing before the break.
25     A. Sure.

Page 149

1      Q. Did you in your review of the deposition
2  testimony see any examples of where Nucor Steel Berkeley
3  used panel interviews?
4      A. I saw -- I saw a couple of examples that I can
5  recall.
6      Q. Okay. Can you have a valid selection process
7  without using panel interviews?
8      A. Oh, absolutely. Absolutely possible, but it
9  needs to be demonstrated.
10     Q. Okay. Could you have a valid selection process
11 without structured interviews?
12     A. The research shows -- I believe -- my reading
13 of the research shows that structure adds to validity;
14 the more structure you have, the better. And, in fact,
15 I would go so far as to say even though Professor --
16 Dr. Jeanneret disagrees with me, that I think a -- that
17 panel interviews can be more valid than even structured
18 interviews. The best alternative is a panel structured
19 interview, I believe.
20     Q. Okay. But can you have a valid selection
21 process without structured interviews?
22     A. Absolutely you can.
23     Q. Okay.
24     A. It's all in the demonstration.
25     Q. Okay. And because panel interviews are the

38 (Pages 146 to 149)

michael buckley                              Nell McCallum & Associates

## Page 150

1  preferred method, you've said, does that mean that all
2  the other forms of interviews are not valid?
3      A. Absolutely not.
4      Q. Okay. Let's talk a little bit about your
5  billing in this case.
6          What is your billing rate in this case?
7      A. $450 dollars per hour.
8      Q. Is that for consulting or for deposition
9  testimony?
10     A. My deposition testimony will be double that,
11  $900 an hour.
12     Q. Okay. What about for courtroom testimony?
13     A. I think it will be a little bit more than
14  that.
15     Q. Okay. Is that the same billing rate that you
16  charge all your clients?
17     A. I do. I do.
18     Q. How much have you billed to date in this case?
19     A. Gosh, the last bill I sent -- and I don't have
20  a copy of it. My apologies. I think it's $13,950 is
21  what I billed.
22     Q. And that's the total so far?
23     A. That's the total that I billed so far, yeah.
24     Q. Was any of part of that, any part of your fee
25  in this case based on the outcome of the case?

## Page 151

1      A. Gosh, no. No. No. Sorry. No. Gosh, no.
2      Q. And who do you send your bills to?
3      A. I sent my bill -- you know, in fact, I don't
4  remember. I think I send them to Ben DeGweck, an
5  associate of --
6      Q. Did you bring your bill today, by the way?
7      A. I didn't. I didn't.
8      Q. Okay. But we could get a copy of it?
9      A. Yeah, absolutely can.
10     Q. Okay. Take us through the typical means of
11  generating income for an industrial psychologist.
12          How would you go about doing that aside
13  from your work as a professor?
14     A. Well, I mean, I don't want to speak to
15  industrial psychologists in general. I'll speak about
16  me.
17     Q. Uh-huh.
18     A. My primary duties are professor at the
19  University of Oklahoma. I'm the JC Penney endowed chair
20  for leadership studies, also professor in the management
21  department, professor in the psychology department. And
22  for me, I typically do $10,000 a year maybe on average
23  consulting. But I don't go out searching for
24  consulting.
25     Q. Okay. You said earlier it's just kind of word

## Page 152

1  of mouth that people call you up?
2      A. Yeah. It's just word of mouth or, you know, a
3  company I'm familiar with or --
4      Q. Is there any particular law firm that you've
5  done more work for than you have for others?
6      A. No, there is not. No, there is not.
7      Q. Your work as a consultant generally, have you
8  been called into situations where there's been an
9  adverse impact found and then it's your job to validate
10  the procedures?
11     A. No.
12     Q. Okay.
13     A. Not typical.
14     Q. What would you describe as the typical type of
15  work you do?
16     A. You know, again, in general, it's just people
17  who know that I have some expertise in human resource
18  management and want to see if I could add some value to
19  their company.
20     Q. You said that you are a professor in management
21  department and the psychology department?
22     A. I am. I am.
23     Q. Are you teaching classes now?
24     A. I do. I do.
25     Q. What do you teach in the management department?

## Page 153

1      A. I teach principals in management.
2      Q. What level of class is that?
3      A. It's a junior level class.
4      Q. Okay. What about in the psychology department?
5      A. I don't have a teaching appointment in the
6  psychology department. My appointment is to mentor
7  their doctoral students.
8      Q. Okay. Mentoring their doctoral students, what
9  kind -- are any of their -- the doctoral students you
10  mentor, are they industrial psychologists?
11     A. They are all industrial psychologists.
12     Q. Okay.
13     A. I am an industrial -- I am -- I have a Ph.D. in
14  industrial psychology.
15     Q. Right. Okay. You have your Ph.D. in
16  industrial organizational psychology.
17          Do you have any degrees in statistics?
18     A. I do not.
19     Q. What is your understanding about how the field
20  of industrial and organizational psychologist view the
21  80 percent rule as a determinant of adverse impact?
22     A. Again, ask me that again so I -- I'm just
23  trying to buy a little time to think here.
24     Q. Sure. Sure.
25          What is your understanding about how the

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

michael buckley                    Nell McCallum & Associates

---

Page 154

1    field of industrial and organizational psychologists
2    view the 80 percent rule as a determinant of adverse
3    impact?
4        A. Yeah. To tell you the truth, I haven't thought
5    of it much. I know there are a number other ways to
6    look at that issue instead of just the 80 percent rule.
7    I have not thought of whether that -- I have not made a
8    personal evaluation whether that's a good thing or not
9    so good thing and I'm not familiar with the discussion
10   that's gone on in the field about it.
11       Q. Okay. So you said you read all the journals
12   and keep current --
13       A. I try to read the journals. But -- I try to
14   read the journals.
15       Q. Okay. But you're not familiar with any
16   articles on that issue?
17       A. No, not in the journals that I looked at.
18       Q. Okay. You said that there are other means
19   besides the 80 percent rule.
20           Is statistical significance one of those
21   means?
22       A. Well, I mean, you look at confidence intervals,
23   you look at a number of other different things, stock
24   analysis. There's just a number of different ways, I
25   think. And which one is better, I just don't know.

---

Page 155

1    That's more for lawyers to decide.
2        Q. Well, isn't statistical significance a
3    preferred method among the -- in the field of industrial
4    and organizational psychologists?
5        A. I believe so. I believe so.
6        Q. And for determining adverse impact?
7        A. I believe so.
8        Q. What about among statisticians, is
9    statistical significance a preferred method for
10   determining adverse impact?
11       A. I'm not sure. You probably have to ask a
12   statistician.
13       Q. Okay. Well, you said you were trained in the
14   field of statistics.
15       A. I make no claim to be a statistician, but I am
16   well trained in statistical areas.
17       Q. Okay. And is -- do you read any journals, any
18   statistical journals?
19       A. No. No, I've not. I do not read psychometrica
20   or those journals because I find they are just formula
21   anymore and not really any impact on statistics. A
22   number of the mainline management journals now have
23   statistical oriented articles in them.
24       Q. So you're just not familiar then with
25   the field of statisticians how they view the 80 percent

---

Page 156

1    rule?
2        A. I think that would be a fair -- a fair
3    evaluation.
4        Q. Okay. Are you aware of the flaws in using the
5    80 percent rule statistically?
6        A. No.
7        Q. So you haven't read any literature at all about
8    potential flaws -- -
9        A. Have not.
10       Q. -- in using the 80 percent rule?
11       A. Have not.
12       Q. Do you know if the 80 percent rule has any
13   basis in psychometrics?
14       A. Do not.
15       Q. You don't know or --
16       A. Do not know. Do not know.
17       Q. And you haven't thought about it yourself so
18   far?
19       A. No. I think of other things.
20       Q. All right. Here's a hypothetical question for
21   you. Let's say you're hired by one of your clients to
22   do some consulting work for them and you're hired to
23   conduct an adverse impact study on promotions decisions.
24           In that example, if you have the
25   availability of census data or internal company data on

---

Page 157

1    selections, which set of data would you use?
2        A. I think frankly if you have -- if you have
3    both, I would use both.
4        Q. You would use both?
5        A. If you had both, I would use both.
6        Q. Okay. Why would you use both?
7        A. Well, I think, again, I think one of the
8    mistakes we make in behavioral sciences is we can't rely
9    on single course data. Can't rely on single source
10   data.
11       Q. So you think that external census data would be
12   just as accurate to use as the actual data on the
13   promotion decisions that were made in the company?
14       A. Well, again, I mean, it's an empirical question
15   given the case. You're asking for a hypothetical. I
16   don't know a lot of the background of it.
17       Q. Would it be your practice commonly to use
18   census data when you have available to you actual
19   promotions data from within a company?
20       A. Again, my judgment would be that the actual
21   promotion data in the company would be more important.
22       Q. You talked earlier about the concept of
23   implicit personality --
24       A. I did.
25       Q. -- when you were talking about subjectivity?

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

michael buckley                    Nell McCallum & Associates

Page 158

1    A. I did.
2    Q. How does daily contact influence the implicit
3  personality issue?
4    A. Well, I think -- again, just to reiterate, what
5  implicit personality theories are we all have a
6  different idea of what constitutes good and bad
7  behavior. What's acceptable and what's not, what's good
8  and what's not so good. I would think the more -- the
9  more exposure you have to people, the more those are
10  shown to either be correct or incorrect.
11        You've been around professors a lot as a
12  person who has a relatively scholarly past in terms of
13  your law training. You know what a good professor is.
14  You didn't know that when you first got there, but after
15  you went through your seven or eight years, you probably
16  had a good idea what a good professor was.
17    Q. When you mentioned Fisk -- is that correct?
18    A. Fisk -- I don't think I mentioned Fisk.
19    Q. Fisk research? You didn't mention Fisk? Okay.
20    A. No, no, no. Who I mentioned and -- yes, Susan
21  -- that's right, Susan Fisk. That's right.
22    Q. Okay.
23    A. That's right. Susan Fisk, I think her name is.
24    Q. Do you know what her conclusions were regarding
25  the influence of daily contact on implicit personality

Page 159

1  issue?
2    A. I don't. I wouldn't hazard a guess.
3    Q. Okay. What about her conclusions regarding
4  individuating information?
5    A. Individuating information? I'm not sure I
6  understand what that means, but I believe I feel more
7  comfortable if you asked her.
8    Q. Okay. Well, the base question, doesn't the
9  Fisk research show that when you have individuating
10  information such as the daily contact information that
11  stereotypes tend to go away?
12    A. Yeah. That I'm not sure of. That I have not
13  read so --
14    Q. Okay. Are you familiar with the use of the
15  position analysis questionnaire, the PQA -- PAQ, rather?
16    A. PAQ, somewhat. Some. Some.
17    Q. Have you ever used it before?
18    A. Have not. Have not. But every -- every
19  graduate student must admit that they had some exposure
20  to it.
21    Q. But you have never used it in any --
22    A. Have not.
23    Q. -- job analysis in the past?
24    A. Have not.
25    Q. Have you seen it used by others in job

Page 160

1  analysis?
2    A. I've read about it being used and how it's been
3  used and -- but that's my exposure. That's the extent
4  of my exposure to it.
5    Q. What do you use rather instead of the PAQ for
6  your job analysis?
7    A. Well, there is number of different -- different
8  options. The one that I've been -- I think is the best
9  or not the best. The best is bad. The one that I think
10  that I have been more particularly wanted to use is
11  something called Functional Job Analysis by Sydney Fein,
12  I think his name was. I'm not sure. But he talks it.
13        In fact, there is a fourth category that's
14  been added. Data, people, things, and now, information.
15  You know, what's a person's relation to data, people or
16  things.
17    Q. And that's what you typically use when you
18  conduct a job analysis?
19    A. Well, that's what I believe is one of the
20  better methodologies. I use different methodologies.
21  There is different ways to collect job analysis
22  information. There is not one job analysis technique.
23    Q. Okay. Do you have any opinion as to whether
24  the PAQ is a good job analysis technique?
25    A. You know, that's -- again, I would imagine it's

Page 161

1  been around for a long time so a lot of people probably
2  think quite highly of it -- quite complimentary.
3    Q. Are you familiar with the Onet?
4    A. I'm a little bit familiar with that. I know
5  there's been a couple articles in Personnel Psychology
6  about it, but I just -- I haven't looked at them.
7    Q. Okay.
8    A. I believe you might should ask Professor --
9  Dr. Jeanneret. I think he's had a lot more to do with
10  that.
11    Q. Do you have a general description of what the
12  Onet is?
13    A. Do not. Do not.
14    Q. Are you familiar with ISO-9000 job analysis?
15    A. Well, I don't think it's job analysis. I think
16  ISO are performance standards, aren't they? They are
17  not job analyses, I don't think.
18    Q. Is that how you would describe them?
19    A. That's how I describe ISO type issue -- you
20  know, the ISO -- I mean, there has been so many numbers
21  -- there have been a couple numbers over time. I look
22  at the Moore's performance standards not his job
23  analysis.
24    Q. Have you used ISO-9000 before?
25    A. Have not. Have not.

41 (Pages 158 to 161)

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

michael buckley                    Nell McCallum & Associates

---

### Page 162

1    Q. If you had done work in the past in a more
2  industrial manufactured environment, do you think you
3  would have had more cause to use the ISO-9000?
4    A. I think -- you know, frankly, it's probably one
5  piece of the puzzle -- a rudimentary piece of the
6  puzzle. It gives you standards and benchmarks. It
7  doesn't give you anything about the criticality of the
8  job or how you determine that.
9    Q. You described it as rudimentary. What do you
10  mean by that?
11    A. I think it requires a lot more supplementary
12  information to be useful.
13    Q. What does ISO-9000 contain?
14    A. Again, I don't present myself as an expert on
15  that. I always think of it as a bunch of different
16  performance benchmarks.
17    Q. Okay. So you're not --
18    A. Just standards, not -- not really descriptors
19  of the job, just standards.
20    Q. Have you looked at examples of ISO-9000 before?
21    A. Not to a great extent.
22    Q. Okay. But you still think it's just kind of a
23  rudimentary --
24    A. Yeah. I mean, that's how I would describe it.
25    Q. What are you basing that on if you haven't

---

### Page 163

1  looked at --
2    A. Based on --
3      MR. WIGGINS: Object to form.
4      Go ahead.
5    A. Based on what I think about the -- it is. And
6  I think to my best recollection, it's more standards
7  than just straight forward job analysis information.
8  BY MR. FARRIS:
9    Q. What kind of -- did you ever receive any kind
10  of training on the ISO-9000?
11    A. Have not. Have not.
12    Q. Is it appropriate for people in industrial
13  engineering to perform job analysis in industrial jobs?
14    A. Absolutely.
15    Q. Ask you about another name you mentioned --
16    A. Yeah, please.
17    Q. -- earlier. Either Dr. or Professor Bernardin?
18    A. Bernardin.
19    Q. Bernardin?
20    A. Bernardin.
21    Q. And --
22    A. Wonderful man.
23    Q. What were Bernardin's conclusions on
24  subjectivity in performance appraisals with regards to
25  race?

---

### Page 164

1      Are you familiar with his research there?
2    A. You know, I'm trying to think about it. You
3  know, I just -- you must be able to tell from my vitae.
4  I'm a Bernardin student. In fact, I talked -- I seen
5  Professor Bernardin within the last three weeks.
6      Most of his articles that I'm familiar with
7  are the training of people to facilitate the accuracy
8  with which performance evaluation is done. Now, give me
9  the -- give me the specific article in question and I'll
10  try to remember it because I am familiar -- mostly
11  familiar with his work.
12    Q. I'm not sure that I have the specific article
13  but --
14    A. Well, if you can give me the citation, I'll
15  read it and I'll tell you what I think. John's a person
16  -- and I'll call John and tell you what he thinks.
17    Q. Have you been critical of some of his work in
18  the past or have you --
19    A. Professor Bernardin, I think, is one of the
20  most important scholars in human research management in
21  the country. Have I been critical of his work? We --
22  he's talked about my work and I've talked about some of
23  his work as maybe not optimal, but he kind of laughs at
24  a thing or two that I've done but he's still a wonderful
25  scholar.

---

### Page 165

1    Q. Have you read any of his conclusions on the
2  influence of subjectivity in leading to discrimination?
3    A. No, I have not. No, I have not.
4      MR. WIGGINS: Object to -- I want to object
5  to form on the last question, but go ahead.
6  BY MR. FARRIS:
7    Q. Are you familiar with the research of Arvy and
8  Murphy?
9    A. And Kevin Murphy. Again, give me the article.
10    Q. I don't have an article. I'm just asking if
11  you're familiar with the research of those two
12  individuals?
13    A. I'm familiar with some of it. More, in terms
14  -- Rich Arvy, I think, of more in terms of some job
15  satisfaction research he's done in the last couple years
16  in terms of job satisfaction being a genetic type
17  variable. I'm just not --
18    Q. Well, they've -- I don't have a specific
19  article, but they've made some conclusions on
20  performance appraisal systems and subjectivity.
21      Are you familiar at all with that work?
22    A. I'm not. I'm not.
23    Q. Okay. You said earlier that you had written an
24  article on the legal aspects of discrimination?
25    A. Yeah. It was -- it was an article a long time

---

42 (Pages 162 to 165)

michael buckley                    Nell McCallum & Associates

---

**Page 166**

1  ago and I'm not sure if it ever got published. I kind
2  of lost track of it. I know it got accepted by a
3  journal called Public Personnel Management, but I don't
4  think -- I'm not sure it ever came out to be real honest
5  with you. I think Professor Bernardin -- it was when I
6  worked with Professor Bernardin. And he -- he may have
7  well have -- again, I haven't thought about it for
8  years. He may have pulled it out of retirement -- out
9  of that cycle for them because he then did a personnel
10 psychology article on the legal issues surrounding
11 performance evaluation.
12     Q. Uh-huh.
13     A. So that may be what happened to it. I'm not
14 sure it's available to be honest.
15     Q. So it was Public Personnel Management was the
16 journal?
17     A. That's right.
18     Q. Do you recall how long ago it was?
19     A. Oh, gosh. This is early Eighties.
20     Q. Early Eighties.
21        Okay. If it's not available through them,
22 is there any other source we could get a copy of that?
23     A. I can't imagine.
24     Q. You wouldn't have a copy of it --
25     A. I can't imagine where it would be around.

---

**Page 167**

1      Q. -- somewhere?
2      A. No. It was about performance appraisal in
3  police organizations and legal issues associated with
4  that. It wasn't -- it wasn't my finest work so....
5      Q. What about Dr. Bernardin, would he have a copy?
6      A. I can't imagine he would. He's a majorly -- a
7  major caregiver now not a --
8      Q. Okay.
9      A. He's a -- his scholarly pursuits are limited.
10     Q. What issues did you discuss with Mr. Wiggins
11 today before your deposition?
12     A. Just kind of what I could expect in terms of --
13 you know, because I've never done this before. He just
14 said tell the truth. You know, just be -- be
15 comfortable, be yourself, and that's what I've tried to
16 be.
17     Q. Did you discuss Dr. Jeanneret's report at all?
18     A. Just a little bit. Not a whole lot. Not a
19 whole lot. I'm trying to -- any of the things that we
20 -- you know, I just -- some of the things that we
21 disagree upon, I think I may have brought them up to
22 Mr. Wiggins.
23     Q. What were some of those items?
24     A. Well, I think that one of the things that
25 Dr. Jeanneret had said which I think is really important

---

**Page 168**

1  is that Nucor wouldn't have a stake in hiring people who
2  weren't the best people. And that's -- you know, I
3  don't think that's an issue here. I mean, that's not an
4  issue of importance here. Motivation is not the issue.
5  Intent is not the issue. It's -- it's more an issue of,
6  you know, what the impact has been. So that was -- that
7  was one thing. I think there are -- there are some
8  others if you would like me to go through.
9      Q. Sure.
10     A. I'm not sure if --
11     Q. Let me ask you about the last thing. You
12 said --
13     A. Yeah.
14     Q. -- intent is not the issue. What did you mean
15 by that?
16     A. Well, it's -- you know, one of the things --
17 intentional -- it's not important to be -- to
18 demonstrate any kind of intentional discrimination. I
19 mean, intent is not the issue. What we intend to happen
20 or how motivated we are to hire good people. It's
21 whether our selection procedures are such that they can
22 be validated to have hired the -- you know, to be solid
23 selection devices.
24     Q. So you haven't looked at intentional
25 discrimination in this case?

