IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Quinton Brown, Jason Guy,<br>Ramon Roane, Alvin Simmons,<br>Sheldon Singletary, Gerald White,<br>and Jacob Ravenell,<br>Individually and on behalf of the class<br>they seek to represent,<br><br>        Plaintiffs,<br><br>vs.<br><br>Nucor Corporation and<br>Nucor Steel Berkeley,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No.: 2:04-22005-CWH<br><br><br><br>ORDER |

## I. BACKGROUND

On December 8, 2003, thirteen original plaintiffs filed a putative, nationwide class action

pursuant to 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as amended, in the

United States District Court for the Western District of Arkansas against Nucor Corporation.

The original plaintiffs, all African-American males, claimed that Nucor discriminated against

them at Nucor facilities in South Carolina, Arkansas, Texas, and Alabama.  At the time that the

litigation commenced, 611 employees worked at Nucor Steel Berkeley, in Huger, South Carolina;

of those, seventy-one were African-American.

On August 24, 2004, United States District Judge Harry F. Barnes of the Western District

of Arkansas severed the plaintiffs' claims into four separate cases and transferred each case to the

judicial district in which the unlawful employment practices allegedly occurred.  Accordingly,



this case was transferred to the District of South Carolina. The plaintiffs in the instant case

(Quinton Brown, Jason Guy, Ramon Roane, Alvin Simmons, Sheldon Singletary, Gerald White,

and Jacob Ravenell ("the plaintiffs")), are African-Americans who are current or former

employees of Nucor Corporation and/or Nucor Steel Berkeley (collectively, "the defendants").

By consent of the parties, the plaintiffs were granted leave to file their third amended

complaint ("the complaint"), which is the operative complaint in this case. The plaintiffs seek,

inter alia, a declaratory judgment that the alleged discriminatory employment practices are

illegal, as well as a permanent injunction, equitable remedies, back pay, nominal, compensatory,

and punitive damages, costs, attorney's fees, and prejudgment interest. Compl. ¶ 64, ECF No.

35, Ex. 3.

On May 7, 2007, the plaintiffs filed a motion for class certification, seeking to represent

the following class:

> All African-Americans who are or were employed at the Nucor Berkeley
> manufacturing plant in Huger, South Carolina at any time since December 2, 1999
> in the beam mill, hot mill, cold mill, melting, maintenance and shipping
> departments (hereafter "production departments") or, in the alternative, for such
> separate classes or subclasses of such persons as may be appropriate under the
> Federal Rules of Civil Procedure.

Mot. for Class Certification 1, ECF No. 184. The plaintiffs seek class certification pursuant to

Rule 23(b)(2) "on the ground that injunctive and other equitable remedies are the primary relief

sought against a pattern or practice of racial discrimination against African-American employees

in promotions and a hostile work environment." Id. "In the alternative, plaintiffs seek hybrid

certification of the equitable claims and relief under subpart (b)(2) and the certification of the

punitive damage claims under subpart (b)(3) of such Rule." Id. 1-2. The plaintiffs advanced the



following three claims on behalf of the class: (1) Nucor engaged in a pattern or practice of disparate treatment against African-American employees with respect to promotion opportunities at the plant; (2) Nucor's promotion procedure, which allowed white managers and supervisors to use subjective criteria to promote employees, had a disparate impact on African-American employees who applied for promotions; and (3) Nucor required African-American employees to work in a plant-wide hostile work environment.

To support these claims, the plaintiffs proffered testimony describing racial hostility against African-Americans at the Berkeley plant. The plaintiffs allege: (1) white employees and supervisors referred to African-American employees using slurs and derogatory terms;[1] (2) the Confederate flag was pervasively displayed;[2] (3) offensive comments, sounds, and songs were broadcast over the plant-wide radio system;[3] (4) racist jokes and images were circulated using

---

[1] White supervisors and employees are alleged to have regularly referred to African-American employees as "nigger," "damn nigger," "yard ape," "bologna lips," "porch monkey," and "DAN," which apparently stood for "dumb ass nigger." Pls.' Br. in Supp. of Class Certification, 10-14, ECF No.184-1; Scott Clark Dep. 108:11-109:20, (date unknown); Thomas Prim Dep. 18:1-19:24, Nov. 10, 2004; Walter Joseph Cook Decl. ¶¶ 2-5, Nov. 8, 2006.

[2] Several white employees and supervisors displayed the Confederate flag on their hard hats, shirts, boxes, vehicles, and other property. Quinton Brown Decl. ¶ 16, May 5, 2007; Kenneth Hubbard Decl. ¶ 5, May 5, 2007; Sheldon Singletary Decl. ¶ 14, May 5, 2007. Items bearing the Confederate flag were sold out of a Nucor "warehouse" at the Berkeley plant. Jason Guy Dep. 167:14 - 177:4, July 10, 2006. One plaintiff "observed tee-shirts for sale in the Nucor-Berkeley gift shop that had the 'Nucor Berkeley' name on it with the Confederate flag." Jacob Ravenell, Jr., Decl. ¶ 10, May 5, 2007. "The display of the Confederate flag was not isolated to one department or area of the plant, but occurred everywhere." Alvin Simmons Decl. ¶ 17, May 5, 2007.

[3] The song "Dixie" was played over the plant radio. Ramon Roane Decl. ¶ 24, May 5, 2007; Brown Decl. ¶ 22. "[G]orilla-type grunting noises" were made over the plant radio in response to the communications of African-American employees. Brown Decl. ¶ 21; Gerald White Decl. ¶ 16, May 5, 2007; Eric Conyers Decl. ¶ 8, May 5, 2007.



company email;[4] (5) offensive and threatening graffiti appeared on company property;[5] (6) white supervisors indicated an unwillingness to promote African-American employees;[6] and (7) some African-American employees were personally threatened.[7]

The plaintiffs claim that despite this racially hostile environment, Nucor allowed its predominantly, if not exclusively, white management to use entirely subjective criteria in making decisions about promotions. This Court previously found the following facts regarding the defendants' lack of objective criteria relevant to promotions:

> Nucor has no plant-wide promotion procedure. Rather it allows department
> managers to create their own promotion procedure. Testimony from four

---

[4] Supervisor Dennis Pew, who is white, allegedly circulated an email with the following headings: "Three signs you live in North Charleston"; "Three things to look for to see if you have crossed the line into North Charleston"; and "Three signs you live in the hood." The email contained three pictures. The first photo depicted "three black kids shooting a basketball through a stolen shopping cart." The second picture showed "four black kids in a boat named 'Jason' with water on the inside rather than the outside." The third and final image featured "an African American man standing behind a customized motorcycle with elaborate wheels and wheel rims" and was accompanied by the caption "Is this G-Man's wheels?" ("G-Man" was a nickname for plaintiff Jason Guy). Roane Decl. ¶ 8. Another email "contained a picture of a dump truck that appeared to be on fire with a black employee inside of it and a little white man on the outside holding a gas can." Id.; Brown Decl. ¶ 17.

