IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Quinton Brown, Jason Guy,<br>Ramon Roane, Alvin Simmons,<br>Sheldon Singletary, Gerald White,<br>and Jacob Ravenell,<br>Individually and on behalf of the class<br>they seek to represent,<br><br>Plaintiffs,<br><br>vs.<br><br>Nucor Corporation and<br>Nucor Steel Berkeley,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No.: 2:04-22005-CWH<br><br><br>**ORDER** |

This order marks the fifth time this Court has addressed the issue of class certification in this case.[1] The matter is before the Court on the defendants' motion for decertification of the current plaintiff class ("motion to decertify") (ECF No. 381) and the defendants' motion to exclude the plaintiffs' expert witness ("motion to exclude") (ECF No. 379). For the reasons set forth in this order, the defendants' motion for decertification is granted with regard to the disparate treatment and disparate impact claims and is denied with regard to the hostile work environment claim. The defendants' motion to exclude is moot.

---

[1] See ECF No. 224 (order denying plaintiffs' motion for class certification); ECF No. 259 (order denying plaintiffs' motion to reconsider denial of class certification); ECF No. 339 (order denying defendants' motion to deny class certification and certifying a class under Rule 23(b)(3)); ECF No. 359 (order denying defendants' motion to reconsider class certification, denying defendants' motion to stay, and denying in part and granting in part defendants' motion to modify the class).

# I.    BACKGROUND

## A. FACTS

The Court assumes familiarity with the facts of this case, which are set forth in detail in the Court's order of February 17, 2011 (ECF No. 339).

## B. PROCEDURAL HISTORY

The following procedural history is relevant to the motions at hand. This case was originally filed in the Western District of Arkansas on December 8, 2003, as a nationwide class action alleging employment discrimination against Nucor Corporation and several of its subsidiaries. The action was severed into four separate cases on August 24, 2004, and each case was transferred to the judicial district in which the unlawful employment practices allegedly occurred. The named plaintiffs in this particular case are seven African-Americans who are or were employed at the Nucor Steel plant in Huger, South Carolina ("the Berkeley plant"). The plaintiffs allege that Nucor Steel Berkeley and Nucor Corporation ("the defendants") discriminated on the basis of race with respect to their promotions. The plaintiffs advance causes of action for disparate treatment, disparate impact, and a hostile work environment.

### 1.    This Court Denies Class Certification

On May 7, 2007, the plaintiffs moved to certify the following class:

All African-Americans who are or were employed at the Nucor Berkeley manufacturing plant in Huger, South Carolina at any time since December 2, 1999 in the beam mill, hot mill, cold mill, melting, maintenance and shipping departments (hereafter "production departments") or, in the alternative, for such separate classes or subclasses of such persons as may be appropriate under the Federal Rules of Civil Procedure.



Mot. for Class Certification 1, ECF No. 184. On August 7, 2007, this Court denied the plaintiffs' motion for class certification, holding that the plaintiffs had failed to satisfy the requirements of Rule 23(a) (ECF No. 224). The plaintiffs moved for reconsideration (ECF No. 228), and the Court denied the motion (ECF No. 259).

### 2.    The Fourth Circuit Reverses

Two years later, on August 7, 2009, a 2-1 panel of the Fourth Circuit Court of Appeals reversed. In its initial order, the Fourth Circuit concluded that the plaintiffs had satisfied the requirements of Rule 23(a) and Rule 23(b)(3) and remanded the case to this Court "with instructions to certify the appellants' class action." Brown v. Nucor Corp., No. 08-1247, at 19 (4th Cir. Aug. 7, 2009), amended by Brown v. Nucor Corp., 576 F.3d 149 (4th Cir. 2009). On October 8, 2009, the panel modified its opinion by deleting its lone reference to Rule 23(b)(3). The portion of the majority's opinion instructing this Court to certify the class remained unchanged. Brown, 576 F.3d at 160.

### 3.    This Court Certifies a Class on Remand

On October 22, 2009, the defendants filed their motion for consideration of FRCP 23(b) and motion to deny class certification (ECF No. 308), urging this Court to analyze the putative class under Rule 23(b) and to deny class certification. Although the Fourth Circuit remanded the case "with instructions to certify the appellants' class action," Brown, 576 F.3d at 160, the defendants insisted that the Fourth Circuit's opinion governed only the 23(a) analysis, and that this Court could deny class certification if it found that the plaintiffs had not satisfied Rule 23(b). In response, the plaintiffs argued that by instructing this Court to "certify the appellants' class action," the Fourth Circuit's opinion required this Court to certify a class under either Rule



23(b)(2) or a hybrid of 23(b)(2) and 23(b)(3) because those were the provisions pursuant to which the plaintiffs originally sought certification.

On February 17, 2011, this Court issued an order (ECF No. 339) certifying a class under Rule 23(b)(3). The Court agreed with the plaintiffs that, in light of the Fourth Circuit's opinion, the Court was required to certify a class. Order Den. Defs.' Mot. to Den. Class Certification 11, Feb. 17, 2011, ECF No. 339 ("Order Granting Class Certification"). However, the Court also found that by removing its lone reference to Rule 23(b), the Fourth Circuit had given the Court discretion to conduct a Rule 23(b) analysis for the purpose of determining the type of class to certify. See id. at 13-15.[2] Accordingly, this Court considered the plaintiffs' class under the various provisions of Rule 23(b) and found that the monetary relief sought by the plaintiffs predominated over the injunctive relief requested, and, therefore, certification was not proper under Rule 23(b)(2). Id. at 23. This Court also declined to certify the class using a "(b)(2)/(b)(3) hybrid," noting that this approach was not well established within the Fourth Circuit. Id. at 24-25.

Finally, the Court considered the putative class under Rule 23(b)(3), noting that although it retained discretion as to the type of class to certify, its evaluation of the facts was significantly constrained by the Fourth Circuit's ruling. Id. at 27 ("[T]he Court of Appeals significantly altered the lens through which this Court must evaluate the facts relevant to an analysis under Rule 23(b)(3)."). Consequently, in considering whether the putative class satisfied Rule 23(b)(3), this Court could not revert to factual findings or assumptions that the Fourth Circuit

---

[2] Before conducting its analysis, this Court remarked, "the question of which provision the plaintiffs' class satisfies essentially requires the same analysis as the question of whether the plaintiffs have satisfied any of the requirements at all." Order Granting Class Certification 15, Feb. 17, 2011, ECF No. 339. Thus, while the Fourth Circuit's opinion compelled a particular outcome (class certification in some form), the analysis required to reach that outcome was otherwise identical to the analysis the Court would have performed had the Fourth Circuit remanded the case with instructions to consider whether the appellants' class satisfied Rule 23(b).



had explicitly rejected in reversing this Court's analysis of Rule 23(a). After examining the

putative class in light of the Fourth Circuit's opinion and applying the relevant factors under

Rule 23(b)(3), this Court found that the putative class satisfied both the predominance and

superiority requirements of Rule 23(b)(3) and certified the following class:

> All African-Americans who are or were employed at the Nucor Berkeley
> manufacturing plant in Huger, South Carolina at any time since December 2, 1999
> in the beam mill, hot mill, cold mill, melting, maintenance, and shipping
> departments.

Order Granting Class Certification 30, ECF No. 339.

### 4.    The Defendants' Motions to Reconsider/Stay/Narrow the Class

On March 7, 2011, the defendants filed a motion for reconsideration (ECF No. 346) and a

motion to stay the case (ECF No. 347) until after the Supreme Court issued an opinion in Wal-

Mart Stores, Inc. v. Dukes. On April 6, 2011, the Court held a hearing to consider the

defendants' motions. The Court declined to stay the case pending a ruling in Wal-Mart and

instructed the defendants that if Wal-Mart were to require this Court to reexamine its

certification decision, the defendants could make a motion to decertify the class at that time.

The Court also declined to reconsider its order certifying the class. Noting that the Fourth

Circuit had clearly ordered it to certify the plaintiffs' class, the Court rejected the defendants'

claim that this Court had the authority to deny class certification altogether. In a footnote, this

Court explained:

> The defendants contend that this Court should not have certified any class at all;
> however, to maintain this position they must completely ignore the Fourth
> Circuit's directive: "we remand the case to the district court with instructions to
> certify the appellants' class action . . . ." Brown, 576 F.3d at 160. Although the
> defendants may find it odd that the Fourth Circuit would dictate the general
> outcome to be reached (class certification) while leaving this Court to fill in the
> details, that appears to be precisely what the Fourth Circuit did. While the
> defendants may insist that the Fourth Circuit made an error, they did not prevail



on the Fourth Circuit or the Supreme Court to correct it.  See Nucor Corp. v.
Brown, 130 S. Ct. 1720 (Mar. 1, 2010) (denying certiorari).

Order Den. Mot. for Recons. 8 n.2, ECF No. 359.

The defendants also moved the Court to narrow the scope of the class.  The Court largely

rejected the defendants' argument that the scope of the class should be narrowed.  The Court did,

however, find that three modifications to the class were needed.  First, the Court agreed with the

defendants that the class definition should indicate that it encompassed only those individuals

who may have been discriminated against by the defendants.  Second, the Court granted the

defendants' request that the class definition specify that it was limited to African-Americans who

were employed by the defendants in one or more of the six enumerated departments at the Nucor

Steel Berkeley plant and did not encompass individuals who may have worked at the plant as

independent contractors or in some other capacity.  Finally, the Court found that it would be

helpful to provide a cutoff date for inclusion in the class, which the Court determined would be

the date of its order.  Accordingly, the class was modified, and was defined as follows:

> All African-Americans who are, as of the date of this order [April 4, 2011], or
> were employed by Nucor Corporation or Nucor Steel Berkeley at the Nucor
> Berkeley manufacturing plant in Huger, South Carolina at any time between
> December 2, 1999, and the date of this order, in the beam mill, hot mill, cold mill,
> melting, maintenance, and shipping departments, and who may have been
> discriminated against because of Nucor's challenged practices.

Id. at 14.

### 5.    Wal-Mart v. Dukes

In June 2011, the Supreme Court decided Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct.

2541 (2011).  Wal-Mart involved the certification of a class encompassing 1.5 million current

and former female employees of Wal-Mart who may have been subjected to discrimination on



the basis of their sex. Wal-Mart delegated decisions about pay and promotion to local managers and gave them broad discretion, which was exercised in a largely subjective manner. The plaintiffs did not claim that Wal-Mart had an explicit policy not to promote women; but contended that Wal-Mart's "strong and uniform 'corporate culture' permit[ted] bias against women to infect, perhaps subconsciously, the discretionary decisionmaking of each one of Wal-Mart's thousands of managers – thereby making every woman at the company the victim of one common discriminatory practice." Wal-Mart, 131 S. Ct. at 2548. The district court found that "[w]omen fill 70 percent of the hourly jobs in [Wal-Mart's] stores but make up only 33 percent of management employees." Id. at 2563 (Ginsburg, J., dissenting) (quoting Dukes v. Wal-Mart, 222 F.R.D. 137, 146 (N.D. Cal. 2004)).