---

**Page 169**

1        MR. WIGGINS: Object to form.
2      A. No, I have not been asked to do that.
3  BY MR. FARRIS:
4      Q. Okay. Did you discuss Dr. Jeanneret's
5  compendium at all before today's deposition?
6      A. The only thing that we discussed was that
7  because I said to Mr. Wiggins that I got part of it. I
8  left -- I left my office at about 11:00ish or something
9  like that to make sure I got to the airport on time.
10 And I was told another group was coming. So I got some
11 of them and I looked at them, but -- and I certainly
12 didn't have enough time to come to any kind of
13 conclusion about those.
14     Q. Okay.
15     A. I did notice the date was a little bit -- you
16 know, kind of a --
17     Q. You said you had a few other issues that you
18 wrote down that you talked about?
19     A. Well, I don't know if we talked about them, but
20 I think there are some issues that -- you know, that
21 I've got with the report done by Dr. Jeanneret. He
22 wants to talk about how I -- you know, how I don't ask
23 for information. And again, I believe the affirmative
24 obligation rests with y'all to provide data to the
25 plaintiffs' attorney. You know, I shouldn't be expected

43 (Pages 166 to 169)

michael buckley                    Nell McCallum & Associates

Page 170

1  to ferret out the data. I mean, the scientific process
2  is not me finding out the data, it's simply presenting
3  the data and me kind of trying to refute it or look at
4  it.
5          You know, complete control, we have a
6  difference of opinion on what control is. I look at
7  control as data keeping and record keeping. In my
8  opinion, there has been no real monitoring of the
9  process. You know, Professor -- I'm sorry. I'm sorry,
10 Dr. Jeanneret. I keep wanting to call you professor.
11 I'm so sorry.
12         MR. JEANNERET: I'm a professor, too.
13 That's okay.
14         THE WITNESS: Okay. I'm so sorry.
15 A.  You know, it talks about how -- I'm trying to
16 think. Gosh, consistency with an applicant. And I'll
17 give you a copy of all of this.
18         Again, I didn't look at job analysis
19 information. I don't believe it's my obligation. I
20 believe you have an affirmative obligation to provide
21 that data. You know, the whole subjective issue is --
22 and I think if we were to talk, and I don't want to talk
23 for Dr. Jeanneret, but we probably agree with this. You
24 know, you want to reduce subjectivity in evaluation, of
25 course, people make subjective decisions, but in the

Page 171

1  absence of management direction -- in the absence of
2  direction, there's a lot more -- there's a lot more
3  subjectivity that becomes involved. And I think that's
4  -- that's an important issue.
5          Oh, my. Oh, my. You know, and again, I
6  didn't take the opportunity to review the tests that
7  were used in the process and I think, you know,
8  Dr. Jeanneret did. He finds the test content to be job
9  related. Well, I just say that needs to be scrutinized
10 by outside experts. I mean, it just -- you know, and I
11 respect Dr. Jeanneret quite a bit, a well-known
12 individual, but I'm not willing to just because he said
13 it's so. I mean, I think I would like others to
14 scrutinize that data. Gosh. Oh, and again, you know,
15 there is -- well, I mean, I could go on but --
16 BY MR. FARRIS:
17 Q.  That's all right. I just got a couple of
18 follow-ups on that.
19 A.  Yeah. Go ahead. Go ahead.
20 Q.  You said it's not your obligation to ferret out
21 the data from Nucor?
22 A.  That's right.
23 Q.  Do you believe as an expert that you have any
24 obligation to ask for certain data from the attorneys
25 for whom you're consulting?

Page 172

1          MR. WIGGINS: Objection.
2  A.  Well, I believe -- again, I'll just repeat it
3  again. I believe that you all have an affirmative
4  obligation to provide the data.
5  BY MR. FARRIS:
6  Q.  Okay.
7  A.  Not for me to go and get it. I mean, it's
8  not --
9  Q.  Do you have any obligation to get data from the
10 attorney from whom you're consulting?
11 A.  Again, I mean, that's something that you might
12 ask -- that you might ask them. I think the scientific
13 methodology, at least to me, means that I am looking at
14 the reputation of data not the collection of data to
15 kind of refute someone else. I just want to look at
16 their data. I made a career of relooking at other
17 people's data and seeing what -- you know.
18 Q.  But sure. Do you think it's a good practice to
19 rely solely on what the attorneys give you and only
20 analyze that without asking for any additional data?
21 A.  Well, again, I believe that --
22         MR. WIGGINS: Objection. I want to object
23 to that. That's assuming there is additional data, and
24 I think the record will show that your answers to
25 interrogatories there are none.

Page 173

1  BY MR. FARRIS:
2  Q.  Okay. You can go ahead and answer.
3  A.  Again, I'll just repeat what I said. There is
4  an affirmative obligation on y'all to provide that
5  information.
6  Q.  You still haven't answered my question. I
7  understand that. But if Mr. Wiggins had production
8  available to him that could have been helpful, would it
9  not have been something you would have asked about?
10         MR. WIGGINS: Objection to both the
11 assumptions that that question is based upon.
12 BY MR. FARRIS:
13 Q.  So in this case -- and let me just ask one
14 final question.
15         In this case then, you relied solely on the
16 data that was given to you by Dr. Wiggins?
17 A.  I relied solely on the deposition that was
18 given to me -- the data that was given to me.
19 Q.  So you relied solely on information provided to
20 you by the attorneys?
21 A.  That's right.
22 Q.  Okay.
23 A.  That's correct.
24 Q.  You mentioned something on the management
25 direction, management controls that that can lead to

44 (Pages 170 to 173)

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

michael buckley                              Nell McCallum & Associates

Page 174

1  less subjectivity; is that correct?
2      A. I believe so, yeah.
3      Q. Okay. So if you do have some form of
4  management control, it takes some of the subjectivity
5  out of the process?
6      A. It can minimize subjectivity. If there are
7  written policies that are adhered to, if there is record
8  keeping that's paid attention to. Again, what I read, I
9  saw a real lack of record keeping.
10     Q. Okay. But some -- we talked earlier about some
11  of the other forms of management control besides record
12  keeping; isn't that true?
13     A. Absolutely.
14     Q. Okay. So there are forms of management control
15  outside of just record keeping; correct?
16     A. There are. There are.
17     Q. And those other forms of management control
18  outside of record keeping, those also could reduce
19  subjectivity in the process?
20     A. One would think if handled appropriately.
21         MR. FARRIS: Okay. I don't have anything
22  else right now, and we've got some lunch here if you
23  want to eat and we can, you know, talk about whether we
24  have any last questions.
25         MR. WIGGINS: Okay.

Page 175

1          VIDEOGRAPHER: Off the record at 11:52 a.m.
2  Ending Tape 3.
3          (Recess from 11:52 to 12:31 p.m.)
4          VIDEOGRAPHER: On the record at 12:31 p.m.
5  Starting Tape 4.
6  BY MR. FARRIS:
7      Q. Dr. Buckley, are you aware that there were some
8  other lawsuits that were filed by Wiggins Childs against
9  other Nucor facilities?
10     A. You know, I was aware but didn't pay a whole
11  lot of attention to it. It didn't have -- it wasn't
12  concerned with me and what I was to decide.
13     Q. Okay. Did you look at any documents, materials
14  or anything --
15     A. Did not.
16     Q. -- from those cases?
17     A. Did not.
18     Q. Okay. What is the scientific method for
19  studying any phenomena?
20     A. Oh, man. You know, there's a number of
21  different ways to describe it. Basically to me the
22  scientific method means the -- basically the procedure
23  of the presentation and refutation of data. Someone
24  brings their data forward, I bring my data forward. I
25  look at it to either say this is good data or this is

Page 176

1  not such good data. And you know, there is many other
2  aspects to it in terms of how the data is collected.
3  You know, when I look at some things, I look at another
4  research study I look at, I look at how the data is
5  collected, do I think it's good data, do I think it's
6  data that basically gets to the point of what -- that
7  the author of the paper is trying to make, et cetera.
8      Q. Is part of the scientific method to collect
9  data?
10     A. Oh, absolutely. Absolutely.
11     Q. How did you collect data in this case?
12     A. I basically -- I considered the data that was
13  sent to me by the plaintiffs' attorneys.
14         MR. FARRIS: Okay. I don't have anything
15  else.
16         MR. WIGGINS: Okay. Thank you.
17         MR. FARRIS: Are you done?
18         MR. WIGGINS: Yeah.
19         MR. FARRIS: Okay.
20         VIDEOGRAPHER: Ending the deposition at
21  12:33 p.m.
22
23         (DEPOSITION CONCLUDED AT 12:33 P.M.)
24
25

Page 177

1          ORAL DEPOSITION OF
2          MICHAEL R. BUCKLEY
3          CHANGE/CORRECTION PAGE
4
5
6      Please indicate changes on this
   sheet of paper, giving the page and line
7  number, the change and the reason for
   the changes.  Reason for changes
8  are: (1) To clarify the record; (2) To
   conform to the facts; (3) To correct
9  transcription errors.
10
11  PAGE/LINE    CORRECTION         REASON
12  _____    _____        _____
13  _____    _____        _____
14  _____    _____        _____
15  _____    _____        _____
16  _____    _____        _____
17  _____    _____        _____
18  _____    _____        _____
19  _____    _____        _____
20  _____    _____        _____
21  _____    _____        _____
22  _____    _____        _____
23  _____    _____        _____
24  _____    _____        _____
25  _____    _____        _____

45 (Pages 174 to 177)

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

michael buckley                    Nell McCallum & Associates

Page 178

1    I, MICHAEL R. BUCKLEY, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5
6
   _____
   MICHAEL R. BUCKLEY
7
8
9  THE STATE OF _____:
10 COUNTY OF _____:
11   BEFORE ME, _____, on this day
   personally appeared MICHAEL R. BUCKLEY, known to me to
12 be the person whose name is subscribed to the foregoing
   instrument and acknowledged to me that they executed the
13 same for the purposes and consideration therein
   expressed.
14
     Given under my hand and seal of office this
15 _____ day of _____, 20___.
16
17
   _____
   NOTARY PUBLIC IN AND FOR
18 THE STATE OF _____
19
20
21
22
23
24
25

Page 179

1    REPORTER'S CERTIFICATE
2
3    I, Kevin J. Bruzewski, Certified Shorthand Reporter
   in and for the State of Texas, hereby certify that the
4  foregoing testimony was given before me after the
   witness, MICHAEL R. BUCKLEY, was first duly sworn.
5
     I further certify that this deposition was prepared
6  by me or under my direction and is a complete and
   correct transcript of the proceedings and that the
7  original is being given to
   _____, for safekeeping and use
8  at trial.
9    I further certify that I am neither attorney for,
   related to, nor employed by any of the parties to the
10 lawsuit in which this deposition was taken.  Further, I
   am neither related to nor employed by any attorney of
11 record in this cause.  I do not have a financial
   interest in this matter.
12
     SUBSCRIBED AND SWORN to by me on _____,
13 20___.
14
15     Kevin J. Bruzewski, CSR
       Certification No. 3727
16     Expires:  December 31, 2007
17 Firm ID No. 62
   Nell McCallum & Associates, Inc.
18 5300 Memorial Drive, Suite 600
   Houston, Texas  77007
19 (713) 861-0203
20
21
22
23
24
25

46 (Pages 178 to 179)

KEVIN J. BRUZEWSKI, CSR
NELL MCCALLUM & ASSOCIATES, INC.

michael buckley                          Nell McCallum & Associates
                                                          Page 1

---

**A**

**abide** 67:20
**ability** 113:23,23
  114:2,2
**able** 21:22 39:2
  42:22 60:3 87:25
  92:24 108:11
  148:15,16 164:3
**above-styled** 1:21
**absence** 40:5 49:8,9
  94:7 171:1,1
**absolute** 138:10,13
**absolutely** 6:19 9:2
  20:17 29:13,15
  39:19 40:22 41:25
  51:5 70:13 75:21
  93:8 109:23
  116:12 117:3
  130:4 145:16
  149:8,8,22 150:3
  151:9 163:14
  174:13 176:10,10
**academic** 19:15
  51:20 62:14 64:14
  64:15
**Academy** 16:15,15
  69:3
**acceptable** 55:17
  117:22 158:7
**accepted** 166:2
**access** 78:14 95:5
  107:10
**accessibility** 108:22
**accessible** 119:23
**accomplish** 117:5
**accord** 101:1
**accountability**
  145:25
**accuracy** 86:9
  146:2 164:7
**accurate** 157:12
**accurately** 86:11
  87:23
**acknowledged**
  178:12
**acquire** 41:10
**acronym** 132:2

140:7
**act** 28:19 94:16
**acting** 33:11,17
**action** 24:4 55:11
  74:11
**actions** 31:23
**activities** 62:1
**activity** 23:23
  116:5 121:20,23
  121:24 125:2
**actual** 49:2 75:11
  145:10,15 157:12
  157:18,20
**add** 41:15 57:25
  59:1 152:18
**added** 160:14
**addition** 10:13
  146:1,20
**additional** 15:12
  172:20,23
**address** 15:4
  147:14
**adds** 149:13
**adequate** 136:4
**adhered** 174:7
**adherence** 124:13
  124:19 125:6
**admin** 53:3
**administered** 98:9
**administration**
  53:9
**administrative**
  51:8 147:20
**admit** 159:19
**adverse** 27:24 32:4
  55:8 58:12 74:11
  74:16,24 75:4,11
  75:15 90:5,11
  137:18 138:2,4,11
  152:9 153:21
  154:2 155:6,10
  156:23
**advice** 61:25
**affirmative** 37:14
  55:11 74:11 77:17
  78:15 169:23
  170:20 172:3

173:4
**affix** 178:2
**age** 27:3,4,5,19,23
  28:5,6,6,7,19,20
  30:11,13,15 31:4
  31:4,7
**agenda** 142:18
**aggregation** 144:21
**ago** 19:13 54:25
  92:7 131:25 166:1
  166:18
**agree** 75:17 104:13
  105:4 107:3
  146:25 170:23
**agreement** 143:22
**agreements** 67:7,16
**ahead** 5:12,23
  10:21 19:19 63:21
  76:25 84:17 85:8
  93:23 123:18
  163:4 165:5
  171:19,19 173:2
**airport** 169:9
**al** 42:7 144:19
**Alabama** 2:5 13:3
  132:15
**Alaniz** 1:22 2:9
**allegations** 11:7
  15:7 27:15
**alleged** 21:4
**allegedly** 43:21
**allow** 24:5
**allowed** 30:4
**alternative** 149:18
**ALVIN** 1:3
**amend** 47:25
**Amended** 3:11
**American** 75:17
**Amherst** 46:12
**amount** 24:23 60:4
  69:18 73:15,15,16
  73:18 74:18
**analyses** 54:23 62:6
  63:17,18 71:8,13
  71:15,16 85:16
  132:3,6,9 137:8
  139:20 140:23

161:17
**analysis** 13:2,7
  15:24 30:8 37:20
  48:10 49:25 50:7
  53:24 54:21 55:3
  55:9,20 57:17,19
  58:2,6,12 62:4,5
  66:15 68:5,7,8,12
  68:16,17,18,20,23
  69:1,6,22 70:12
  71:2,3,6,19,21,24
  72:8,20 73:7
  78:24 79:6 80:13
  84:16,24 85:4,11
  87:18 88:16,18
  91:10,25 92:25
  94:9,18,22 95:3,4
  95:9 99:18,19
  100:24 101:2,6
  104:8 109:3,8,13
  109:21,24 110:2,3
  110:5,10,14,16,23
  116:24 117:2,16
  117:25 126:14,25
  127:20 128:15
  130:10 139:18
  154:24 159:15,23
  160:1,6,11,18,21
  160:22,24 161:14
  161:15,23 163:7
  163:13 170:18
**analyze** 44:12
  172:20
**analyzed** 66:22
**and/or** 125:24
  128:20 135:7
**annual** 73:14
**answer** 54:11 82:3
  84:18 85:8 87:2
  87:25 93:23 94:3
  94:4,6,7 99:7,9
  111:16 112:14
  128:18 173:2
**answered** 85:6
  93:19 121:14
  173:6
**answers** 172:24

**anticipate** 14:5
  15:20
**anybody** 17:9
**anymore** 155:21
**apologies** 150:20
**apparently** 12:8,8
**Appearances** 3:3
**appeared** 42:24
  178:11
**appears** 140:24
**applicable** 19:8
**applicant** 170:16
**applicants** 105:22
  106:2
**application** 136:12
**applied** 16:12
  17:16
**apply** 46:25
**appointment** 71:10
  153:5,6
**appraisal** 62:17,19
  62:25 63:12
  165:20 167:2
**appraisals** 27:21
  163:24
**approach** 26:9
**approached** 33:10
**appropriate** 62:19
  127:24 128:2
  140:25 141:4
  163:12
**appropriately** 78:6
  174:20
**area** 18:4 42:25
  53:22 55:4 90:8
  111:23 137:9
  140:10,11 142:10
**areas** 31:13 42:22
  54:19 59:1 74:10
  155:16
**argue** 107:25 108:1
  108:1
**argument** 29:11
**arrangements**
  33:23,24
**article** 15:15 58:9
  68:25 69:4 144:18

michael buckley                    Nell McCallum & Associates
Page 2

164:9,12 165:9,10
165:19,24,25
166:10
**articles** 15:19 16:11
139:7,10 154:16
155:23 161:5
164:6
**Arvy** 165:7,14
**aside** 14:1 43:21
71:14 151:12
**asked** 7:12,20
20:20 31:12 36:24
40:6 62:7 73:7
75:1 77:22 78:7
85:6 87:13,16
90:8,12 91:7,10
91:12,13 92:2
93:18 101:8
105:23 119:19
136:20,20 137:6
137:19 143:4
144:6,10 148:3
159:7 169:2 173:9
**asking** 81:3,11
86:13 103:8
115:17 117:18
127:11 130:22
131:16 157:15
165:10 172:20
**aspects** 165:24
176:2
**assert** 46:22
**assessment** 61:3,6
61:10
**assets** 45:2
**assign** 54:8
**assignments** 26:10
**assisted** 62:16
**associate** 151:5
**associated** 21:9
65:7,24 89:17
96:17 131:11
167:3
**Associates** 179:17
**Association's** 75:18
**assortment** 72:7
**assume** 54:17 78:3

94:3 109:11
**assumes** 91:19
92:13 95:17 97:15
**assuming** 89:8
172:23
**assumptions**
173:11
**attached** 1:24
**attendance** 41:4
84:9 116:10
125:22 128:9
130:25 134:15,18
**attended** 17:6
**attention** 174:8
175:11
**attitude** 83:25
**attorney** 9:15,16
21:16,17 23:8,12
77:20,24 169:25
172:10 179:9,10
**attorneys** 12:5 21:6
27:9 29:7,18
33:25 78:1 98:23
99:1 171:24
172:19 173:20
176:13
**Auburn** 13:2 17:7
33:14 60:6 137:11
**author** 176:7
**authoritative** 75:20
76:2
**authors** 15:21
**automatic** 46:17
**availability** 139:20
140:11 156:25
**available** 8:22
15:17 37:17 54:23
78:12 98:14
110:11,12 157:18
166:14,21 173:8
**average** 28:7
151:22
**aware** 22:7,11
35:17 74:13 89:24
89:24 156:4 175:7
175:10
**awareness** 84:1