[5] For example, "KKK" was "inscribed on a stall in the men's locker room." Brown Decl. ¶ 24. The slogan "niggers go back to Africa" was written in the restrooms. White Decl. ¶ 15. See also Cook Decl. ¶ 6 (describing racist graffiti "in the bathroom below the CP 1 pulpit in the Beam Mill").

[6] Scott Clark, a white supervisor, testified that he discussed the plaintiff Ramon Roane's application for a supervisor position with the head of the beam mill, Paul Ferguson. Clark alleges that Ferguson said, "I don't think we'll ever have a black supervisor while I'm here." Clark Dep. 112:10-113:1.

[7] The plaintiffs allege that a "hangman's noose [was] held up to a black employee who was told 'This is for you.'" Pls.' Br. Supp. Class Certification 15; see also Singletary Decl. ¶ 14 (describing how a white employee, Ray Bilbrough, said, while holding pistols, that he ought to shoot two African-American employees).



> department managers and one supervisor reveal the following similarities in each
> department's promotion procedures: (1) the department managers and supervisors
> list the training requirements for every job posted, (2) for the majority of jobs
> posted, training requirements are the only objective criteria required to obtain a
> job, (3) decision makers rely on subjective criteria, such as attitude, teamwork,
> and willingness to learn, to select applicants, (4) an objective system to evaluate
> applicants for jobs is lacking, (5) the majority of managers and supervisors are
> white, and (6) the decision makers for promotions are different for each
> department and sometimes are different within a department.

Brown v. Nucor Corp., No. 2:04-22005-CWH, 2007 WL 2284581, at *1 (D.S.C. Aug. 7, 2007)

(footnotes omitted), rev'd, 576 F.3d 149 (4th Cir. 2009).  The plaintiffs allege that as a result,

African-American employees were denied promotions in favor of equally or less qualified whites

and prevented from training on equal terms.  Roane Decl. ¶ 17; Brown Decl. ¶ 10.  For example,

one of the plaintiffs claimed that when he applied for a promotion to serve as a supervisor, the

position was "canceled."  Roane Decl. ¶ 8.  He applied again and was told his application was

"misplaced."  Id.; see also Aaron Butts, Sr. Decl. ¶ 5, May 5, 2007 (reporting a similar

experience).  Several of the plaintiffs claim that, after observing the way the company treated

other African-American employees who applied for promotions, they were discouraged from

applying for promotions themselves.  See, e.g., Conyers Decl. ¶ 4.

In addition to anecdotal evidence, the plaintiffs also presented five statistical comparisons

that they claimed demonstrated a pattern of discrimination.  See Brown, 2007 WL 2284581, at

*4.  Four of the five comparisons juxtaposed various statistics reflecting rates of employment and

promotion of African-Americans at the Nucor plant with the percentage of qualified African-

Americans living in the geographic area surrounding the plant, which the plaintiffs' experts

estimated based upon data from the 2000 Census.  Nonetheless, the class allegations at issue in

this case involve discrimination in internal promotions, not hiring.  Therefore, the percentage of



qualified African-Americans in the surrounding communities was of little relevance, as the defendants proffered evidence that their promotions were almost exclusively internal.  See Nucor Corp. & Nucor Steel Berkeley's Resp. to Pls.' Mot. for Class Certification 9-10, ECF No. 197.

The final statistic offered by the plaintiffs was "a comparison of the estimated percentage of African-Americans who bid on promotions between December 1999 and December 2003 and the estimated percentage of African-Americans who received promotions for the same time period." Brown, 2007 WL 2284581, at *4.  Nucor failed to maintain its bidding records prior to January 2001, so the plaintiffs' experts used change-of-status forms produced by the defendants to identify twenty-seven positions that they claimed the defendants filled between December 1999 and January 2001.  Id.; Drs. Bradley's & Fox's Expert Report 10-11, Sept. 12, 2006, ECF No. 186-1.  The plaintiffs' experts "estimated that the percentage of African-Americans who bid on the twenty-seven jobs was the same as the average percentage of African-Americans who bid on jobs from 2001 to December 2003." Drs. Bradley's & Fox's Expert Report 10-11.  They concluded that "19.24% of applicants were African-American and 7.94% of applicants selected for promotion were African-American." Brown, 2007 WL 2284581, at *4.  Using these numbers, the plaintiffs' experts concluded that "[t]he difference between [the] African-American selection rate of 7.94% and their bidding rate of 19.24% [was] statistically significant at –2.54 standard deviations from what would be expected if race were neutral in the selection process." Drs. Bradley's & Fox's Expert Report 11.

The defendants objected to these calculations.  They argued that the plaintiffs' experts could not reliably calculate the number of selections that occurred between December 1999 and



January 2001 using only change-of-status forms.[8]  Accordingly, the defendants urged this Court to disregard the plaintiffs' calculations for the period between December 1999 and January 2001. Additionally, the defendants argued that the relevant calculation should include data regarding promotions through 2006, the year before the motion for class certification was filed, instead of through December 2003, when the original action was filed.  Applying the plaintiffs' method of calculation to the data from the period advanced by the defendants (January 2001 - December 2006) produced a standard deviation of −0.84, well below the "two or three standard deviations" sufficient to overturn the null hypothesis that the selections were race-neutral.  Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 309 n.14 (1977).

On August 7, 2007, this Court denied the plaintiffs' motion for class certification, holding that they had failed to satisfy the requirements of Rule 23(a).  Although the Court concluded the evidence supported a finding that a class consisting of all African-Americans who had worked at the plant since 1999 satisfied the numerosity requirement, it held that the plaintiffs had failed to demonstrate that the class claims raised questions of fact or law common to the entire class or that the plaintiffs' claims were typical of the class claims.

This Court's ruling that the plaintiffs had failed to satisfy the requirements of Rule 23(a) rested largely on three substantial factors.  First, this Court chose to apply standard deviation analysis instead of the 80% rule advanced by the plaintiffs.  Brown, 2007 WL 2284581, at *5. Second, the Court decided that in conducting the standard deviation analysis, the relevant

---

[8] "Change of status forms from [Nucor Steel Berkeley] are simply a company record which documents any employee's change of status, whether the employee was promoted, demoted, received a standard pay increase, or was transferred.  However, these forms do not indicate whether any African-American actually bid for the job in question." Nucor Corp. & Nucor Steel Berkeley's Resp. to Pls.' Mot. for Class Certification 6, ECF No. 197.



evidence should be limited to actual bidding records that predated the lawsuit. Id. In other words, the Court rejected both the plaintiffs' calculations, which included estimated data for the period between December 1999 and January 2001, and the defendants' calculations, which included actual data for the period between December 2003 and 2006. Analysis of the data gleaned from the bidding records from January 2001 to December 2003 demonstrated a disparity in the promotion rates of African-Americans, but the disparity resulted in a standard deviation of only 1.48, which was below the "two or three standard deviations" deemed significant in Hazelwood, 433 U.S. at 309 n.14.