The Wal-Mart decision involved two primary questions: (1) did the plaintiffs' class satisfy the commonality requirement of Rule 23(a); and (2) did the plaintiffs' class satisfy the requirements of Rule 23(b)(2). The Court answered both questions in the negative. On the issue of whether the class satisfied the commonality requirement of Rule 23(a), a 5-4 majority composed of Chief Justice Roberts and Justices Scalia, Kennedy, Thomas, and Alito found that the class did not satisfy the requirements of Rule 23(a). Justice Ginsburg dissented on behalf of herself and Justices Breyer, Sotomayor, and Kagan. On the issue of whether the class was properly certified under Rule 23(b)(2), the Court unanimously found that certification was not proper. The dissenters would have remanded the case to the district court to consider whether the class could be certified under Rule 23(b)(3); however, given the majority's finding that the class did not even meet the commonality requirement of Rule 23(a), the case was not remanded. Applying the Wal-Mart holding to the case at bar, the defendants contended that these holdings

upended the reasoning of the Fourth Circuit's opinion in this case and required this Court to decertify the plaintiffs' class.

## II.    DISCUSSION

Rule 23(c)(1)(C) authorizes a district court to alter or amend its certification of a class at any time prior to final judgment. A court has an ongoing duty to monitor a class and has "considerable discretion" to decertify it if it finds that class treatment is no longer appropriate. Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 433 (4th Cir. 2003). Furthermore, the burden remains on the plaintiff to demonstrate that certification remains appropriate. Stastny v. S. Bell Tel. & Tel. Co., 628 F.2d 267, 277-78 (4th Cir. 1980) (holding that the class representative has the burden of producing an adequate record establishing the continued propriety of maintaining a class action).

The plaintiffs argue that Wal-Mart is distinguishable from the case at hand and should have no impact on the class certified by this Court. This Court agrees with the plaintiffs that there are significant differences between the facts in the present case and those at issue in Wal-Mart. Whereas Wal-Mart involved a class of over 1.5 million plaintiffs, this case involves a class of approximately 200. Whereas Wal-Mart involved approximately 3,400 stores spread throughout the United States, this case involves a single plant. Whereas Wal-Mart involved social framework evidence and a proposal to resolve individual issues through trial by proxy, this case involves neither. Nevertheless, the Court finds that three of Wal-Mart's central holdings are relevant to this case.

First, the Wal-Mart Court reaffirmed the need for a district court to perform "a rigorous analysis" before certifying a class and explained that such an analysis will often require a court to reach determinations that overlap with the merits. Wal-Mart, 131 S. Ct. at 2551 (citation



omitted). Second, the Court clarified the commonality requirement under Rule 23(a)(2),

explaining that commonality is not the raising of common questions, but the potential for a single

proceeding to produce common answers. Id. Specifically, the Court held that to establish

commonality in a Title VII action for discrimination, plaintiffs must present "significant proof"

that the defendant "operated under a general policy of discrimination" and demonstrate that they

have suffered a common injury. Id. at 2553. Finally, the Court explained that delegation of

subjective decision-making authority is not, without more, a "policy" that is sufficiently uniform

to raise "common" issues appropriate for resolution on a class-wide basis.[3] Id. at 2554. These

holdings call into question the Fourth Circuit's opinion in this case, and require this Court to

reexamine its order granting class certification. The Court will begin by considering whether

class certification remains proper with regard to the plaintiffs' disparate treatment and disparate

impact claims ("promotions claims") and then turn to the plaintiffs' hostile work environment

claim.

### A.    "A RIGOROUS ANALYSIS"

In Wal-Mart, the Supreme Court reaffirmed its holding in General Telephone Co. of

Southwest v. Falcon , 457 U. S. 147 (1982), that "[class] certification is proper only if 'the trial

court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been

satisfied.'" Wal-Mart, 131 S. Ct. at 2551 (quoting Falcon, 457 U.S. at 161). The Court

acknowledged that "frequently," the required analysis "will entail some overlap with the merits

---

[3] Aside from the clarification of Rule 23(a), the other significant holding of Wal-Mart is the Court's holding that a (b)(2) class should not be certified where the plaintiffs seek "monetary relief" that is "not incidental to . . . injunctive or declaratory relief." Wal-Mart, 131 S. Ct. at 2557. The Court held that in light of the structure of Rule 23, "individualized monetary claims belong in Rule 23(b)(3)." Id. at 2558. This holding merely confirms that this Court was correct in refusing to certify a Rule 23(b)(2) class as requested by the plaintiffs. Because this Court certified the plaintiff's class under Rule 23(b)(3), this holding does not affect the class in this case.



of the plaintiff's underlying claim," a result which "cannot be helped." Wal-Mart, 131 S. Ct. at 2551. "Actual, not presumed, conformance with Rule 23(a) remains indispensable." Id. (quoting Falcon, 457 U.S. at 160). That the plaintiffs must establish a particular fact at trial does not relieve them of the obligation to establish the same fact at the class certification stage if the fact is necessary to satisfy a Rule 23 requirement. See id. at 2552 n.6 (observing that plaintiffs seeking class certification in a securities fraud action often rely upon the "fraud on the market" presumption, which requires them to "prove that their shares were traded on an efficient market, an issue that they will surely have to prove again at trial").

The Wal-Mart Court also explained that language from its decision in Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177 (1974), is sometimes "mistakenly cited" for the proposition that a court may not delve into the merits of a case at the certification stage. Wal-Mart, 131 S. Ct. at 2552, n.6. In Eisen, the Supreme Court said: "We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." 417 U.S. at 177. The Wal-Mart Court distinguished the inquiry in Eisen from the typical certification inquiry, noting that in Eisen, "the judge had conducted a preliminary inquiry into the merits of a suit, not in order to determine the propriety of certification under Rules 23(a) and (b)[,] . . . but in order to shift the cost of notice required by Rule 23(c)(2) from the plaintiff to the defendants." Wal-Mart, 131 S. Ct. at 2552 n.6. The Wal-Mart Court concluded: "To the extent the quoted statement goes beyond the permissibility of a merits inquiry for any other pretrial purpose, it is the purest dictum and is contradicted by our other cases." Id. In short, Eisen's prohibition on considering the merits at the class certification stage is inapplicable as long as the purpose of the inquiry is to determine whether the requirements of Rule 23 have been satisfied.



As in <u>Wal-Mart</u>, the plaintiffs in this case allege a "pattern or practice" of discrimination in violation of Title VII. To prevail on this claim, the plaintiffs must "establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure the regular rather than the unusual practice." <u>Int'l Bhd. of Teamsters v. United States</u>, 431 U.S. 324, 336 (1977) (footnote omitted). To establish commonality, the plaintiffs must present "'significant proof' that [the defendant] 'operated under a general policy of discrimination.'" <u>Wal-Mart</u>, 131 S. Ct. at 2553 (quoting <u>Falcon</u>, 457 U.S. at 159 n.15). The standard for establishing commonality is so similar to the standard for establishing liability that it is hard to imagine how a court could evaluate commonality without delving deeply into the merits of the plaintiffs' claims. "[P]roof of commonality necessarily overlaps with [the plaintiffs'] merits contention that [the defendant] engages in a <u>pattern or practice</u> of discrimination. . . . [b]ecause, in resolving an individual's Title VII claim, the crux of the inquiry is 'the reason for a particular employment decision.'" <u>Id.</u> at 2252 (quoting <u>Cooper v. Fed. Reserve Bank of Richmond</u>, 467 U.S. 867, 876 (1984) (footnote omitted)). Without proof of a general policy of discrimination, there is no "glue" to hold together the "reasons" for challenged employment decisions, making it "impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question <u>why was I disfavored</u>." <u>Id.</u> Accordingly, in Title VII pattern or practice actions, a trial court not only may, but must evaluate the merits of the plaintiffs' case to ensure that the plaintiffs have satisfied the commonality requirement.

The statistical evidence presented in this case is thoroughly described in this Court's previous orders on class certification, <u>see</u> Order 5-8, Feb. 16, 2011, ECF No. 339; Order 6-10, Aug. 7, 2007, ECF No. 224, as well as in the Fourth Circuit's opinion. <u>See Brown</u>, 576 F.3d at



153-57. The plaintiffs presented five statistical comparisons[4] that purported to demonstrate a

statistically significant disparity in the rate at which African-American employees were

promoted. This Court and the Fourth Circuit focused on the plaintiffs' final comparison, which

this Court summarized as follows:

> The final statistic offered by the plaintiffs was "a comparison of the estimated
> percentage of African-Americans who bid on promotions between December
> 1999 and December 2003 and the estimated percentage of African-Americans
> who received promotions for the same time period." Brown, 2007 WL 2284581,
> at *4. Nucor failed to maintain its bidding records prior to January 2001, so the
> plaintiffs' experts used change-of-status forms produced by the defendants to
> identify twenty-seven positions that they claimed the defendants filled between
> December 1999 and January 2001. Id.; Drs. Bradley's & Fox's Expert Report 10-
> 11, Sept. 12, 2006, ECF No. 186-1. The plaintiffs' experts "estimated that the
> percentage of African-Americans who bid on the twenty-seven jobs was the same
> as the average percentage of African-Americans who bid on jobs from 2001 to
> December 2003." Drs. Bradley's & Fox's Expert Report 10-11. They concluded
> that "19.24% of applicants were African-American and 7.94% of applicants
> selected for promotion were African-American." Brown, 2007 WL 2284581, at
> *4. Using these numbers, the plaintiffs' experts concluded that "[t]he difference
> between [the] African-American selection rate of 7.94% and their bidding rate of
> 19.24% [was] statistically significant at -2.54 standard deviations from what
> would be expected if race were neutral in the selection process." Drs. Bradley's
> & Fox's Expert Report 11.

Order 6, Feb. 16, 2011, ECF No. 339.

This Court excluded the plaintiffs' comparison, finding that the alternative benchmark for

the period between December of 1999 and January of 2001 required assumptions that rendered

the comparison less probative than a comparison constructed using the actual bidding records for

2001-2003. Limited to this period, the comparison did not demonstrate a statistically significant

disparity. In dissent, Judge Agee agreed with this Court, finding that the plaintiffs' alternative

---

[4] This Court rejected four of these comparisons because they employed benchmarks drawn from Census estimates of
the qualified African-American workforce in the geographic area surrounding the Berkeley plant, despite undisputed
evidence that the defendants' hiring was almost exclusively internal. The majority did not address this Court's
decision to exclude the four comparisons based on the qualified African-American workforce, and the Court
continues to believe that these comparisons are of little relevance in this case.



benchmark "was without a valid foundation, purely speculative, and thus not entitled to probative weight." Brown, 576 F.3d at 167 (Agee, J., concurring in part and dissenting in part).

The majority began by noting, "statistical evidence is unnecessary to establish commonality."

> [P]laintiffs need not, at the time of the motion for class certification, demonstrate by statistical evidence that blacks have been terminated [or promoted] at a higher rate than have whites, or any other differential. Certification is only concerned with the commonality (not the apparent merit) of the claims and the existence of a sufficiently numerous group of persons who may assert those claims . . . .