**a.m** 1:21 4:3 64:1,3
64:4 123:20,22,23
148:19,20,21
175:1

---

**B**

**B** 133:4
**back** 18:21 27:1
43:6,13 64:7
66:25 76:5 77:8
80:9 110:24 122:5
148:23
**background** 50:9
51:19 75:3 157:16
**bad** 40:8 114:19
128:17 158:6
160:9
**bank** 30:17
**Barnhill** 42:13,24
109:1,7
**Bartlesville** 30:17
**base** 67:14 99:16
107:5 159:8
**based** 23:9 27:23
30:14 38:7 40:17
45:2 53:10 65:1
66:14,14 68:5,17
70:20 79:6 88:16
93:13,13 95:7
97:5 104:2,3,20
108:11 120:21
122:14 150:25
163:2,5 173:11
**basic** 120:6
**basically** 7:21
14:24 23:9,18
24:2 25:18 31:2,3
31:17 41:12 43:25
46:13,15,23 48:9
48:15 50:5 54:15
57:3,23 61:3,7,11
61:18 62:17,22
69:1,2 111:24
114:10 138:7
141:11 144:19
175:21,22 176:6
176:12
**basing** 48:7 162:25

**basis** 16:10,13
20:21 45:1 58:11
73:14 86:5,18
107:23 156:13
**Bay** 21:20
**beam** 38:5,24 39:9
44:12,13 47:1
82:15 84:10 87:9
121:6
**beginning** 76:24
**beginnings** 84:25
**behalf** 1:6 11:6
14:16,21 26:6
**behavior** 21:23
40:8 158:7
**behavioral** 17:19
25:16 40:4 48:15
113:13 157:8
**belief** 78:14
**believe** 8:16 21:7
22:22 24:14 26:7
28:18 29:9 33:20
36:24 37:14 38:11
42:18,18 43:4,13
43:18,18 44:18,18
44:24 45:9 48:4
49:8 59:5 62:14
65:2 66:9,11,12
66:14 69:1 70:21
77:16 78:7 82:19
85:13,19 86:8
87:3,4 88:4,4,24
96:10 97:1,2
102:20,21 106:8
107:4,9 108:22
109:1 111:1
112:14 116:9
118:5 121:13
125:10 142:16
143:20,21 145:22
147:14 149:12,19
155:5,5,7 159:6
160:19 161:8
169:23 170:19,20
171:23 172:2,3,21
174:2
**Bell** 42:9 96:23

142:23 143:15,15
**Ben** 33:12 34:19,20
151:4
**benchmarks** 162:6
162:16
**Berkeley** 1:10 2:7
15:6 35:18 77:12
87:6,20 89:23
90:19 93:12,17
94:1,16 95:2,12
95:15,20 99:13
103:24 106:19
118:4,20 120:16
148:13 149:2
**Berkeley's** 108:13
108:21
**Bernard** 62:14
**Bernardin** 163:17
163:18,19,20
164:4,5,19 166:5
166:6 167:5
**Bernardin's** 163:23
**best** 26:7 40:16,20
40:22 57:4,4
72:11 121:14
149:18 160:8,9,9
163:6 168:2
**better** 56:19 57:20
57:24 62:1 145:21
145:21 149:14
154:25 160:20
**bias** 45:20 46:5
**big** 57:5 68:23
142:10,10
**bill** 150:19 151:3,6
**billed** 150:18,21,23
**billing** 150:5,6,15
**bills** 151:2
**Birmingham** 2:5
**bit** 16:14 25:25
34:2 36:11,11,14
36:15 37:12 49:15
50:9 66:21 74:20
150:4,13 161:4
167:18 169:15
171:11
**board** 47:6,14

michael buckley

Nell McCallum & Associates
Page 3

**Bob** 93:21
**bolts** 71:18,21
**bonus** 44:23,23
    45:7,8,9
**book** 13:5 136:2
**Bottling** 22:25
    24:11
**bottom** 83:8 96:19
**Boulevard** 1:23
    2:10
**Bradley** 90:2
    136:17
**brands** 57:4
**break** 11:1 148:18
    148:24
**briefly** 64:7
**bring** 6:3 7:23 13:6
    18:9 30:14 72:3
    151:6 175:24
**brings** 175:24
**broad** 102:10
**broken** 141:23
**brought** 6:2,4 7:3
    8:11,17,21 9:9,12
    18:16,18 28:2
    167:21
**BROWN** 1:3
**Brumbeck** 58:8
**Bruzewski** 1:22
    179:3,15
**Buckley** 1:15,20
    3:5,12,15 4:11,18
    4:25 48:21 124:2
    175:7 177:2 178:1
    178:6,11 179:4
**bulk** 9:22
**bullet** 104:18
**bunch** 61:12
    162:15
**Burkeley** 35:13
    143:8
**business** 56:21
**buy** 57:4 153:23

————— **C** —————

**C** 2:1 4:1
**cabinet** 60:11
**cabinets** 60:10,13

**calculations** 74:16
    74:24 75:4,12,15
**California** 132:22
**call** 26:11 40:4 72:1
    152:1 164:16
    170:10
**called** 4:12 17:3,16
    25:17 29:17 34:9
    113:19 152:8
    160:11 166:3
**Campion** 144:18
**candidate** 51:14
    52:14,16 64:20
    123:11 145:2
    147:17 148:6
**candidates** 52:4
    55:18 64:8 121:1
    121:7 122:18
    123:3,9,13 143:5
    147:18 148:5,8
**captured** 50:6
**card** 30:19,19 31:2
**cards** 30:21
**care** 23:23
**career** 67:12 71:9
    139:4 172:16
**carefully** 46:7
**caregiver** 167:7
**Carolina** 1:1 4:7
**Cary** 2:8 4:20
    101:12
**Cascio** 17:15,21
**case** 1:8 12:12,16
    13:14,19,25 14:3
    14:13 16:24 19:16
    20:15 21:2 22:8
    22:10 23:6 24:7
    24:21 25:9,11
    26:8 27:2,3,10,13
    27:14,17,25 28:2
    28:10,15,17,24
    29:8,25 30:9,14
    32:5,12 33:10,18
    34:1,14 35:15
    39:8 41:7 45:11
    69:10 71:10,13
    75:2 79:19,22,23

80:5,7,10,13,15
80:18,20 81:1,4,8
81:9,11,25 82:1,5
83:5,10,14,21
85:19 86:20 88:3
88:23 89:4,12
90:3,11,24 91:2
91:11 92:9,12
93:9 94:16 95:21
95:22 96:4,9
98:21 99:5,5
100:21 101:19,25
102:3 103:17
118:13 127:14
136:18 137:18
142:21 143:7
144:8 150:5,6,18
150:25,25 157:15
168:25 173:13,15
176:11
**cases** 20:19 22:17
    26:15 30:13 80:1
    81:12,17 175:16
**categories** 141:19
**category** 141:23
    160:13
**cause** 1:21 138:2
    162:3 179:11
**cautioned** 4:13
**caveat** 113:6
**census** 139:16
    140:4,17,22 141:7
    141:19,22,25
    156:25 157:11,18
**center** 61:4,7,10
**centers** 57:13,15
**central** 53:9
**centralized** 55:21
**CEO** 42:18
**certain** 47:7 59:15
    91:16 120:12
    171:24
**certainly** 8:24 20:7
    20:7 37:20 44:9
    45:18 88:13 94:25
    169:11
**Certificate** 3:7

179:1
**Certification**
    179:15
**certified** 4:14 179:3
**certify** 55:17 179:3
    179:5,9
**cetera** 21:21 43:24
    55:12 75:7 176:7
**Chad** 15:25
**chair** 33:2 151:19
**challenged** 138:9
**chance** 23:24
**change** 14:6 55:1
    177:7
**changed** 27:20
    81:25 82:4
**changes** 3:6 177:6
    177:7,7
**CHANGE/COR...**
    177:3
**characteristics**
    111:14,15
**characterized**
    111:9
**charge** 124:24
    150:16
**CHARLESTON**
    1:2
**chief** 42:25
**Childs** 2:4 26:15
    33:20 35:2 91:5
    175:8
**choosing** 40:21
**chums** 34:3
**circumstances**
    127:24 128:2,8,11
    128:13 129:12,23
    129:25 133:9,11
    133:18
**citation** 164:14
**cited** 144:18
**city** 1:23 2:10 21:4
    57:10,11 60:23,24
    61:5,5,20
**Civil** 1:23 22:8
**claim** 28:1 31:5,13
    155:15

**claimed** 27:23
**claiming** 23:25
**claims** 27:24
**clarify** 177:8
**class** 1:6 153:2,3
**classes** 138:22
    152:23
**clerical** 54:25
    147:25
**Cleveland** 71:11
**client** 67:14 136:8
**clients** 63:20 67:4,8
    67:17 68:1 69:5
    70:23 78:24 93:6
    109:22 130:2
    132:4,7,10 147:6
    150:16 156:21
**closely** 134:20
**coarse** 22:4
**Coca-Cola** 22:25
    24:11
**codes** 142:7
**collect** 59:18,19,20
    59:20 72:8,9 95:9
    138:14 160:21
    176:8,11
**collected** 86:5
    176:2,5
**collection** 125:4
    172:14
**college** 19:7 34:3
**combination** 41:6,9
    47:3 65:10 111:10
    118:14,15 126:24
**combine** 64:19,25
    65:1
**combined** 38:10
    64:22
**combines** 64:23
**come** 10:12,15
    47:19 49:11 57:24
    57:24 77:8 92:2
    92:10 103:6
    104:20 136:20
    147:18 169:12
**comes** 32:15 142:19
    147:17

michael buckley                    Nell McCallum & Associates
Page 4

comfortable 22:2,6
23:15 75:1 159:7
167:15
coming 72:2 133:13
169:10
comment 36:25
105:7 115:1
comments 61:7
committed 36:8
committee 53:11
64:22,22,23 148:3
common 47:8
88:20 109:14,15
commonly 157:17
communicating
31:21
communication
84:4
compact 12:3
companies 56:8,10
57:3
company 23:1
24:12 28:7 40:3
43:5 47:16 56:25
59:1 62:9 71:7
72:13,15,18 81:18
85:3 93:2 131:23
132:1,22 152:3,19
156:25 157:13,19
157:21
company's 32:8
78:18 80:17,21,23
81:5,21
compelling 21:8
compendium 10:5
83:2,8,12,15
100:4 101:13
169:5
competent 37:21
66:11 72:8 78:17
94:23,25 108:2
126:25 147:10
competently 130:9
complainants
80:12
complaint 23:20,21
37:22,23 41:22

80:11 88:2 104:6
complaints 21:15
23:10
complete 7:20 11:5
14:8,19 76:11
170:5 179:6
compliance 66:23
compliant 106:4,7
complied 106:19
complimentary
161:2
composition 140:1
compound 79:2
computer 84:10
114:5
concept 157:22
concerned 175:12
concerning 31:16
CONCLUDED
176:23
conclusion 47:20
90:10 92:2 104:20
136:21 138:20
169:13
conclusions 49:10
89:15 102:14
158:24 159:3
163:23 165:1,19
concurrent 59:14
59:17,19
conduct 30:8 45:10
59:9,10 71:24
80:13,15 92:25
95:2 101:1 104:22
117:15 147:21
148:1 156:23
160:18
conducted 68:11
71:1,3 75:11 85:3
85:16 94:17,22
95:10 130:9 137:8
139:17 140:18
conducting 69:21
73:6 78:24 84:16
85:11 141:6
145:14
conducts 55:2

confidence 154:22
confident 59:10
confidentiality
67:7,16
conform 177:8
confronted 86:7
conjunction 50:22
85:17 123:6
consider 20:21
21:18 35:19 36:22
46:22,24 52:25
59:3 74:7,15,23
114:1 115:11
123:10 125:19
127:15,17 134:21
137:7 141:5 147:1
considerable 74:18
considerably 84:21
86:1,19
consideration
178:13
considered 44:20
53:20 116:1,11
123:7 126:16
127:22 134:22
146:14,21 176:12
consisted 109:25
consistency 170:16
consistent 49:17
107:2 108:9,14
constitute 119:20
constitutes 40:8
158:6
construct 113:19
117:9
constructs 116:22
133:20 136:7
consult 15:9,22
101:17,21
consultant 32:16
56:11 67:2 73:12
73:13 79:6,13,14
152:7
consulted 15:6
62:10 67:3
consulting 20:11
33:2 56:2 73:17

109:20,22 150:8
151:23,24 156:22
171:25 172:10
consumer 31:14
contact 33:17,19
95:8 158:2,25
159:10
contacted 33:12
34:19
contain 162:13
contained 100:21
100:24 101:4
138:16
content 104:12,19
117:8 121:14
122:11,15 171:8
contentions 45:11
contents 3:13
contracts 62:16
contribution 65:9
control 12:11 46:18
119:17,21 120:1
120:13,16,18,19
121:3,8,12,21
122:9,13,18,19,21
124:4,6,12,15,16
124:25 125:3,4,9
170:5,6,7 174:4
174:11,14,17
controls 119:9,13
120:4,10 121:18
124:1 173:25
Cook 2:13
copies 6:5 11:19
14:15 25:22 89:23
98:15,23
copy 3:11,13,14,16
5:24 7:2,10,20
8:21,22 9:14,24
10:1 11:5,22 14:8
14:19 19:20,23,24
45:18 76:19,20
85:22 97:11
150:20 151:2
166:22,24 167:5
170:17
corporate 57:9,9

CORPORATION
1:9 2:6
correct 18:22 20:16
50:18 68:16 77:4
81:15 82:16 83:21
83:22 84:1 85:25
86:17 88:12 92:19
98:2 99:21,22,25
100:2,15 106:23
106:25 108:4
111:11,12 116:17
118:4 119:11
120:25 126:1
128:6 136:19
141:23 158:10,17
173:23 174:1,15
177:8 178:3 179:6
correction 12:7
177:11
correctly 142:24
correspondence
8:14,17 9:4,6
corroborating 70:9
70:10 95:8
corroborations
68:21
cost 84:8
counsel 8:15 9:8
100:23
counseled 31:12
counties 141:16
country 57:3 62:15
164:21
COUNTY 178:10
couple 6:7 18:21
56:7 80:9 149:4
161:5,21 165:15
171:17
course 13:3 45:3
53:23 65:12 91:24
157:9 170:25
courses 53:23
court 1:1 4:4 26:23
28:23 29:6 45:23
46:1 103:14
115:19
courtroom 150:12

michael buckley

Nell McCallum & Associates
Page 5

**Court's** 88:22
**covered** 7:20
**create** 122:1 142:25
  146:16
**created** 122:8
**creates** 55:2 144:4
**credentials** 64:13
  64:14,15
**credit** 30:17,19,19
  30:20,20 31:2
**criteria** 38:14 40:3
  40:24 47:4,5
  48:11 54:9 112:11
  114:21 115:23,25
  116:6,11 117:13
  117:16 118:23,24
  125:19 126:4,17
  128:4,16,16
  130:12 131:8,12
**criterion** 59:16
**critical** 164:17,21
**criticality** 70:18
  86:6 162:7
**cross** 125:23
  128:20 135:7
**cross-training**
  121:17
**crux** 136:5
**CSR** 1:22 179:15
**current** 13:23,24
  16:20 154:12
**cut** 132:23
**CV** 20:5 139:7
**cycle** 166:9
**C-A-S-C-I-O** 17:15

— D —

**D** 4:1
**daily** 158:2,25
  159:10
**damage** 24:23
**damages** 24:1,24
**data** 31:9 41:9
  48:20,20 59:18,20
  68:22 70:4,6,9,11
  70:11,11 72:11,11
  75:6 94:7,8,9,9,10
  119:14,15,16

125:5,5 138:13
139:16 140:4,6,17
140:19,22 141:20
141:22 142:1,2,5
144:21 156:25,25
157:1,9,10,11,12
157:18,19,21
160:14,15 169:24
170:1,2,3,7,21
171:14,21,24
172:4,9,14,14,16
172:17,20,23
173:16,18 175:23
175:24,24,25
176:1,2,4,5,6,9,11
176:12
**date** 4:2 150:18
169:15
**dates** 20:16
**Dave** 42:15
**day** 60:9 178:11,15
**days** 12:2
**day's** 30:6
**December** 179:16
**decide** 91:22 155:1
175:12
**decision** 31:7 46:16
65:5 78:12 107:23
128:14 133:13
140:2,2
**decisions** 46:17
50:24 51:4 55:9
61:12 121:7
127:18 146:2
156:23 157:13
170:25
**decreased** 31:11
**defendant** 4:12
23:13 35:15 37:7
37:15
**defendants** 1:11,20
2:6 24:6,8 27:7,9
36:5
**defendant's** 5:16
27:9
**defense** 20:1 26:1
29:7,18

**define** 114:9,10,10
116:22 119:13
120:9
**defined** 44:4 120:3
**definite** 143:4
**definition** 110:15
111:13 113:12
120:4,6 142:12
143:15 145:13
**definitions** 110:13
142:17
**degree** 53:1,21,22
**degrees** 153:17
**DeGweck** 33:12
34:19,20 151:4
**delegate** 61:13
**demographic**
139:13,21 141:6
**demography**
139:22
**demonstrate** 27:18
93:14,17 168:18
**demonstrated** 97:2
97:3 116:15
126:13 127:19
128:15 130:9
149:9
**demonstrates**
143:7
**demonstration**
149:24
**department** 35:22
43:10,15 47:7
48:25 49:6 51:3
55:9,12,24 105:4
105:9,10,13 108:6
108:8 109:17
110:4,8,10 121:1
121:5,6 122:17
127:5,5,6,12
129:10 151:21,21
152:21,21,25
153:4,6
**departments** 35:17
36:10 37:2,25
39:12 43:17
105:18 126:5

**deposed** 22:9,12
26:20,22 28:12
**deposition** 1:14,19
3:12 4:21 5:2 8:3
22:22 28:10 42:3
43:13 78:19 79:7
79:12,19 80:2,5
80:24 81:4,22
88:11,14 91:16
96:23 97:9 99:23
103:21 104:3,25
105:17 106:20
108:15 142:20,24
143:6,16 149:1
150:8,10 167:11
169:5 173:17
176:20,23 177:1
178:2 179:5,10
**depositions** 8:1,2
18:16 19:17 20:21
20:23 21:5 23:10
34:22,24 35:4,6
38:2,7 40:19
41:12 44:4 49:14
79:15 80:11 81:9
81:13 87:8 88:18
90:14,22 91:2,7
91:11 92:2,9
98:10 108:24
120:22,23 148:14
**describe** 21:19
71:23 73:21 98:11
121:21 152:14
161:18,19 162:24
175:21
**described** 73:22
86:11 87:23 162:9
**description** 3:10
82:8 161:11
**descriptions** 72:21
72:23 77:13 78:9
81:24 88:19 109:3
119:18,21,25
**descriptors** 162:18
**designated** 29:8
**designed** 121:11,19
125:8 130:2