Finally, the Court chose to classify the plant's six production departments as "separate environments." Brown, 2007 WL 2284581, at *7. While the sixteen declarations submitted by the plaintiffs detailed a litany of racist behavior, the Court found that the vast majority of the offensive conduct alleged occurred in a single department--the beam mill. Specifically, the Court noted that, "[o]f the sixteen declarations, only Singletary and Beaufort make specific allegations of a manager or supervisor treating African-American employees unfairly in a department besides the beam mill." Id. at *6. Although the Court acknowledged that the plaintiffs "presented plant-wide racist acts potentially experienced by every African-American employee working at the plant," it found that the plaintiffs' direct evidence was insufficient to establish a pattern or practice of discrimination or a hostile work environment for the plant as a whole because the vast majority of the conduct alleged occurred in a single department. Id. at *6-7.

As a result of these three findings, the Court held that the plaintiffs had failed to raise an issue of fact or law common to the class as a whole. Id. at *6. Since this Court concluded that the discrimination and hostile work environment alleged by the plaintiffs was primarily limited to

a few individuals in a single department, the Court also concluded that the plaintiffs' claims were not typical of the putative class. Id. at *8-9. Finally, the Court found that because the named plaintiffs sought an injunction ordering the defendants to give them the promotions that they had sought through the bidding process, they had conflicts of interest with members of the proposed class who also had an interest in receiving the same promotions. Having concluded that the plaintiffs had failed to satisfy the requirements of Rule 23(a), this Court explicitly declined to analyze whether the plaintiffs had met the requirements of Rule 23(b). Id. at *10 ("Because the plaintiffs fail to satisfy the commonality and typicality requirements, the Court will not determine whether the class satisfies the remaining requirements of Rule 23(b).").

On March 3, 2008, the plaintiffs filed an interlocutory appeal, pursuant to Fed. R. Civ. P. 23(f), and the Fourth Circuit granted the plaintiffs' petition for permission to appeal this Court's denial of the motion for class certification. Following oral arguments on January 27, 2009, the Court of Appeals issued an initial order on August 7, 2009, vacating this Court's order and remanding for certification. Over a lengthy dissent by Judge Agee, the majority found that this Court had "abused its discretion in denying class certification." Brown v. Nucor Corp., No. 08-1247, at 2 (4th Cir. Aug. 7, 2009), amended by Brown v. Nucor Corp., 576 F.3d 149 (4th Cir. 2009). Although the Court of Appeals accepted this Court's ruling that standard deviation analysis should be applied instead of the 80% rule, it disagreed with the Court's decision to limit the statistical analysis to the 2001-2003 period for which Nucor had retained bidding records as well as the Court's characterization of the six production departments as separate environments. Id. at 6-16. The Court of Appeals found that the plaintiffs "presented compelling direct evidence of discrimination" and concluded that "[t]his evidence alone establishes common claims of

discrimination worthy of class certification." Id. at 7. With regard to Rule 23(b), the Fourth

Circuit said, "our assessment inevitably leads us to conclude that the requirements of Federal

Rule of Civil Procedure 23(b)(3) have also been satisfied for these claims." Id. at 19 (footnotes

and citations omitted).

On October 8, 2009, the Court of Appeals issued an order amending the August 7, 2009

opinion by deleting the sentence quoted above and a corresponding case citation and footnote.

This modification effectively removed the majority's only reference to Rule 23(b). Nevertheless,

the Fourth Circuit's instructions to this Court remained unchanged: "We therefore vacate the

district court's denial of the appellants' motion for class certification, and we remand the case to

the district court with instructions to certify the appellants' class action and to engage in further

proceedings consistent with this opinion." Brown v. Nucor, 576 F.3d 149, 160 (4th Cir. 2009).

On October 8, 2009, the Court of Appeals denied the defendants' motion for a rehearing and a

rehearing en banc without issuing a written opinion. The defendants filed a petition for a writ of

certiorari, which was denied by the Supreme Court on March 1, 2010. Nucor Corp. v. Brown, –

U.S. –, 130 S.Ct. 1720, 176 L.Ed. 2d 185 (2010).

## II. **DISCUSSION**

The defendants and the plaintiffs urge this Court to give the ruling of the Court of

Appeals two very different interpretations. The defendants contend that the Fourth Circuit's

ruling is limited to this Court's analysis of Rule 23(a). The defendants argue that the Fourth

Circuit eliminated its only reference to Rule 23(b) "because it lacked jurisdiction over the issue

since Plaintiffs neither received an adverse ruling from this Court nor requested review of any

Rule 23(b) ruling." Defs.' Reply to Pls.' Opp'n to Defs.' Mot. for Consideration of FRCP 23(b)


#10
Cert.

and Mot. to Deny Class Certification ("Defs.' Reply") 3, ECF No. 310. Thus, they assert that

this Court retains a duty to independently analyze the plaintiffs' request for class certification

under Rule 23(b) and must exercise discretion to deny class certification if, as the defendants

allege, the plaintiffs fail to satisfy the requirements of Rule 23(b).

Conversely, the plaintiffs claim that "[b]y issuing an instruction to certify the class, the

Court of Appeals necessarily decided that the standards of Rule 23(a) and Rule 23(b) have been

satisfied and that no further proceedings on these issues are remanded to this Court." Pls.' Opp'n

to Mot. to Deny Class Certification 2, ECF No. 309. The plaintiffs further contend that since the

Court of Appeals did not explicitly remand consideration of issues relating to Rule 23(b), this

Court's consideration of those issues would violate the mandate rule. See id. 2 n.1. The

plaintiffs claim that by removing the reference to Rule 23(b)(3), but retaining the instruction for

this Court to certify the class, "the Court of Appeals recognized that this case easily satisfies both

subsection b-2 and b-3 in the manner set forth in plaintiffs' Motion for Class Certification." Id. 4

n.2. Citing the Fourth Circuit's directive to "certify the appellants' class action," id. 4 (quoting

Brown, 576 F.3d at 160) (emphasis added by the plaintiffs), the plaintiffs argue that "[t]he

'appellants' class action' is the one defined [by the plaintiffs] in the original Motion for Class

Certification which was defined in terms of subsection (b)(2) of Rule 23 . . . ." Pls.' Opp'n to

Mot. to Deny Class Certification 4.