Id. at 153 (quoting Lilly v. Harris-Teeter Supermarket, 720 F.2d 326, 332-33 (4th Cir. 1983)).

As discussed in the following section, Wal-Mart heightens the commonality standard by requiring that the plaintiffs identify a biased testing procedure or present "significant proof that [the defendant] operated under a general policy of discrimination." Wal-Mart, 131 S. Ct. at 2553 (quoting Falcon, 457 U.S. at 159.) Nothing in Wal-Mart implies that the requisite "glue" must be in the form of statistical evidence. Writing for the majority, Justice Scalia suggested that evidence of "discriminatory bias on the part of the same supervisor" might suffice, Id. at 2551, and such evidence will often be anecdotal as opposed to statistical.

On the other hand, whatever significant proof is offered must be sufficiently broad to demonstrate a general policy of discrimination. The term "general" suggests that the policy must be applicable to the class as a whole, not to just a small subsection of the class, such as a few Wal-Mart stores, or to a single department in the case at hand. Furthermore, in cases where a defendant delegates discretion over promotion decisions to numerous low level managers, proof that a particular manager exercised his or her discretion in a discriminatory manner will not be sufficient to certify a class extending beyond those workers affected by the particular manager. In such cases, statistical evidence is critical because it may help the plaintiffs to "identif[y] a



common mode of exercising discretion that pervades the entire company [or plant]." Wal-Mart, 131 S. Ct. at 2554-55. In summary, although Wal-Mart does not explicitly hold that statistical evidence is required, in the absence of evidence of a common biased test or proof of discriminatory bias on the part of a manager who has discretionary authority over the entire class, statistical evidence will almost always be needed to establish commonality.

Relying on United States v. County of Fairfax, 629 F.2d 932 (4th Cir. 1980), in which the Fourth Circuit approved the use of an alternative benchmark after the defendant destroyed job applications, the Fourth Circuit held that "since Nucor destroyed the pre-2001 job promotions data, the appellants likewise were free to attempt to utilize an alternative benchmark in order to form their calculations, and the district court abused its discretion in ruling that only the data that Nucor provided could be used." Brown, 576 F.3d at 155. This Court interprets the Fourth Circuit's ruling to hold that a district court abuses its discretion where it excludes an alternative benchmark employed to replace missing data based on the broad assertion that statistical comparisons drawn from the limited actual data are more reliable than statistical comparisons that utilize the alternative benchmark. The Court does not understand the Fourth Circuit to suggest that a court must accept whatever alternative statistical analysis plaintiffs may offer, regardless of its reliability.

Although it acknowledged that a district court has an obligation to perform "a rigorous analysis" before granting class certification,[5] the Fourth Circuit majority faulted this Court and Judge Agee for delving too far into the merits of the plaintiffs' claims and for rejecting the plaintiffs' statistical evidence. Citing Eisen, the Fourth Circuit "reiterate[d] that an in-depth assessment of the merits of appellants' claims at [the class certification] stage would be

---

[5] Brown, 576 F.3d at 162 (quoting Falcon, 457 U.S. at 161) ("[A] Title VII class action, like any other class action, may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.").



improper." Brown, 576 F.3d at 156.  Significantly, the Fourth Circuit never suggested that the

substance of Judge Agee's analysis was wrong; it was simply premature:

> [We] emphasize that at this stage, we are dealing only with whether the appellants
> have presented sufficient statistical information to establish commonality.  We
> must walk a fine line between a facial class certification assessment and
> assessment on the merits, and the dissent has stepped to the other side.  The
> dissent's critiques might very well discredit the appellants' statistics later, upon a
> full review of the merits, but the information that the appellants have presented is
> enough to allow them to get to that point.

Id. at 156 n.10.

If the Fourth Circuit majority had based its decision on a finding that the plaintiffs'

statistical evidence was inherently reliable, this Court would be extremely hesitant to revisit the

issue of class certification, even in light of Wal-Mart.  However, the Fourth Circuit majority did

not base its ruling on the strength of the plaintiffs' statistical evidence, but on the claim that

strong evidence is not required at the class certification stage, Brown, 576 F.3d at 156 (finding

that "evidence need not be conclusive to be probative, and even evidence that is of relatively

weak probative value may be useful in meeting the commonality requirement"), and the

contention that statistical proof was not necessary at all.  Id. at 153.

Wal-Mart suggests that a rigorous analysis of the merits for the purpose of assessing

commonality is not only permitted, but required.  There is nothing to indicate that this Court or

Judge Agee examined the merits of the plaintiffs' evidence for any purpose other than

determining whether the plaintiffs had satisfied the requirements of Rule 23(a).  The majority's

reliance on Eisen and repeated criticism of this Court and Judge Agee for examining the merits

of the plaintiffs' evidence is arguably inconsistent with Wal-Mart.  For this reason, the Court

concludes that Wal-Mart requires it to reevaluate the plaintiffs' class certification evidence.



In rejecting the plaintiffs' statistics in its original order denying class certification, this Court failed to explicitly identify significant flaws in the construction of the plaintiffs' alternative benchmark analysis and to explain that these flaws rendered the benchmark unreliable. Instead, the Court merely suggested that the alternative benchmark for the period between December of 1999 and January of 2001 required assumptions that rendered the comparison <u>less probative</u> than a comparison constructed using the actual bidding records for 2001-2003. The Court regrets this understatement and will take this opportunity to state, unequivocally, that the plaintiffs' statistical analysis is not only <u>relatively less probative</u> than an analysis based on the actual data, it is <u>fundamentally unreliable</u>.

This Court shares Judge Agee's view of the plaintiffs' statistical analysis, and his opinion dissenting in part and concurring in part thoroughly expresses this Court's concerns. Judge Agee explained that in order to conduct their statistical analysis, the plaintiffs' experts were required to formulate two variables: "(1) the number of posted job promotions available for bidding by the existing Nucor employees during 2000, and (2) whether those job promotions were 'similarly situated' as defined by the district court (i.e., job promotions for which at least one African-American employee applied)." <u>Brown</u>, 576 F.3d at 167 (Agee, J., dissenting in part and concurring in part). In constructing these variables, the plaintiffs' experts made at least two significant assumptions that rendered their analysis unreliable.

First, the plaintiffs' experts determined the number of posted job promotions available for bidding in the period between December 1999 and January 2001 by looking at change-of-status forms produced by the defendants. The plaintiffs' experts claim to have identified 27 change-of-status forms, which they contend represent posted promotions available for bidding. As Judge



Agee explained, there were substantial ambiguities regarding how the plaintiffs' experts

determined that the 27 forms they located actually represented 27 promotions open for bidding:

> It is not clear from the record whether the twenty-seven change-of-status forms
> represent all, or only selected, jobs open for promotion in 2000 because these
> forms are not identified. Nucor argues that the change-of-status forms "are simply
> a company record which documents any employee's change of status, whether the
> employee was promoted, demoted, received a standard pay increase, or was
> transferred." Appellee's Br. at 36.

> Indeed, the change-of-status forms found in the record for 2000 fail to bolster the
> appellants' claim that those forms reflect only promotion positions open to bid.
> For example, nine change-of-status forms appear in the record dated between
> December 1999 and January 2001 (including three in January 2001). J.A. 8397-
> 99, 8406-07, 8416, 8673-74, 8701. Of these forms, one (J.A. 8399) simply reflects
> an increase in pay for an existing employee. Two (J.A. 8397, 8406) reflect
> completion of probation for an existing employee. Another (J.A. 8407), reflects a
> new hire and not a promotion. The remaining five reflect promotions of some
> type, though only one (J.A. 8673) identifies a promotion acquired through a bid
> process. On this record, **it is difficult, if not impossible, to discern whether the
> 2000 data based on the nebulous change-of-status forms proves those
> positions were promotion positions available for employee bidding** and thus
> relevant to the formulation of statistical evidence for the appellants' claims.

Id. at 167-68 (emphasis added).  Furthermore, Judge Agee noted that even if all 27 of the

change-of-status forms represented promotions, the plaintiffs must further assume that each of

these promotions was actually posted for bidding by employees.  Id. at 168.  Given these

uncertainties, Judge Agee concluded that it was "highly dubious" that the plaintiffs had reliably

established the number of positions available for bidding.  Id.

　　　This Court agrees.  The most significant problem, with regard to the plaintiffs' first

variable, is that it is impossible for this Court to determine how the plaintiffs' experts reached the

conclusion that a particular change-of-status form represented a promotion.  Despite repeated

criticism of their analysis by the defendants, this Court, and Judge Agee, the plaintiffs have done

nothing to assure the Court that the "promotions" their experts identified were, in reality,

promotions.  The plaintiffs have submitted thousands of pages of evidence in support of their

class, yet the Court has never seen the 27 change-of-status forms upon which their experts apparently relied. This Court is every bit as qualified as the plaintiffs' experts to look at an employment record and determine what, if anything, it represents. The plaintiffs have claimed that, with regard to the positions implicated in this case, Nucor Berkeley promoted only a single African-American between December 1999 and January 2001, and whether that promotion was 1 of 27, 1 of 14, or 1 of 4 is a fact that matters. The plaintiffs have not explained how their experts determined the number of promotions available, and the Court is not inclined to take their word for it.

Second, having identified what they believed to be 27 relevant "promotions" between December 1999 and January 2001, the plaintiffs' experts needed a way to estimate how many African-Americans had applied for each one of these "promotions." Because Nucor had destroyed the bidding data, the plaintiffs' experts "assumed 'that the racial composition of the bidding pool' [applicants] for those [27] jobs was the same as the weighted average of the racial composition of the bidding pools (applicants) for the' 2001-2003 period." Brown, 576 F.3d at 168 (Agee, J., concurring in part and dissenting in part). The data from the 2001-2003 period was drawn exclusively from "similarly situated" jobs, meaning "promotions for which at least one African-American employee applied." However, because they lacked the bidding data, the plaintiffs' experts could not determine how many of the 27 "promotions" they identified were likewise "similarly situated." In other words, the plaintiffs' experts took an average drawn exclusively from bidding pools that included at least one African-American and applied it to bidding pools that may not have included any African-Americans. In so doing, they effectively assumed that at least one African-American had bid for each one of the 27 "promotions," despite

the fact that they could point to only one instance where they knew for sure that an African-American had done so.

The plaintiffs' experts admitted that because the definition of "similarly situated" requires that at least one African-American bid on the position, "the African-American representation among bidders for 'similarly situated' jobs provided by Nucor-Berkeley is necessarily inflated." Id. at 169 (Agee, J., concurring in part and dissenting in part). When this "inflated" average is applied to "promotions" for which an African-American may not have applied, it almost certainly overstates the expected number of African-American promotions.

In summary, to take the plaintiffs' statistical analysis at face value, the Court must assume that the 27 change-of-status forms selected by the plaintiffs' experts actually represent 27 promotions posted for bidding and that each of these 27 "promotions" fell within the Court's definition of a "similarly situated" promotion. The plaintiffs' assumptions are self-serving, and without them, the plaintiffs cannot demonstrate a statistically significant disparity in the rate at which African-Americans were promoted at the Berkeley plant. Allowing the plaintiffs to utilize such statistics to satisfy their burden to present significant proof of a common policy of discrimination effectively permits them to assume what they would otherwise be required to prove.