**designs** 121:17
**desk** 11:22
**determinant**
153:21 154:2
**determination**
47:23 64:20
**determine** 21:11
23:17 24:24 55:16
57:21 92:11
104:25 106:18
113:20 114:11,15
114:21 136:4
141:3 162:8
**determined** 29:23
108:13 118:20
134:9
**determining** 85:3
155:6,10
**develop** 37:21
**developed** 46:7
87:5 89:19 96:20
97:10,17,22 98:9
100:20 131:25
**development** 20:12
85:17 90:13,21
**developmental**
61:25
**devices** 168:23
**difference** 23:14
44:22,24 111:25
170:6
**differences** 36:23
105:20 126:4
**different** 12:2
18:15 34:4 35:17
35:25 36:9,10
37:2,25 38:14
40:7 42:22 47:3
54:16 55:4 56:16
58:14 59:1 68:18
69:3,16,24 70:4,4
71:4 72:9 86:7
95:7,8 105:4,7,13
105:18 107:7,7,15
107:25 110:16
117:7 125:19
126:3,10,10,12,17

michael buckley                    Nell McCallum & Associates
Page 6

126:22 127:9
129:7,11 138:21
141:11,14 144:2
148:5 154:23,24
158:6 160:7,7,20
160:21 162:15
175:21
**differently** 102:19
**difficult** 30:14
35:24 36:3,4
93:14 94:2,6,7
112:3 114:11
115:9,9,10 118:10
118:11 132:24
133:1,19 136:1,1
136:3
**difficulty** 115:13
133:13
**direction** 171:1,2
173:25 179:6
**director** 50:12,21
51:2 61:6,20,21
61:21,22
**disagree** 102:7,22
102:22 104:1,13
105:4 107:3,4
137:20 167:21
**disagreement**
107:6
**disagrees** 103:9
149:16
**disciplinary** 115:11
115:14 116:5
125:23 128:9
130:25 134:16,19
**discipline** 114:19
115:21
**discourse** 22:4
**discoverable** 15:8
**discovery** 88:23
**discrimination**
15:7 20:15 21:3
22:17 23:11,19,20
24:21 27:3,4,5,15
28:10,19,20 30:13
31:4 74:7 75:8,9
107:19 165:2,24

168:18,25
**discuss** 34:13 67:6
122:17 123:1,12
144:14,24 167:10
167:17 169:4
**discussed** 90:13
145:24 148:5,6,7
169:6
**discussing** 148:24
**discussion** 145:8
146:4,6,10 154:9
**disposal** 88:1
**disqualification**
30:1
**dissemination**
125:5
**distribution** 27:20
28:5,6 57:2,13,15
57:18
**distributions** 28:5
30:11 31:4
**DISTRICT** 1:1,1
**diversified** 132:14
**division** 1:2 50:12
50:21
**doctoral** 153:7,8,9
**document** 70:12,14
**documentary** 106:9
**documentation**
62:20 99:13
106:13
**documents** 6:3,4
7:21 8:14 9:7
12:10,14 13:20
14:3,20 15:12
19:17 35:1,8
41:21 55:19 76:10
76:12,14 77:23
104:24 175:13
**doing** 16:20 26:6
31:11 52:17 62:18
62:19 72:16 75:1
79:13 132:14
133:2 151:12
**dollars** 150:7
**double** 150:10
**downward** 22:5

**Dr** 4:18 6:7 9:17
17:7 18:12 35:21
36:19 90:2,3,23
102:2,13,21 107:1
107:18 124:2
136:17,17 137:21
143:14 144:18
149:16 161:9
163:17 167:5,17
167:25 169:4,21
170:10,23 171:8
171:11 173:16
175:7
**draft** 11:24 12:4,6
**drafted** 101:25
136:24,25
**drafting** 7:4,6,13
17:12 77:13
101:21 119:25
137:2
**drafts** 11:19,23
100:14
**drift** 119:10
**drilled** 72:10
**drink** 76:7
**Drive** 179:18
**driven** 84:8
**due** 12:7 56:24
**duly** 1:20 4:13
179:4
**dunk** 134:18
**duties** 19:7 37:1
73:20 74:4 136:16
140:13 151:18

━━━━━ E ━━━━━
**E** 2:1,1 4:1,1
**ear** 143:24
**earlier** 6:25 92:23
97:19 139:4
151:25 157:22
163:17 165:23
174:10
**early** 46:16 71:9
166:19,20
**easily** 110:7 118:18
**eat** 174:23
**Ed** 68:23

**education** 137:10
**educational** 13:17
75:18
**EEOC** 66:10
118:25
**effect** 25:18,18
**effective** 96:13
120:7
**effectively** 92:25
**efficiency** 84:8
**efforts** 55:20
**eight** 158:15
**Eighties** 166:19,20
**either** 22:9 45:4
97:7 98:2 158:10
163:17 175:25
**electric** 132:1
**element** 144:20
**emailed** 10:4,10,11
82:24 83:17,17
**emails** 8:18
**empirical** 49:22
82:2 121:13
157:14
**employed** 15:5
179:9,10
**employee** 42:1
95:15 100:1 104:6
105:2 106:24
108:18 116:7,8
120:24
**employees** 87:15
121:11
**employer's** 138:2
**employment** 28:19
50:20,24 74:6,10
115:8 121:2
**encountered** 115:7
**endowed** 33:2
151:19
**engage** 23:22 24:4
121:25
**engineering** 163:13
**ensure** 51:3
**ensuring** 125:6
**entire** 148:7
**entirely** 100:17

115:7 118:21
**entrepreneurship**
65:18
**entry** 30:24 44:20
44:25 63:2,4
131:22
**environment** 21:8
132:18 162:2
**error** 107:18
**errors** 177:9
**especially** 15:25
36:19
**essentially** 41:5
**establish** 81:2
**established** 98:4
**et** 21:21 43:24
55:12 75:7 144:18
176:7
**ethic** 84:8 114:4
117:13,23
**evaluate** 51:14
78:13
**evaluated** 31:10
97:23
**evaluation** 31:9,14
31:16,18 38:15
62:15,24 63:9
111:23 125:21
127:22 133:17
154:8 156:3 164:8
166:11 170:24
**evaluations** 31:15
45:21 46:5 130:12
**event** 138:9
**everybody** 143:25
**evidence** 21:8 28:3
**exact** 27:1 32:24
52:13 57:8 65:13
127:6,12
**exactly** 12:20 22:16
39:5 69:22 129:3
131:2
**Examination** 3:5
4:16
**examine** 80:10,17
96:14,16 97:7,8
141:20

michael buckley

**examined** 4:14 80:20,22 81:20 96:17 97:6 106:20 148:12
**examining** 81:5,17
**example** 16:9 19:9 20:25 35:20 38:3 38:5 46:20 53:18 65:17 79:17 80:4 80:22 87:10 92:5 107:16 114:14 117:11 121:6 124:20,21 129:4 156:24
**examples** 40:10 41:2 49:6 111:21 113:25 124:17 132:12 138:22 143:12 149:2,4 162:20
**excellent** 83:25 84:3
**excuse** 45:19
**executed** 178:12
**executive** 31:1
**exhaustive** 19:5
**exhibit** 5:13 9:22 11:3 19:20 20:2 82:9,11
**EXHIBITS** 3:9
**exist** 92:22 96:7
**existed** 88:21 109:9 119:19
**existence** 108:24 109:2
**exists** 81:2 91:19
**expect** 109:16 167:12
**expected** 169:25
**experience** 36:1 53:6 64:11 115:4 125:21 128:1,3 130:14 134:2 147:24
**experienced** 130:24
**experiences** 125:24 128:21 135:8

**expert** 3:14 20:14 20:22 21:18 26:21 28:16,17,24 29:3 29:8,16 30:1 32:16 33:11,18 35:20 36:22 59:4 62:14 74:8,15,23 78:11 94:16 95:14 137:7 147:1 162:14 171:23
**expertise** 31:13 58:24 59:5 137:9 152:17
**experts** 95:6 171:10
**Expires** 179:16
**explain** 39:20 49:5 109:21 114:6 122:3 139:15,24
**explained** 21:13
**exposure** 158:9 159:19 160:3,4
**expressed** 178:13
**extent** 87:7 112:19 112:19,21 160:3 162:21
**external** 157:11

**F**

**facia** 28:3 30:14
**facilitate** 164:7
**facilities** 175:9
**facility** 57:7 87:12 109:9,17
**fact** 9:15 14:22 22:22 27:16 30:10 31:21 43:12 48:19 50:6 53:19 54:24 71:9 97:15 112:9 113:2 145:16 147:22 149:14 151:3 160:13 164:4
**factor** 129:5 136:11
**factors** 31:6 38:7 39:18,21,23,25 40:10 41:1,6 43:20 44:13 47:3 65:6,11,14,19,21

68:5 86:7 111:10 118:14,15,18,21 126:1,12,24 127:15,17 129:2 129:17,22 130:1 133:8,8
**factory** 132:20,21
**facts** 26:8 27:8 177:8
**faculty** 50:22,25 51:10,15 52:25 147:18
**fair** 105:22 106:2 156:2,2
**fairly** 38:10 137:10 142:17
**familiar** 23:16 28:18 30:11 35:22 36:9,11,14 37:1 37:24 61:11 62:6 88:20 109:18 114:17 131:1,3 138:15 141:24,25 142:4 152:3 154:9 154:15 155:24 159:14 161:3,4,14 164:1,6,10,11 165:7,11,13,21
**familiarity** 87:6
**familiarize** 57:15
**families** 34:4
**far** 16:14 21:1 40:9 82:17 127:5 149:15 150:22,23 156:18
**Farris** 2:8 3:5 4:6 4:17,20 5:9,18,21 5:22 10:16,19,21 10:25 11:4 19:25 20:3 32:21 49:4 63:24 64:6 79:3 79:11,25 81:3,10 82:10,13,14 83:4 83:7,13,19 84:22 85:7 86:25 89:10 90:18 91:20 92:8 92:15,18,23 93:4

93:20,22 95:19 96:1 97:16,21,25 98:5 99:11 100:6 100:10 101:15,16 102:12 103:5,8,13 103:15,23 104:17 115:20 123:18,25 142:3 148:18,22 163:8 165:6 169:3 171:16 172:5 173:1,12 174:21 175:6 176:14,17 176:19
**fascinating** 133:5
**fashion** 38:10 39:24 96:13
**fast** 45:25
**faxed** 82:19
**federal** 1:23 4:6 22:7 27:10,11,12
**fee** 150:24
**feel** 22:1 23:14 32:17 37:20 40:17 74:25 80:14,16 94:23,25 108:20 159:6
**feeling** 40:12,15 43:6,21 44:7,12 129:4,5,9,19,20
**Fein** 160:11
**fellow** 58:8
**Ferguson** 42:5,19 43:13 129:14
**ferret** 88:17 170:1 171:20
**field** 13:3 16:14 17:2,3,7,20 75:20 110:13 153:19 154:1,10 155:3,14 155:25
**fields** 74:7
**figurative** 48:16
**file** 7:21,22 29:3 60:10,11,13
**filed** 175:8
**filing** 7:11
**final** 11:24 173:14

**finance** 61:6,21
**financial** 179:11
**find** 70:10 77:7 105:16,17 106:6 110:5,15 112:3 115:10 118:11,13 118:20 127:6 155:20
**finding** 170:2
**findings** 137:5
**finds** 104:11 171:8
**fine** 77:9
**Fines** 90:23
**finest** 167:4
**finger** 44:3
**finished** 11:24 53:21 139:22
**firm** 33:21 91:13 152:4 179:17
**first** 4:13 6:17 7:6,7 7:20 8:4 16:25 20:14 32:12 47:21 50:7 71:9,9,23 81:2 83:20 104:18 158:14 179:4
**Fisk** 46:11 158:17 158:18,18,19,19 158:21,23 159:9
**fits** 62:21
**flaws** 156:4,8
**Fleming** 56:10,21 56:25 57:5 58:1 58:13,17
**Flieshman** 68:22
**flip** 56:6 63:22
**Florida** 16:1 68:24
**fly** 103:20
**folder** 3:13 10:22
**folks** 15:24 72:7
**follow** 55:11 102:25
**follows** 4:14
**follow-ups** 171:18
**fond** 15:25
**food** 57:2
**forbid** 118:25
**force** 30:15

michael buckley                    Nell McCallum & Associates
Page 8

foregoing 178:1,12
179:4
forget 25:20 140:7
form 31:18,19 49:1
79:1,8,20 80:25
81:7 85:5 86:23
89:7 90:16 91:19
92:20 102:9
119:25 121:2,7,12
122:8,12,18,19,20
124:3,6,11,15,16
124:25 125:3,4,9
147:3 163:3 165:5
169:1 174:3
formal 116:24
117:15
formed 103:17
forming 84:24
101:18
forms 150:2 174:11
174:14,17
formula 155:20
forthcoming 10:14
fortunate 62:13
Fortune 63:20 67:3
69:5 70:23 71:7
forward 163:7
175:24,24
found 24:3 49:20
103:24 105:3,19
105:21 106:3,12
106:16 107:1
118:8,9,15 127:8
127:11 133:10,18
152:9
four 22:10,12,19
60:10 145:17
fourth 160:13
four-fifths 138:15
139:9
Fox 90:3
Fox's 136:17
frankly 26:4 59:24
147:1 157:2 162:4
freelance 57:23
frequent 16:13
58:11

Friday 12:6
friend 33:13,13
front 85:22 102:17
fulfilled 106:10
full 4:23 76:17,19
function 55:5 57:8
57:25 58:15,25
Functional 160:11
functions 61:15
86:10 87:22
furnace 82:16
84:11,11 87:10
further 23:5 48:1
179:5,9,10
future 12:15

G

G 4:1
Gatewood 17:3,20
gather 107:8
gathered 91:15
gender 20:15 21:3
general 34:2 47:9
47:14 48:23 56:17
103:2,8 131:17
151:15 152:16
161:11
generalist 58:24
generalities 67:23
generally 110:12
152:7
generating 151:11
genetic 165:16
gentleman 62:13
143:24
geological 62:10
63:7,15
GERALD 1:4
give 22:21,22 26:5
30:4 41:2 45:18
61:12,25 76:20
80:4 91:4 113:25
117:11 134:7
141:2 162:7 164:8
164:9,14 165:9
170:17 172:19
given 28:9 33:19
36:18 45:12 46:8

66:1 92:1,1 114:2
127:24 128:2
157:15 173:16,18
173:18 178:14
179:4,7
gives 71:25 78:20
162:6
giving 65:14 177:6
glad 8:24
go 5:11,23 7:16
10:21 19:19 20:4
22:13 35:24 39:5
41:15 43:6 47:5
56:1,7 57:3 63:21
63:24 64:7 68:13
69:15,15,21 70:17
71:12,24 76:5,25
77:5 80:4 84:17
85:8 93:23 102:13
102:19,24 110:24
111:6 117:10,12
119:3 122:5
123:18 133:16
142:18 149:15
151:12,23 159:11
163:4 165:5 168:8
171:15,19,19
172:7 173:2
God 28:25 35:3
going 5:6 9:19 10:1
12:21 63:19 91:18
97:14 101:12
102:19 103:18,19
125:16
good 4:18 16:2,3
17:9 18:2,2 27:22
31:19,20,22 33:12
33:13 40:1,8
46:20 48:13 53:24
58:20,21 62:18,21
62:25 65:5 70:11
75:2 76:25 78:20
84:6,7,8 110:1,2
111:7 113:15
114:3 116:19
117:17 121:24
123:7 124:5,9,16

124:18 125:1,1
128:16 138:6,13
145:17 154:8,9
158:6,7,8,13,16
158:16 160:24
168:20 172:18
175:25 176:1,5
gosh 12:25 18:23
22:15 23:1 36:6
50:2 63:6 66:8
69:18,18 73:17
88:8 131:24
132:22 150:19
151:1,1 166:19
170:16 171:14
gotten 16:14 37:14
graduate 50:7 60:8
62:12 63:10,11
71:10 132:14
159:19
great 5:1 9:23 10:3
10:20,24 11:2
20:9 22:25 24:11
25:3 38:21 50:10
50:10,10 60:7,12
63:23 67:1 162:21
group 34:17 52:2
52:15 89:1,2
122:16 144:19
148:4,8 169:10
guess 20:1,21 28:21
30:21 32:25 49:22
159:2
guidance 47:4
107:13
guidelines 12:18,22
37:16,22,23 45:17
45:19 48:19,22
50:1,4 51:4 55:11
66:10,13,17,19,23
70:17 77:16 85:16
85:20,24 106:4,7
106:12,16,19
110:20 118:25
120:9,12 138:1,7
138:12,16 147:9
147:13

gut 40:12,15 43:6
43:21 44:6,11
129:4,5,9,18,20
GUY 1:4
guys 51:22

H

Hall 42:3,17
hand 178:14
handbook 42:1
100:1 104:6 105:2
106:24 108:18
120:24
handled 174:20
hands 136:15
handwritten 6:5,9
happen 24:5
168:19
happened 23:18
30:16 166:13
happens 24:22
46:13
harassment 21:4,9
21:25 80:7
hard 44:3 82:3,6
88:17
hate 19:5
hazard 159:2
head 106:17
headquartered
57:10
headquarters
57:10
heard 48:13
held 122:16
help 57:24,24 61:4
62:1 101:24
helped 92:10
helpful 85:2,11
89:14 91:9 146:17
173:8
hereinafter 4:13
hereto 1:24
he'll 103:10
higher 38:15 63:8
highly 65:19 161:2
hire 30:23,24,25
31:1 51:7,7 53:4

michael buckley

Nell McCallum & Associates
Page 9

168:20
hired 27:9 30:22
  53:8,9 54:22 92:6
  94:15,19 95:2
  147:25 156:21,22
  168:22
hiring 46:9,22
  50:25 51:1,1 53:7
  55:9 64:23 125:20
  127:21 133:17
  168:1
history 51:16
  115:11 125:21
  127:25 128:3
  130:14 134:1
honest 34:16 166:4
  166:14
hopefully 59:1
  132:25
hoping 56:24
hot 36:6 39:9 44:13
hotel 9:2
hour 150:7,11
hourly 53:3
housing 61:22
Houston 1:23 2:10
  179:18
human 13:4 17:3,4
  17:10 18:3,4 31:7
  34:6,7 42:25 55:5
  56:15,17 57:22,25
  58:15,23,25 61:21
  71:5 96:12 110:7
  110:9 119:10
  120:8 121:22
  124:5,10 125:1
  147:10 148:9
  152:17 164:20
hypothetical 75:6
  138:22 156:20
  157:15
hypothetically
  94:12,20

I

ID 179:17
idea 24:2 38:18
  40:7 158:6,16

Ideking 15:25 19:9
idiosyncratic 126:1
  129:2,5,16,22
imagine 160:25
  166:23,25 167:6
impact 27:24 32:5
  55:8 58:12 74:11
  74:16,24 75:4,11
  90:5,11 137:18
  138:2,4,11 152:9
  153:21 154:3
  155:6,10,21
  156:23 168:6
implement 56:19
  62:25
implicit 40:5 129:8
  157:23 158:2,5,25
importance 168:4
important 54:20
  61:14 65:2,16,23
  68:5 73:10 77:22
  119:15 126:25
  127:1,17,22
  128:14 129:23
  141:6,17,20
  145:24 157:21
  164:20 167:25
  168:17 171:4
imprecise 58:10
imprecision 68:20
improper 40:21
inappropriate
  141:1
incidentally 56:21
inclined 84:9 114:4
included 70:18
including 7:21
inclusion 144:20,21
income 32:15 73:17
  73:18 151:11
inconsistencies
  105:19,20
incorrect 158:10
increases 145:25
independent 87:17
  95:10
independently