In keeping with both precedent and the Fourth Circuit's opinion above, the Court agrees

with the plaintiffs that class certification, in some form, is required, and likewise agrees with the

defendants that the Court is required to analyze Rule 23(b) before it can certify a class. This

Court concludes that it must conduct an independent analysis of Rule 23(b) because Rule 23



requires an analysis of both 23(a) and 23(b), and the mandate rule does not preclude the Court from analyzing Rule 23(b).

## A.    Rule 23 Requires Analysis of Both 23(a) and 23(b)

The Fourth Circuit has instructed district courts to "conduct a 'rigorous analysis' to ensure compliance with Rule 23." Thorn v. Jefferson-Pilot Life Ins., 445 F.3d 311, 318 (4th Cir. 2006) (quoting Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 161 (1982)). Rule 23 requires that a court analyze both section 23(a) and section 23(b) before certifying a class. See Amchem Prods. v. Windsor, 521 U.S. 591, 614 (1997) ("In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)."). An analysis that omits the second step entirely can hardly be characterized as "rigorous." Indeed, satisfaction of 23(a) alone cannot be assumed to render satisfaction of 23(b) a foregone conclusion. In Thorn, the Fourth Circuit assumed for the purpose of argument that the appellants had satisfied Rule 23(a) and upheld the district court's decision to deny certification based solely on the appellants' failure to satisfy Rule 23(b). See 445 F.3d at 319, 332. Thorn demonstrates that the Rule 23(b) analysis is individually significant.

Since this Court originally withheld its analysis of Rule 23(b), and the Fourth Circuit removed the lone reference to Rule 23(b) from its opinion, no court has conducted an analysis of Rule 23(b) in this case. The plaintiffs' suggestion that the Fourth Circuit implicitly found Rule 23(b) to have been satisfied is unpersuasive. This Court will not read the Fourth Circuit's opinion to have dispensed with a critical element of what it has said should be a "rigorous analysis" without so much as a word about it.



**B.     The Mandate Rule Does Not Preclude the Rule 23(b) Analysis**

Notwithstanding the plaintiffs' claims, this Court's consideration of Rule 23(b) in no way violates the mandate rule. "The mandate rule is a 'more powerful version of the law of the case doctrine.'" Doe v. Chao, 511 F.3d 461, 465 (4th Cir. 2007) (quoting Invention Submission Corp. v. Dudas, 413 F.3d 411, 414 (4th Cir. 2005)). "The mandate rule prohibits lower courts, with limited exceptions, from considering questions that the mandate of a higher court has laid to rest." Chao, 511 F.3d at 465. The mandate rule also limits the issues a district court may consider on remand from the court of appeals. As the Fourth Circuit has explained: "First, 'any issue conclusively decided by this court on the first appeal is not remanded,' and second, 'any issue that could have been but was not raised on appeal is waived and thus not remanded.'" Id. (quoting United States v. Husband, 312 F.3d 247, 250-51 (7th Cir. 2002)).

The issue of whether the plaintiffs have satisfied Rule 23(b)(1), (b)(2), and/or (b)(3) was not "conclusively decided" above. As the plaintiffs point out, the defendants raised the lack of 23(b) analysis on appeal. Pls.' Opp'n to Mot. to Deny Class Certification 2-3. Since the Fourth Circuit did not analyze the plaintiffs' class in light of Rule 23(b) and the defendants raised the issue on appeal, the mandate rule does not preclude this Court from analyzing Rule 23(b).

For the reasons set forth above, this Court is unwilling to interpret the Fourth Circuit's instruction to certify the class as having implicitly "laid to rest" the Rule 23(b) analysis of the plaintiffs' proposed class. Even if the Fourth Circuit implicitly decided that the plaintiffs had satisfied Rule 23(b), the Fourth Circuit's final opinion provides no guidance regarding which provision or provisions of Rule 23(b) the plaintiffs satisfied. Accordingly, this Court must



analyze Rule 23(b) to determine the section(s) under which the action is maintainable before it can comply with the Fourth Circuit's instruction to certify the class.

The plaintiffs contend that the Fourth Circuit's instruction to "certify the appellants' class action" should be interpreted as an instruction to this Court to certify the class "in the form set forth in the plaintiffs' Motion for Class Certification." Pls.' Opp'n to Mot. to Deny Class Certification 4. In other words, the Court must certify a (b)(2) class. See id. ("The 'appellants' class action' is the one defined in the original Motion for Class Certification which was defined in terms of subsection (b)(2) of Rule 23 . . . ."). The Court is unpersuaded. The Fourth Circuit's instruction "to certify the appellants' class action" in its final opinion appears in identical form in its original opinion, which concluded that the plaintiffs had satisfied Rule 23(b)(3), but failed to mention Rule 23(b)(2). Thus, the plaintiffs urge this Court to interpret the deletion of the sentence regarding Rule 23(b)(3) to have added meaning to the term "appellants' class action" in the Fourth Circuit's final opinion. This Court will not presume the Fourth Circuit to have been so cryptic. The deletion of language regarding Rule 23(b)(3) may give the plaintiffs more traction to argue that this Court may certify their class under Rule 23(b)(2), but it does not suggest that the Court must certify their class under that specific provision. Since the Court of Appeals has neither implicitly or explicitly instructed this Court as to the specific provision of Rule 23(b) to apply, the Court must turn to an analysis of Rule 23(b) before it can issue any order regarding certification.

In summary, as the parties appear to recognize, the proverbial "elephant in the room" on remand is whether this Court could decline to certify the class if it found that the plaintiffs had failed to satisfy Rule 23(b). On the one hand, the Fourth Circuit's instruction to certify a class



appears unambiguous. On the other hand, the Supreme Court's instruction that both 23(a) and

23(b) be satisfied and the Fourth Circuit's instruction that the Rule 23 analysis be "rigorous" are

equally clear. By removing its only reference to Rule 23(b), the Court of Appeals has allowed

this Court to exercise discretion to determine the type of class to certify. However, to make that

determination, the Court must look at each of the provisions of Rule 23(b) and enquire whether

the plaintiffs' class satisfies the requirements. In other words, the question of <u>which</u> provision

the plaintiffs' class satisfies essentially requires the same analysis as the question of <u>whether</u> the

plaintiffs have satisfied any of the requirements at all. Consequently, this Court can proceed with

a standard Rule 23(b) analysis without issuing an advisory opinion or considering an issue the

Court of Appeals has already settled.