This Court cannot, consistent with Wal-Mart, allow the plaintiffs to rely on inherently faulty evidence simply to ensure evidentiary fairness. The Court is, however, cognizant of the Fourth Circuit's concern that the plaintiffs not be prejudiced by the defendants' destruction of some of their promotions data. Perhaps the best way to accommodate this concern is for the



Court to revisit its ruling on the scope of discovery.[6]  It was, after all, the plaintiffs' experts who

initially claimed that they needed more data to be able to present reliable statistics.  The Court is

mindful that, when using the standard deviation analysis, the smaller the number of decisions

analyzed, the more difficult it is to demonstrate a statistically significant disparity.  Thus, the

destruction of evidence or an overly restrictive discovery regime may effectively mask a true

disparity.  Accordingly, if the plaintiffs believe that the production of additional evidence will

enable their experts to conduct a reliable statistical analysis or construct a more meaningful

alternative benchmark, the Court will entertain a motion to revisit the scope of discovery.[7]

## B.    COMMONALITY

Federal Rule of Civil Procedure 23(a)(2) requires plaintiffs seeking to represent a class to

show that "there are questions of law or fact common to the class."  This "language is easy to

misread, since '[a]ny competently crafted class complaint literally raises common 'questions.'"[8]

Wal-Mart, 131 S. Ct. at 2551 (quoting Richard Nagareda, Class Certification in the Age of

Aggregate Proof, 84 N.Y.U. L. Rev. 97, 131-32 (2009)).  As the Wal-Mart Court explained,

"[w]hat matters to class certification . . . is not the raising of common 'questions' – even in

droves – but, rather the capacity of a classwide proceeding to generate common answers apt to

drive the resolution of the litigation."  Id. (quoting Nagareda, 84 N.Y.U. L. Rev. at 132).

---

[6] The Fourth Circuit declined to address the plaintiffs' argument that this Court should have compelled Nucor to provide more data because the Court of Appeals concluded that it lacked jurisdiction under Rule 23(f) to consider a separate discovery order.  Brown, 576 F.3d at 155 n.8.
[7] The Court is reluctant to reconsider its discovery order in light of the age of this case, however, it can conceive of no other way, short of accepting inherently unreliable evidence, to accommodate the Fourth Circuit's fairness concerns.
[8] The Wal-Mart majority offered the following examples of questions that, while "common" in a literal sense, are not "common" for the purposes of Rule 23(a)(2): "Do all of us plaintiffs indeed work for Wal-Mart? Do our managers have discretion over pay?  Is that an unlawful employment practice?  What remedies should we get?" According to the majority, "[r]eciting these questions is not sufficient to obtain class certification." Wal-Mart, 131 S. Ct. at 2551.



Wal-Mart teaches that establishing commonality requires more than simply identifying a sufficient number of employees who claim to have suffered discrimination at the hands of the same company; the plaintiffs must establish a "common injury," which "does not mean merely that they have all suffered a violation of the same provision of law." Wal-Mart, 131 S. Ct. at 2551.

> [T]he mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once. Their claims must depend upon a common contention – for example, the assertion of discriminatory bias on the part of the same supervisor. That common contention, moreover, must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

Id. The defendants refer to the concept set forth above as Wal-Mart's "common injury requirement."

"[T]here is a wide gap" between an individual's claims of discrimination and "the existence of a class of persons who have suffered the same injury . . . such that the individual's claim and the class claims will share common questions of law or fact and that the individual's claim will be typical of the class claims." Falcon, 457 U.S. at 157. To bridge this "gap," the plaintiffs must point to a "testing procedure or other companywide evaluation method that can be charged with bias," or present "'significant proof' that [the defendant] 'operated under a general policy of discrimination.'" Wal-Mart, 131 S. Ct. at 2553 (quoting Falcon, 457 U.S. at 159 n.15). Evidence of a common biased evaluation method or a general policy of discrimination provides the requisite "glue" to link various employment decisions to one another. Without such "glue," "it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question why was I disfavored." Wal-Mart, 131 S. Ct. at 2552. The defendants refer to this concept as Wal-Mart's "common policy" requirement.



The "common injury" and "common policy" requirements do not demand that the plaintiffs prove that every member of their class has actually suffered an injury at the class certification stage. As the plaintiffs point out, such a requirement would be inconsistent with the two-stage approach set forth in Teamsters and referenced with approval in Wal-Mart. At the class certification stage, Wal-Mart simply requires that the plaintiffs identify a common discriminatory mechanism that potentially affects the entire class – the same discriminatory policy, the same biased test, the same prejudiced supervisor (or group of supervisors).[9] By presenting this "common contention," the plaintiffs assure the Court that if they succeed in establishing an injury, it will be a class-wide injury. See Stastny, 628 F.2d at 273 ("Central to both [disparate impact and disparate treatment] theories of liability where class-wide sex (as other) discrimination is alleged is the existence of an identifiable employment pattern, practice or policy that demonstrably affects all members of a class in substantially, if not completely, comparable ways.").

The plaintiffs argue that Wal-Mart merely reaffirms Falcon and Teamsters and that the "common injury" and "common policy" requirements are well-established concepts that change nothing in the commonality analysis.

> Defendants have organized their argument under the headings of "common policy" and "common injury," as if those were new concepts just announced in Wal-Mart, and unknown to the Court of Appeals and this Court when it issued its class certification order. . . . [T]he Court of Appeals and this Court trod well-

---

[9] Construed in this manner, the "common injury" and "common policy" requirements are neither inconsistent nor incompatible with the Teamsters framework. At Stage I, a jury will determine whether the mechanism or mechanisms identified by the plaintiffs are in fact discriminatory, i.e. whether the company has engaged in a pattern or practice of discrimination. However, establishing that the defendant employed a discriminatory policy, a biased test, or a prejudiced supervisor does not automatically establish that every individual who was subject to the policy, or took the test, or worked for the supervisor incurred damages as a result thereof. There may be individual claimants who were never affected by the discriminatory policy, or excelled on the biased test, or were favored by an otherwise prejudiced supervisor. It may be that the defendant can show that the reason a particular claimant was denied a promotion had nothing to do with the discriminatory policy, biased test, or prejudiced supervisor. Such claimants are still properly a part of the class at Stage I because they were subjected to the discriminatory mechanism, even if it caused them no harm.



defined paths in certifying this class. The Supreme Court trod those same paths in rejecting the sprawling <u>Wal-Mart</u> class. Its decision provides this Court's class certification order with reassurance, not doubt.

Pls.' Opp. to Class Decert. 5, ECF No. 386. The requirements that the plaintiffs seeking class certification "demonstrate that the class members 'have suffered the same injury'" and present "'significant proof' that [the defendant] 'operated under a general policy of discrimination'" are drawn directly from the language of <u>Falcon</u>; however, <u>Wal-Mart</u>'s application of this language effectively heightened the standard under Rule 23(a)(2). <u>See</u> <u>Wal-Mart</u>, 131 S. Ct. at 2565 (Ginsburg, J., dissenting) ("The Court blends Rule 23(a)(2)'s threshold criterion with the more demanding criteria of Rule 23(b)(3), and thereby elevates the (a)(2) inquiry so that it is no longer 'easily satisfied.'") (citation omitted).[10] Whether <u>Wal-Mart</u>'s application of Rule 23(a)(2) is characterized as a "clarification" of long-standing precedent or an abrupt change in the law, one need look no further than the numerous classes that have been decertified in its wake[11] to

---

[10] Additionally, numerous scholars have acknowledged (often with criticism) that the practical effect of <u>Wal-Mart</u> is to heighten the requirements for class certification in general and the certification of Title VII pattern-or-practice classes in particular. <u>See, e.g.</u>, Suzette M. Malveaux, <u>How Goliath Won: The Future Implications of Dukes v. Wal-Mart</u>, 106 Nw. U. L. Rev. Colloquy 34, 39 (2011) (observing that the requirement that plaintiffs, to demonstrate commonality, provide "'significant proof' that [the defendant] 'operated under a general policy of discrimination' . . . goes beyond prior Title VII class action jurisprudence"); Tristin K. Green, <u>The Future of Systemic Disparate Treatment Law</u>, 32 Berkeley J. Emp. & Lab. L. 395, 397 (2011) (predicting that if a "'policy-required' view of systemic disparate treatment theory . . . succeeds in gaining conceptual foothold beyond <u>Wal-Mart</u>, [it] will result in a drastic reshaping of systemic disparate treatment law"); Myriam Gilles & Gary Friedman, <u>After Class: Aggregate Litigation in the Wake of AT&T Mobility v. Concepcion</u>, 79 U. Chi. L. Rev. 623, 623 (2012) (describing the <u>Wal-Mart</u> Court's interpretation of the Rule 23(a) commonality requirement as "new and highly restrictive").

[11] <u>See, e.g.</u>, <u>Cruz v. Dollar Tree Stores, Inc.</u>, Nos. 07-2050 SC, 07-4012 SC, 2011 WL 2682967 (N.D. Cal. July 8, 2011) (employee misclassification claims); <u>Walter v. Hughes Commc'ns, Inc.</u>, No. 09-2136 SC, 2011 WL 2650711 (N.D. Cal. July 6, 2011) (tort and consumer law claims); and <u>Lee v. ITT Corp.</u>, 275 F.R.D. 318 (W.D. Wash. 2011) (contract claims)); <u>Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Mich.</u>, 654 F.3d 618(6th Cir. 2011) (ERISA claims); <u>Premium Plus Partners, L.P. v. Goldman, Sachs & Co.</u>, 648 F.3d 533, (7th Cir. 2011) (securities law claims); <u>Haynes v. Planet Automall, Inc.</u>, 276 F.R.D. 65 (E.D.N.Y. 2011) (consumer law claims); <u>Daskalea v. Washington Humane Soc'y</u>, 275 F.R.D. 346(D.D.C. 2011) (constitutional and tort claims); <u>Soto v. Diakon Logistics (Del.), Inc.</u>, Civil No. 08cv33-L (WMC), 2011 WL 3515917 (S.D. Cal. Aug. 10, 2011) (state wage and hour claims); <u>Corwin v. Lawyers Title Ins. Co.</u>, 276F.R.D. 484 (E.D. Mich. 2011) (consumer law claims); <u>Khan v. H & R Block E. Enters., Inc.</u>, No. 11-20335-Civ, 2011 WL 3269440 (S.D. Fla. July 29, 2011) (state constitutional and wage and hour claims); <u>Bacon v. Stiefel Labs., Inc.</u>, 275 F.R.D. 681 (S.D. Fla. 2011) (ERISA claims); <u>Gray v. Bayer Corp.</u>, Civil Action No. 08-4716 (JLL), 2011 WL 2975768 (D.N.J. July 21, 2011) (consumer law claims); <u>Garcia v. McNeil</u>, No. 4:07cv474-SPM/WCS, 2011 WL 3274009 (N.D. Fla. July 20, 2011) (ADA claims); <u>In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Liab. Litig.</u>, 276 F.R.D. 336 (W.D. Mo. 2011) (products liability claims). <u>See</u> Defs.' Reply to Pls.' Opp. 1 n.4 & 2 n.5.



conclude that <u>Wal-Mart</u> has changed the class-action landscape. Although the common injury and common policy requirements set forth in <u>Wal-Mart</u> are drawn directly from the language of <u>Falcon</u>, they are, in reality, new requirements that heighten the standard under Rule 23(a).