137:4
INDEX 3:1
indicate 126:25
  177:6
indicated 119:9
indicates 30:12
  146:25
indicator 65:8
  112:4 113:18
  114:12 135:1,4
indicators 111:25
  112:2,6,8 113:16
  115:10 116:19
  118:6,7
individual 23:19
  31:21 52:2,17
  54:14 72:16 98:9
  144:11 171:12
individually 1:5
  47:9 52:19
individuals 51:24
  52:3 97:5 144:7
  165:12
individual's 31:10
individuating
  159:4,5,9
industrial 49:24
  109:17 131:13,17
  132:4,17 138:18
  151:11,15 153:10
  153:11,13,14,16
  153:20 154:1
  155:3 162:2
  163:12,13
infer 113:20
inferred 113:19
  133:20
influence 140:1
  158:2,25 165:22
inform 110:10
information 13:1,1
  13:8,13 25:19
  26:8 36:18 37:5,6
  37:6,13,16,17,20
  38:25 39:1,11
  40:6 47:17,18,19
  47:22,24 48:1,10

49:9,10,13,20
  50:5 60:10,14
  64:24 69:24 72:1
  72:3,7,9,13,15,16
  72:18 73:10 78:21
  82:3,7 84:21
  85:14 86:2,3,5,19
  88:1,21 89:16,18
  91:14,19 92:11,14
  92:16,24 93:13
  95:5,6,9 98:13
  99:10,17,20 104:2
  104:21 108:11,22
  109:4,8,12 110:5
  110:11 127:1
  141:7 159:4,5,10
  159:10 160:14,22
  162:12 163:7
  169:23 170:19
  173:5,19
ingots 133:4
initial 9:17 11:23
  12:4 18:13 34:21
initially 34:23
innovate 113:24
  114:3
instance 1:20 35:23
  44:14 49:6 91:25
  94:15 124:23
  139:16 147:23
instances 141:18
  143:9,11
instructions 7:24
  45:22 46:6
instrument 178:12
instruments 138:7
  138:9
intelligence 113:17
intend 14:3 168:19
intent 168:5,14,19
intentional 27:15
  168:17,18,24
interact 68:15
  69:25 72:5
interest 18:5
  142:11 179:11
interested 16:15

17:10 34:17
interesting 25:16
  45:16 144:17
interestingly 21:17
internal 156:25
interpersonal 44:2
interpretation
  143:23
interrogatories
  172:25
intervals 154:22
interview 51:21,22
  52:18 53:15 64:17
  98:20,24 99:4,7
  125:25 128:25
  133:12,13 135:11
  140:2 142:13,14
  142:16,18,22,25
  143:1,3,3,7 144:3
  144:9,13,23,23,25
  145:10,13,15,19
  145:22,24 146:2,4
  146:7,16,23 147:4
  147:6,15 148:1,12
  148:23 149:19
interviewed 87:14
interviewer 52:7,19
  54:13,14
interviewers 52:13
  146:1
interviewing 16:3
  19:10 52:20
  107:14 139:23,23
  145:1 146:9 147:1
  147:3
interviews 51:25
  52:2,2 124:2
  144:15 146:8
  147:21 148:6
  149:3,7,11,17,18
  149:21,25 150:2
introduce 19:19,25
  82:10
introduced 82:15
invalid 95:16
involved 44:2 45:14
  68:20 91:1 107:11

michael buckley                    Nell McCallum & Associates
Page 10

| | | | | |
|---|---|---|---|---|
| 119:24 136:16 | 167:25 169:21 | 125:25 126:14,25 | 77:18 86:13,15,21 | 89:20 107:14 |
| 145:9 171:3 | 170:10,12,23 | 127:19,25 128:3 | 90:9 105:23 | 140:11 |
| **ISO** 161:16,19,20 | 171:8,11 | 128:15,18,20,23 | 137:19 157:20 | **knew** 108:24 |
| **ISO-9000** 161:24 | **Jeanneret's** 6:7 | 128:23 130:10,14 | **judgments** 46:15 | **know** 7:24 10:8 |
| 162:3,13,20 | 9:17,17 18:12 | 131:10,13 132:3,6 | **July** 50:16 | 11:21 12:6,20,25 |
| 163:10 | 36:19 102:2,13 | 132:9 134:1,23,25 | **junior** 13:3 17:2,7 | 13:15,21 14:22 |
| **issue** 23:23 34:6,7 | 143:14 167:17 | 135:7,13,13,17 | 153:3 | 15:15,18,23 17:2 |
| 36:10 39:8,22 | 169:4 | 136:11,12,14 | | 17:6,13,24 19:3 |
| 41:8 43:7,9 44:12 | **Jerry** 2:13 | 141:19,23 152:9 | ─────── **K** ─────── | 20:6,20 22:3 24:2 |
| 45:12 46:9 68:19 | **job** 3:16 13:2,7 | 159:23,25 160:6 | **K** 73:17,18 | 24:17 25:10,13,16 |
| 69:14 86:24 89:4 | 15:24 31:20 32:7 | 160:11,18,21,22 | **keep** 11:23 16:19 | 26:3,3,11,12,12 |
| 107:17,18,19,20 | 37:4,19 40:21,23 | 160:24 161:14,15 | 18:3 23:2,4 25:22 | 26:13 28:25 29:2 |
| 131:10 133:20 | 40:24 48:10 49:11 | 161:17,22 162:8 | 25:23 55:22,23,25 | 30:10 32:22,24 |
| 136:3,5,6 143:17 | 49:25 50:6 54:21 | 162:19 163:7,13 | 66:6 134:20 | 33:7 34:2,3,5,5,16 |
| 148:23 154:6,16 | 54:23 55:3,20 | 165:14,16 170:18 | 154:12 170:10 | 35:19 36:5,23 |
| 158:3 159:1 | 56:19 58:2,6 | 171:8 | **keeping** 170:7,7 | 37:3,12,13 38:8 |
| 161:19 168:3,4,4 | 59:21 62:4,5,6,18 | **jobs** 30:24 36:9,12 | 174:8,9,12,15,18 | 38:11,23 39:10,14 |
| 168:5,5,14,19 | 63:17,18 65:2 | 36:14 37:2,5 39:7 | **kept** 55:21 108:25 | 39:22 40:11,12,16 |
| 170:21 171:4 | 66:15 68:3,5,6,8 | 39:15 44:19,23,23 | 119:16 | 40:17 42:20,21,23 |
| **issues** 9:1 21:9,12 | 68:12,14,16,16,17 | 44:25,25 45:1,1 | **Kevin** 1:21 60:6,12 | 43:2,3,12,24 |
| 31:15 33:16 34:12 | 68:18,20,23,25 | 48:10 49:10,14 | 165:9 179:3,15 | 44:19,22 45:16 |
| 44:2 53:18,25 | 69:6,21,25 70:1,1 | 54:25 57:16,18,19 | **kind** 5:21 8:19 9:3 | 46:8,18 47:8,17 |
| 54:18 56:18 59:6 | 70:2,12 71:1,3,6,8 | 61:17,18,19 62:21 | 14:25 17:17 21:20 | 47:25 48:20 49:17 |
| 62:23 70:19 74:12 | 71:12,14,16,18,21 | 63:1,2,3,4,5 67:2 | 21:25 27:2,22 | 50:25 52:1,11,21 |
| 74:14 75:9 89:21 | 71:24 72:1,3,8,17 | 69:10,11,12,16,20 | 29:11 30:8 34:12 | 54:6,24 57:23 |
| 118:1 139:5 145:9 | 72:20,21,21,23,24 | 69:22 71:17 72:14 | 38:17 40:2,2,2,13 | 58:23 60:3 61:10 |
| 145:24 166:10 | 72:25 73:1,2,6 | 87:6,18 94:9 | 40:13 45:10 52:12 | 61:20 62:22 63:6 |
| 167:3,10 169:17 | 77:12 78:8,11,13 | 121:17 131:14,17 | 52:24 53:22,25 | 66:15 67:18 68:16 |
| 169:20 | 79:6 80:13 81:5 | 131:18,21 140:10 | 55:8 57:15,21 | 70:8,9,16 71:20 |
| **ISO-9000** 161:14 | 81:24 82:8,15 | 163:13 | 58:2,12 59:21 | 72:25 73:22 74:9 |
| **item** 8:13 11:19 | 83:4,9,13,21 | **John** 33:13,14,15 | 61:19,24,24 63:4 | 74:17,17 77:24 |
| 12:10 14:7,15,19 | 84:16,24 85:3,11 | 33:17,23,23 34:1 | 70:19 72:20 74:22 | 86:4,4 87:9,22 |
| 15:11 16:22 | 85:16 86:12,22 | 34:3,7 42:9 62:13 | 89:11,18 98:11 | 88:4,10,17 89:22 |
| **items** 5:17 6:23 7:3 | 87:18,22,23,24 | 164:16 | 101:1 104:8 109:3 | 90:4 92:22 94:2 |
| 11:17 12:17,20,24 | 88:15,16,18,19 | **John's** 164:15 | 110:11 113:5,24 | 95:25 98:23 |
| 20:11 38:15 44:17 | 89:3,7,9,20 93:7 | **jokes** 21:21 | 115:17 119:18 | 101:13 103:4,16 |
| 56:8 77:2 125:20 | 94:9,17,22 95:2,4 | **journal** 15:15,18 | 130:7 131:23 | 103:19 107:9,10 |
| 146:20,22 167:23 | 95:9,9 99:18,19 | 16:16 69:4 139:7 | 132:21,23 134:16 | 107:12 109:7,24 |
| | 103:15,25 104:9 | 166:3,16 | 136:15 137:12 | 111:15 115:13 |
| ─────── **J** ─────── | 105:7 109:3,3,8 | **journals** 13:21,23 | 139:13 146:6 | 116:4,18 119:14 |
| **J** 1:21 179:3,15 | 109:13,21,24 | 13:24 14:1,20 | 151:25 153:9 | 120:5 124:22 |
| **JACOB** 1:5 | 110:1,2,2,2,5,10 | 15:21 16:5,7,8,9 | 162:22 163:9,9 | 126:7 129:7 130:7 |
| **JASON** 1:4 | 110:13,16,23 | 154:11,13,14,17 | 164:23 166:1 | 131:2,3 132:13 |
| **JC** 33:2 151:19 | 112:10,23 116:13 | 155:17,18,20,22 | 167:12 168:18 | 134:21 135:9,15 |
| **Jeanneret** 2:13 | 116:14,15 119:18 | **JR** 2:4 | 169:12,16 170:3 | 136:3 139:3 |
| 35:21 102:21,21 | 119:18,21,25 | **judgment** 31:8 40:7 | 172:15 | 140:10 141:2,16 |
| 107:1,18 144:18 | 125:21,23,24,24 | 47:18 59:6,7 | **kinds** 9:4 41:4 | 141:22,24 142:10 |
| 149:16 161:9 | | | 69:11 72:18 74:11 | |

michael buckley

Nell McCallum & Associates
Page 11

143:14,19 144:24
151:3 152:2,16,17
154:5,25 156:12
156:15,16,16
157:16 158:13,14
158:24 160:15,25
161:4,20 162:4
164:2,3 166:2
167:13,14,20
168:2,6,16,22
169:16,19,20,22
169:25 170:5,9,15
170:21,24 171:5,7
171:10,14 172:17
174:23 175:10,20
176:1,3
knowing 58:25
119:22
knowledge 15:8,13
26:7 38:4,20
41:10 50:4 84:10
84:11 120:11,14
known 178:11
knows 103:11

_____ L _____

L 2:4
lack 119:9,17
120:17 174:9
Ladd 42:3,17
laid 81:8
large 67:14 69:2
largest 57:2
laughs 164:23
law 1:22 27:10,11
30:12,12 33:21
152:4 158:13
lawsuit 7:22 11:20
15:14 179:10
lawsuits 175:8
lawyer 89:22
lawyers 9:9 26:12
99:21 155:1
lead 102:25 173:25
leadership 113:23
114:2 151:20
leading 165:2
leads 146:1

learn 84:12 110:4
leave 10:15
left 123:16 169:8,8
legal 62:23 139:4
165:24 166:10
167:3
legality 31:15
lend 144:15
lesson 60:7
let's 5:23 6:1 7:16
10:22 12:19,19
16:24 19:19,25
20:4 22:13 35:13
38:3 41:15,15
43:6 48:6 50:8
51:6,14 56:1
58:22 60:22 67:22
71:20 76:5 77:5
77:10 79:4 80:4
80:20 99:6 104:14
110:24 114:13
115:18 117:11,12
117:12 119:3
121:5,16 125:11
127:21 130:11
131:18 150:4
156:21
level 22:4 30:24
44:20,25 61:20
63:2,4,8 120:12
131:14,20,22
153:2,3
levels 119:9
Levine 68:23,23
liberty 67:6
limited 167:9
LINCOLN 2:9
line 119:6 177:6
lines 145:19
list 7:16 12:19 19:5
20:15,18 22:8,14
22:17 41:15,21
52:18 70:3,6,8
76:11
listed 8:5 20:11,14
24:15,15 41:13,14
83:24 88:6 125:25

127:16 128:23
135:13 136:12
listen 72:2
literature 16:20
65:9 146:24 156:7
litigation 28:20
74:7,10
little 16:14 19:13
25:25 34:2 36:11
36:11,14,15 37:12
47:4 49:15 50:8
54:25 66:21 80:9
131:25 150:4,13
153:23 161:4
167:18 169:15
live 103:7
LLP 2:9
local 4:7
locally 96:20 97:10
97:17,22
location 55:21
lock 132:22
logistics 57:6
long 66:6 67:11
92:7 113:14 161:1
165:25 166:18
longer 25:19
look 6:1 10:25
12:25 13:16,21
14:25 15:23 18:15
19:2,3 20:8 33:16
51:15,18 53:4
54:6,9,16 62:17
64:13 71:25 72:12
72:23 73:4,5
76:23 79:18 82:8
83:12,23,23 96:19
101:13 105:9
108:6 114:15
117:17,20,22
118:1 127:23
135:17 140:6,10
141:17 154:6,22
154:23 161:21
170:3,6,18 172:15
175:13,25 176:3,3
176:4,4

looked 17:2,13,15
18:19 21:2 30:10
30:11 31:5,17
38:7 39:20 41:22
42:1,3 44:17
54:19 56:16 59:14
63:18 64:10 68:2
69:23,23 75:7,10
79:15,17 80:23
81:4,12 87:7 90:4
90:4,7 104:24
105:7 108:3,5
136:23 138:21
140:12,13 154:17
161:6 162:20
163:1 168:24
169:11
looking 52:25
61:16 63:1 69:10
69:17 77:7 78:19
105:16 108:15
117:13 172:13
looks 44:14
lost 166:2
lot 16:13 17:24
19:2,4 23:2,4
25:10,20 30:22,25
37:4,4,6,6 38:7,8
38:9 39:10 44:1
45:13,14 46:8,12
46:14,18 48:9
65:6 70:21 72:25
72:25 73:1 89:8
107:11,12 113:6
115:14 118:17
120:19,19 127:8
132:11 133:6
139:4,6 143:23
144:2 157:16
158:11 161:1,9
162:11 167:18,19
171:2,2 175:11
lower 30:25 131:14
131:20
lucrative 30:21
lunch 174:22

_____ M _____

machine 1:22
mainline 155:22
major 13:5 16:18
167:7
majorly 167:6
making 5:15 46:16
74:24 78:12 95:22
96:6,8 127:17
128:14 129:24
male 27:17
man 15:25 163:22
175:20
management 16:8
16:9,15,16,16
17:16 18:1,2,3,4
20:12 44:25 45:5
45:7 50:12,21
61:14,17,18,19
69:4,14 119:9,11
119:13,17,20,24
120:1,3,7,8,10,13
120:15,18 121:3,8
121:11,12,16,18
121:21 122:8,9,12
122:18,19,20
124:1,4,6,12,14
124:15,16,22,25
125:3,4,7,9
151:20 152:18,20
152:25 153:1
155:22 164:20
166:3,15 171:1
173:24,25 174:4
174:11,14,17
managements
124:3
manager 109:17
110:4 121:6
122:17 124:24
managerial 61:8
62:7 68:10 69:12
71:16
managers 42:21
43:4 61:5,8,20
62:1 63:8 121:1,5
122:1 125:18
126:16 127:9

michael buckley                    Nell McCallum & Associates
Page 12

142:21
manila 10:22
manufacture 35:23
manufactured
  162:2
manufacturing
  131:18 132:10,18
man's 21:6
MARC 2:8
mark 2:9 10:21
marked 5:10,13
  9:20 11:3 20:2
  82:9
Massachusetts
  46:11
master's 31:14
material 78:13
materials 16:23
  18:8,19 19:15,16
  78:12 88:6,25
  100:12 175:13
matter 95:6 179:11
matters 74:6
McCallum 179:17
mean 9:13 16:17
  19:3,3,4 26:6
  36:16,17 39:24
  40:11 48:21 78:6
  89:8 91:14 93:16
  93:25 103:10
  109:8 110:15
  112:15 114:8
  121:23 122:4,20
  124:9 126:4,6,21
  128:13 131:3
  133:12,21 135:21
  139:15 143:2
  144:22,25 146:8
  146:12 147:24
  150:1 151:14
  154:22 157:14
  161:20 162:10,24
  168:3,14,19 170:1
  171:10,13,15
  172:7,11
meaning 136:14
means 40:21 79:10

109:10 129:3
139:25 140:8
151:10 154:18,21
159:6 172:13
175:22
meant 28:23
measure 113:6,20
  114:8 117:18
  133:20 135:10
  136:5,6,7
measured 114:11
  115:14 134:7,9
  135:16,16,20,22
measurement
  107:18,20 113:21
  136:6
measures 113:14
  113:15,15 117:22
  118:3
mechanical 131:14
  131:20 133:21
mechanically 84:9
  114:4
meet 51:3 52:15
  122:23 123:9,11
  123:12
meeting 122:16
  124:24
meetings 124:23
Meleah 42:13,23
member 52:25
  53:14
members 50:22
  51:1
Memorial 179:18
memory 25:23 36:8
  139:3
mention 136:17
  158:19
mentioned 40:25
  158:17,18,20
  163:15 173:24
mentor 153:6,10
Mentoring 153:8
message 144:1
met 26:19
method 150:1

155:3,9 175:18,22
176:8
methodologies
  160:20,20
methodology 40:2
  172:13
methods 47:16
metropolitan 140:7
Michael 1:15,19
  3:5,12,15 4:11,25
  177:2 178:1,6,11
  179:4
middle 103:21
mill 36:6 38:5,24
  39:9,9 44:12,13
  44:14,20 47:1
  82:15 84:10 87:9
  121:6
millions 136:2
mind 101:9 142:19
mine 33:13,13 60:6
minimize 21:24
  174:6
minute 115:19
minutia 139:5
missed 38:15
  125:20
missing 92:12,14
Missouri 48:17
mistakes 157:8
moment 60:8
Monday 23:24
monetarily 73:22
money 71:12
monitoring 170:8
month 66:8
months 80:9
Moore's 161:22
morning 4:18,19
  4:22 26:19 29:6
Mosholder 60:6
motivated 25:20
  84:7 114:3 168:20
Motivation 168:4
mouth 152:1,2
move 19:1 50:8
moving 144:19

multiple 68:21,21
  68:22
multivariate
  137:14
Murphy 165:8,9

─────── N ───────

N 2:1 4:1
name 4:23 15:4
  21:2,6 33:20,20
  33:25 39:7 40:10
  44:21 158:23
  160:12 163:15
  178:12
named 14:12 15:25
  44:17 46:10 58:8
  62:13 145:22
names 20:18 22:8
  36:5 39:14
narrative 102:11
Nathan 21:6
nature 111:11
near 35:20
nearly 31:22
necessarily 126:6
necessary 48:20
  85:1 86:19
need 9:19,24 19:23
  25:19 32:22,24
  34:10 65:17 69:2
  80:14,16 84:20
  85:13 86:1,3,4,4,7
  99:9 116:3,3
  122:5
needed 34:8 57:22
  58:6
needs 23:16,17
  44:9 50:5 58:7,10
  70:17 97:2,3
  143:19 149:9
  171:9
neither 137:24
  179:9,10
Nell 179:17
never 21:1 26:19
  26:22 28:9,12
  53:7 66:22 68:19
  71:1,3,17 81:20