### C.    <u>Rule 23(b) Analysis</u>

"[F]ederal courts should 'give Rule 23 a liberal rather than a restrictive construction,

adopting a standard of flexibility in application which will in the particular case best serve the

ends of justice for the affected parties and . . . promote judicial efficiency.'" <u>Gunnells v.

Healthplan Servs., Inc.</u>, 348 F.3d 417, 424 (4th Cir. 2003) (quoting <u>In re A.H. Robins</u>, 880 F.2d

709, 740 (4th Cir. 1989)). A plaintiff bears the burden of demonstrating that its proposed class

complies with the requirements of Rule 23. <u>Thorn</u>, 445 F.3d at 321.

The plaintiffs urge this Court to certify their proposed class under Rule 23(b)(2) or a

hybrid of Rule 23(b)(2) and (b)(3). Where a class is capable of certification under both Rule

23(b)(1) or (b)(2) and Rule 23(b)(3), a court should certify the class pursuant to Rule 23(b)(1) or

(b)(2). <u>See</u> 7AA Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, <u>Federal Practice and</u>



Procedure § 1784.1 (3d ed. 2005). Neither party has suggested that certification would be proper under Rule 23(b)(1), so the Court will begin its analysis with Rule 23(b)(2).

### (1) *Rule 23(b)(2)*

A class action may be maintained under Rule 23(b)(2) where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). This Court is cognizant that Rule 23(b)(2) was initially designed for the purpose of providing class-wide relief to the victims of civil rights violations, including the very type of violations the plaintiffs allege here. See, e.g., Penson v. Terminal Trans. Co., Inc., 634 F.2d 989, 993 (5th Cir. 1981). However, as various courts have recognized, the 1991 amendments to the Civil Rights Acts created additional rights and remedies that, in some instances, increase the likelihood that a putative class will prove incompatible with Rule 23(b)(2). See, e.g., Allison v. Citgo Petroleum Corp., 151 F.3d 402, 409-410 (5th Cir. 1998).[9] Moreover, the Fourth Circuit has made it clear that "[t]here is no legal presumption . . . in favor of certifying cases alleging discrimination." Thorn, 445 F.3d at 330.

The Advisory Committee Notes state that Rule 23(b)(2) "does not extend to cases in which the appropriate final relief relates exclusively or predominately to money damages." Rule 23(b)(2) advisory committee note (1966), as quoted in Thorn, 445 F.3d at 329. In 1994, the

---

[9] "Before passage of the Civil Rights Act of 1991, liability and the appropriate remedies in all Title VII cases were determined in bench trials. Monetary relief was limited to back pay and other equitable remedies. By bringing additional monetary claims within the scope of intentional discrimination cases, the Civil Rights Act of 1991 added to the complexity and diversity of the issues to be tried and decided. By injecting jury trials into the Title VII mix, the 1991 Act introduced, in the context of class actions, potential manageability problems with both practical and legal, indeed constitutional, implications." Allison, 151 F.3d at 410.



Supreme Court questioned whether actions seeking monetary damages could ever be certified under Rule 23(b)(1) and (b)(2), which lack the "opt-out" provisions found in (b)(3). See Ticor Title Ins. Co. v. Brown, 511 U.S. 117, 121 (1994) (per curiam) (suggesting that there is "at least a substantial possibility" that "in actions seeking monetary damages, classes can be certified only under Rule 23(b)(3)"). The Supreme Court declined to address the issue of whether due process required class members to be given a right to opt out, and as Justice O'Connor's dissent predicted, "courts will continue to certify classes under Rules 23(b)(1) and (b)(2) notwithstanding the presence of damages claims[]." Id. at 124 (O'Connor, J., dissenting).

Like other circuits, the Fourth Circuit allows plaintiffs to pursue monetary damages in (b)(2) actions provided that "the relief sought is . . . predominantly injunctive or declaratory." Thorn, 445 F.3d at 329 (quoting Lukenas v. Bryce's Mountain Resort, Inc., 538 F.2d 594, 595 (4th Cir. 1976)). While monetary relief is not "fundamentally incompatible with Rule 23(b)(2)[,] . . . relief that is neither injunctive nor declaratory may not predominate over the injunctive and declaratory relief in a proper Rule 23(b)(2) action." Id. at 331. In other words, "Rule 23(b)(2) does not apply where the proposed class seeks 'essentially monetary relief.'" Id. at 329 (quoting Zimmerman v. Bell, 800 F.2d 386, 389-90 (4th Cir. 1986)).

How a court should determine whether monetary relief predominates over injunctive or declaratory relief is an issue that has engendered considerable debate and spawned a three-way circuit split that is pending before the United States Supreme Court. See Dukes v. Wal-Mart Stores, Inc., 603 F.3d 571 (9th Cir. 2010) (en banc), cert. granted, 131 S. Ct. 795 (U.S. Dec. 6, 2010) (No. 10-277). A majority of the circuits considering the issue have followed the Fifth Circuit's "incidental damages" test, set forth in Allison v. Citgo Petroleum Corp., 151 F.3d 402



(5th Cir. 1998). Under this test, "monetary relief predominates in (b)(2) class actions unless it is

incidental to requested injunctive or declaratory relief." Allison, 151 F.3d at 415; see also Reeb

v. Ohio Dep't of Rehab. & Corr., 435 F.3d 639, 646-51 (6th Cir. 2006); Murray v. Auslander,

244 F.3d 807, 812 (11th Cir. 2001); Lemon v. Int'l Union of Operating Eng'rs Local No. 139,

216 F.3d 577, 580-81 (7th Cir. 2000). In contrast, the Second Circuit adopted an approach that

focused upon "the relative importance of the remedies sought," determined by considering

(among other things): whether the value of the injunctive or declaratory relief was predominant

from the perspective of the plaintiffs; whether reasonable plaintiffs would have brought the suit if

monetary relief had not been available; and whether "the injunctive or declaratory relief sought

would be both reasonably necessary and appropriate were the plaintiffs to succeed on the merits."

Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 164 (2d Cir. 2001). Although the

Ninth Circuit initially followed the Second Circuit, see Molski v. Gleich, 318 F.3d 937, 950 (9th

Cir. 2003), it subsequently abandoned the Robinson approach in Dukes and held that "[t]o be

certified under Rule 23(b)(2), . . . a class must seek only monetary damages that are not superior

[in] strength, influence, or authority to injunctive and declaratory relief." Dukes, 603 F.3d at 616

(internal quotation marks and citations omitted).