The commonality standard applied by the Fourth Circuit in <u>Brown</u> was less rigorous than the standard applied by the <u>Wal-Mart</u> Court. The Fourth Circuit said, "allegations of 'a practice of disparate treatment in the exercise of unbridled discretion . . . rais[es] questions of law and fact common to all [subject] black employees.'" <u>Brown</u>, 576 F.3d at 153 (quoting <u>Lilly</u>, 720 F.2d at 333). After <u>Wal-Mart</u>, the plaintiffs must do more than allege a pattern or practice of discrimination – they must offer "significant proof" that the defendant "operated under a general policy of discrimination." The plaintiffs' allegations may raise common questions in a literal sense, but without significant proof of a general policy of discrimination, there is no reason to believe that a class-wide proceeding will generate "common answers" regarding the reasons for Nucor's promotion decisions.

The Fourth Circuit found that the plaintiffs had "presented compelling direct evidence of discrimination" and that "[t]his evidence alone establishe[d] common claims of discrimination worthy of class certification." <u>Brown</u>, 576 F.3d at 153. The Fourth Circuit cited the declarations of several African-American employees describing "denials of promotions when more junior white employees were granted promotions (J.A. 1004, 1017), denial of the ability to cross-train during regular shifts like their white counterparts (J.A. 1000, 1023), and a statement by a white supervisor that he would never promote a black employee (J.A. 1885-86)." <u>Id.</u> This is "compelling direct evidence of discrimination," but all of the individuals who offered the testimony cited by the Fourth Circuit worked primarily in a single department – the Beam Mill.[12]

---

[12] <u>See</u> Decl. of [Beam Mill employee] Ramon Roane ¶ 30 (J.A. 1004) (alleging that African-American employees were equally if not better qualified than the non-African-American employees who received promotions); Decl. of



Anecdotes from the Beam Mill dominate not only the evidence cited by the Fourth

Circuit majority, but also the record as a whole. Of the 16 declarations submitted by the

plaintiffs in support of class certification, 11 of them were provided by Beam Mill employees.

Of the remaining declarants, three of them worked[13] in the Hot Mill, one worked in the Melt

Shop, and one worked in the Shipping Department.

This Court has reviewed the declarations submitted by the plaintiffs, as well as the

affidavits of approximately 80 African-American employees who worked at the Berkeley plant.

The defendants took these affidavits in 2003, prior to the filing of this litigation, and submitted

them to the Court in support their original opposition to the plaintiff's motion for class

certification.[14] Affidavits, ECF Nos. 198-3–198-8; 199-1–199-5; 200-1–200-5. The affidavits

are not universally positive, and varied significantly by department. For example, of the 13

affiants who worked in the Cold Mill, not a single one claimed to have been unfairly denied a

promotion on the basis of race. Furthermore, several of these employees specifically stated they

had good working relationships with their supervisors and believed them to be fair. Likewise,

---

[Beam Mill employee] Quinton Brown ¶ 29 (J.A. 1017) (same); Decl. of [Beam Mill employee] Ramon Roane ¶ 17 (J.A. 1000) (alleging that he was denied the opportunity to cross train during his shift, an opportunity which was granted to white employees working in his department); Decl. of [Beam Mill employee] Alvin Simmons ¶ 17 (J.A. 1023) (alleging that he and fellow Beam Mill employee Quinton Brown were denied the opportunity to cross train for a position that they had applied for in the Beam Mill, while the white employee who was ultimately selected for the position was permitted to cross train); Dep. of [former Beam Mill Supervisor] Scott Clark 113:10-114:4 (J.A. 1885-86) (alleging that Beam Mill Manager Paul Ferguson said, "I don't think we'll ever have a black supervisor while I'm here").

[13] Several of the declarants worked in more than one department, but in each of these instances, the declarant's allegations relate almost exclusively to the single department to which he or she is attributed for the purposes of this order.

[14] The plaintiffs moved the Court to exclude these affidavits because of the circumstances under which they were taken (as a part of Nucor's pre-lawsuit, internal investigation in connection with the related EEOC charges). See Pls.' Mot. to Strike, ECF No. 169. The Court denied the plaintiffs' motion, holding that the plaintiffs' objections went to the weight of the evidence, and not its admissibility. See Transcript of July 19, 2007 Hearing 3:16-4:24, ECF No. 225. The Court afforded the affidavits limited weight, and, to the extent that any of the affidavits submitted by the defendants conflicted with a declaration of the same individual submitted by the plaintiffs, the Court disregarded the affidavit. Furthermore, it should be noted that although the affidavits submitted by the defendants helped to confirm this Court's view that the allegations of discrimination in promotions against select managers did not reflect conduct that was typical of managers at the Berkeley plant, the Court's review of the affidavits actually bolstered the plaintiffs' claims of a common hostile work environment because employees from every department reported that they were exposed to the Confederate flag, racist graffiti, and offensive emails.



the overwhelming majority of employees who worked in the Melt Shop said they did not believe

that they had ever been denied a promotion on the basis of race.  Admittedly, there were more

allegations of discrimination in the Hot Mill, but even when the declarations of the three Hot

Mill employees seeking to join the named plaintiffs are factored in, a significant majority of the

Hot Mill employees denied that they had been denied promotions on the basis of race.  Notably,

the departments in which all or most of the affiants denied that they had suffered discrimination

in promotions are the same departments that are poorly represented or not represented at all in

the plaintiffs' declarations – the Cold Mill, the Melt Shop, and the Maintenance Department.[15]

In short, while there is significant direct evidence of a pattern of discrimination in promotions,

the scope of that evidence does not correspond to the scope of the current class.

In addition to comprising a majority of the plaintiffs' declarations, testimony from Beam

Mill employees accounts for almost all of the allegations of overtly racist behavior on the part of

managers or supervisors.  The same four names appear repeatedly in the declarations and

depositions submitted by the plaintiffs: Beam Mill Manager Paul Ferguson, and Beam Mill

Supervisors Gary Henderson, Paul Nowlin, and Dennis Pew.  See Dep. of Scott Clark 113:10-

114:4 (alleging that Ferguson said "I don't think we'll ever have a black supervisor while I'm

here"); Roane Decl. ¶ 13, Brown Decl. ¶ 5, 26, Decl. of Gerald White ¶ 8, and Decl. of Jason

Guy ¶ 6 (alleging that Ferguson denied them promotions in favor of less qualified white

candidates and specifically identifying the white candidates selected); Guy Decl. (alleging that

Paul Ferguson refused to sign his transfer form even though he had been selected for a position

---

[15] The affidavits submitted from the Beam Mill did not reflect a higher rate of claims of discrimination in promotions, but the defendants apparently took affidavits from only one of the named plaintiffs in this case (Jacob Ravenell).  Additionally, the Court disregarded the affidavits of several Beam Mill employees who later provided declarations in support of the plaintiffs' case.  Taken together, over half of the Beam Mill employees collectively represented in the defendants' affidavits and the plaintiffs' declarations alleged that they had been denied promotions on the basis of their race.



in the Cold Mill); Brown Decl. ¶ 26 (alleging that Ferguson disciplined him unfairly); Decl. of

Walter Cook (alleging that Henderson remarked "[t]he damn niggers have been in here messing

with my computer and copier machine, I can't keep paper in here because the damn niggers" and

said "that he was "glad the damn nigger got fired" in reference to the termination of Ken

Hubbard); Decl. of Eric Conyers ¶ 7 (alleging that Henderson made derogatory comments about

eating fried chicken to Conyers and his wife at a co-worker's wedding); Decl. of Robyn Spann

(alleging that Henderson intimidated her for applying for a promotion in the Beam Mill); Decl.

of Ken Hubard (alleging that Henderson wore a T shirt bearing the Confederate Flag); Brown

Decl. ¶ 16, Decl. of Alvin Simmons ¶¶ 7, 9-10 (alleging that Henderson denied them promotions

in favor of less qualified white candidates and specifically identifying the white candidates

selected); Clark Decl. ¶ 2 (alleging that Nowlin "used the word "nigger" so frequently, it was

part of his everyday language"); Brown Decl. ¶ 26 (alleging that Nowlin disciplined him

unfairly); Conyers Decl. ¶ 2, 5 (alleging that Nowlin discriminated against him with regard to

cross training, refused to submit his bid for a position in the Melt shop, said in his presence,

"when I first started working for Nucor, they worked me like a nig . . . . like a brother," and

began requiring Conyers to perform menial tasks after Conyers complained about the comment);

Roane Decl. ¶ 22, Guy Decl. ¶ 9 (alleging that Pew circulated a racially offensive email);

Simmons Decl. (alleging that Pew enabled a white employee to cross train for a position

Simmons was seeking, but denied Simmons a similar opportunity); Guy Decl. ¶ 9 (alleging that

Pew laughed in his face after he complained that he was being given the dirtiest clean up jobs);

Decl. of Aaron Butts, Sr. ¶ 5 (alleging that Pew told him that his application for a promotion had

been "misplaced"); Guy Decl. ¶ 6, Butts Decl. ¶ 4 (alleging that Pew denied them promotions in

favor of less qualified white candidates and specifically identifying the white candidates



selected).  In summary, the <u>vast</u> majority of the direct evidence alleging clear racial bias on the

part of managers and supervisors concerns one manager and three supervisors, all of whom

worked in the Beam Mill.

In <u>Brown</u>, the Fourth Circuit said:

> [A] person who has been injured by unlawful, discriminatory promotion practices
> in one department of a single facility may represent others who have been injured
> by the same discriminatory promotion practices in other departments of the same
> facility.  In such a case, the representatives of the class all have the same interests
> in being free from job discrimination, and they have suffered injury in precisely
> the same way in the denial of promotion.

576 F.3d at 158 (quoting <u>Hill v. W. Elec. Co.</u>, 596 F.2d 99, 102 (4th Cir. 1979)).  After <u>Wal-</u>

<u>Mart</u>, the critical qualifying language in this passage is that the employees must be "injured by

the <u>same</u> discriminatory promotion practices." <u>Id.</u> (emphasis added).  <u>Wal-Mart</u> specifically held

that proof that one manager exercised his discretion to discriminate against a protected class does

not permit a court evaluating commonality to assume that other managers exercised their

discretion in a similar way.  <u>See</u> 131 S. Ct. at 2554.  Strong evidence of discrimination in one

store or one department is not a substitute for proof that the class has suffered a common injury

or proof that the defendant operates under a general policy of discrimination.

To be very clear, this Court is not discounting the gravity of the plaintiffs' allegations.