92:4 96:2 118:8
136:17 139:21
159:21 167:13
new 30:19 50:25
night 10:5
nods 42:12
normally 26:14
Norman 60:23,24
Northern 46:2
NOTARY 178:17
note 5:11,14
noted 178:3
notes 6:5,7,7,9
  11:10,11 14:20
  66:3 98:21,24
  99:4,7
notice 3:11 5:7
  17:14 169:15
noticed 54:18
November 1:16,21
  4:3
Nucor 1:9,10 2:6,6
  3:16 15:6 35:13
  35:18 42:22 77:12
  87:6,20 89:23
  90:19 93:12,14,16
  94:1,16 95:1,12
  95:15,20 99:12
  103:24 106:18
  108:13,21 111:8
  118:4,20 120:16
  143:8 148:13
  149:2 168:1
  171:21 175:9
number 1:8 6:4 9:6
  12:2 15:5 18:15
  21:9 23:9 26:25
  36:6 38:8,13,13
  38:14,14 40:18
  47:3 50:6 56:14
  56:16 57:14 58:5
  58:25 62:15 63:12
  65:23,25 67:3
  68:13,18 69:2,3
  69:23,24 70:4
  71:8 72:9 74:10
  83:7 86:6 95:7,8

michael buckley

107:7,7,15 117:7
117:21 125:20
129:11 138:21
145:17 148:4
154:5,23,24
155:22 160:7
175:20 177:7
**numbered** 1:21
41:17
**numbers** 129:22
161:20,21
**numerous** 126:1
129:2,21
**nuts** 71:18,21

**O**

**O** 4:1
**object** 65:8 79:8,20
81:7 90:16 91:18
92:6,20 97:14
102:9 163:3 165:4
165:4 169:1
172:22
**objected** 83:1 98:3
**objection** 29:18
49:1 79:1 80:25
84:17 85:5 86:23
89:7 92:13 93:18
95:17,24 99:6
103:3 172:1,22
173:10
**objections** 5:15
**objective** 39:25
40:25 41:6 65:6,8
65:10 111:13,14
111:15,16,17,22
111:25 112:2,3,11
112:18,19,20,23
113:3,5,6,10,15
113:18 114:7,12
114:14,20 115:4,6
115:8,10,10,12,16
115:25 116:8,11
116:16,18 118:3,6
118:9,14,23
133:10,12,13,18
134:3,4,6,10,11
134:23 135:9,13

135:18,25
**objectivity** 133:7
135:10
**obligation** 37:15
77:17 78:15
169:24 170:19,20
171:20,24 172:4,9
173:4
**observed** 87:14
**Obviously** 129:2
**occasion** 50:25
**occasions** 58:5
71:18
**occupational** 142:2
142:5,7
**occurred** 23:11
47:10,13
**October** 82:16
**offhand** 24:18 36:7
43:3
**office** 23:3 60:9
169:8 178:14
**offices** 1:22
**official** 109:11
**off-color** 21:21
**oftentimes** 134:19
**oh** 13:21 14:17
18:23 23:1 26:25
29:13 36:6 40:22
44:8 45:24 48:4
51:5 59:10 63:6
66:8 68:8 69:18
71:8 73:15 89:19
94:23 100:19
109:15,19,23
110:19 115:5
117:3 130:4 131:2
131:24 132:22
145:12 149:8
166:19 171:5,5,14
175:20 176:10
**Ohio** 71:11
**okay** 4:2 5:1,4,9,23
6:9,12,15,20 7:7
7:13,16 8:9,13,20
8:22,25 9:6,19
10:2,3,4 11:9 12:1

12:10,19 13:7,11
14:1,7,15 15:2,11
15:18,21 16:22
17:5,20,23 18:6
18:14,19,24 19:14
19:19,25 20:9
22:7,13 24:10,25
25:8,12,14,24
26:18,20,24 28:9
28:12,15,21,22
29:1,19,22 30:3,5
31:24 32:7,12,15
32:23 33:4,6,8,21
34:11,19,23 35:11
36:2,9,13,15,21
37:1,11,24 38:3
39:4,7,12,17 40:9
40:14 41:10,13,20
41:21 42:19 43:1
43:6,14 44:6,11
44:16,19 45:4,10
47:11,12,21 48:2
48:6 49:5,13,16
49:24 50:3,23
51:6,18,21,24
52:17,24 53:12
54:1,13,21 55:6
55:13,19 56:1,3
56:23 57:12,17
58:4,16,22 59:7
59:12 60:1,20
61:23 62:2 63:10
63:19 64:7 65:4
65:13,20,25 66:6
66:9,12,18,25
67:10,13,16,22
68:6,11 69:13,20
70:25 71:14,20
72:23 73:9,12
74:3,6 75:14,17
76:5,9,13,15,22
76:25 77:1,6,15
78:5,8 79:16 80:1
80:8,10 81:11,24
82:4,8 83:20,23
85:20,23 86:1,15
86:20 87:5,17,22

88:11,22 89:3,11
89:14 90:2,10,23
91:1,4,21,23 92:4
93:9,25 94:4,11
94:15,24 95:1
96:2,14 97:4,7
98:11,15 99:12,16
100:11,17,20
101:15,24 102:7
102:23 103:1,24
104:3,11 105:3,9
105:12,16,21,24
106:6,11,15,18
107:1,5 108:3,13
109:5,16 110:9,12
110:22 111:3,5,21
112:3,6,9,22
113:2,12,22 115:7
115:18 116:2,6,20
117:24 118:2,8,25
119:4,7,20 120:3
120:9,21 121:16
122:3,7,12 123:8
123:15,18 124:17
125:11 126:3,15
126:19 127:3,10
127:15,21,25
128:7,12,18,25
129:21 130:1,18
131:12,20 132:3
133:7,14,23 134:1
135:2,7,11,17
137:1,7,12,23,25
138:15,23 141:5
141:25 142:9,20
144:8,13 145:13
145:18 146:3,6,11
146:15,19 147:5
147:12,20 148:9
148:23 149:6,10
149:20,23,25
150:4,12,15 151:8
151:10,25 152:12
153:4,8,12,15
154:11,15,18
155:8,13,17,24
156:4 157:6

158:19,22 159:3,8
159:14 160:23
161:7 162:17,22
165:23 166:21
167:8 169:4,14
170:13,14 172:6
173:2,22 174:3,10
174:14,21,25
175:13,18 176:14
176:16,19
**Oklahoma** 21:4
26:23 30:18 50:14
50:15 54:22 57:10
57:11 64:8 71:1
74:5 122:23 123:8
136:9,16 151:19
**old** 27:17
**ones** 8:5 17:21,22
25:15,24 39:25
100:5 121:19
130:8,8
**Onet** 161:3,12
**one's** 26:6 65:9
113:23,23
**Opelika** 132:15
**operating** 118:17
**operation** 57:6
**operationalized**
135:23,24
**operationally**
116:22
**opinion** 20:22
24:22 26:5 37:21
47:15 48:7 78:18
81:25 82:4 95:14
95:23 96:6,8,25
99:5,16 105:24
106:1 108:8 115:2
137:17 140:21
147:11 160:23
170:6,8
**opinions** 15:14
100:20 101:18
103:16
**opportunity** 131:9
171:6
**optimal** 147:3

michael buckley
Page 14

Nell McCallum & Associates

164:23
**optimum** 40:23
**options** 160:8
**oral** 1:14,19 84:3
  98:2 177:1
**order** 88:22
**organization** 23:21
  23:22 24:3 27:20
  30:16 71:4 107:13
  121:25
**organizational**
  138:19 153:16,20
  154:1 155:4
**organizations**
  63:13 67:19 75:8
  75:10 167:3
**orientation** 114:3
**oriented** 84:6 114:9
  114:16,22 117:8,9
  155:23
**original** 100:18
  179:7
**OU** 55:7 147:15
**ought** 81:2
**outcome** 59:21
  96:17 150:25
**outside** 14:2 33:2
  171:10 174:15,18
**overall** 148:7

—————— P ——————
**P** 2:1,1 4:1
**page** 3:2,10 20:4,5
  38:13,13 41:17,19
  56:4 76:6,14,24
  77:5,6,8 82:12
  96:18,19 102:15
  102:16,18 111:1,2
  111:3,4,6 119:3,5
  119:6 125:13,15
  125:16 177:3,6
**PAGE/LINE**
  177:11
**paid** 45:2 174:8
**pallet** 133:3
**panel** 19:10 124:2
  139:23 140:1,3
  144:22,23,25

145:13 146:8,9,14
146:23 147:4,5,15
147:21 149:3,7,17
149:18,25
**panels** 144:20
**Pantazis** 2:4
**pants** 103:20
**paper** 19:11 86:18
  98:2 139:1,3,22
  176:7 177:6
**papers** 52:11
  140:12
**PAQ** 159:15,16
  160:5,24
**part** 21:21 30:20
  31:3 37:15 47:21
  53:11 56:1 59:16
  71:4,4 77:18 83:2
  84:23 123:10
  126:9,10 150:24
  150:24 169:7
  176:8
**participates** 124:3
**particular** 54:11
  87:23 96:14 152:4
**particularly** 96:13
  96:16 160:10
**parties** 179:9
**parts** 65:2 83:12
  115:5 146:15
**pass** 143:25
**patiently** 29:21
**PATTON** 2:8
**Paul** 42:5,19
  129:14
**pay** 175:10
**PC** 2:4
**pen** 98:2
**Penney** 33:2 151:19
**people** 14:2 26:9
  30:23,24,25 40:6
  42:25 43:25 46:14
  46:23 51:1,8 53:3
  53:4,15 63:7
  67:19 68:13,14,15
  69:24,25 70:7
  71:5,17 72:4

88:20 108:2
110:10 119:19
134:20 140:11
144:24 145:1,3
146:25 147:2
152:1,16 158:9
160:14,15 161:1
163:12 164:7
168:1,2,20 170:25
**people's** 172:17
**percent** 138:16,20
  153:21 154:2,6,19
  155:25 156:5,10
  156:12
**percentage** 26:1,2
  32:15,17 65:25
  73:14
**perception** 98:10
**perform** 49:25
  54:21 64:17 68:14
  69:25 163:13
**performance** 27:21
  31:9,10,14,15,16
  31:18,22 59:15,22
  62:15,17,24,25
  63:9,12 111:23
  112:1,2 125:23
  128:18 134:23,25
  161:16,22 162:16
  163:24 164:8
  165:20 166:11
  167:2
**performed** 79:6
  87:17
**performing** 62:18
**performs** 68:15
  70:1
**period** 12:3 66:5,6
  67:11 96:9 132:19
**person** 13:4 15:5
  33:15 34:20 40:16
  40:20,22 46:10
  61:12 65:17,18
  67:14 68:15,23
  69:25 72:1,5
  103:7 107:24,24
  107:25 112:15

129:14 134:7
145:14 146:9
147:25 158:12
164:15 178:12
**personal** 154:8
**personality** 40:5
  129:8 157:23
  158:3,5,25
**personally** 54:4,6
  55:22 58:3 178:11
**personnel** 16:10,11
  16:16 17:16 19:12
  75:23 109:11
  118:3 161:5 166:3
  166:9,15
**person's** 160:15
**perspective** 96:12
**pertaining** 7:22
  99:18,19
**pertains** 13:25
**PHD** 1:15,20 3:5,12
  4:11
**phenomena** 175:19
**phonetic** 13:16
**photographs** 14:16
  14:17
**phrased** 28:21
**Ph.D** 153:13,15
**pick** 40:16
**picking** 40:20,22
**piece** 86:18 162:5,5
**Plains** 22:25 24:11
  25:4
**plaintiff** 23:13
  27:17
**plaintiffs** 1:7 2:3
  5:16 8:15,15 9:7,8
  11:7 12:11,12
  14:12,13 15:7
  21:16 26:2 27:6
  88:2 95:21 98:23
  99:1,21 100:23
  169:25 176:13
**plan** 7:11 12:15
  13:14 101:6
**planner** 61:5
**planning** 61:22

**plant** 36:1 131:15
**planters** 131:22
**please** 4:24 5:10
  10:23 35:14 85:9
  163:16 177:6
**plenty** 63:18
**plus** 28:7 84:11,12
**point** 48:24 59:15
  59:23 92:7 101:10
  107:17,21,23
  115:15 130:6
  133:4,4 176:6
**points** 68:22 70:5,6
  102:20
**police** 167:3
**policies** 124:13,14
  124:14,18 125:5,6
  174:7
**policy** 26:4 125:8
**pool** 55:17,17
**population** 141:11
  141:14
**portions** 13:5
**posed** 91:17
**position** 42:20
  46:21,23 51:15
  54:25 84:13 87:10
  131:22 159:15
**positions** 36:23
  44:20 51:6,10,12
  54:22 62:7 68:10
  147:19,21
**possess** 59:5 72:22
**possession** 12:11
  78:2 114:4
**possibility** 45:20
  46:4 94:14 113:11
**possible** 3:12 49:19
  49:22 93:16,25
  94:3,5,12 105:12
  105:15 117:24
  133:23,25 149:8
**possibly** 129:9
**posting** 3:16 82:15
  83:4,9,13,21
  87:24 88:15
  125:25 128:23

michael buckley

135:13 136:12
postings 72:24,25
73:1,2
potential 52:25
156:8
PQA 159:15
practice 47:10,13
93:5 121:22 123:5
123:7 124:5,10
138:2,6 140:22
147:11 148:10,11
157:17 172:18
practices 119:11
practitioner 16:9
preceding 22:10
predetermined
148:4
predicate 81:1,8
predict 59:19
predictive 59:17,18
predictor 59:20
preemployment
53:17
prefer 102:18
preferred 150:1
155:3,9
preliminary 3:14
7:9
preparation 8:3
16:23 18:9 19:7
19:11,11
prepared 11:6,8
86:14 103:4,6
179:5
preparing 6:10
18:20,21
present 2:12 37:16
60:25 81:22
111:17,20 112:20
112:25 162:14
presentation
175:23
presented 48:10
52:11
presenting 170:2
presidents 31:1
pretty 16:3 21:8

58:20 75:2 78:20
134:18
previously 135:5
pride 16:20
prima 28:3 30:14
primarily 16:19
110:18
primary 18:4 73:20
74:4 151:18
principals 107:2
153:1
principles 17:25
18:1 75:22 108:10
108:15,20
prior 28:12,14
77:13 83:8
prioritizing 61:14
privy 37:5 39:10
47:19 109:10,12
probably 12:25
13:6 25:23 41:7
60:19,21 67:9
69:19 134:3,4
135:9,12 141:18
142:6 155:11
158:15 161:1
162:4 170:23
problem 126:23
problems 21:25
115:14 134:20
procedure 1:24
22:8 48:5,8,11
66:11 78:21
116:23 123:10
126:11 175:22
procedures 32:10
41:11 47:1 68:2
75:23 78:18 80:18
80:21,23 81:6,18
81:21 85:18 90:20
93:12 94:1,13
95:11 99:14
108:10 111:9
119:1 120:20
126:5 127:7,13
152:10 168:21
proceedings 179:6

process 37:25 39:6
44:10 45:15 46:10
49:7 51:22 56:16
84:11 92:5 93:7
101:18 107:12,14
108:3 115:8
126:13 143:1,8
144:4,9,16 145:19
145:22 146:15,16
147:6 149:6,10,21
170:1,9 171:7
174:5,19
processes 17:10
38:22 49:12,21
103:25 104:11
105:3,13,18,21
106:3 107:2
108:14,21 126:22
130:2 148:12
processing 30:19
30:20
produce 6:12,22
produced 1:20 6:25
6:25 15:12 83:5,9
83:14
producing 6:17
production 44:23
44:25 45:1,5,7
83:7 173:7
products 132:14
profanity 21:20
professional 26:14
63:3 97:6,24
107:2 108:9,14,20
138:18,20 140:13
professor 9:16
13:22 16:19 19:7
60:6 65:3,5 73:20
74:4 102:20
132:17 149:15
151:13,18,20,21
152:20 158:13,16
161:8 163:17
164:5,19 166:5,6
170:9,10,12
professors 17:8
101:17 122:24

158:11
profit 67:19
program 44:5
121:15,17 122:1
122:15 131:25
programs 121:10
122:7,11
projects 63:12
promotion 103:24
104:11 105:3,13
105:21 106:3
107:1 108:14,21
157:13,21
promotions 37:24
38:5,22,24 44:13
127:17 156:23
157:19
proud 60:11
prove 94:12
provide 37:8 72:13
77:18 169:24
170:20 172:4
173:4
provided 8:14 9:7
9:10 19:5 37:7,20
40:23 72:15,16,18
77:20 78:15,16
92:17 93:2 95:21
173:19
provisions 1:24
psychological
75:18,19
psychologist 49:25
151:11 153:20
psychologists
151:15 153:10,11
154:1 155:4
psychology 16:10
16:12,13 17:16
19:12 138:19
151:21 152:21
153:4,6,14,16
161:5 166:10
psychometrica
155:19
psychometrics
156:13

Public 16:16 166:3
166:15 178:17
publication 16:11
65:7,8
published 16:12
17:17 166:1
Pulakos 145:23
pulled 133:3,3
166:8
punitive 24:1
purely 118:9
purposes 178:13
pursuant 1:23
pursuits 167:9
put 39:23 40:1 44:3
118:16
puzzle 162:5,6
p.m 1:21 175:3,4
176:21,23