      While the Fourth Circuit Court of Appeals has not expressly adopted any of these tests, it

looked to the Fifth Circuit's reasoning in Allison to support its refusal to certify a (b)(2) class in

Thorn. Citing Allison, the Fourth Circuit held:

> A class-action claim for monetary relief may present common questions of
> liability, but, because the goal of the damage phase is to compensate the plaintiffs
> for their individual injuries, the claim will generally require the court to conduct
> individual hearings to determine the particular amount of damages to which each
> plaintiff is entitled. . . . Where the requested relief is declaratory or injunctive, by
> contrast, the goal of the remedy phase is either to make a declaration about or



Page 18 of 30

enjoin the <u>defendant's actions</u> affecting the class as a whole, and individual
hearings will not be necessary.

<u>Thorn</u>, 445 F.3d at 330. The court explained that back pay awarded under Title VII does "not

predominate over the injunctive remedies available because the 'calculation of back pay

generally involves [relatively un]complicated factual determinations and few[ ] individualized

issues.'" <u>Id.</u> at 331-32 (quoting <u>Coleman v. Gen. Motors Acceptance Corp.</u>, 296 F.3d 443, 449

(6th Cir. 2002)). Conversely, monetary relief that required "complicated factual determinations"

or raised a host of "individualized issues" would likely predominate over the injunctive remedies

available under Title VII. <u>See</u> <u>Thorn</u>, 445 F.3d at 331-32.

To determine whether (b)(2) certification is warranted in this case, the Court must

examine the remedies sought by the plaintiffs.

     (a)    <u>Declaratory and Injunctive Relief</u>

The plaintiffs in this case seek a permanent injunction against the defendants' alleged

discriminatory employment practices. In contrast to cases where courts have found that the

declarative or injunctive relief sought was moot, in the present case, such relief could still prove

meaningful to the members of the proposed class. <u>See id.</u> (noting that "certification under Rule

23(b)(2) is appropriate only if members of the proposed class would benefit from the injunctive

relief they request") (quoting <u>In re Monumental Life Ins. Co.</u>, 365 F.3d 408, 416 (5th Cir. 2004)).

     (b)    <u>Back Pay</u>

In addition to declaratory and injunctive relief, the plaintiffs also seek back pay. As the

Fourth Circuit made clear in <u>Thorn</u>, claims for back pay alone typically do not cause monetary

relief to predominate over declaratory or injunctive relief because they usually do not require

significant individual inquiries. 445 F.3d at 331. Nevertheless, claims for back pay "weigh[] on

Page 19 of 30

the monetary side of the scale." <u>Dukes</u>, 603 F.3d at 618 n.40 (construing <u>Thorn</u>, 445 F.3d at 332).

        (c)    <u>Punitive Damages</u>

The plaintiffs contend that their pursuit of punitive damages should not preclude certification under Rule 23(b)(2). They argue that "[p]unitive damages . . . focus on the defendants' conduct in fostering . . . a pattern or practice," and thus should be addressed in Stage I as opposed to Stage II, during "which only individual issues about particular class members are addressed." Pls.' Opp'n to Mot. to Deny Class Certification 5-6. This argument has a measure of intuitive appeal. Given the rationale for imposing punitive damages, it is the behavior of the defendant, as opposed to the losses of the plaintiff, that is the most relevant consideration in determining whether punitive damages are warranted. <u>Barefield v. Chevron, U.S.A., Inc.</u>, No. C 86-2427, 1988 WL 188433, at *3 (N.D. Cal. 1988) ("Because the purpose of punitive damages is not to compensate the victim, but to punish and deter the defendant, any claim for such damages hinges, not on facts unique to each class member, but on the defendant's conduct toward the class as a whole."). However, as will be discussed, this does not mean that an individual plaintiff may recover punitive damages for wrongful conduct that caused him no harm.

Notwithstanding the plaintiffs' arguments, the Court finds that the plaintiffs' claims for punitive damages weigh heavily against the propriety of (b)(2) certification. Although the goal of punitive damages is to punish a defendant and deter similar conduct, as opposed to compensating a plaintiff, the imposition of punitive damages in an employment discrimination case still involves the type of "complicated factual determinations" and "individualized issues" that cause monetary damages to predominate over declaratory or injunctive relief. In order to



recover punitive damages, a plaintiff must establish "that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved <u>individual</u>." 42 U.S.C. § 1981a(b)(1) (emphasis added). As other courts have acknowledged, punitive damages cannot be awarded under this provision without an examination of the harm suffered by the individual plaintiffs. <u>See, e.g.</u>, <u>Lemon</u>, 216 F.3d at 581 ("[T]o win punitive damages, an individual plaintiff must establish that the defendant possessed a reckless indifference to the plaintiff's federal rights– a fact-specific inquiry into that plaintiff's circumstances."); <u>Allison</u>, 151 F.3d at 418 ("[P]unitive damages are . . . non-incidental– requiring proof of how discrimination was inflicted on each plaintiff, introducing new and substantial legal and factual issues, and not being capable of computation by reference to objective standards."). Notably, even the Ninth Circuit's disputed holding in <u>Dukes</u> questioned whether punitive damages could properly be certified under Rule 23(b) and remanded the issue to the district court for further consideration. <u>See</u> 603 F.3d at 621-22.

Furthermore, this Court rejects the plaintiffs' contention that punitive damages may be addressed in the first stage of a pattern or practice suit. A Title VII pattern or practice suit proceeds in two stages. In the first stage, the plaintiffs must establish a prima facie case by showing by a preponderance of the evidence that "discrimination was the company's standard operating procedure." <u>Int'l Bhd. of Teamsters v. United States</u>, 431 U.S. 324, 336 (1977). At this stage, the plaintiffs are not required to establish that each individual member of the class was actually a victim of discrimination. <u>Id.</u> at 360. Rather, the plaintiffs may use anecdotal evidence supported by statistical evidence. <u>See id.</u> at 338-39. If the plaintiffs establish the existence of a pattern or practice of discrimination, the burden shifts to the employer to rebut this evidence. If



the employer fails to counter the plaintiffs' prima facie case, the "court may conclude that a violation has occurred." Id. at 361. Such a finding "justifies an award of prospective relief." Id.

If the plaintiffs seek individual relief, such as back pay, the court must proceed to the second stage of the trial "to determine the scope of individual relief." Id. Having already established a pattern or practice of discrimination, the individual plaintiffs are entitled to "an inference that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy." Id. at 362. However, a defendant is then afforded the opportunity to present affirmative defenses and to show "that the individual applicant was denied an employment opportunity for lawful reasons." Id.

If the Court were to adopt the plaintiffs' proposition that punitive damages are properly considered in the first stage of a pattern or practice suit, the defendants could be subjected to potentially staggering punitive damages without ever having the opportunity to explain why they refused to promote a particular member of the class. This is potentially problematic for at least two reasons. First, while a finding that the defendants maintained a discriminatory policy at the first stage of a pattern or practice suit entitles a class to prospective relief, liability giving rise to damages arguably does not actually attach until after the individual plaintiffs have prevailed in the second stage of the case. See Price Waterhouse v. Hopkins, 490 U.S. 228, 266 (1989) (O'Connor, J., concurring) (superseded in part by statute) ("It is misleading to speak of the additional proof required by an individual class member for relief as being a part of the damage phase, that evidence is actually an element of the liability portion of the case.") (quoting Dillon v. Coles, 746 F.2d 998, 1004 (3d Cir. 1984)).