Without question, the plaintiffs have presented evidence of a serious pattern of racial

discrimination regarding promotions in the Beam Mill, and their evidence would almost certainly

satisfy <u>Wal-Mart</u>'s demand for "significant proof" of a general policy of discrimination in that

particular department.  Assuming that the plaintiffs could satisfy the numerosity requirement,

this Court could probably certify a promotions class consisting of all African-American



employees who worked in the Beam Mill or applied to work in the Beam Mill.[16]  The Court

concludes, however, that the plaintiffs have failed to present "significant proof" that the

departments encompassed within the current class operated under a common policy of

discrimination.  Without such proof, the plaintiffs cannot establish a common injury, and their

promotions class must be decertified.

### C.    SUBJECTIVITY AS A POLICY

Wal-Mart rejected the argument that the delegation of discretion to supervising

employees is, without more, a "general policy of discrimination."  Like the plaintiffs in the case

at hand,[17] the plaintiffs in Wal-Mart alleged that the offending policy was the defendant's

decision to allow individual managers to make decisions about compensation and promotions

based on subjective factors.  The Wal-Mart Court took issue with this approach:

> The only corporate policy that the plaintiffs' evidence convincingly establishes is
> Wal-Mart's "policy" of allowing discretion by local supervisors over employment
> matters.  On its face, of course, that is just the opposite of a uniform employment
> practice that would provide the commonality needed for a class action; it is a
> policy against having uniform employment practices.  It is also a very common
> and presumptively reasonable way of doing business—one that we have said
> "should itself raise no inference of discriminatory conduct."

Id. at 2554 (quoting Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 990 (1988)).

Although the Court acknowledged that "giving discretion to lower-level supervisors can

be the basis of Title VII liability under a disparate-impact theory," it held that the existence of

---

[16] The impact that Ferguson and his supervisors may have had upon the ability of Beam Mill employees to secure
promotions in other departments would be accounted for by defining the hypothetical class to include all African-
Americans who worked in the Beam Mill as well as those who applied for positions in the Beam Mill.
[17] In their most recent filing, the plaintiffs take the position that they have never relied on evidence of subjective
hiring alone.  Although the plaintiffs have presented proportionally more anecdotal evidence than the plaintiffs in
Wal-Mart, their evidence suffers from a similar flaw – the absence of facts demonstrating that the various decision
makers exercised their discretion in a common way.



such a policy does not automatically create a common question suitable for resolution on a class-

wide basis.

> [R]ecognition that this type of Title VII claim "can" exist does not lead to the
> conclusion that every employee in a company using a system of discretion has
> such a claim in common. To the contrary, left to their own devices most
> managers in any corporation—and surely most managers in a corporation that
> forbids sex discrimination—would select sex-neutral, performance-based criteria
> for hiring and promotion that produce no actionable disparity at all. Others may
> choose to reward various attributes that produce disparate impact—such as scores
> on general aptitude tests or educational achievements. And still other managers
> may be guilty of intentional discrimination that produces a sex-based disparity. In
> such a company, demonstrating the invalidity of one manager's use of discretion
> will do nothing to demonstrate the invalidity of another's. A party seeking to
> certify a nationwide class will be unable to show that all the employees' Title VII
> claims will in fact depend on the answers to common questions.

Id. (citation omitted).

The Wal-Mart Court concluded that the plaintiffs had failed to identify "a common mode

of exercising discretion that pervades the entire company." Id. at 2554-55. Similarly, this Court

finds that the plaintiffs have failed to identify any factor that unites the manner in which the

various decision makers throughout the Berkeley plant exercised their discretion. Showing that a

particular manager or supervisor was biased – or even that all the management in a single

department was biased – does not establish a plant-wide policy that may be challenged by a

plant-wide class. Finally, even if the plaintiffs can distinguish their disparate impact theory from

the theory rejected in Wal-Mart, their statistical evidence is not sufficiently reliable to withstand

the rigorous analysis required by Wal-Mart.

In light of the Supreme Court's clarification of the commonality standard in Wal-Mart,

this Court concludes that the plaintiffs have failed to raise "questions of law or fact common to

the class" as required by Rule 23(a)(2).



Since the plaintiffs have not presented any common issues, it necessarily follows that common issues do not predominate as required under Rule 23(b)(3). However, even if the Fourth Circuit subsequently concludes that the plaintiffs have identified a common issue that satisfies Rule 23(a)(2), this Court nonetheless finds that "common issues," as that term is defined by Wal-Mart, do not predominate over individual issues with regard to the plaintiffs' promotions claims.

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Prods. v. Windsor, 521 US. 591, 623 (1997). The predominance requirement is "far more stringent than the commonality requirement of Rule 23(a)." Lott v. Westinghouse Savannah River Co., 200 F.R.D. 539, 563 (D.S.C. 2000) (citing Amchem Prods., 521 U.S. at 623-24). Although "individualized damage determinations cut against class certification under Rule 23(b)(3)[,]" Ward v. Dixie Nat. Life Ins. Co., 595 F.3d 164, 180 (4th Cir. 2010), "if 'common questions predominate over individual questions as to liability, courts generally find the predominance standard of Rule 23(b)(3) to be satisfied.'" Gunnells, 348 F.3d at 428 (quoting 5 Moore's Federal Practice § 23.46[2][a] (1997)). Accordingly, in the context of a Teamsters two-stage trial, it is particularly important that common issues predominate in Stage I.

Perhaps the best way to illustrate the lack of cohesion in the current promotions class is to compare the Court's strictly hypothetical "Beam Mill class," which probably would satisfy the predominance requirement, with the class that is currently certified. The Court has no difficulty envisioning how it would try a Beam Mill class given the anecdotal evidence in the record. In Stage I, the parties would present evidence regarding whether or not Ferguson and the supervisors who worked for him engaged in a pattern or practice of discrimination in



promotions. See Teamsters, 431 U.S. at 360 (noting that at Stage I, the plaintiffs' burden "is to establish a prima facie case that . . . a [discriminatory] policy existed"). The plaintiffs could present evidence such as Ferguson's alleged statements that he would never promote a black employee, and the defendants would be afforded the opportunity to respond. At this stage, the plaintiffs' case would presumably rest upon a "common contention" – the alleged biases of one manager and/or a group of supervisors who were responsible for awarding promotions in the Beam Mill. The focus of the proceeding would be on proving or disproving this common contention, so it is likely that common issues would predominate.

If the jury believed the plaintiffs' claims about the behavior of Beam Mill management, it might find that Ferguson and his supervisors had engaged in a pattern or practice of discrimination against African-Americans. At that point, the class would be entitled to prospective relief in the form of an order from the Court enjoining the pattern or practice of discrimination. See id. at 361 ("Without any further evidence from the [plaintiff], a court's finding of a pattern or practice justifies an award of prospective relief.").

In Stage II, each African-American who worked in the Beam Mill or applied for a promotion in the Beam Mill would be afforded the opportunity to prove that he or she was damaged by the pattern or practice of discrimination and to prove the amount of such damages. In doing so, the members of the class would be entitled to a presumption that any promotion decision that was made or influenced by Ferguson and his supervisors was a product of the pattern or practice of discrimination established in Stage I. See id. at 361-62 ("[T]he question of individual relief does not arise until it has been proved that the employer has followed an employment policy of unlawful discrimination. The force of that proof does not dissipate at the remedial stage of the trial.").

Assuming the plaintiffs had established a pattern or practice of discrimination at Stage I, there would be nothing unfair in the Court instructing the jury to presume that each promotion decision involving the Beam Mill management was affected by the previously established pattern or practice of discrimination. The law essentially allows a jury to presume that the same racial animus that influenced the decisionmaker's choice in the instances presented in support of the pattern or practice also influenced the same decisionmaker's choice in each of the employment decisions presented in Stage II. See id. at 362 ("The proof of the pattern or practice supports an inference that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy."). The defendants, of course, would be permitted the opportunity to rebut this presumption with regard to any specific individual by showing that a particular promotion decision was made for a legitimate, nondiscriminatory reason. See id. ("[T]he burden then rests on the employer to demonstrate that the individual applicant was denied an employment opportunity for lawful reasons."). The Court could then submit this evidence to a jury to determine which, if any, of the plaintiffs was entitled to damages and the amount of damages to be awarded. This would require individualized findings, but, as previously noted, the need for these findings at Stage II should not preclude a court from concluding that common issues predominate with regard to the class as a whole.

The problem is that the current class encompasses African-American employees who worked in or applied for promotions in the Beam Mill, as well as those who worked in or applied for promotions in the Hot Mill, Cold Mill, Melt Shop, Shipping, and Maintenance Departments. Except in a few limited instances where Beam Mill employees applied for transfers or promotions in other departments, the plaintiffs have presented no evidence that Ferguson and his supervisors exercised any influence over the promotions decisions in other departments. To



employ the language of <u>Wal-Mart</u>, there is no "glue" connecting the promotions decisions in the

Beam Mill to the decisions in other departments.  Establishing that Ferguson and his supervisors

engaged in a pattern or practice of discrimination with respect to promotions in the Beam Mill

does not provide a "common answer" to the "crucial question" "why was I disfavored" as to any

African-American employee in the Cold Mill or Melt Shop.  Furthermore, it would clearly be

unfair for this Court to instruct the jury to presume that an African-American employee in the

Hot Mill or Shipping Department failed to receive a promotion because of a pattern of behavior

on the part of individuals who had absolutely no ability to affect the promotion in question.

      Although there are, to varying degrees, a few allegations of discrimination in promotions

in departments other than the Beam Mill, there is nothing to link these allegations to the pattern

of behavior alleged in the Beam Mill.  The primary evidence against the non-Beam Mill

managers and supervisors consists of allegations made by a limited number of claimants who

contend that they were denied promotions in favor of less qualified white applicants.  In contrast

to the evidence regarding the Beam Mill management, there is little to no evidence, aside from

the actual promotions decisions, to support the claim that any of the non-Beam Mill managers

harbored discriminatory bias against African-Americans.  Thus, at Stage I, a jury examining the

plaintiffs' evidence of discrimination in departments other than the Beam Mill would have to

delve into the merits of each individual promotion decision to determine whether there was a

pattern of discrimination.  This would undoubtedly raise a myriad of individualized issues

regarding the qualifications of particular employees, and common issues would no longer

predominate.  For this reason, the Court concludes that even if the plaintiffs have raised common

issues regarding their promotions claims, such issues do not predominate.



For all the reasons set forth above, the Court concludes that it must decertify the plaintiffs' class with regard to their claims for disparate treatment and disparate impact.

### D.    HOSTILE WORK ENVIRONMENT

In Brown, the Fourth Circuit held that this Court abused its discretion when it classified the production departments at the Berkeley plant as "separate environments" and refused to certify the plaintiffs' hostile work environment claim.  Brown, 576 F.3d at 158.  The defendants claim that Wal-Mart requires this Court to decertify the plaintiffs' hostile work environment class because the Fourth Circuit failed to rigorously examine the plaintiffs' evidence and failed to require the plaintiffs to meet Wal-Mart's common policy and common injury requirements. Having carefully reviewed the evidence, the Court declines to decertify the plaintiffs' class with respect to the hostile work environment claim.