_____
Q
_____

qualifications
52:24 53:4 54:2
83:24 84:15 86:21
qualified 28:16
29:14 33:16 37:21
qualify 28:23 74:23
quality 53:1 54:7
question 23:15
28:21 49:22 78:6
79:2 82:2 85:9
87:1,3 93:20 99:9
102:10 111:18
112:14 117:18
119:15 121:13
127:10 136:1,1
140:24 141:21
156:20 157:14
159:8 164:9 165:5
173:6,11,14
questionnaire
159:15
questions 51:23
52:4,5,6,8,14,18
52:22 54:16 91:4
91:10,12,16,24
92:4,10 93:6 99:8
111:22 142:22,25

michael buckley                              Nell McCallum & Associates
Page 16

| | | | |
|---|---|---|---|
| 143:4,18,20,22 | 92:9 97:5,9 102:2 | 99:17,20,23 104:2 | **reiterate** 158:4 |
| 144:3,6,10 148:4 | 108:23 136:22 | 108:12 137:24 | **rejournal** 16:12 |
| 174:24 | 137:21,22,24 | **Recess** 64:3 123:22 | **relate** 11:7,20 |
| **quick** 7:17 41:15 | 154:11,13,14 | 148:20 175:3 | 15:13 59:21 |
| **Quinn** 2:4 | 155:17,19 156:7 | **recollection** 163:6 | **related** 13:14 37:4 |
| **QUINTON** 1:3 | 159:13 160:2 | **record** 1:24 4:3,5 | 40:24 59:15,16 |
| **quit** 23:25 | 164:15 165:1 | 4:23 5:15 10:17 | 68:3 89:20,20 |
| **quite** 16:21 17:8 | 174:8 178:1 | 63:24 64:1,4 65:7 | 94:9 96:17 103:25 |
| 26:25 28:18 30:25 | **readily** 15:16 | 65:8 84:9 114:20 | 116:13,14,15 |
| 56:14,14 58:7 | **reading** 30:12 | 115:24 123:20,23 | 117:23 171:9 |
| 62:6 74:20 110:7 | 45:17,24 88:17 | 148:19,21 170:7 | 179:9,10 |
| 144:2 161:2,2 | 138:12 146:24 | 172:24 174:7,9,11 | **relatedness** 32:8 |
| 171:11 | 149:12 | 174:15,18 175:1,4 | 104:9 |
| **quo** 21:21 | **readings** 138:3 | 177:8 179:11 | **relating** 15:14 |
| **quote** 48:13,14 | **reads** 126:2 | **recorded** 14:8,10 | 106:12 |
| | **real** 7:17 12:3 | 115:15 116:4,5 | **relation** 140:17 |
| ——— **R** ——— | 30:21 41:15 60:11 | **recorder** 84:12 | 160:15 |
| **R** 1:15,19 2:1,8,13 | 61:14 94:2 110:20 | **records** 14:20 41:3 | **relational** 139:22 |
| 3:5,12,15 4:1,11 | 114:7 144:1 166:4 | 43:24 125:22,23 | **relationship** 23:12 |
| 177:2 178:1,6,11 | 170:8 174:9 | 128:9,10 130:25 | **relatively** 16:13 |
| 179:4 | **really** 16:2,3 21:1 | 130:25 131:8 | 32:17 39:24 47:4 |
| **race** 28:10 163:25 | 26:3 30:13 40:13 | 134:15,16,19,19 | 58:11 112:18 |
| **racial** 22:17 23:11 | 71:17 118:16 | **recruitment** 56:17 | 158:12 |
| 23:20 24:20,21,21 | 127:10 131:10 | **rectify** 23:25 | **relied** 138:19 139:1 |
| 139:25 | 155:21 162:18 | **reduce** 170:24 | 173:15,17,19 |
| **raised** 91:25 | 167:25 | 174:18 | **relooking** 172:16 |
| **RAMON** 1:3 | **reason** 143:21 | **reduces** 145:25 | **rely** 12:12 14:3 |
| **ran** 61:3,6 | 177:7,7,11 | **reengineer** 56:15 | 15:19 137:1 139:9 |
| **range** 16:7 63:2 | **reasonable** 31:6,6 | 57:24 | 157:8,9 172:19 |
| **ranged** 63:6 | **rebuttable** 103:4 | **reference** 17:18 | **remedial** 23:22 |
| **ranges** 33:3 | **rebuttal** 36:19 | 19:9 | 24:4 31:23 |
| **rapidly** 55:1 | 103:7,11,22 | **referenced** 16:23 | **remember** 17:14 |
| **rarely** 118:9 | **recall** 17:15,22,23 | **referred** 25:21 | 22:24 25:8,13,14 |
| **ratcheted** 22:5 | 18:23,25 19:18 | **referring** 13:8 98:1 | 25:20,25 26:4 |
| **rate** 150:6,15 | 20:7,7 24:16,17 | **reflect** 86:11,21 | 27:1 28:2,3 31:18 |
| **raters** 45:22 46:6 | 25:6,24,25 27:2 | **reflective** 49:2 | 36:7 42:23 43:3 |
| **rating** 46:5 | 27:14 28:4 29:7 | **refutation** 175:23 | 48:14 98:8 127:14 |
| **ratings** 45:21 | 29:10,11,21 31:20 | **refute** 170:3 172:15 | 132:12,13 136:13 |
| **RAVENELL** 1:5 | 35:3 43:10,16,20 | **regard** 75:14 | 136:14 137:20 |
| **reach** 138:20 | 81:19,23 88:10,10 | **regarding** 20:22 | 139:5 142:24 |
| **reaching** 89:15 | 90:21 129:12 | 32:1,4 55:19 | 143:13 151:4 |
| **read** 8:3 13:23,24 | 139:12 143:12 | 158:24 159:3 | 164:10 |
| 16:10 17:24 18:1 | 149:5 166:18 | **regardless** 83:14 | **repeat** 85:9 172:2 |
| 19:6,10,10 21:5 | **receive** 5:1 10:14 | **regards** 163:24 | 173:3 |
| 21:14 23:10 36:17 | 35:1 137:13 163:9 | **regular** 16:10 | **repeated** 133:4 |
| 38:1,16 39:1,2 | **received** 5:7 34:23 | 20:20 | **report** 3:14 6:6,7 |
| 40:18 41:12 43:12 | 34:25 53:2 54:7 | **reheat** 84:11 | 6:10,13,22,24,25 |
| 81:24 90:7,22 | | | **reported** 1:22 21:5 |
| | | | 21:7 23:21 113:7 |
| | | | 113:8,9 |
| | | | **Reporter** 4:4 45:23 |
| | | | 46:1 115:19 179:3 |
| | | | **Reporter's** 3:7 |
| | | | 179:1 |
| | | | **reports** 5:18,18 6:6 |
| | | | 11:6,20 |
| | | | **represent** 1:6 25:11 |
| | | | 147:6 |
| | | | **representation** |
| | | | 95:25 141:11,14 |
| | | | **represents** 20:24 |
| | | | **reputation** 172:14 |
| | | | **requests** 15:12 |
| | | | **require** 22:8 48:22 |
| | | | 85:24 120:12 |
| | | | 138:1 |
| | | | **required** 86:12 |
| | | | 147:8,12 |
| | | | **requirement** 85:15 |

7:1,2,4,6,7,9,9,11
8:4,7 9:15,18 11:8
11:23,25 16:24
17:12 18:9,13,14
18:20,21 19:19
22:23 23:6,8,9,9
24:6,8 29:4 36:20
38:6 41:16,17
47:25 48:2 76:5
76:16,16,17 77:5
77:13 90:2,5,23
96:10,18 97:16
100:15,17,21,24
101:4,22,25 102:2
102:4,4,8,13,15
102:16 103:4,7,9
103:12,22 107:10
110:24 111:4
118:23 119:3
125:11 126:16
127:16 129:13
133:9 136:18,18
136:24,25 137:1,2
137:21 143:15
167:17 169:21

michael buckley

106:13 138:5,10
requirements
  88:15 106:9,10
  110:23
requires 48:21
  162:11
reread 13:5
research 16:2
  25:21 46:12 52:5
  52:11 53:1 59:13
  59:13,24 60:4,5
  60:17 140:20
  142:11 145:16,23
  149:12,13 158:19
  159:9 164:1,20
  165:7,11,15 176:4
researcher 16:1
researchers 25:17
Reserve 71:10
residents 48:16
resource 13:4 17:3
  17:4,9,10 18:3,4
  31:7 34:6,7 56:18
  57:25 58:23,25
  96:12 121:22
  124:10 125:1
  147:10 152:17
resources 42:25
  55:5 56:16 57:22
  58:15 61:21 71:5
  110:8,9 119:11
  120:8 124:5
  148:10
respect 17:8 171:11
response 6:2 9:12
  9:17 18:12 20:23
responsibilities
  13:22 74:13
responsibility 51:2
  55:15 120:7
restate 103:3
Reston 17:17
rests 169:24
resulted 119:10
results 125:25
  128:25 133:12
  135:12 144:15

resume 50:8,11
  56:2 66:25
retain 55:19 66:3
  100:14
retirement 166:8
return 45:2
reveal 88:15
review 12:5 16:15
  17:1 19:12 77:12
  77:15,21 78:11
  88:2,7,9,11,22,25
  89:3,11 90:2,23
  98:20 120:21
  121:1 142:20
  143:6 149:1 171:6
reviewed 16:23
  17:11 18:9 19:14
  37:18 76:12 77:2
  88:15 89:15 90:14
  99:4
reviews 121:6
Rich 165:14
Richard 2:13
right 5:20,20 6:13
  8:6,8 14:7,18 15:4
  18:8 19:1 20:10
  22:13 24:9,18
  25:5,5 30:7 33:5,5
  35:13 41:19,24
  44:16 45:6,6
  47:15 48:2,18
  50:17,19 53:14,16
  55:16 56:14 62:9
  63:19 66:25 67:24
  79:4 83:3 90:6,6
  96:22,22 97:7
  100:5 102:3,5
  103:5 106:21
  108:7,7,7,17,19
  111:5 115:21
  116:10 122:25
  123:2 126:17,18
  126:20 128:8,11
  128:12 129:6,23
  129:25 133:9,11
  133:15,18 134:12
  134:14 140:9

141:9 144:12,12
  146:12 153:15
  156:20 158:21,21
  158:23 166:17
  171:17,22 173:21
  174:22
ROA 44:23 45:8,9
ROANE 1:3
Roberson 42:11
  43:1
ROBERT 2:4
role 50:20 53:12
  70:25
rolling 84:10
Ronald 4:25
room 143:23 144:1
  145:1
rudimentary 162:5
  162:9,23
rule 138:16,20
  139:9 153:21
  154:2,6,19 156:1
  156:5,10,12
rules 1:23 4:6,7
  22:7
run 31:2

_____ S _____
S 2:1 4:1
Sadler 89:1,2
safekeeping 179:7
safety 41:3 43:24
  83:25 113:3,7,7
  124:23,24 125:8
  125:22 128:9
  130:25 131:7,10
  134:15,19,21,22
salaries 32:18
salary 32:19,24
  33:1
sat 7:1 11:21,25
  29:17,21
satisfaction 165:15
  165:16
satisfies 66:9,12
save 59:18
saw 23:3 38:8,11
  43:18 47:9 83:21

107:19 119:17
  129:9,11 149:4,4
  174:9
saying 22:2 44:6
  97:4
says 25:18 45:20
  46:15,21 69:2
  92:22 111:8
  145:23
scheduling 9:1
scholar 60:12
  164:25
scholarly 16:8 65:9
  158:12 167:9
scholars 164:20
school 33:14 52:10
  55:5 71:10 132:16
Schraeder 1:23 2:9
science 25:17
sciences 17:19 40:4
  113:13 157:8
scientific 45:10
  68:6,12 104:8
  170:1 172:12
  175:18,22 176:8
scientists 48:15
scope 88:23
scores 125:20
  127:21 130:11
  133:17
scrutinize 171:14
scrutinized 171:9
scrutiny 116:15
seal 178:14
searching 151:23
seat 103:20
second 7:11 8:13
  63:25 102:15
  104:18 111:2,3,4
  111:6,8
seconds 123:16
secretarial 51:1
see 6:1 13:24 20:10
  21:22 22:16 45:14
  56:8 58:22 59:14
  60:11,13 61:12
  73:3 75:8 82:17

104:14 112:6,8
  117:17,20,23
  138:24 139:7
  147:5 148:14
  149:2 152:18
seeing 43:16 82:3,6
  172:17
SEEK 1:6
seen 37:4 82:18
  96:2 99:15 106:14
  159:25 164:4
select 61:4 64:21
  108:2
selected 49:14
selection 13:4 17:3
  17:4,10 41:11
  44:5,10 47:1,16
  51:4 53:21 54:9
  56:17 58:19,19
  64:8 66:11 68:2
  75:23 78:18,21
  80:17,21,23 81:5
  81:18,21 85:17
  90:20 92:5 93:7
  93:11 94:1,13
  95:15 99:14
  105:18 108:10
  115:8 116:23
  118:3 119:1 121:7
  123:10 126:4,5,10
  126:13 127:6,12
  127:16 128:14
  130:2,12 131:8,9
  131:12,25 138:7,8
  149:6,10,20
  168:21,23
selections 50:20
  121:2 129:24
  157:1
self 84:7 114:3
seminal 17:18
send 8:24 151:2,4
sense 48:23
sent 10:5 12:6
  34:21,21,21 77:24
  77:25 78:4 100:3
  100:7,8 150:19

michael buckley                    Nell McCallum & Associates
Page 18

151:3 176:13
sentence 111:8
    125:15
separate 146:11,13
series 35:6 42:21
    51:23 133:3
serve 29:16
service 63:15
set 52:6,18 92:1,2
    127:12,24 128:2,8
    128:11,12 143:4
    157:1
seven 158:15
Seventies 58:9
sexual 21:4,9,25
    23:19 80:7
sheet 177:6
SHELDON 1:4
short 66:5 132:19
shorthand 1:22
    179:3
short-term 25:23
show 5:6 30:14
    48:17,17 99:6,13
    138:25 159:9
    172:24
shown 31:9 93:2
    158:10
shows 149:12,13
signature 3:6 178:2
significance 154:20
    155:2,9
significant 21:12
    60:4 89:16,18
    137:18
significantly 85:13
similar 14:20 24:20
    54:15
SIMMONS 1:3
simply 170:2
single 68:19 70:11
    72:11 157:9,9
SINGLETARY 1:4
SIOP 13:15 75:24
    75:25
sir 32:14
sit 39:2 66:20

site 63:7
sitting 103:20
situation 21:3,14
    21:19,20,23,24
    23:16,25 119:8
    141:3 148:2
situations 46:14
    118:22 140:25
    152:8
skill 133:21
skills 61:8 84:4,7
    84:10 114:5
    125:22,24 128:7
    128:23 130:16
    133:6 134:5,13
    135:13,18 136:4,5
    136:11,14
slam 134:18
slash 125:21
slew 16:17 34:21
Slow 46:1
small 32:17 69:18
    73:15,15,16,18
smart 121:20,23
Smith 42:7
SMSA 140:6
society 22:4
solely 79:7 172:19
    173:15,17,19
solid 168:22
somebody 9:25
    23:15
someone's 114:15
somewhat 35:19
    36:17 38:1 159:16
soon 24:3 25:18
    29:17,17 100:7
sorry 23:20 35:7
    41:18,18 45:24
    46:3 68:22 88:9
    107:21 109:2
    141:10,13 143:16
    151:1 170:9,9,11
    170:14
sort 57:17 103:20
sound 119:10 123:4
    123:10 133:5

140:22 148:9,11
source 16:4 41:21
    68:19 70:11 72:11
    75:20 76:10,14
    88:6 97:6 110:5
    110:12,18 157:9
    166:22
sources 68:19 69:3
    69:24 72:10,12
    95:7,8 110:16
South 1:1 4:6 68:24
Southtrust 2:5
spare 60:8
speak 151:14,15
speaking 46:2
specific 13:19
    15:21 16:5 19:16
    20:18 22:8 38:4
    38:22 39:7,14
    40:10 43:19 44:19
    48:24 49:6 54:8
    69:6 70:8 87:18
    89:3,8,9 101:9
    110:2 112:10,22
    114:14 121:17
    143:12 164:9,12
    165:18
specifically 13:14
    15:18 17:21 34:13
    41:13,14 46:25
    66:24 87:11 102:7
    105:11 147:12
specifications
    72:21 119:18
specifics 109:8
specify 90:17
spectrum 63:9
speculate 115:17
spent 73:13
spoke 39:17
spot 130:7
staff 51:1
stages 46:16
stake 168:1
stand 39:2
standard 12:17,19
    12:24 13:18

107:18,20 120:6
    142:17
standards 13:15,17
    13:17 75:18
    161:16,22 162:6
    162:18,19 163:6
standpoint 57:23
start 84:20
started 7:13 30:19
Starting 64:5
    123:24 175:5
state 1:22 4:23 16:1
    27:10 48:16
    131:24 178:9,18
    179:3
stated 1:24 18:15
    142:21
statement 46:21
    47:21
statements 14:8,10
STATES 1:1
statistical 53:24
    74:19,20,21,22
    75:3 136:18 137:5
    137:8 140:7,15,18
    140:22 154:20
    155:2,9,16,18,23
statistically 117:21
    137:17 156:5
statistician 155:12
    155:15
statisticians 155:8
    155:25
statistics 27:19
    137:11,12,15
    153:17 155:14,21
status 21:21
stay 14:17
steel 1:10 2:6 15:6
    36:1 93:12 94:16
    95:1,12,15,20
    99:12 106:19
    108:21 118:4,20
    120:16 131:15
    132:6 143:8 149:2
step 29:23 39:6,6
    71:23

steps 117:10,12
stereotypes 159:11
Stigometric 137:14
Stipulations 3:4
    4:4
stock 139:18
    154:23
stocker 82:16 87:10
store 57:4
straight 163:7
structure 143:1,7
    143:10,11 144:4,9
    144:16,20 146:16
    146:18,20 149:13
    149:14
structured 51:21
    143:3 145:19
    147:3,5 148:23
    149:11,17,18,21
struggled 111:24
stuck 40:13
student 17:6 50:7
    60:8 62:12 63:10
    63:11 132:14
    159:19 164:4
students 74:13 75:7
    138:24 153:7,8,9
studies 59:4 60:15
    63:14 67:25 70:22
    95:11 138:1
    139:14 151:20
study 32:2 45:11
    58:16 59:9,11,23
    59:24 60:18 62:2
    62:3 80:15 94:24
    104:22 140:18
    141:6 156:23
    176:4
studying 175:19
stuff 23:2,4 37:11
subgroups 141:12
    141:15
subject 116:24
subjective 38:9,9
    38:10 39:17,21,23
    39:24 40:9 41:6
    43:7 45:21 46:5

michael buckley

46:15 47:2 65:4
65:11 95:6 111:9
111:11,25 112:6,8
112:11 113:4,12
113:14,14 114:1,6
115:4,12 116:23
117:1,13 118:7,14
118:21,24 119:1
126:24 133:24
134:11,24,25
135:12,14,18
170:21,25
**subjectivity** 41:9
45:13,14 46:9,13
49:18 107:11
116:25 127:8
157:25 163:24
165:2,20 170:24
171:3 174:1,4,6
174:19
**submitted** 19:13
**subordinates** 70:2
72:6
**subpoena** 5:1,7,16
5:17 6:2 7:16
**subscribed** 178:12
179:12
**subset** 38:14
125:19 126:7
**subsets** 126:3,17
**successful** 59:25
**succession** 69:14
**sufficient** 59:5
99:13
**suggest** 119:8 138:8
138:13
**suggested** 33:15
40:3 58:5 92:21
**suggesting** 102:23
**suggestions** 53:10
53:12 62:8
**Suite** 1:23 2:10
179:18
**Sumoski** 42:15
**supervisor** 98:20
**supervisors** 70:1
72:6 116:5 122:17

125:18 126:16
142:21 144:14
**supervisory** 45:21
46:5
**supplementary**
162:11
**support** 45:11
**supporting** 72:3
**supportive** 31:5
**sure** 5:3 7:19 12:20
19:22 20:10 22:15
23:2 28:18 29:9
32:14 35:16 39:1
41:16 43:8,8,15
51:17 54:5 56:5,9
56:9,12,23,24
67:5 71:20 72:15
74:25 76:8 79:9
79:21 87:2 109:19
109:19 112:8,24
118:16 122:3
125:12,14 129:3
135:6 138:17
141:22 142:24
143:2 147:16
148:25 153:24,24
155:11 159:5,12
160:12 164:12
166:1,4,14 168:9
168:10 169:9
172:18
**Surely** 130:13,15
130:17
**surprised** 108:23
**surrounding** 28:20
62:23 74:10
166:10
**survey** 62:11 63:8
68:25
**Susan** 158:20,21,23
**suspension** 115:24
116:7
**switch** 123:19
**sworn** 1:20 4:13
179:4,12
**Sydney** 160:11
**system** 62:17,25

118:9
**systematic** 103:11
103:21
**systems** 62:20
165:20

————————
**T**
**take** 6:1 10:25
23:23 26:9 38:3
79:4 120:7 148:18
151:10 171:6
**taken** 1:20 14:9,16
31:23 53:23 80:11
179:10
**takes** 174:4
**talk** 10:16 14:12
16:24 25:17 34:1
34:4 35:13 46:23
47:8 48:6,19 50:8
51:6 52:15 54:3
54:17 60:22 65:16
67:18,22 68:13
72:2,4,5,6,6 80:20
98:6 114:13
125:11 142:19
150:4 169:22
170:22,22 174:23
**talked** 21:13 40:12
52:9 56:2 58:9,18
70:15 71:16 96:11
107:16 113:13
133:7 143:15
148:3 157:22
164:4,22,22
169:18,19 174:10
**talking** 22:6 23:15
32:18 44:11 67:20
79:23 90:17 94:8
94:20 96:20 98:4
98:6 107:21
115:21 124:1
145:10 146:3
157:25
**talks** 43:25 145:17
160:12 170:15
**tape** 63:22 64:2,5
123:17,21,24
175:2,5