Second, a plaintiff is not typically entitled to recover punitive damages without an award of compensatory damages because "punitive damages are not appropriate in cases where a plaintiff has failed to demonstrate actionable harm." Corti v. Storage Tech. Corp., 304 F.3d 336, 342 (4th Cir. 2002) (quoting People Helpers Found., Inc. v. Richmond, 12 F.3d 1321, 1327 (4th Cir. 1993)). In Corti, the Fourth Circuit held that "[i]n Title VII cases, a jury's punitive damage award will stand even in the absence of compensatory damages if back pay has been awarded" because "a loss of income due to discrimination amounts to 'actionable harm.'" 304 F.3d at 342-43. Judge Niemeyer's concurring opinion suggested that some form of compensatory relief, whether in the form of "compensatory damages" or in the form of back pay, is required to sustain an award of punitive damages. See id. at 344 (Niemeyer, J., concurring). Therefore, like back pay, punitive damages may be awarded only to those class members who withstand the defendants' affirmative defenses in the second stage of a pattern or practice suit. See Lemon, 216 F.3d at 581 ("Damages can be awarded only after proof of discrimination and injury specific to the individual plaintiff."); Allison, 151 F.3d at 418 ("[P]unitive damages must be determined after proof of liability to individual plaintiffs at the second stage of a pattern or practice case, not upon the mere finding of general liability to the class at the first stage."). For the reasons stated above, this Court finds that the plaintiffs' claims for punitive damages cause monetary damages to predominate over declaratory and injunctive relief, making certification under Rule 23(b)(2) improper.

      (d)     Compensatory Damages

In their complaint, the plaintiffs sought compensatory damages. However, when they filed their motion for class certification, they specifically requested that the Court certify their



punitive damage claims, but did not seek certification of their compensatory damage claims. At

the hearing on the motion, the plaintiffs' counsel informed this Court that the plaintiffs had

"waived their compensatory damage claim[s]." Hr'g Tr. 24:24-25:1, July 19, 2007, ECF No.

225. The defendants argued that despite the absence of a request for compensatory damages in

the plaintiffs' motion for class certification, the Court should nevertheless interpret the plaintiffs'

motion as seeking certification of compensatory damages. Resp. to Pls' Mot. for Class

Certification 56-57, ECF No. 197. As the numerous cases discussed in this opinion make clear,

claims for compensatory damages, like claims for punitive damages, typically raise

individualized issues that cause monetary damages to predominate over injunctive or declaratory

relief, thereby rendering (b)(2) certification inappropriate. As the Court already has found that

the plaintiffs' claims for punitive damages are sufficient to foreclose (b)(2) certification, the

Court need not consider the defendants' arguments regarding compensatory damages.

### (2)    *Rule 23(b)(2)/(b)(3) Hybrid*

Alternatively, the plaintiffs seek certification through what is known as a 23(b)(2)/(b)(3)

hybrid. Under this approach, the Court would certify all of the plaintiffs' claims under Rule

23(b)(2) except for their claims for punitive damages, which would be certified under Rule

23(b)(3). Rule 23(c)(4) permits an action to "be brought or maintained as a class action with

respect to particular issues." A few of the circuit courts have suggested that this provision allows

a court to certify claims for monetary damages as a separate (b)(3) class, see, e.g., Dukes, 603

F.3d at 622; Jefferson v. Ingersoll Int'l, Inc., 195 F.3d 894, 898 (7th Cir. 1999); however, this

Court is directed to no instance where the Fourth Circuit has endorsed such an approach. The

only case cited by the plaintiffs within the Fourth Circuit which adopts the hybrid approach is



Newsome v. Up-To-Date Laundry, Inc., 219 F.R.D. 356, 364 (D. Md. 2004), and Newsome does not appear to have been followed by any other court within the Fourth Circuit with regard to this issue.[10]

In their motion for class certification, the plaintiffs argued for a (b)(2)/(b)(3) hybrid as an alternative to a (b)(2) class. More recently, the plaintiffs have abandoned this approach. In their most recent memorandum, the plaintiffs focus their arguments on Rule 23(b)(2) certification and provide no further discussion in favor of a hybrid approach. In the absence of further argument from the plaintiffs, and without Fourth Circuit precedent permitting the certification of a (b)(2)/(b)(3) hybrid class, this Court declines to certify a (b)(2)/(b)(3) hybrid class in this case.[11]

### (3)    *Rule 23(b)(3)*

The Court's final option for class certification in this case is to certify the class under Rule 23(b)(3). Rule 23(b) permits certification if:

> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

---

[10] Furthermore, Newsome is potentially distinguishable on the grounds that the court's certification of the (b)(3) class for the purpose of damages was conditional. See 219 F.R.D. at 366. The 2003 amendments to Rule 23 prohibited conditional certification, and pursuant to the amended rule, if a court is "not satisfied that the Rule 23 requirements have been met, . . . [it] should refuse certification until class proponents have proven that certification is appropriate." Hunter v. Am. Gen. Life & Accident Ins. Co., CA 3:01-5000-22, 2004 WL 5231631, at *4 (D.S.C. Dec. 2, 2004).

[11] To be clear, this Court is not holding that the certification of a Rule 23(b)(2)/(b)(3) hybrid violates Rule 23. Indeed, it is quite possible that such an approach may ultimately prove to be a useful way to handle class certification in most employment discrimination suits. However, there remains ambiguity as to the extent to which Rule 23(c)(4) permits a court to mix and match the provisions of Rule 23(b), and in the absence of controlling precedent expressly authorizing the use of a (b)(2)/(b)(3) hybrid, the Court declines to adopt the approach.



(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

The two central requirements of Rule 23(b)(3) are (1) that common questions predominate ("the predominance requirement") and (2) that the class action is superior to other methods of adjudication ("the superiority requirement"). As the Fourth Circuit has explained, "Rule 23(b)(3) class actions must meet predominance and superiority requirements not imposed on other kinds of class actions . . . . because these suits involve situations where 'class[ ]action treatment is not as clearly called for.'" Gunnells, 348 F.3d at 424 (quoting Fed. R. Civ. P. 23 advisory committee's note (1966 Amendment, subdivision (b)(3))).