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race [or] . . . sex." 42 U.S.C. § 2000e-2(a)(1).  "Since an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action."  EEOC v. Cent. Wholesalers, Inc., 573 F.3d 167, 174 (4th Cir. 2009) (quoting EEOC v. R & R Ventures, 244 F.3d 334, 338 (4th Cir. 2001)).

"When the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quotation marks and citations omitted).  To establish a hostile work environment in the present case, the plaintiffs must prove that the harassment was "(1) unwelcome, (2) based on [race], (3) sufficiently severe or pervasive to alter the conditions of [the



plaintiffs'] employment and create an abusive atmosphere, and (4) imputable to [the defendant]."
Central Wholesalers, 573 F.3d at 175. "The 'severe or pervasive' element of a hostile work
environment claim 'has both subjective and objective components.'" EEOC v. Sunbelt Rentals,
Inc., 521 F.3d 306, 315 (2008) (quoting Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 333 (4th
Cir. 2003) (en banc)).

To satisfy the subjective component, a plaintiff must show that he actually viewed the
environment as hostile. Sunbelt Rentals, 521 F.3d at 315; see also Harris, 510 U.S. at 21-22
(reasoning that "if the victim does not subjectively perceive the environment to be abusive, the
conduct has not actually altered the conditions of the victim's employment, and there is no Title
VII violation."). To satisfy the objective component, a plaintiff "must demonstrate that the
conduct was such that 'a reasonable person in the plaintiff's position' would have found the
environment objectively hostile or abusive." Sunbelt Rentals, 521 F.3d at 315 (quoting Oncale
v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81-82 (1998)). This inquiry requires
consideration of "all the circumstances, including the frequency of the discriminatory conduct;
its severity; whether it is physically threatening or humiliating, or a mere offensive utterance;
and whether it unreasonably interferes with an employee's work performance." Sunbelt Rentals,
521 F.3d at 315 (quotation marks and citations omitted).

The appropriate standard to use when determining whether harassment is imputable to a
defendant differs depending on whether the plaintiff alleges harassment by a supervisor or a
coworker. "An employer is liable for harassment by the victim's coworkers only 'if it knew or
should have known about the harassment and failed to take effective action to stop it.'" Sunbelt
Rentals, 521 F.3d at 319 (quoting Howard v. Winter, 446 F.3d 559, 565 (4th Cir. 2006)). An
employer placed on notice that harassment is occurring "must respond with remedial action



'reasonably calculated to end the harassment.'" Sunbelt Rentals, 521 F.3d at 319 (quoting

Amirmokri v. Baltimore Gas & Elec. Co., 60 F.3d 1126, 1131-32 (4th Cir. 2008)). "[T]he mere

fact that harassment reoccurs in the workplace, either by the same offender or different

offenders, does not, ipso facto, allow a jury to conclude that an employer's response was not

reasonably calculated to end the harassment." EEOC v. Xerxes Corp., 639 F.3d 658, 669 (4th

Cir. 2011).

An employer is "liable under the doctrine of respondeat superior" if a victim's supervisor

created a hostile work environment . . . ." Dulaney v. Packaging Corp. of Am., 673 F.3d 323,

328 (4th Cir. 2012). However, provided the employer took no tangible employment action

against the victim, the employer may raise an affirmative defense, known as the Faragher-Ellerth

defense, by showing: "(a) that the employer exercised reasonable care to prevent and correct

promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to

take advantage of any preventive or corrective opportunities provided by the employer or to

avoid harm otherwise." Mosby-Grant v. City of Hagerstown, 630 F.3d 326, 337 (4th Cir. 2010)

(citing Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998)); see also Burlington Indus.,

Inc. v. Ellerth, 524 U.S. 742, 765 (1998).

As the discussion above makes clear, a court must consider a number of individualized

facts when determining whether a hostile work environment exists. The defendants contend that

"hostile work environment claims are far too individualized for Rule 23 class treatment" and cite

a long list of cases where courts have declined to certify classes advancing such claims. Defs.'

Mot. For Decert. 19, ECF No. 381. Additionally, the defendants assert that the Fourth Circuit's

mandate that this Court certify the plaintiffs' hostile work environment as a class "mark[s] the

only instance in which the Fourth Circuit [has] approved a Rule 23 hostile work environment



class." Id. at 19 n.76.  Nevertheless, several district courts, including one within the Fourth

Circuit, have certified hostile work environment claims for class treatment.  See, e.g., Newsome

v. Up-To-Date Laundry, Inc., 219 F.R.D. 356, 362 (D. Md. 2004); BreMiller v. Cleveland

Psychiatric Inst., 195 F.R.D. 1, 21 (N.D. Ohio 2000); Markham v. White, 171 F.R.D. 217, 224

(N.D. Ill. 1997).  Furthermore, the Fourth Circuit's instruction to certify the plaintiffs' hostile

work environment class suggests that it is at least theoretically possible for a hostile work

environment class to satisfy the requirements of Rule 23, and nothing in the Wal-Mart opinion

explicitly forecloses this possibility.

The Fourth Circuit majority explained, in assessing class claims of hostile work

environment, that this Court should have made a "totality-of-the-circumstances assessment of the

plant as a whole." Brown, 576 F.3d at 168.  This approach is consistent with the idea that "[a]

hostile work environment claim is composed of a series of separate acts that collectively

constitute one 'unlawful employment practice.'" Nat'l R.R. Passenger Corp. v. Morgan, 536

U.S. 101, 117 (2002) (quoting 42 U.S.C. § 2000e-5(e)(1)).  Significantly, courts have held that a

plaintiff pursuing an individual claim of a hostile work environment may present evidence of

abusive conduct against other employees to establish severe or pervasive harassment.  See, e.g.,

Sunbelt Rentals, 521 F.3d at 317 ("[C]omments made to others are also relevant to determining

whether [the plaintiff] was subjected to severe or pervasive harassment.") (quotation marks and

citations omitted).  Because the proper focus is on the overall environment, and not on any one

specific act, a hostile work environment may be established through aggregate proof, even if the

individuals providing accounts of harassment experienced separate instances of abuse at the

hands of various individuals.  See id. ("[W]e are, after all, concerned with the environment of

workplace hostility, and whatever the contours of one's environment, they surely may exceed the



individual dynamic between complainant and his coworkers.") (quotation marks and citations omitted).

The members of a class alleging a hostile work environment are not required to prove that each of them experienced abuse, which, considered in isolation, was objectively sufficiently severe or pervasive to alter the conditions of their employment and create an abusive atmosphere. Rather, the plaintiffs must "demonstrate that the 'landscape of the total work environment' was hostile towards the class." Newsome, 219 F.R.D. at 362 (quoting BreMiller, 195 F.R.D. at 21).

Shortly before the issuance of this opinion, the defendants submitted a letter attaching the Seventh Circuit's opinion in Bolden v. Walsh Constr. Co., No. 12-2205, --- F.3d.---, 2012 WL 3194593 (7th Cir. Aug. 8, 2012). In Bolden, the District Court for the Northern District of Illinois certified a hostile work environment class consisting of all African-Americans employed by the defendant at its construction sites in the Chicago Metropolitan area. See Bolden v. Walsh Grp., No. 06 C 4104, 2012 WL 1079893 (N.D. Ill. Mar. 30, 2012). During the relevant period, the defendant Walsh, a construction company, employed workers at "262 construction projects in the Chicago area." Id. at *1. The district court reasoned that the plaintiffs had raised common issues, including "whether Walsh management knew of its supervisors' harassing conduct at various construction sites and yet allowed supervisors to act with unfettered discretion on the job" and "whether Walsh exercised reasonable care to prevent and correct . . . racial harassment." Id. at *10. The Seventh Circuit reversed, reasoning that "[t]he 12 plaintiffs did not experience the working conditions at all 262 sites either individually or collectively, and a given plaintiff's bad experience with one of the five supervisors we have named does not present any question about the conduct of Walsh's many other superintendents and foremen." 2012 WL



3194593, at *5.  Additionally, the Court of Appeals found that the hostile work environment class was unmanageable.  Id.

The defendants contend that under Wal-Mart and Bolden, a group of plaintiffs alleging a hostile work environment can only pursue relief through supervisor-specific classes in which all claimants worked for or with the same bad actor.  This Court does not read either case to stand for that proposition.  Both Wal-Mart and Bolden involved classes that spanned hundreds or thousands of geographically separate work sites.  In contrast, the case at hand involves what the Fourth Circuit has classified as a single work environment.  In Bolden, the Seventh Circuit said that "[p]laintiffs may choose to propose site- or superintendent-specific classes, which the district court may certify if all requirements of Rule 23(a) and Rule 23(b)(3) are met."  Id. (emphasis added).  Given the Fourth Circuit's rejection of this Court's "separate environments" analysis, the plaintiffs' class is sufficiently "site-specific."

Furthermore, the defendants contend that the Court should require the plaintiffs to provide significant proof of a common policy of discrimination and to demonstrate that the members of the class have suffered a common injury.  These concepts apply to hostile work environment claims, but look different than they do in the promotions context.  A defendant need not actively adhere to a policy of discrimination to create a hostile work environment, which often is as much a product of what an employer tolerates as what it promotes.  If the plaintiffs present significant proof "that the 'landscape of the total work environment' was hostile towards the class," the only "common policy" they need to evince is the defendants' failure to take "remedial action 'reasonably calculated to end the harassment.'"[18]

---

[18] The plaintiffs must also establish that the defendants had notice of the harassment, however, "[i]f the harassment is pervasive, it can be presumed, subject . . . to rebuttal, to have come to the attention of someone authorized to do something about it."  Young v. Bayer Corp., 123 F.3d 672, 674 (7th Cir. 1997).  In this case, there is no shortage of allegations that various members of the plaintiffs' class complained to management about racial harassment.



The common contention required to support the presentation of a common injury is the existence of a single, <u>class-wide</u> hostile work environment. That a group of employees who share a protected trait can cobble together a long list of abusive conduct does not entitle them to adjudicate their claims in a single case. As <u>Wal-Mart</u> held, there must be some "glue" that holds the plaintiffs' claims together. What is critical is that the plaintiffs be able to show that they are subject to a single, shared hostile work environment as opposed to several separate hostile work environments or to a series of unrelated instances of harassment. It is not entirely clear what factors this Court should consider in determining the contours of a particular hostile work environment.[19] At a minimum, the Court agrees with the Seventh Circuit that a class should almost always be "site- or superintendent-specific." <u>Bolden</u>, 2012 WL 3194593, at *5. Additionally, where the plaintiffs allege a hostile work environment across several departments in a large facility such as the one at issue in this case, the plaintiffs should be able to point to at least some plant-wide behavior affecting the class as a whole, as well as to evidence that the defendants knew or should have known about the plant-wide pattern.