**tapping** 68:4
**tasks** 16:18 70:19
**teach** 17:25 65:18
152:25 153:1
**teaching** 74:12
152:23 153:5
**team** 114:9,15,21
**teamwork** 84:6
114:3,13
**technical** 86:8,8
106:9 109:13
110:21,23 125:22
128:7 130:16
134:5,13
**technique** 160:22
160:24
**techniques** 46:6
**telephone** 15:4
**tell** 17:25 19:2
24:17 35:25 39:3
39:5 53:6 60:3
72:4 102:14
103:10,18 112:25
135:18 143:24
154:4 164:3,15,16
167:14
**telling** 83:16
**tells** 103:19
**ten** 70:22
**tend** 159:11
**term** 109:13,14,15
**Terminal** 53:1
**terminated** 27:23
**termination** 34:8
**terms** 21:3 24:21
58:24 60:17 66:16
102:10 107:20
118:17 136:3
140:6,13 146:17
158:12 165:13,14
165:16 167:12
176:2
**test** 53:20 59:14,20
89:19,19 90:13,21
96:15,16,17,21,25
97:1,3,10,11,15
97:17,19,20,22,24

98:1,2,7,8,11,18
134:7 171:8
**testified** 4:14 22:9
22:11 26:20,22,23
28:9,16 29:6 32:1
32:4,7 75:14
92:15,23 93:1
**testify** 26:5 103:16
**testifying** 26:6 27:6
27:8 41:5 86:10
120:15,17 126:15
**testimony** 12:13,15
16:24 22:21 30:4
30:6 31:3 49:3
78:19 79:7,12,19
80:2,5,24 81:5,22
88:11,14 91:16
93:11 97:9 99:12
142:20 143:6
149:2 150:9,10,12
179:4
**testing** 75:19 139:3
**tests** 53:17,21
58:19 89:4,8,11
89:23,25 90:17,19
95:14,18,20,23,25
96:2,7,9,11
116:13,14 171:6
**Texas** 1:22,23 2:10
179:3,18
**text** 13:8 14:1
16:25 17:11,13,20
17:21 18:3 76:4
**textbook** 13:10,12
**textbooks** 17:24
18:1 110:17,19
**texts** 16:22 17:1
**Thank** 5:25 19:24
20:9 176:16
**theories** 40:5 129:8
158:5
**theory** 137:14
**thesis** 31:14
**thing** 5:21 7:25,25
9:20 10:5 20:14
21:2 44:7 79:16
101:14 154:8,9

michael buckley
Page 20

Nell McCallum & Associates

164:24 168:7,11
169:6
**things** 6:9 8:19
13:19 14:2,25
16:14,17 19:2,4,4
19:6 25:20,22
34:4 40:18 41:4
46:17 48:12,24
52:12 53:20 54:1
54:16 56:17 61:24
64:19 70:10,20
77:10 107:8,15,15
107:16 108:23
113:24 123:7
129:22 136:7
140:12 146:11,13
154:23 156:19
160:14,16 167:19
167:20,24 168:16
176:3
**think** 7:5,5 10:6
16:2,3 17:8,18
19:5 22:1,5 23:6
23:10 24:8 28:4,4
31:4,19,20 34:5,9
34:20 37:3,12
38:6,25 39:22,25
40:11,18,20 41:3
41:7,8 43:11,12
44:3,21 45:13
47:2,14,22 48:13
52:21 54:15 56:4
58:24 61:5 65:6
65:22 66:16,18,21
68:10 69:4 70:17
72:8 73:11 74:9
76:19 77:22 78:17
78:20,22 81:2,25
82:2 85:10,21
89:16 91:9 94:3
94:17,21 96:11
98:1,13 100:1
105:6 107:15,17
110:20 111:4
115:5 116:3
118:22 119:15
120:5,18 121:20

123:4,6 124:18,21
128:7 129:15
132:1 134:16
136:3,5 137:9
142:23,23 143:9,9
143:10 145:22
146:17,24,25
147:2 148:9,11
149:16 150:13,20
151:4 153:23
154:25 156:2,19
157:2,7,7,11
158:4,8,18,23
160:8,9,12 161:2
161:9,15,15,17
162:2,4,11,15,22
163:5,6 164:2,15
164:19 165:14
166:4,5 167:21,24
167:25 168:3,7
169:20 170:16,22
171:3,7,13 172:12
172:18,24 174:20
176:5,5
**thinking** 14:23
114:23
**thinks** 92:16
164:16
**thought** 45:13 46:8
54:20 56:18 58:20
58:20 60:15 66:15
68:3,4 70:1,2
129:13 141:3
154:4,7 156:17
166:7
**thoughts** 107:8
**thread** 88:20
**three** 60:13 145:1,3
148:3 164:5
**thrown** 118:24
**time** 6:18 9:2 45:17
59:16 61:9 66:5,6
67:11 72:22 73:13
73:14 79:4 83:20
86:14 103:3
113:14 132:19
144:1 145:3

146:10 153:23
161:1,21 165:25
169:9,12
**times** 8:19 40:18
115:14
**timewise** 73:21
**timing** 70:16
**Title** 27:13,14
**today** 4:21 5:2 6:2
6:17,24 7:3 11:8
11:11,17 18:10,17
18:18 28:13,14
103:15 151:6
167:11
**today's** 4:2 169:5
**told** 10:13 21:16
34:15 97:18
169:10
**top** 61:4 106:17
111:8
**total** 150:22,23
**touch** 34:18
**Tower** 2:5
**track** 166:2
**trained** 70:10 74:9
112:10,12,16
137:10 155:13,16
**training** 51:18,20
53:2,24 54:7
62:23 68:17 74:19
74:20,21,22
112:20,21,22,25
121:10,14,20,23
121:24 122:1,7,11
122:15 125:24
128:20 135:7
137:12 140:15
158:13 163:10
164:7
**transcript** 179:6
**transcription** 177:9
**transcripts** 5:19
99:24 104:4,25
105:17 106:22
108:16
**travel** 8:19 9:2
**tree** 131:22

**trial** 3:12 12:12
179:8
**tried** 18:3 23:22
24:4,4 27:18
167:15
**troubleshooting**
84:7
**true** 137:25 174:12
178:3
**truly** 134:25
**truth** 24:17 154:4
167:14
**try** 19:3 23:25 60:4
61:4 70:9 107:8
138:24 154:13,13
164:10
**trying** 28:1,1 52:21
98:8 143:13
153:23 164:2
167:19 170:3,15
176:7
**Tulsa** 26:23,23
29:6
**two** 15:16 17:14
69:19,20,22 73:23
73:24 79:2 114:2
146:11 164:24
165:11
**type** 9:1 11:15
19:15 24:20 53:17
57:18 131:13,14
131:21 137:8
139:17 140:19,19
152:14 161:19
165:16
**types** 5:17 51:12
69:16
**typical** 151:10
152:13,14
**typically** 16:5,7
25:10 30:23,25
33:3 46:13,21
52:1,8,15 53:11
64:23 65:22 66:5
67:19 75:19 78:23
112:1 136:16
151:22 160:17

**typo** 12:8

──────── **U** ────────

**Uh-huh** 12:23
20:13 22:18 41:23
42:8,10,14 50:13
51:9,11 61:1 64:9
64:12,16,18 69:9
76:13 81:16 84:2
84:14 96:24,24
104:7 112:13,17
115:22 117:14
118:12 125:17
128:19,22,24
129:1 139:8
140:16 142:15
148:17 151:17
166:12
**uncomfortable**
32:18
**understand** 19:14
23:4 57:20 60:5
79:9 83:6 122:3
141:21 159:6
173:7
**understanding**
45:4 85:23 153:19
153:25
**uniform** 12:17,21
37:16 49:25 51:3
66:10,13,17,23
70:16 77:16 85:16
85:20,24 106:4,7
106:11,16,19
110:19 118:25
120:9,12 137:25
138:16 147:8
**union** 30:17
**unit** 127:2,4
**UNITED** 1:1
**univarinte** 137:14
**university** 13:2,22
16:1,19 17:7
32:18 33:1,14
34:3 46:11,11
50:14,15 53:8,8
53:10 60:7 64:8
65:3 68:24 71:1

michael buckley

71:11 73:20 74:5
122:23 123:8
128:6 136:9
137:11 151:19
unnamed 71:7
unstructured
142:12,14,16,17
unusual 40:13
updated 54:24,24
upright 34:17
use 3:12 12:15
13:14 16:6,7
17:18 27:18 40:6
51:21 52:13 53:17
53:20 54:13 59:18
62:20 65:15 69:3
75:23 84:16 97:20
108:10 110:18,19
110:19 113:18
114:20 119:1
139:21 140:22
141:16 157:1,3,4
157:5,6,12,17
159:14 160:5,10
160:17,20 162:3
179:7
useful 162:12
uses 40:24 52:7,19
97:19
usually 53:10 69:18
110:7,9
utility 84:12

------- V -------
valid 47:16 48:5,8
48:24 49:7,12,20
78:19 93:12 94:1
94:5,13 96:7,25
97:4 99:14 104:12
104:19 149:6,10
149:17,20 150:2
validate 152:9
validated 48:12
138:5,6,8 168:22
validation 32:1
55:20 58:16 59:4
59:6,9,11,14
60:18 62:2,3

63:14 67:25 75:22
80:15 94:24 95:11
117:8,9 138:1
validity 59:16
70:22 93:15,17
96:9 97:1,3
104:22,25 116:24
117:2,15,25
149:13
value 57:4,4,25
59:1 152:18
Van 15:25 19:9
variable 141:17
165:17
variables 141:5,8
various 37:2
Veres 33:13,17
34:1,14
verify 137:4
versus 44:13 45:1,5
vice 31:1
Videographer 2:13
4:2 64:1,4 123:16
123:20,23 148:19
148:21 175:1,4
176:20
Videotape 3:11
VIDEOTAPED
1:14,19
view 45:20 46:4,4
153:20 154:2
155:25
viewed 75:19
violate 108:21
violation 106:11,16
134:21,22
violations 113:3,8
Virginia 17:17
visit 57:14
visited 87:12
visits 63:7
vitae 60:4 164:3
volitional 46:18
VS 1:8

------- W -------
Wait 45:23,23,23
Waley 21:6

want 5:11,14 38:15
38:17 47:8 54:3
56:6,7 63:22 64:7
67:19 71:20 72:3
73:3 95:1,4 96:18
99:7 101:12 103:2
117:10 148:18
151:14 152:18
165:4 170:22,24
172:15,22 174:23
wanted 21:22 22:3
24:1 57:20 77:21
160:10
wanting 170:10
wants 169:22
warehouses 57:13
57:14
Washington
131:24
wasn't 21:19 31:11
31:18,22 44:8
59:24 92:6 94:19
96:12 118:15
127:10 132:23
136:20,20 137:6
167:4,4 175:11
way 11:7 15:7,13
40:23 46:25 60:15
66:18 68:17 72:8
91:1 97:20 101:24
103:22 108:2
113:20 114:7
117:21,23 133:21
135:17 140:4
151:6
Wayne 17:15
ways 71:12 114:14
117:7 118:1 154:5
154:24 160:21
175:21
weeks 18:21 73:23
73:24 164:5
weigh 65:19
weight 54:1,8,11
65:14
weighted 65:21
127:2,4

weighting 47:5
54:14 118:18
Welch 90:24
Welch's 137:21
welcome 9:14
14:25
well-known 13:4
60:12 171:11
went 13:2 23:5
27:22 29:5,5
33:14 52:10 60:9
132:16 158:15
weren't 27:22
58:21 168:2
West 1:23 2:10
Western 71:10,13
we'll 10:25 77:7
123:18 133:16
139:16
we're 4:3 9:19 22:3
25:19 44:11 46:21
46:22,23 48:15,16
63:19 65:17 79:23
90:17 146:24
we've 44:17 76:10
103:3 133:7
174:22
white 1:4 27:17
Wiggins 2:4,4 4:8
5:11,14,20 7:24
10:4,10 26:15,16
26:19 32:13,20
33:20 35:2 37:8
49:1 79:1,8,20,23
80:25 81:7 82:12
82:23 83:1,6,11
83:16 84:17 85:5
86:23 89:7 90:16
91:4,13,18,25
92:6,13,20 93:1
93:18 95:17,24
97:14,18 98:3
99:6 100:3,7
101:12 102:9
103:2,6,10,14,18
104:16 142:2
163:3 165:4

167:10,22 169:1,7
172:1,22 173:7,10
173:16 174:25
175:8 176:16,18
William 42:11 43:1
willing 84:12
114:23 171:12
wish 38:12 48:14
withstand 116:15
witness 1:20 4:12
10:8,12,18,20,24
11:2 20:15 26:21
28:16,17,24 29:3
29:8 32:16 33:11
42:12 45:24 46:2
82:25 83:3 100:5
100:9 170:14
179:4
woman 145:22
wonderful 46:10
46:20 163:22
164:24
WOPS 132:1
word 97:19,20
151:25 152:2
wording 43:19
work 15:24 30:15
32:16 34:7,15
37:23 41:3 51:15
56:2 57:7,12
60:15 62:13 64:10
73:12 79:5,13
84:7,8 100:18
109:20 114:4,9,15
114:21 115:4
117:12,22 125:21
127:25 128:3
130:14 132:17,19
132:23 134:1
136:15 151:13
152:5,7,15 156:22
162:1 164:11,17
164:21,22,23
165:21 167:4
worked 32:13
56:11 60:22,24
166:6

michael buckley
Page 22

Nell McCallum & Associates

| | | | |
|---|---|---|---|
| **working** 36:1 73:13 93:6 | 97:18 100:9 102:6 103:13,15 110:25 | **10:32** 123:20,22 **10:34** 123:22,23 | **3** |
| **works** 60:16 138:25 | 117:19 119:5 | **10:58** 148:19,20 | **3** 3:14 9:6 20:1,2 |
| **wouldn't** 35:19 | 125:10 131:4 | **1000** 1:23 2:10 | 84:6 119:3 123:24 |
| 39:2 47:8 126:10 | 134:18 136:20 | **11** 3:13 15:11 84:10 | 125:21 175:2 |
| 159:2 166:24 | 137:15 139:18 | **11:00ish** 169:8 | 177:8 |
| 168:1 | 148:11 150:23 | **11:26** 148:20,21 | **30** 123:16 |
| **write** 65:13,20 | 151:9 152:2 154:4 | **11:52** 175:1,3 | **31** 179:16 |
| 136:2 144:3 | 159:12 162:24 | **12** 84:11 | **35203** 2:5 |
| **writing** 143:18,19 | 163:16 165:25 | **12:31** 175:3,4 | **3727** 179:15 |
| **written** 11:10,11,15 | 168:13 171:19 | **12:33** 1:21 176:21 | |
| 14:2,8,10 16:11 | 174:2 176:18 | 176:23 | **4** |
| 22:23 38:15 52:6 | **year** 27:1,17 33:1,4 | **13** 84:12 | **4** 3:4,5,16 11:5 |
| 52:9 54:10 65:23 | 45:3 50:7 71:13 | **14** 85:21 86:8 | 41:19 76:6,14,24 |
| 65:24 66:4 68:24 | 73:24 151:22 | **14B2** 45:19 | 82:9 84:6 125:22 |
| 76:18 84:3 96:10 | **years** 22:10,12,19 | **14C** 85:21 86:8 | 134:15 175:5 |
| 124:13,14,18 | 26:25 56:14 60:2 | 106:8 | **40** 28:7,8 |
| 125:5,6,8,20 | 111:24 131:25 | **1400** 2:5 | **41** 27:17 |
| 127:21 130:12 | 147:25 158:15 | **15C** 85:21 106:8 | |
| 133:17 139:2,6 | 165:15 166:8 | **178** 3:6 | **5** |
| 142:22,25 143:13 | **yesterday** 10:15 | **179** 3:7 | **5** 3:11 77:5,6,8 84:7 |
| 143:21 144:5,9 | 82:20,21,22,24 | **1987** 60:25 | 102:16,18 125:13 |
| 165:23 174:7 | 83:17,18,20 99:19 | **1989** 69:4 | 125:23 134:23 |
| **wrong** 28:21 | 100:4,6 | **1992** 56:13 | **500** 63:20 67:4 69:5 |
| **wrote** 7:2 22:23 | **young** 15:25 21:6 | **1997** 25:12 56:13 | 70:23 71:7 |
| 24:2,6,8 58:8 | **you-all** 7:1 | **1998** 50:16 | **5300** 179:18 |
| 70:15 139:4 | **y'all** 53:17 91:22 | | |
| 169:18 | 169:24 173:4 | **2** | **6** |
| | **y'all's** 33:21 77:17 | **2** 3:3,13 11:3 64:5 | **6** 12:10 84:7 96:18 |
| **X** | | 84:3 111:1 123:21 | 125:23 |
| **X** 143:25 | **Z** | 125:21 177:8 | **60** 107:24 |
| | **Zygarnic** 25:17,18 | **2:0422005-12** 1:9 | **600** 179:18 |
| **Y** | | **20** 3:14 178:15 | **61** 107:25 |
| **yeah** 7:18 9:21 10:8 | **$** | 179:13 | **62** 179:17 |
| 10:18 17:22 18:11 | **$10,000** 33:3 | **200** 73:17 | |
| 22:11 23:8 32:22 | 151:22 | **2002** 22:17 23:1,7 | **7** |
| 33:21 34:20 38:19 | **$13,950** 150:20 | 24:13 25:3 | **7** 14:7 27:13,14 |
| 39:13,22 40:11 | **$197,000** 33:1 | **2003** 22:17 24:19 | 84:8 125:24 |
| 41:3,14 43:22 | **$450** 150:7 | 24:20 25:1 | **713** 179:19 |
| 54:10 56:3 59:8 | **$900** 150:11 | **2004** 22:17 24:15 | **77007** 179:18 |
| 62:12 63:21 65:12 | | 82:16 | **77042** 2:10 |
| 65:22 67:24 71:22 | **1** | **2006** 1:16,21 4:3 | |
| 71:25 73:25 74:2 | **1** 3:11 5:13 64:2 | **2007** 179:16 | **8** |
| 74:25 76:7,19,21 | 83:25 125:19 | **22** 1:16 4:3 20:4 | **8** 33:3 84:8 125:25 |
| 76:25 77:9,11 | 129:22 130:5 | **22nd** 1:21 | 129:22 130:5 |
| 79:9,22 80:3 | 133:8 177:8 | **2500** 1:23 2:10 | 133:8,14 |
| 82:22,23,25 86:16 | **10** 60:2 67:9,10,17 | **281** 2:11 | **8:28** 1:21 4:3 |
| 87:2 88:13 94:20 | 68:1 73:18 84:9 | | **80** 69:1 138:16,20 |
| | | | 153:21 154:2,6,19 |

| | |
|---|---|
| 155:25 156:5,10 156:12 | **9** |
| **82** 3:16 | **9** 84:9 125:25 129:21 |
| **83** 69:1 | **9:24** 64:1,3 |
| **833-2200** 2:11 | **9:33** 64:3,4 |
| **861-0203** 179:19 | **91** 25:15 |
| | **93** 68:25 |
| | **95** 25:15 |
| | **97** 144:19 |
| | **99** 25:6 |