Taking these two factors in order, "[t]he Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Prods., 521 U.S. at 623. "The predominance of common questions of law or fact requirement of Rule 23(b)(3) is far more stringent than the commonality requirement of Rule 23(a)." Lott v. Westinghouse Savannah River Co., 200 F.R.D. 539, 563 (D.S.C. 2000) (citing Amchem Prods., 521 U.S. at 623-24). The presence of claims or defenses raising individual issues incapable of resolution on a class wide basis may lead a court to conclude that common issues do not predominate. See Thorn, 445 F.3d at 320. Although "individualized damage determinations cut against class certification under Rule 23(b)(3)[,]" Ward v. Dixie Nat. Life Ins. Co., 595 F.3d 164, 180 (4th Cir. 2010), "if 'common questions predominate over individual



Page 26 of 30

questions as to liability, courts generally find the predominance standard of Rule 23(b)(3) to be satisfied.'" Gunnells, 348 F.3d at 428 (quoting 5 Moore's Federal Practice § 23.46[2][a] (1997)). With respect to the second factor, the superiority requirement simply requires that class resolution of the certified issues be preferable to any alternative method of resolution. Gregory v. Finova Capital Corp., 442 F.3d 188, 191 n.3 (4th Cir. 2006) ("[A] class cannot be certified under Rule 23(b)(3) if there is a method to which the class action is not superior.").

The defendants argue that, in light of this Court's previous holding that the plaintiffs failed to satisfy the commonality requirement of Rule 23(a), the plaintiffs certainly cannot be found to have satisfied the more stringent predominance requirement of Rule 23(b). The flaw in this argument is that it overlooks the Fourth Circuit's prior holding in this case. Although this Court does not believe that the Fourth Circuit's ruling obviates the need for an independent analysis of Rule 23(b), the Court of Appeals significantly altered the lens through which this Court must evaluate the facts relevant to an analysis under Rule 23(b)(3). At the beginning of this order, the Court identified three critical findings that led to its prior decision to deny class certification under Rule 23(a). These were: (1) the decision to apply standard deviation analysis instead of the 80% rule; (2) the decision to base the standard deviation analysis on the promotions data gleaned from Nucor's records for the period between January 2001 and December 2003; and (3) the decision to classify the plant's production departments as separate environments. The Fourth Circuit majority disagreed with two of these findings, which fundamentally altered this Court's view of the facts.



From the outset of this case, it has been clear that the plaintiffs alleged a group injury. The relevant question was the level at which the injury was inflicted.[12]  The Fourth Circuit held that "a practice of disparate treatment in the exercise of unbridled discretion . . . rais[es] questions of law and fact common to all [subject] black employees." Brown, 576 F.3d at 153 (alteration in original) (quoting Lilly v. Harris-Teeter Supermarket, 720 F.2d 326, 333 (4th Cir. 1983)).  Since the Fourth Circuit rejected this Court's characterization of the production departments as separate environments, the Court must proceed under the assumption that the production departments were permeable, if not unitary.  This assumption is buttressed by the fact that Nucor's bidding is plant-wide, and this Court already has held that "potential applicants are eligible to prove that they would have applied for a promotion but for the discriminatory practice." Brown, 2007 WL 2284581, at *9.  Therefore, all African-Americans who worked in the production departments qualify as "subject black employees."  It follows, then, that there are common issues of law and fact with regard to the members of the proposed class.

Given the Fourth Circuit's rejection of this Court's "separate environments" analysis, the Court also finds that common issues predominate with regard to the plaintiffs' hostile work environment claims.  Furthermore, in light of the Fourth Circuit's ruling, the statistical evidence now bolsters the plaintiffs' claim that common issues predominate with regard to both their disparate treatment and disparate impact claims.

The four factors that Rule 23(b)(3) instructs a court to consider before certifying a (b)(3) class support this Court's conclusion that class adjudication is appropriate with regard to all of

---

[12] If, as this Court initially found, the alleged discrimination was limited to a single department, then common questions arguably would not predominate with regard to a plant-wide class of African-American employees.



the plaintiffs' causes of action. No member of the class has asserted an interest in individually

controlling the prosecution or defense of separate actions. The named plaintiffs and their counsel

have already invested substantial time in the development of this case, and efficiency favors

allowing them to represent the class. The claims in this case were transferred to this Court

because they arise out of allegations regarding a South Carolina plant, so the Court is confident

that the claims are in the proper forum. Admittedly, the need for individualized findings will

likely increase the difficulty of managing the proposed class. Individual issues remain in this

case, and as the Court has discussed, the defendants will be afforded the opportunity to present

affirmative defenses in the second stage of the pattern or practice proceedings if the plaintiffs

continue to pursue back pay and punitive damages. However, the Court does not believe that the

need for these individualized findings renders the class unmanageable, and the Court retains

discretion to decertify the class should class adjudication prove unworkable. See Brown, 576

F.3d at 159-60. Finally, given the number of employees potentially affected by the defendants'

alleged conduct, the Court finds that a class action is superior to any other method that might be

used to adjudicate these claims.

### III. CONCLUSION

In summary, having carefully considered the Fourth Circuit's ruling in this case and

thoroughly examined the parties' arguments, the Court determined that a Rule 23(b) analysis was

necessary before it could certify the plaintiffs' class. After carefully evaluating the proposed

class under Rule 23(b), the Court declines to certify the class under Rule 23(b)(2) because it finds

that, taken together, the plaintiffs' claims for back pay and punitive damages cause monetary

relief to predominate over injunctive or declaratory relief. The Court also declines to certify a



Rule 23(b)(2)/(b)(3) hybrid class action for the reasons discussed above. However, having

reconsidered the evidence in light of the Fourth Circuit's opinion, the Court finds that common

issues predominate and that a class action is superior to any other method for adjudication of the

claims in this case. Therefore, the Court certifies the following class under Rule 23(b)(3):

> All African-Americans who are or were employed at the Nucor Berkeley
> manufacturing plant in Huger, South Carolina at any time since December 2, 1999
> in the beam mill, hot mill, cold mill, melting, maintenance, and shipping
> departments.

The Court appoints the plaintiffs' counsel to serve as class counsel. The plaintiffs'

counsel is instructed to provide written notice to the members of the class, advising them of the

pendency of the action and their right to opt out of the class. The notice shall comply with the

requirements set forth in Rule 23(c)(2)(B) and shall be submitted to this Court for approval

within twenty (20) days of the date of this order. The defendants' motion to deny class

certification (ECF No. 308) is denied. Finally, the Court shall hold a status conference on

Tuesday, March 1, 2011, at 11:00 a.m. to address scheduling and discovery issues.

**AND IT IS SO ORDERED.**

C. WESTON HOUCK
**UNITED STATES DISTRICT JUDGE**

February 16, 2011
Charleston, South Carolina