Having once again reviewed the evidence, this Court finds that the plaintiffs have submitted significant proof that the landscape of the total work environment at the Berkeley plant was hostile towards African-Americans and that the defendants failed to take "remedial action 'reasonably calculated to end the harassment.'" As discussed in this order and in those that have preceded it, a significant number of the plaintiffs have alleged a substantial pattern of racial harassment by their supervisors and coworkers in the Beam Mill. The Court sees no reason to

---

[19] Courts regularly consider whether specific evidence of harassment can be considered a part of a single hostile work environment for the purpose of establishing the Title VII limitations period. <u>See generally</u> Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002); <u>McGullam v. Cedar Graphics, Inc.</u>, 609 F.3d 70 (2d Cir. 2010). These cases primarily address the temporal scope of a hostile work environment, but some of the factors considered might be useful in determining the breadth of a particular hostile work environment as well. Because the Fourth Circuit has already determined that the Berkeley plant should be treated as a single work environment, this Court need not address the issue of how a court should determine the contours of a hostile work environment.



recite these allegations again.  It suffices to say that they are sufficiently numerous and offensive to raise questions of law and fact common to all African-Americans who worked in the Beam Mill.

Claims of harassment in other departments are less prevalent and typically do not involve managers and supervisors participating directly in the harassment.  Nevertheless, most of the declarations of non-Beam Mill employees submitted by the plaintiffs allege significant instances of racist behavior by coworkers.  See Decl. of Sheldon Singletary (Hot Mill) ¶¶ 14-15 (alleging that a white employee, while sitting in his truck and holding pistols, said he ought to shoot Singletary and a fellow black employee; alleging that the Confederate flag was displayed pervasively throughout the plant; alleging that numerous white co-workers made derogatory comments about African-Americans and used the term "nigger;" and alleging that the song "Dixie" was broadcast over the plant radio); Decl. of Byron Turner (Hot Mill) ¶¶ 3-5 (alleging that he observed the Confederate flag at the plant despite a company directive that it was not to be displayed; alleging that numerous white co-workers made derogatory comments about African-Americans and one co-worker used the term "nigger"); Decl. of Bernard Beaufort (Shipping) ¶¶ 3-6 (alleging that racist screen savers were put on his computer; alleging that the Confederate flag was displayed pervasively throughout the plant; alleging that he observed a hangman's noose suspended from the ceiling of the shipping bay; alleging that numerous white co-workers made derogatory comments about African-Americans and one co-worker used the term "nigger"); Decl. of Earl Ravenell (Melt Shop) (alleging that the Confederate flag was displayed throughout the plant; alleging that a white co-worker called him "boy"; alleging that a white co-worker made a derogatory comment over the radio; alleging that he observed racist graffiti in the men's bathroom in the refractory).



Beyond the declarations provided by the plaintiffs, the Court also reviewed approximately 80 affidavits of African-American employees that were submitted by the defendants. These affidavits support the Court's conclusion that although allegations of a hostile work environment were most prevalent and severe in the Beam Mill, employees from all of the production departments were subjected to abusive behavior. Specifically, employees from every department reported seeing the Confederate flag; employees from every department reported seeing racist graffiti; and employees from every department reported receiving racially offensive e-mails. Furthermore, in several instances, employees who worked in one department indicated that they were harassed by employees from other departments, and many employees reported observing what they considered to be racist symbols and racist graffiti in common areas of the plant.

From the declarations and affidavits it has reviewed, the Court gathers that, in at least a few instances, management, including Plant Manager Ladd Hall, took some action in response to the victims' reports of harassment. For example, at some point, it appears that employees were instructed that the Confederate flag was not to be displayed on company property, although there are numerous allegations that this directive was ignored.[20] Additionally, after a racially offensive email was circulated in the plant, Hall appears to have warned all employees that email was to be used for work purposes only. Despite these remedial efforts, there is significant evidence that management ignored a wide range of harassment, and thus the Court concludes that the plaintiffs have met their burden to present significant proof of a general policy of discrimination.

---

[20] In 2005, Hall testified that the company had no policy against displaying the Confederate flag.



The Court also finds that the plaintiffs' claims that they were subjected to a single hostile work environment present a common contention sufficient to satisfy the requirement that the plaintiffs advance a common injury. As the history of this case has unfolded, the critical question has always been whether the other departments at the plant could be considered a part of a unitary environment. The Fourth Circuit answered that question in the affirmative. Indeed, the Fourth Circuit's classification of the various departments at the Berkeley plant as a single work environment simplifies the plaintiffs' task of showing a common injury. From the outset, the plaintiffs have presented sufficient evidence of a hostile work environment to proceed with a pattern or practice claim with respect to the Beam Mill. Although Wal-Mart calls into question the Fourth Circuit's reasoning with regard to the disparate treatment and disparate impact classes, it does little to help the defendants escape the Fourth Circuit's holding that this Court abused its discretion by classifying the various departments at the Berkeley plant as "separate environments." Brown, 576 F.3d at 158 ("[T]here is scant, if any, evidence that each of the departments is so autonomous as to justify classifying them as separate environments.").

The defendants argue that the Fourth Circuit's reliance on Eisen invalidates all of the Fourth Circuit's factual analysis. This Court disagrees. A fair reading of the Fourth Circuit's opinion indicates that it relied on Eisen primarily, if not exclusively, with regard to its review of the statistical evidence. As previously noted, the Fourth Circuit criticized the treatment by this Court and by Judge Agee of the statistical evidence as premature and perhaps unfair, but not as substantively flawed. The Fourth Circuit did not hold that the plaintiffs' statistical evidence was actually more reliable than this Court or Judge Agee claimed; it held that the plaintiffs' statistical evidence did not need to be as reliable as this Court and Judge Agee claimed. By contrast, the panel majority in Brown never suggested that this Court looked too closely at the plaintiffs'



anecdotal evidence.  Rather it suggested that the Court had erred in ignoring accounts of plant-

wide racist acts and in assuming that departments that were operated separately were, therefore,

separate environments.

Notably, Judge Agee agreed with the majority that this Court abused its discretion in

classifying the departments as separate environments:

> To the extent the district court's judgment was based upon a determination with
> regard to Sections III(B)(2) and (C) that the appellants' hostile work environment
> claim did not have common questions of law or fact or was not typical of the class
> because the evidence showed separate, unconnected work environments, that
> determination is not supported by the record.  While Nucor's evidence shows its
> operation of the plant departments was distinct and separated among the
> departments, that evidence is not probative as to the effects of the alleged acts on
> the employees' working environment across the whole facility.  However, should
> Nucor adduce relevant evidence on the merits showing distinct and unconnected
> work environments as affects the appellants and other employees, the district
> court may take such further action as Rule 23(c)(1)(C) permits.

Brown, 576 F.3d at 160 n.1 (Agee, J., concurring in part and dissenting in part).  The defendants

do not contend that Judge Agee failed to conduct a rigorous analysis, and he agreed with the

majority that the record did not support treating the various departments as separate

environments. The defendants have not presented significant new facts to support their claim that

the production departments should be treated as separate environments.[21]  The only significant

change in the law or facts of this case since this Court certified the plaintiffs' class has been the

issuance of the Wal-Mart opinion.  As noted above, nothing in that decision leads this Court to

question the Fourth Circuit's finding that the production departments at the Berkeley plant

should be treated as a single work environment.  The plaintiffs have presented significant

---

[21] The defendants claim that the deposition testimony of plaintiff Jason Guy undermines the plaintiffs' contention
that racist comments and songs like "Dixie" and "High Cotton" were broadcast over a "plant-wide radio."  Guy
testified that each department had its own radio channels, so employees outside the Beam Mill would have had to be
tuned in to the Beam Mill's channel to have heard the offensive material.  Dep. of Jason Guy 216-17, May 8, 2007,
ECF No. 193-6.  Even if Guy's testimony is construed to suggest that there was no plant-wide radio, this testimony
is not particularly strong evidence of "distinct and unconnected work environments."  At most, it undermines one of
several alleged instances of plant-wide racial harassment.



allegations of racial harassment within this environment and have thus presented a common

injury. For the reasons discussed above, the Court concludes that, with regard to the plaintiffs'

hostile work environment claim, the class certified in this case continues to satisfy the

requirements of Rule 23(a).

Whether the plaintiffs have satisfied the predominance requirement of Rule 23(b)(3) is a

much closer question. Even if the Berkeley plant is treated as a single environment, there is

significant variation in the prevalence and severity of the conduct alleged across the various

departments. Moreover, hostile work environment claims require a range of individualized

findings. At a minimum, each plaintiff must show that the conduct was unwelcome and

subjectively abusive. Additionally, it also is likely that individualized findings regarding the

defendants' "notice and negligence" would be required at the second stage of a pattern or

practice trial. See EEOC v. Mitsubishi Motor Mfg. of Am., Inc., 990 F. Supp. 1059, 1074 n.7

(C.D. Ill. 1998) ("A company's notice of a pattern or practice and its notice of individual

harassment, although related, involve slightly different inquiries. Similarly, a company's

negligence in responding to a systemic problem of . . . harassment requires different findings

than those required to hold a company negligent for failing to remedy an individual act of . . .

harassment.").

Although Wal-Mart did not specifically address Rule 23(b)(3), the defendants argue that

in effect, it heightened the 23(b)(3) standard because the predominance requirement has been

described as a more stringent version of the 23(a) commonality requirement. See Amchem

Prods., 521 U.S. at 609. The Court agrees that it may be more difficult for the plaintiffs to

satisfy Rule 23(b)(3) in the wake of Wal-Mart, but it is important to note why that is the case.

By clarifying the definition of commonality, Wal-Mart narrows the number of questions that



now may properly be considered "common." A court that certified a class prior to <u>Wal-Mart</u> now may find that some of the questions it previously had regarded as "common" no longer qualify as such and thus should not be considered in evaluating whether common questions predominate.

With respect to the plaintiffs' hostile work environment claim, the defendants have not identified any issues that this Court previously had treated as common, but which no longer should be considered common under Wal-Mart. This Court previously held that the plaintiffs' class satisfied the requirements of Rule 23(b)(3), and, at least with regard to the plaintiffs' hostile work environment claim, the Court finds no change in the law or the facts to justify reversing that decision.

### III.    CONCLUSION

This Court has never believed that trying this case as a class was a sensible course of action. From the outset, the Court's consistent concern was that the plaintiffs were attempting to extend the numerous allegations of misconduct in a single department to reach a plant-wide class. Indeed, this concern is well known to the parties and the Fourth Circuit. The Supreme Court's <u>Wal-Mart</u> decision unquestionably changes the nature of the class certification inquiry, but this Court does not regard it as a broad invitation to ignore the Fourth Circuit's prior holding. To the best of its ability, this Court has attempted to fairly analyze <u>Wal-Mart</u> and to carefully apply its holdings to the facts of this case and the Fourth Circuit's opinion. This process has required a thorough reexamination of an extensive record, significant study of the relevant authorities, and careful reflection upon both. The Court appreciates the parties' patience.

For the reasons set forth in this order, the defendants' motion to decertify the plaintiffs' class (ECF No. 381) is granted with respect to the plaintiffs' claims for disparate treatment and



disparate impact, and is denied with respect to the plaintiffs' claim for a hostile work

environment.  Class members who wish to pursue claims for disparate treatment and/or disparate

impact may do so individually.  The defendants' motion to exclude (ECF No. 379) is moot.

**AND IT IS SO ORDERED.**

C. WESTON HOUCK
UNITED STATES DISTRICT JUDGE

September 11, 2012
Charleston, South Carolina