IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

QUINTON BROWN, JASON GUY,      )
RAMON ROANE, ALVIN SIMMONS,    )
SHELDON SINGLETARY,            )
GERALD WHITE, and              )
JACOB RAVENELL, individually and )
on behalf of the class they seek to )
represent,                     )
                               )
          Plaintiffs.          )
                               )
vs.                            )          CIVIL ACTION NUMBER:
                               )          2:04-22005-CWH
                               )
NUCOR CORPORATION and          )
NUCOR STEEL-BERKELEY,          )
                               )
          Defendants.          )

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO COMPEL**

Defendants' response does not oppose discovery on the merits of the class claims and defenses pursuant to the bifurcated discovery previously ordered in this case. Instead, it seeks to limit such merits discovery based on yet another motion to "alter or amend" the Court's class certification order to eliminate half the jobs and nine years of the liability period that the Court has certified as a class action. *Compare* ECF ##476, 477 *with Order* at 30 (ECF #339) and *Order* at 9-13 (ECF #359). The Court has already rejected these same time and job restrictions when they were first argued by the defendants in 2011. *See Order* at 9-13 (ECF #359). The Court held that it "rejects the notion that the temporal scope of the class is strictly limited by the temporal scope of the plaintiffs' statistical evidence. Class definitions in other Title VII cases have extended up to the date

1

of certification and indefinitely into the future." *Order* at 12 (ECF #359).[1]  It further held that it "declines to narrow the class by job description" – that "the fact that class members may have worked in different departments, held positions with varying responsibilities, and applied for jobs with distinct qualifications does not render their claims uncommon or defeat the predominance of common issues under Rule 23(b )(3)." *Order* at 11-12 (ECF #359).  In addition, the Court rejected Nucor's argument "that the class defined by the Court is overly broad because it encompasses 'departments in which no named Plaintiffs have worked, jobs which no named Plaintiff has sought, and time periods for which there is no evidence in the record of discrimination of any form.'" *Order* at 10 (ECF #359; quoting Defs.' Mot. for Recons. 2, ECF No. 346).

The Court did not just reject defendants' time and job restrictions on the merits.  It also held that 2011 was too late for Nucor to raise such issues because "any flaw that exists in the current class definition also existed at the time the class was proposed by the plaintiffs, opposed by the defendants, rejected by this Court, reviewed by the Fourth Circuit, opposed by the defendants again, and only then adopted by this Court. The defendants have been afforded **every imaginable opportunity** to raise objections to the scope of the plaintiffs' class and have previously presented most, if not all of the arguments advanced in their motion for reconsideration." *Order* at 9-1 (ECF #359; emphasis added).  That is even more true today than it was in 2011.  The Fourth Circuit has vacated decertification of the promotion class and issued a second appellate mandate ordering reinstatement of the class this Court certified to include " **all** African-Americans who are or were

---

[1]  The Court's prior decision cited the following precedent for extending the class to the present or "indefinitely into the future": *Newsome v. Up-To-Date Laundry, Inc.*, 219 F.R.D. 356, 360, 369 (D. Md. 2004); *Dukes v. Wal-Mart Stores, Inc.*, 222 F.R.D. 137,188 (N.D. Cal. 2004); *Adams v. Pinole Point Steel Co.*, No. C-92-1962, 1994 WL 515347, at *4, *9 (N.D. Cal. May 18, 1994); *Jenson v. Eveleth Taconite Co.*, 139 F.R.D. 657, 667 (D. Minn. 1991).  *See* ECF #359 at 12.

employed . . . at any time since December 2, 1999 in beam mill, hot mill, cold mill, melting, maintenance and shipping departments." *Order* at 30 (ECF #339; *see Brown II*, 785 F.3d at 922. By ordering that such class be recertified, the Fourth Circuit foreclosed any further reliance on the time and job restrictions this Court rejected in 2011. *See Order* at 9-13 (ECF #359). The Court's decision rejecting Nucor's time and job restriction was before the Fourth Circuit at the time it ordered reinstatement of the promotions class without such restrictions.

## STANDARD OF REVIEW

"'Over the course of more than four decades, district judges and magistrate judges in the Fourth Circuit . . . have repeatedly ruled that the party or person resisting discovery, not the party moving to compel discovery, bears the burden of persuasion.'" *EEOC v. Altec Ind., Inc.*, 2012 U.S. Dist. LEXIS 83774, *2 (W.D. N.C. 2012) (citing *Kinetic Concepts, Inc. v. ConvaTec Inc.*, 268 F.R.D. 226, 243 (M.D.N.C. 2010) (collecting cases); *Mainstreet Collection, Inc. v. Kirkland's, Inc.*, 270 F.R.D 238, 241 (E.D.N.C. 2010); *Billips v. NC Benco Steel, Inc.*, No. 5:10cv95, 2011 U.S. Dist. LEXIS 101447, 2011 WL 4005933 (W.D.N.C. Sept. 8, 2011) (Keesler, Mag. J.)).

## I.    THE FOURTH CIRCUIT'S MANDATE PRECLUDES NARROWING THE CLASS THAT IT ORDERED TO BE CERTIFIED

The Court of Appeals has already rejected Nucor's argument that this Court has the discretion not to certify the class that it was instructed to certify. *Brown II*, 785 F.3d at 920-921. The latest appellate mandate "vacate[s] the district court's decertification of the promotions class and remand(s) the case . . . with instructions to certify the class." *Brown II,* 785 F.3d at 922. The Court held there is no discretion not to certify such class, or to certify a more limited class, because:

> [T]he district court had no grounds to revisit the question of predominance in the first place given this Court's remand instructions and mandate in Brown I.

* * *

Following our instructions in *Brown I* for the district court to "certify the appellants' class action," the court found that "the putative class satisfied both the predominance and superiority requirements of Rule 23(b)(3)." J.A. 10930. The court then certified the class for those employed in all six Nucor operations departments. The district court cites no new facts or legal precedent after *Brown I* to justify revisiting that determination once the underlying question of commonality has been resolved.

* * *

As for the first question, the district court had no discretion to find that the workers' class failed to satisfy Rule 23(b)(3), after we expressly told it "to certify the appellants' class action and to engage in further proceedings consistent with this opinion." *Brown I*, 576 F.3d at 160.

* * *

Indeed, the district court itself recognized that we had "dictate[d] the general outcome to be reached (class certification) while leaving [the district court] to fill in the details." J.A. 9886 (Order Den. Mot. for Recons. 8 n.2). Of course, the court could have, and did, evaluate whether certification was best under Rule 23(b)(2) or (b)(3). But it had no discretion to then find that the prerequisites of either rule were not met. As the court observed, Nucor's argument on remand that the workers had failed to satisfy Rule 23(b) "overlook[ed] the Fourth Circuit's prior holding in this case." J.A. 9704 (Certification Order). * * * Indeed, following our instructions and findings in *Brown I*, the court proceeded to make the only finding it could under Rule 23(b)(3), namely, that "common issues predominate and that a class action is superior to any other method for adjudication of the claims in this case."

* * *

Given the fact that our prior ruling foreclosed the denial of certification on the basis of Rule 23(b)(3), the district court needed some compelling reason to reconsider the question. *Bell*, 5 F.3d at 67 (describing the "extraordinary" exception to the mandate rule when there is "a show[ing] that controlling legal authority has changed dramatically"). But the court cited no such reason and, unlike the question of commonality, *Wal-Mart* provided none.

*Brown II*, 785 F.3d at 920-921.

There is even less basis to deviate from the class ordered to be certified in the latest appellate mandate. By vacating the decertification of the promotion class, the Fourth Circuit reinstated that class which included "**all** African-Americans who are or were employed . . . in the beam mill, hot mill, cold mill, melting, maintenance and shipping departments." *Order* at 30 (ECF #339). The time

and job restrictions argued by Nucor were not part of that mandate or instruction.

Nucor has offered no cognizable basis to "alter or amend" the class that the Court has been instructed to certify. There has been no effort to establish either of the two principal grounds for not strictly following an appellate mandate – a "showing that controlling legal authority has changed dramatically" or that "significant new evidence, not earlier obtainable in the exercise of due diligence, has come to light." *U. S. v. Bell*, 5 F.3d at 64, 66-67 (4th Cir. 1993). Nor has Nucor shown that the Fourth Circuit or this Court engaged in "blatant error in the prior decision [which] will, if uncorrected, result in a serious injustice." *Id.* at 67. Every point raised by Nucor in its current Response has already been argued and rejected by this Court in 2011 (ECF #359), and consequently was before the Court of Appeals at the time it issued the second appellate mandate in 2015.

The Fourth Circuit has held that "[f]ew precepts are as firmly established as the doctrine that the mandate of a higher court is 'controlling as to matters within its compass.'" *U.S. v. Bell*, 5 F.3d 64, 66 (4th Cir. 1993) (quoting *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 168 (1939). Finality and respect for the appellate process are the core purposes of the mandate rule. *Walker v. Kelly*, 589 F.3d 127, 137 (4th Cir. 2009). That rule is absolute in order to "promote judicial economy and finality" and "foreclose relitigation of issues expressly or implicitly decided by the appellate court." *Id.*; *see also Bell*, 5 F.3d at 66. The Supreme Court has emphasized that adherence to the mandate rule promotes finality by "protecting against the agitation of settled issues" that "threaten to send litigants into a vicious circle of litigation." *Christianson v. Colt Industries Op. Group*, 486 U.S. 800, 816 (1988) Put simply, there is a compelling "need for litigation to finally come to an end." *U. S. v. Williams*, 162 Fed. Appx. 254, 259 (4th Cir. 2006). The mandate rule "'provides stability and finality in litigation, which are crucial cornerstone values for developing a just and efficient judicial

5

process." *Id.* (quoting *Klay v. All Defendants*, 389 F.3d 1191, 1199 (11th Cir. 2004). "'Repetitive hearings, followed by additional appeals, waste judicial resources and place additional burdens on . . . hardworking district and appellate judges.'". *Id.* (quoting *U. S. v. O'Dell*, 320 F.3d 674, 679 (6th Cir. 2003)).[2]

## II.    THE COURT HAS ALREADY REJECTED THE MORE NARROW CLASS PROPOSED BY NUCOR

### A.    The Court Has Already Rejected Nucor's Argument That the Class Certified Should Be Limited to Jobs That Class Members Or The Named Plaintiffs Bid On Or Sought

Nucor argues that "[p]laintiffs are not entitled to discovery on promotions which were not bid on by a single class member, as that evidence is irrelevant and not 'reasonably calculated to lead to the discovery of admissible evidence.'" *Defs.' Resp.* at 7 (ECF # 477). This Court and the Fourth Circuit have already rejected this argument. *See Order* at 10-12 (ECF #359). On April 27, 2011, the Court held that "[i]n light of the Fourth Circuit's opinion, the fact that class members may have worked in different departments, held positions with varying responsibilities, and applied for jobs with distinct qualifications **does not** render their claims uncommon or defeat the predominance of common issues under Rule 23(b )(3)." *Order* at 11-12 (ECF #359; emphasis added). The Court's holding on this point also included the following ruling which was subsequently affirmed by the

---

[2] "[I]t is indisputable that a lower court generally is 'bound to carry the mandate of the upper court into execution and not consider the questions which the mandate laid at rest.'" *Bell*, 5 F.3d at 66; *see also United States v. Pileggi*, 703 F.3d 675, 679 (4th Cir. 2013). The Court has emphasized that "this 'mandate rule' . . . **compels compliance** on remand with the dictates of a superior court and forecloses relitigation of issues expressly **or implicitly** decided by the appellate court." *Id.* (emphasis added). "Thus, when this court remands for further proceedings, a district court **must**, except in rare circumstances, 'implement both the **letter and spirit** of the . . . mandate, taking into account our opinion and the circumstances it embraces.'" *Bell*, 5 F.3d at 66-67 (emphasis added); accord *Pileggi*, 703 F.3d at 679.

Fourth Circuit a second time in 2015:

> The defendants object that the class includes "jobs which no named Plaintiff has sought" and jobs that are not "similarly situated to those held by the named Plaintiffs." Defs.' Mot. for Recons. 2,19, ECF No. 346. Again, it should be noted that the Fourth Circuit was aware of these facts, yet found that the named plaintiffs were "adequate representatives" for the claims "of the putative class." Brown, 576 F.3d at 160 (emphasis added). Furthermore, the proper scope of the class was thoroughly addressed by this Court on remand.

> > From the outset of this case, it has been clear that the plaintiffs alleged a group injury. The relevant question was the level at which the injury was inflicted. The Fourth Circuit held that "a practice of disparate treatment in the exercise of unbridled discretion ... rais[es] questions of law and fact common to all [subject] black employees." Brown, 576 F.3d at 153 (alteration in original)(quoting Lilly v. Harris-Teeter Supermarket, 720 F.2d 326, 333 (4th Cir. 1983)). Since the Fourth Circuit rejected this Court's characterization of the production departments as separate environments, the Court must proceed under the assumption that the production departments were permeable, if not unitary. This assumption is buttressed by the fact that Nucor's bidding is plant-wide, and this Court already has held that "potential applicants are eligible to prove that they would have applied for a promotion but for the discriminatory practice." Brown, 2007 WL 2284581, at *9. Therefore, all African-Americans who worked in the production departments qualify as "subject black employees."

> Order Granting Class Certification 28, Feb. 17,2011, ECF No. 339. In light of the Fourth Circuit's opinion, the fact that class members may have worked in different departments, held positions with varying responsibilities, and applied for jobs with distinct qualifications does not render their claims uncommon or defeat the predominance of common issues under Rule 23(b )(3). The various distinctions emphasized by the defendants may be relevant to a determination on the merits, and the defendants will be afforded the opportunity to raise such arguments. However, at this time, the Court declines to narrow the class by job description.

*Order* at 11-12 (ECF #359).  The Fourth Circuit quoted this same ruling with approval in *Brown II*,

785 F.3d at 910-912.

This Court and the Fourth Circuit have also already determined that all black employees in

the six production departments "should be counted in the class because 'potential applicants are eligible to prove that they would have applied for a promotion but for the discriminatory practice (JA8994)." *Brown*, 576 F.3d at 152-153.

> **B.    The Class Was Properly Certified To Include "All African-American Employees In Six Departments, Not Just "Blue Collar" Employees**

Defendants' argument that the class should be limited to "blue collar" production jobs has also been rejected by the Court. *Compare Order* at 9-12 (ECF #359) *with Def. Motion* (ECF #477 & #476 at n.1). The Court held that it "declines to narrow the class by job description." *Order* at 12 (ECF #359). The decision explained that the Court cannot "narrow the class by job description" because:

> The Fourth Circuit rejected this very argument.
>
> > A person who has been injured by unlawful, discriminatory promotion practices in one department of a single facility may represent others who have been injured by the same discriminatory promotion practices in other departments of the same facility. In such a case, the representatives of the class all have the same interests in being free from job discrimination, and they have suffered injury in precisely the same way in the denial of promotion.
>
> Brown, 576 F.3d at 158 (quoting Hill v. W. Elec. Co., 596 F.2d 99,102 (4th Cir. 1979). This Court's finding that Nucor lacked a plant-wide promotion procedure did not stop the Fourth Circuit from concluding, "the appellants are adequate representatives for the disparate impact and treatment claims of the putative class." Brown, 576 F.3d at 160.

*Order* at 10-11 (ECF #359). Nucor's current argument is even more restrictive than the departmental argument that has already been rejected. Under that departmental argument, all class members in the same department were still part of the class, but now Nucor argues that each department should be subdivided to exclude non-blue collar jobs, entry-level jobs, jobs not bid on by a named plaintiff and

promotions which occurred after 2003 or 2007.

The Court properly rejected all such restrictions when it certified the class to include "**all African-Americans**" in the six production departments, not just those in "blue collar" jobs.

> For the reasons set forth in this order, the defendants' motion for reconsideration (ECF No. 346) is denied. The Court modifies the class definition, which now reads as follows:
>
>> All African-Americans who are, as of the date of this order, or were employed by Nucor Corporation or Nucor Steel Berkeley at the Nucor Berkeley manufacturing plant in Huger, South Carolina at any time between December 2, 1999, and the date of this order, in the beam mill, hot mill, cold mill, melting, maintenance, and shipping departments, and who may have been discriminated against because of Nucor's challenged practices.

*Order* at 14 (ECF #359).

Nothing in that Order or the Fourth Circuit's mandate indicated that "all" meant less than all. The term "blue collar" does not even appear in the Court's orders, the Fourth Circuit's mandate, or the plaintiffs' Complaint, motions or briefs. The plaintiffs have always sought class certification for **all** African-Americans and jobs in the six departments **without limitation**. *See Complaint* (ECF #35).[3] Not even Nucor has ever before argued that class certification should be restricted to "blue

---

[3] The *Complaint* filed in 2003 specifically challenged racial discrimination in promotion to non-blue collar supervisory jobs and that has remained true since then. *See Third Am. Compl.* at ¶¶31, 43, 53-55 (ECF #35) (Declarations of named plaintiffs and class members in support of class certification). Paragraph 31 of the *Complaint* states "[f]or example, Roane applied for two positions, rolling mill supervisor and mill adjuster. Roane was qualified for both positions. The positions were given to white employees with less seniority and experience than Roane." (ECF #35 at ¶31); Paragraph 42 states "[f]or example, White applied for a roll shop supervisor position in 2001. Said defendants selected Jerry Herman, a less qualified white employee for the position." ECF #35 at ¶42. Paragraph 54 states:

> 54.    Nucor-Berkeley's and/or Nucor's selection and compensation procedures incorporate the following racially discriminatory practices: 1) reliance upon subjective procedures and criteria . . . refusal to post or announce vacancies or

collar jobs."

It is a matter of record that non-blue collar supervisory and management claims have been made by at least 4 of the 7 named plaintiffs and 3 of the class members who submitted declarations in support of class certification. They include:

> Quinton Brown (ECR #185, Exh. 2, ¶7) (Pl. Exh. 1)
> Ray Roane (ECF #185;, Exh. 1, ¶8) (Pl. Exh. 2)
> Gerald White (ECF #185, Exh. 5, ¶8) (Pl. Exh. 3)
> Sheldon Singletary (ECF #185. Exh. 6, ¶8) (Pl. Exh. 4)
> Aaron Butts (ECF #185, Exh. 10, ¶8) (Pl. Exh. 5)
> Ken Hubbard (ECF #185, Exh. 12, ¶5) (Pl. Exh. 6)
> Bernard Beaufort (ECF #192, Exh. 41) (Pl. Exh. 70)

Defendants' "blue collar" argument is also contrary to the plain words of the Fourth Circuit's decisions which repeatedly refer to the non-blue collar supervisory jobs sought by the plaintiffs in both appellate mandates. The first appellate mandate emphasizes that "[t]here were no black supervisors until after the institution of the Equal Employment Opportunity Commission charges that preceded this litigation. Indeed, a white supervisor testified that his department manager-who wore a Confederate flag emblem on his hardhat-told him that he would never promote a black employee to supervisor." *Brown*, 576 F.3d at. 151; *see also Decl. of Ray Roane* at ¶11 (ECF #185, Exh. 1) (Pl. Exh. 2); *Decl. of Alvin Simmons* at ¶5 (ECF #185, Exh. 3) (Pl. Exh. 3).   The Fourth Circuit

------

employment opportunities in a manner that allows African-Americans to learn about such opportunities and compete for them before they arc filled by white employees or applicants; 5) pre-selection of whites before vacancies or opportunities become known; and 7) discouragement of applications and expressions of interest by African-Americans through a reputation for racial bias, racially hostile conditions of work, and unequal terms and conditions of employment in such arcas as work hours and position assignments.

ECF #35 at ¶54.  Non-blue collar jobs are subject to these policies and practices in the same way as blue collar jobs.  Nothing in the *Complaint* restricts the class claims to blue collar jobs.

specifically included non-blue collar supervisory jobs as part of the pattern-or-practice that it ordered

certified as a class, holding that:

> The appellants have certainly presented compelling direct evidence of discrimination, such as denials of promotions when more junior white employees were granted promotions (J.A. 1004, 1017), denial of the ability to cross-train during regular shifts like their white counterparts (J.A. 1000, 1023), and a statement by a white supervisor that he would never promote a black employee (J.A. 1885-86). **This evidence alone establishes common claims of discrimination worthy of class certification.**

*Brown*, 576 F.3d at 153 (emphasis added). The Court's second appellate mandate continued to

include the non-blue collar jobs like supervisor, manager, etc. as part of the pattern-or-practice and

disparate impact claims which it ordered to be certified as a class.  After finding direct evidence of

a pattern of racial discrimination in non-blue collar supervisory jobs, the Court held that "[s]uch facts

provide a critical nexus between the racial animus at the plant and promotion decisions that impacted

**all** black workers."  *Brown II*, 785 F.3d at 916-917 (emphasis added).  Among other parts of *Brown*

*II*, the Court of Appeals stressed that:

> There was, however, at most one black supervisor in the production departments until after the Equal Employment Opportunity Commission ("EEOC") initiated charges that preceded the putative class action.
>
> * * *
>
> The workers also presented abundant direct and circumstantial anecdotal evidence of discrimination in promotions, including. . . [t]estimony by a white supervisor that his department manager told him that "I don't think we'll ever have a black supervisor while I'm here."
>
> * * *
>
> In addition to the direct and circumstantial evidence of discrimination in promotions decisions in multiple departments, racial bias in one Nucor plant department itself diminished the promotional opportunities for black workers in all the departments -- including those who wanted promotions into the infected department and those who sought promotions to other departments and needed their supervisors' recommendations. To that end, the workers cogently observe that requirements for dual approvals for promotions -- by originating and destination department heads -- "carr[ied] the effects of racial discrimination from one department and supervisor to another, either by systemic tolerance, acquiescence or design." Appellants' Reply Br.

24 (citing *Smith v. Bray*, 681 F.3d 888, 897 & n.3 (7th Cir. 2012)).

\* \* \*

Here, however, the workers have provided substantial evidence of unadulterated, consciously articulated, odious racism **throughout the Nucor plant**, including affirmative actions by supervisors and a widespread attitude of permissiveness of racial hostility. The examples in the record are ubiquitous:

\* \* \*

Moreover, no more than one black supervisor worked in the Nucor production departments until after the EEOC charge that preceded this litigation. It strains the intellect to posit an equitable *promotions system* set against that cultural backdrop, particularly in light of the other evidence presented.

\* \* \*

It is difficult to fathom how widespread  racial animus of the type alleged here, an animus that consistently emphasized the inferiority of black workers, bears no relationship to decisions whether or not to promote an employee of that race.

\* \* \*

Hubbard's declaration, however, accuses Nucor of placing him "in the position to get [him] out of the mill and **the line of progression that lead to supervisory positions**." J.A. 1097. Hubbard also observes that his trajectory at the company was dramatically different from that of a white co-worker who started at the plant at the same time and later became a supervisor.

\* \* \*

For purposes of class certification, the workers have provided sufficient evidence that such a policy, paired with the exercise of discretion by supervisors acting within it, created or exacerbated racially disparate results. The **promotions system**, requiring approvals from different levels of management, created an environment in which the discriminatory exercise of discretion by one department head harmed the promotions opportunities for **all black workers at the plant** by foreclosing on opportunities in that department and **generally impeding upward mobility**. Moreover, the disproportionate promotions of white workers had to be ratified by the general manager, Ladd Hall, who was thus on notice, or should have been on notice, that there were pronounced racial disparities in department-level promotion practices, as indicated by the statistical and anecdotal evidence presented.

The workers have also presented sufficient evidence of a practice of inaction by the general manager who ignored the evidence of, and complaints regarding, discrimination in promotions at the plant. *See, e.g.*, J.A. 996-97, 1016, 1056, 1087, 1104. Such managerial inaction occurred despite Nucor's status as an "Equal Opportunity Employer" and its claim to have a "plantwide policy barring racial discrimination." Resp'ts' Br. 6. One black worker, Ray Roane, has testified that he complained directly to Hall about discrimination in promotions. J.A. 996-97. Hall threatened his job. J.A. 997. \* \* \* The workers have sufficiently alleged that such a uniform policy of managerial inaction also contributed to racial disparities in promotions decisions.

12

Consistent with Scott, the workers have further demonstrated that the exercise of discretion at Nucor was joined by "**a company-wide policy** of discrimination" that was encouraged, or at least tolerated, by supervisors and managers. *See Scott*, 733 F.3d at 114. In addition to the evidence of a hostile work environment previously described in detail, one white supervisor has expressly stated in a deposition that he heard the head of the Beam Mill declare, "**I don't think we'll ever have a black supervisor while I'm here**." J.A. 1885-86. Such facts provide a critical **nexus** between the racial animus at the plant and promotions decisions that **impacted all black workers** by foreclosing opportunities for them. Or, using Wal-Mart's language, the evidence of pervasive racial hostility in the working environment provides a "common mode of exercising discretion that pervade[d] the entire company." *Wal-Mart*, 131 S. Ct. at 2554-55.

*Brown II*, 785 F.3d at 898-899, 911-912, 913, n. 18, 916-917 (emphasis added).

The defendants have not identified any non-blue collar jobs or entry-level jobs that are outside the scope of this Court's findings and the Fourth Circuit's decisions on commonality, typicality, predominance or any other aspect of Rule 23. Nor is there any evidence offered which indicates that non-blue collar jobs like supervisor are not within the scope of this Court's findings in support of class certification (ECF ## 339 & 359) and the Fourth's Circuit's decisions.

It is undisputed that blue collar jobs are subject to the same District Managers, Supervisors, Plant Manager and plant policies as the non-blue collar jobs. This was the central fact which caused this Court and the Fourth Circuit to certify a class of "all African-Americans" in the six production departments, not just "blue collar" employees and jobs. *Brown II*, 785 F.3d at 910-912. The Court of Appeals stressed that commonality and predominance has been satisfied for **all** such employees because they were all subject to the same managers and supervisors regardless of which job or department they came from.

Moreover, named plaintiffs and class members have, in fact, routinely applied and been rejected for non-blue collar jobs, such as supervisor and entry-level jobs. For example, Ray Roane

13

applied for a non-blue collar job as Roll Mill Supervisor and "was the best qualified candidate based on the posted qualifications." *Decl. of Ramon Roane* at ¶8 (ECF #185, Exh. 1) (Pl. Exh. 2); *Depo. of Ramon Roane* at pp. 28-33, (ECF #188, Exh. 32A)   (Pl. Exh. 9); Beam Mill- Rolling Mill Supervisor 8-24-01 (ECF #202-4).  His Department Manager, however, "suddenly canceled the job posting" and announced "You know, that black bastard will never move up as long as I'm manager." *Decl. of Ramon Roane* at ¶8 (ECF #185, Exh. 1) (Pl. Exh. 2); *Depo. of Scott Clark* at pp. 112-113 (ECF #186, Exh. 30) (Pl. Exh. 10); *Depo. of Ramon Roane* at p. 149:1-6 (ECF #188, Exh. 32A) (Pl. Exh. 9).  Instead, the supervisory job was given to a white employee, Gary Henderson. *Id.*[4] When Roane subsequently applied for a second non-blue collar job as Roll Mill Supervisor the same Department Manager told him he would not be considered because his application "had been misplaced."  *Decl. of Ramon Roane* at ¶8 (ECF #185, Exh. 1) (Pl. Exh. 2); *Depo. of Ramon Roane* at pp. 27-32 (ECF #188, Exh.32A) (Pl. Exh. 9). Aaron Butts' application for finishing mill supervisor similarly was allegedly "misplaced" around the same time. *Id.*; *Depo. of Ramon Roane* at pp. 44:20-46:7 (ECF #188, Exh. 32A) (Pl. Exh. 9)  Roane told the plant manager, Ladd Hall,  that his application had been "misplaced" to avoid appointment of the first black supervisor in the plant, but Hall did nothing about it. *Decl. of Ramon Roane* at ¶8 (ECF #185, Exh. 1) (Pl. Exh. 2). The Fourth Circuit partially based its two decisions on these facts.  *Brown I* at 153-154; *Brown II*, 785 F.3d at 898-899, 911-912, 916-917.

---

[4] Roane reiterated to his Department Manager that " my qualifications were excellent and far superior to Henderson's, that as a CP-1 operator I had consistently received high evaluations, that my supervisors relied on me to fix problems in the mill without their supervision, and that my engineering technology degree with training in quality control, electrical controls, computers, hydraulics and pneumatics made me a better candidate than Henderson."*Decl. of Ramon Roane* at ¶12 (ECF #185, Exh. 1).

Ray Roane was not the only class member denied promotions to supervisory positions. Gerald White testified that he applied for the Supervisor posting in the Roll Shop that was given to a white employee from another department, Jerry Herrman. *Decl. of Gerald White* at ¶8 (ECF #185, Exh. 5); Pl. Exh. 3 App. for Transfer, Pl. Exh. 1 (ECF #202-3); *Depo. of Gerald White* at pp. 13:18-25:5 (ECF #188, Exh. 36A) (Pl. Exh. 12).  White had extensive training and experience for this job, while Herman had none. *Decl. of Gerald White* at ¶¶3-4, 8 (ECF #185, Exh. 5) (Pl. Exh. 3).  "It was widely known that Hermann had poor leadership skills and had been demoted from a previous position at Nucor because he couldn't get along with his co-workers.".  *Decl. of Gerald White* at ¶8 (ECF #185, Exh. 5) (Pl. Exh. 3).  White was also denied the Leadman job in the Roll Shop that was given to an employee who had no leadership experience except at a pizza restaurant. *Decl. of Gerald White* at ¶7 (ECF #185, Exh. 5)(Pl. Exh. 3); *Decl. of Alvin Simmons* at ¶7 (ECF #185, Exh. 3; *Depo. of Gerald White* at p. 66:12-15, p. 68: 5-22 (ECF #188, Exh. 36A) ("As long as I have been employed at Nucor Berkeley there have never been any black Mill Adjusters and only one black Mill Inspectors.  The Mill Adjusters are Leadmen positions and are some of the higher pay grade positions in the Beam Mill or the plant."); Job Description Roll Shop Crew Leader 2-16-04 (ECF #202-5, 203-2); *Depo. of Gerald White* at p. 71:2-20, p. 73:4-14 (ECF #188, Exh. 36A).

Both Roane and Gerald White reported to Hall that black employees "could not get promoted at Nucor-Berkeley" because "there was a 'glass ceiling' . . . and that they couldn't get a fair shot." *Decl. of Ramon Roane* at ¶10 (ECF #185, Exh. 1); *Depo. of Ramon Roane* at p. 339:8-340:25 (ECF #188, Exh. 320); *Depo. of Sheldon Singletary* at p. 49 (ECF #191, Exh. 37A).[5]  Roane told the

---

[5] The six production departments shared a common General Manager, Ladd Hall, who became involved in a series of incidents of racial discrimination in supervisory promotions that he was asked to handle including the supervisor promotions denied plaintiffs Roane, White, Butts and

plant's General Manager, Ladd Hall about such racial discrimination in plant promotions in April 2001, including "misplacing" his application for Roll Mill Supervisor. *Decl. of Ramon Roane* at ¶¶8-9 (ECF 185, Exh. 1). "Hall told me that he didn't want to hear about complaints of race discrimination." *Decl. of Ramon Roane* at ¶9 (ECF #185, Exh. 1). Roane then sent Hall an e-mail on August 2, 2001 that told him of other black employees who were experiencing similar racial discrimination in promotions. *Email from Ramon Roane to Ladd Hall re: discrimination* (ECF #193, Exh. 51). This time, Hall "did nothing about what [I] told him except to threaten me." *Decl. of Ramon Roane* at ¶9 (ECF #185, Exh. 1). Rather than looking into the discrimination in promotions reported to him, Hall threatened Roane with loss of his job, "asking [me] how much money [I] made last year with the implicit threat [I] could not afford to lose my job." *Decl. of Ramon Roane* at ¶9 (ECF #185, Exh. 1); *Depo. of Ramon Roane* at 365:1-367:18 (ECF #188, Exh. 320). Rather than doing something about such discrimination, Hall also told Roane that "there would be serious repercussions if what was being reported about discrimination turns out not to be true."

---

Brown. *Decl. of Ramon Roane* at pp. 3, 5, 9-10 (ECF #185, Exh. 1); *Decl. of Quinton Brown* at pp. 8-9 (ECF #185, Exh. 2); *Decl. of Sheldon Singletary* at p. 9 (ECF #185, Exh. 6); *Decl. of Jason* Guy at p. 12 (ECF #185, Exh. 7); *Decl. of Robyn Spann* at p. 3 (EFC #185, Exh. 13); *Decl. of Earl Ravenell* at pp. 3-4 (ECF #185, Exh. 14); *Depo. of Quinton Brown* at 111-114 (ECF #188, Exh. 33A); *Depo. of Robyn Spann* at pp. 47, 49 (ECF #185, Exh. 13); *Depo. of Aaron Butts* at pp. 131-134 (ECF #192, Exh. 40); *Depo. of Jason Guy* at pp. 263-264 (ECF #193, Exh. 460); *Depo. of Ramon Roane* at pp. 22:7-32:9, 42:3-43:5, 55:18-25, 137-142, 332-336, 365-367 (ECF #188, Exh. 32A). Nucor's tolerance of racial hostility at Nucor came from the plant's General Manager, Ladd Hall, who admitted that it was his responsibility to investigate and respond to racial harassment or discrimination. *Aff. of Ladd Hall* at p. 2 (ECF #185, Exh. 17). Systemic tolerance was shown by the fact that nothing was ever done about the multitude of racially hostile incidents reported by the putative class. *Decl. of Ramon Roane* at pp. 10-11 (ECF #185, Exh. 1); *Decl. of Quinton Brown* at pp. 8-9 (ECF #185, Exh. 2); *Decl. of Gerald White* at pp. 7-8 (ECF #185, Exh. 5); *Decl. of Sheldon Singletary* at pp. 7-9 (ECF #185, Exh. 6); *Decl. of Jason Guy* at p. 11 (EFC #185, Exh. 7); *Decl. of Robyn Spann* at p. 4 (ECF #185, Exh. 13); *Decl. of Earl Ravenell* at p. 2-3 (ECF #`85, Exh. 14); *Decl. of Byron Turner* at pp. 2-3 (ECF #185, Exh. 16); *Decl. of Ramon Roane* (ECF #213, Exh. 52).

16

*Decl. of Ramon Roane* at ¶9 (ECF #185, Exh. 1); *Id.* Roane also reported the "racial hostility . . .

black employees were experiencing to . . . Ladd Hall." *Decl. of Ramon Roane* at ¶25 (ECF #185,

Exh., 1).[6] The Fourth Circuit also relied upon all of these facts as part of its mandate. *Brown II*, 785

F.3d at 916-917. Other class members also reported racial discrimination in promotions to Hall as

plant manager. *Decl. of Quinton Brown* at ¶9 (ECF #185, Exh. 1).[7]

---

[6] Roane also reported to management that "promotions were racially unfair", that "there wasn't any test of a person's knowledge, that Nucor was "promoting people without testing their knowledge or qualifications for the job", and that "it's difficult for an African American to move up in the plant in the present environment." *Decl. of Ramon Roane* at ¶10*; Depo. of Ramon Roane* at pp. 332:13-336:11 (ECF #188, Exh. 320). Roane further reported that the promotion process was so unstructured that "this allowed racial bias to affect who was chosen."

> I have never been tested either oral or written on my knowledge of the process, yet denied promotions every time. When I asked what do I need to do, it is never anything that could be defined, or anything that is documented.

*Decl. of Roane Decl.* at ¶ 26 (ECF #185, Exh. 1). When Roane was subsequently denied promotion to Mill Adjustor that was given to a white employee, Matt Blitch, he asked his Department Manager, Paul Ferguson, if he "could put the reasons I was not selected in writing so that I would know what to work on."*Decl. of Ramon Roane* at ¶13 (ECF #185, Exh. 1); *Depo. of Ramon Roane* at pp. 137:18-140:6 (ECF #188, Exh. 32A);. Ferguson told him he "would have to speak with Ladd Hall, the plant manager. *Decl. of Ramon Roane* at ¶13 (ECF #185, Exh. 1). Roane then asked Ladd Hall "about the reasons I did not get the job" but was told that no reason would be given. *Decl. of Ramon Roane* at ¶13 (ECF #185, Exh. 1).

[7] Quinton Brown reported to Hall "about the promotion problems I was having", but "nothing was ever done to correct the situations I told him about." JA1016, ¶26; JA2376:20-2377:21,2378:17-2379:23. Shelton Singletary told Ladd Hall about the racial hostility in the Hot Mill, but Hall did not respond to my concerns. JA1056, ¶17. Jason Guy "complained to Paul Ferguson and Ladd Hall about [his] treatment, but nothing was done." JA1071, ¶29; JA5498:24-5499:9. Byron Turner "complained to Ladd Hall, the plant manager, about the racially discriminatory comments and material that [he] encountered at Nucor." JA1123, ¶5.

> I complained to Ladd Hall about the racial discrimination I was encountering at Nucor on perhaps four different occasions. Hall asked me if I thought there was racism at Nucor, and I told him, "Yes," that I thought there was. When I suggested that Nucor initiate training regarding racial issues and designate some people who

Additionally, Bernard Beaufort worked in the Cold Mill and in Shipping where he bid on "Shipping Supervisor." JA1118, ¶9: JA4542:1-7. There were "no black supervisors in the . . . Shipping Department" and his supervisor Mike Gwynn, told him "there was no need for me to apply." JA1119, ¶9; JA4542:8-25,4543:16-4544:15. Consequently, Beaufort was "never interviewed." JA1118-1119, ¶9; *id.* A white employee, Phillip Clark, was given the promotion notwithstanding the fact that Beaufort had trained Clark. JA1119, ¶9; JA4544:12-25.. Beaufort objected, but was never given a reason for Clark bypassing him. *Id.* Nor was he given the opportunity to cross train. JA118, ¶7; JA4520:2-4522:23. "When I asked if I could train for other positions, my supervisor and manager would not give their okay." JA1118, ¶7.

Sheldon Singletary's prior education and experience "made me interested in supervisory jobs which were not posted and which were usually filled before I knew about the chance to say I was interested" because they were "handpicked in a secret manner." JA1051, ¶8; JA3983:25-4003:21. "White employees had brothers, uncles and cousins in key positions at the plant; therefore, white employees were able to move through the ranks quickly and to much higher jobs than black

_____

have training in equal opportunity and racial issues to whom Nucor employees can consult about racial issues that arise, my impression was that this could not be done because it may offend the white employees.

JA1124, ¶5 (Turner). Earl Ravenell reported the racial discrimination against him and black employees in Melting to Ladd Hall on three different occasions, but nothing changed. JA1112, ¶5. Robyn Spann also took her rejection for promotion to Ladd Hall, "but nothing ever happened." JA1104, ¶4; JA4214:2-4216:9. Aaron Butts testified that he "met with plant manager, Ladd Hall, and Controller, Brian Kurtz" about race discrimination in promotions." JA1087, ¶8; JA4456:11-4459:19. "During the meeting, Mr. Hall said to me, 'I heard there was some race discrimination going on. Have you heard anything about this?' I said, 'Yes, there is race discrimination being displayed,' and described to him the problems that black persons like myself were having in getting promotions. Nothing ever changed, however." JA1087, ¶8.

18

employees." JA1053, ¶12. Singletary's brother, John Singletary, was a graduate of the Citadel, but was unable to move into higher paying or supervisory positions despite his credentials. JA1053, ¶12; JA3739:8-3740:13. Another black graduate of the Citadel, Hillary Douglas, worked on the Pickle Line in the Hot Mill and was also unable to advance to supervisor or manager at Nucor. JA1053, ¶12; JA3741:10-3743:2.

Ken Hubbard sought supervisory positions for which he was well qualified but he was put in the position of Production Coordinator "to get me out of Mill and line of progression that lead to supervisory positions." JA1097, ¶5; JA5056:22-5058:2. Quinton Brown also testified that he was qualified for supervisory jobs "which were not posted and which were usually filled before I knew about [them]" because white employees "were handpicked in a secret manner." JA1010, ¶7; JA2477:10-2478:11,2486:16-2488:14. This Court has already held that "other black employees should be counted in the class because 'potential applicants are eligible to prove that they would have applied for a promotion but for the discriminatory practice.'" *Brown*, 576 F.3d at 152.

Earl Ravenell worked in Melting. JA4790:22-4791:23. He applied and was qualified and not interviewed or selected for promotion to Leadman in Melting. JA1110-1111, ¶3; JA4759:23-4765:23,4766:17-4767:10. He was also interested and qualified for supervisory positions in both the Hot Mill and Cold Mill, but his supervisor in Melting, Darin Reynolds, "would not give me a good recommendation." JA1111, ¶4; JA4749:3-21. Ravenell told the Plant Manager, Ladd Hall, three times "about the discriminatory treatment I and other African-American employees were receiving" in Melting, but Hall "did nothing to change the situation." JA1112, ¶5; JA4795:17-4798:24,4799:8-4780:15.

Nucor mistakenly argues that plaintiffs have "stated their intention to limit any class to . . .

19

'blue collar' production level jobs in steel mill operations." *Def. Resp.* at 5 & n. 5 (ECF #477). The

sole support for that contention is a statement to Magistrate Kosko in 2005 that discovery was

limited to the six production **departments** and did not include "the quality systems department, the

safety department, the controller's department, the order instructive department, the environmental

department [and] the metallengical department." Tr. at 39:5-11(ECF #53, April 21, 2005). Nothing

whatsoever was said, however, about limiting discovery to "blue collar jobs" in the six production

departments for which a class was subsequently certified. The sole reference was to "blue collar

steel mill *operations*," not to "blue collar steel mill *jobs*." *Id.* The exact statement in the 2005

transcript was as follows:

> We're not – when they said across the plant, across the board, we've not asked for
> information and we're not contesting matters in the quality systems department, the
> safety department, the controller's department, the administrative department. We're
> not asking for anything in the metallurgical department, the environmental
> department. We're asking for these blue collar steel mill operations."

ECF #477 at 5, n. 5 (Transcript of Mar. 29, 2005, Motion Hearing, ECF #51, at 39:5-11 (Apr. 21,

2005)).

C.     **There Are No "Entry-Level" Jobs Which Are Restricted To Hiring Applicants Or Not Subject To Promotion Bids**

These same considerations apply equally to defendants' argument that the class should be

"altered or amended" to exclude entry-level jobs and employees. First, employees in entry-level jobs

routinely seek to promote to better jobs, including other better-opportunity entry-level jobs. *See e.g.*

Exhs. 29-36. Second, entry-level jobs are posted and filled internally just like non-entry-level jobs.

*See* Exhs. 29-36. They are not filled exclusively or even predominately by hiring. *Id.* Third, entry-

level jobs are subject to the same Department Managers, Supervisors, Plant Manager and plant

policies as non-entry-level jobs. *Id.* That fact was the basis for the Fourth's Circuit's mandate to clarify the class for **all** jobs in the six production departments, not just non-entry level jobs. *Brown*, 785 F.3d 895. Fourth, the jobs Nucor calls "entry-level" refer to "entry" into a crew or department, not entry at hire. Entry at hire is usually into the Lab Department or a temporary job with a contractor which precedes **promotion** to an "entry-level" job as a regular employee in one of the six production departments. Those promotions are no different than any other. *Id.* Fifth, nothing in the *Complaint*, motions, briefs, evidence or decisions in this case has ever subdivided the six production departments into entry-level or non-entry level jobs or promotions.

Nucor has offered no evidence of "entry level jobs" that can only be filled by hiring. To the contrary, all entry-level jobs are posted for competition by both internal and external applicants or bidders. Plaintiffs' class certification evidence established that employees bid on and are denied promotion to entry-level positions. *See* Exhibits 29-36. For example, the Department Manager of the Beam Mill, Paul Ferguson, testified that jobs of Tagger, Stocker; Inspector, Surge Inspector, Crane Operator and Stand Assembler are "entry-level" jobs but are still posted for promotion bids from existing employees. *Ferguson Depo.* at 285:5-18 ("We've posted all those jobs from time to time."). Pl. Exh. 37. Nucor has included job postings for entry-level jobs as part of the promotions they determined to be "similarly situated" to the promotions sought by the named plaintiffs. *See* Exhs. 29-36; Exhibits 29-39 are bid forms submitted by incumbent employees seeking to promote to those jobs[8]; Exhibit 38 is a "Job Posting" for the entry-level job of Tagger; Exhibit 39 are promotion bid forms submitted by an incumbent employee for the entry-level job of Tagger by an employee occupying an other entry-level job as Strand Tender; Exhibit 40 is a promotion bid form

---

[8] Nucor's standardized bid forms for promotions are titled "Application For Transfer."

for the entry-level job of Stand Assembler by an employee holding another entry level job as Tagger; Exhibit 41 is a promotion bid form by a clerical "receptionist" for the entry level job of Tagger; Exhibit 42 is another promotion bid form by an entry level employee in the job of Stand Assembler who was bidding for another entry-level job as a "Finishing Tagger."

Plaintiffs also presented evidence of employees bidding on lower-paying entry-level jobs in order to advance to better jobs in a more desirable crew or department. *See* Exhibits 29-42. For example, Joseph Rider moved from a higher Grade 3 job as a BM Shipping Utility Operator making $9.54 per hour to a lower Grade 1 job as a Cold Mill Utility Man making just $8.65 per hour. *See* Exhibit 43. The Cold Mill Manager, Al Smith admits that this Cold Mill Utility job is an "entry level job." *Smith Depo.* at 49:19-23; Pl. Exh. 44. It was nonetheless filled internally by Joseph Rider, who was an existing employee from another department. Exh. 45.

## III.    THE COURT HAS ALSO PREVIOUSLY REJECTED THE TIME RESTRICTIONS ARGUED BY NUCOR

### A.    The Court Has Already Rejected Nucor's Proposal To Certify A Class Through Only 2003 Or 2007

The Court has already rejected Nucor's argument that the class should be restricted to employees before 2003 or 2007. It stated: "The Court rejects the notion that the temporal scope of the class is strictly limited by the temporal scope of the plaintiffs' statistical evidence. Class definitions in other Title VII cases have extended up to the date of certification and indefinitely into the future." *Order* at 12 (ECF #359).[9]  The Fourth Circuit subsequently ordered that such class be

---

[9]  The Court's prior decision cited the following precedent for extending the class to the present or "indefinitely into the future": *Newsome v. Up-To-Date Laundry, Inc.*, 219 F.R.D. 356, 360, 369 (D. Md. 2004); *Dukes v. Wal-Mart Stores, Inc.*, 222 F.R.D. 137,188 (N.D. Cal. 2004); *Adams v. Pinole Point Steel Co.*, No. C-92-1962, 1994 WL 515347, at *4, *9 (N.D. Cal. May 18, 1994); *Jenson v. Eveleth Taconite Co.*, 139 F.R.D. 657, 667 (D. Minn. 1991).  *See* ECF #359.

reinstated. *Compare Order* at 30 (ECF #339) and *Order* at 9-13 (ECF #359) *with Brown v. Nucor*, 785 F.3d 895, 911-912, 916-917 (4th Cir. 2015).

Contrary to Nucor's argument, a class can properly include persons who become class members before the date of a final judgment in the case. The Court noted the fact that "[c]lass definitions . . have extended . . . indefinitely into the future." *Order* at 12 (ECF #359), citing *Newsome v. Up-To-Date Laundry, Inc.*, 219 F.R.D. 356, 360, 369 (D. Md. 2004). Moore's standard treatise on *Federal Practice* states: "A class may include future members as long as the court will be able to determine, at any given time, whether a particular individual is a member of the class at that time. Correspondingly, the membership of a class may change over time as long as there is an administratively feasible method of identifying the class members at any particular time." 5-23 *Moore's Federal Practice*, §23.21; s*ee also Mayburg v. Heckler*, 574 F. Supp. 922, 928 (D. Mass. 1983) *, aff'd in part, vacated in part on other grounds*,740 F.2d 100 (1st Cir. 1984); *Probe v. State Teacher's Ret. Sys*., 780 F.2d 776, 780 (9th Cir. 1986) (including future members in class does not render class definition vague); *Elliott v. Sperry Rand Corp*., 29 F.E.P. 754, 755 (D. Minn. 1981), *aff'd,* 680 F.2d 1225 (8th Cir. 1982) (approving class of both present and future employees); *Pederson v. Louisiana State University*, 213 F.3d 858, 868 n.11 (5th Cir. 2000).[10] The Fourth Circuit

---

[10] *See also Ashe v. Board of Elections*, 124 F.R.D. 45, 47 (E.D.N.Y. 1989) (class definition may include future members); *White v. National Football League*, 822 F. Supp. 1389, 1403 (D. Minn. 1993); *Johnson v. Brelje*, 482 F. Supp. 121, 123 (N.D. Ill. 1979) (Class membership may change.); *Esler v. Northrop Corp*., 86 F.R.D. 20, 32 (W.D. Mo. 1979) (same); *Austin v. Metropolitan Council*, 2012 U.S. Dist. LEXIS 41750, **29-30 (D. Minn. 2012); *Rajender v. University of Minnesota,* Civ. No. 4-73-435, 1978 U.S. Dist. LEXIS 19598, 1978 WL 212 (D. Minn. Feb. 13, 1978) (approving class of "past, present, and future [female nonstudent] applicants" at the University of Minnesota because future applicants' interests were co-extensive with current applicants); *Beasley v. Griffin,* 81 F.R.D. 114 (D. Mass. 1979) (including future applicants in Title VII class because otherwise they would be unable to enforce provisions of settlement agreement); *accord Thompson v. Roberson*, 2000 U.S. Dist. LEXIS 20605, 2000 WL 33281120, *4 (S.D. Ind. Dec. 4, 2000) (noting

has held that a cut-off date cannot be imposed when it would preclude proof of the continuing effects of racial discrimination through the time of trial or final judgment.  *EEOC v. Korn Industries, Inc.*, 662 F.2d 256, 262-263 (4th Cir. 1981) ("[W]e can find no justification in the record for cutting off the awards at an arbitrary date long prior to judgment.").

In rejecting defendants' argument to limit class membership to a time period that did not extend to the present "date of this Order," this Court specifically found that no such time restriction had ever been suggested by Nucor before 2011.

> The defendants argue that if the Court is unwilling to reconsider its certification decision, it should at least narrow the scope of the class. The defendants assert that the "class as currently certified has never been examined under Rule 23" and "is far more broad than the class analyzed by both this Court and the Fourth Circuit under Rule 23's requirements." Defs.' Mot. for Recons. 2, ECF No. 346. Contrary to this claim, the class certified by the Court is essentially identical to the class originally proposed by the plaintiffs in May of 2007, which included:
>
> > All African-Americans who are or were employed at the Nucor Berkeley manufacturing plant in Huger, South Carolina at any time since December 2, 1999 in the beam mill, hot mill, cold mill, melting, maintenance and shipping departments (hereafter "production departments") or, in the alternative, for such separate classes or subclasses of such persons as may be appropriate under the Federal Rules of Civil Procedure.
>
> Motion for Class Certification 1, ECF No. 184. In February of 2011, the Court certified the following class:

---

that the court had previously certified a class that specifically included all past, present, and future employees); *Richardson v. Byrd*, 709 F.2d 1016 (5th Cir. 1983) (affirming the district court's class certification and definition that included future members and determining that the class representative had a sufficient nexus to enable her to represent a class consisting of past, present, and future employees and applicants pursuant to Rule 23(a) and (b)(2); *In re Northrop Grumman Corp. ERISA Litig.*, 2011 U.S. Dist. LEXIS 94451, 2011 WL 3505264, *13 (C.D. Cal. Mar. 29, 2011) ("The inclusion of future class members in a class is not itself unusual or objectionable.") (quoting *Rodriguez v. Hayes*, 591 F.3d 1105, 1118 (9th Cir. 2010)); *Perez-Farias v. Global Horizons, Inc.*, 2006 U.S. Dist. LEXIS 51432, 2006 WL 2129295, *2 -*3 (E.D. Wash. July 28, 2006).

> All African-Americans who are or were employed at the Nucor
> Berkeley manufacturing plant in Huger, South Carolina at any time
> since December 2, 1999 in the beam mill, hot mill, cold mill, melting,
> maintenance, and shipping departments.

Order Granting Certification 30, ECF No. 339. As is obvious, the class ultimately certified by the Court was drawn directly from the class proposed by the plaintiffs.

Because the class definition does not include a cut-off date, the number of individuals who fall within the definition is likely to have increased with time; however, excepting these changes, any flaw that exists in the current class definition also existed at the time the class was proposed by the plaintiffs, opposed by the defendants, rejected by this Court, reviewed by the Fourth Circuit, opposed by the defendants again, and only then adopted by this Court. The defendants have been afforded every imaginable opportunity to raise objections to the scope of the plaintiffs' class and have previously presented most, if not all of the arguments advanced in their motion for reconsideration.

*Order* at 9-10 (ECF #359).

## B. The Cut-Off Date For Class Membership Does Not Affect Discovery Of The Continuing Effects Of The Challenged Discrimination

The defendants' reliance on the April 25, 2011 cut-off date for class membership is misplaced for purposes of discovery. Merely because persons hired after such cut-off date are argued not to be class members does not mean that those hired from 1999-2011 are precluded from conducting discovery on their class claim against the continuing effect of the challenged discrimination. Such discovery is essential to the class claim for injunctive relief. The Fourth Circuit's mandate to certify the promotion and hostile environment class is based, in part, on such claim for classwide injunctive relief against the pattern-or-practice of racial discrimination that has been alleged in this case.[11] Injunctive relief cannot be awarded absent proof that a pattern-or-practice has continued into the present. *See e.g. NAACP v. City of Evergreen, Ala.*, 693 F.2d 1367, 1370 (11th

---

[11] *See Brown I*, 576 F.3d at 159 ("The district court can address plaintiffs' claims for injunctive or other relief after liability and other common issues are determined.").

25

Cir. 1982) ("[I]njunctive relief is mandatory absent clear and convincing proof that there is no reasonable probability of further noncompliance with the law. * * * Moreover, even absent the threat of future discriminatory behavior, the courts have a duty to correct and eliminate the present effects of past discrimination.").[12]

The Fourth Circuit has similarly held that "[t]o the extent that the district court finds racial discrimination, it is under a duty to render a decree which will both eliminate past discrimination **and bar discrimination in the future**." *United States v. County of Fairfax*, 629 F.2d 932, 941 (4th Cir. 1980), *cert. denied*, 449 U.S. 1078 (1981) (emphasis added; citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975)); *Rock v. Norfolk and Western Ry. Co.*, 473 F.2d 1344, 1348 (4th Cir. 1973) ("The rule is well-established that, where discrimination violations of the Act have been found, the remedy granted must eliminate all residual effects of past discrimination to the greatest extent practical.");*United Transp. Union v. Norfolk &Western Ry. Co.*, 532 F.2d 336, 344 (4th Cir. 1975) ("[O]ur decisions . . . establish that Title VII requires elimination of all continuing effects of past discrimination."); *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1561 (11th Cir. 1986) ("[I]njunctive relief is mandatory absent clear and convincing proof that there is no reasonable

---

[12] *See also Evans v. Harnett Co. Bd. of Educ.*, 684 F.2d 304, 306 (4th Cir. 1982) ("'[T]o the extent that the district court finds racial discrimination, it is under a duty to render a decree which will both eliminate past discrimination and bar discrimination in the future.'") (quoting *County of Fairfax*, 629 F.2d at 941; *United States v. Gregory*, 871 F.2d 1239, 1246 (4th Cir. 1989) ("We first observe that when a plaintiff has prevailed and established the defendant's liability under Title VII, there is no discretion to deny injunctive relief completely."); *United States v. County of Fairfax, VA*, 629 F.2d 932, 941-42 (4th Cir. 1980); *Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1132 (4th Cir. 1995) ("The equitable relief ordinarily available in Title VII workplace harassment cases is an injunction prohibiting further harassment.") (citing *Albemarle Paper*, 422 U.S. at 417-18; and *Spencer v. General Elec. Co.*, 894 F.2d 651, 660 (4th Cir. 1990)); *Evans v. Harnett Co. Bd. of Educ.*, 684 F.2d 304, 306 (4th Cir. 1982) ("When failure to grant injunctive relief constitutes clear error, the remedy will be ordered by an appellate court.") (citing *Sandford v. R.L. Coleman Realty Co., Inc.*, 573 F.2d 173, 178-79 (4th Cir. 1978)).

probability of further noncompliance with the law."); *James v. Stockham Valves and Fittings Co.*, 559 F.2d 310, 354-355 (5th Cir. 1977) (" This Court has held that absent clear and convincing proof of no reasonable probability of further noncompliance with the law a grant of injunctive relief is mandatory.").

"The time frame may appropriately include a period before, as well as after, commission of the alleged discriminatory acts against the plaintiff because conduct by the employer during such periods can be relevant to establishing that a pattern or practice of discrimination existed, or that the reasons given by the employer for actions against the plaintiff are pretextual." *Lovett v. Cracker Barrel Old Country Store*, 2015 U.S. Dist. LEXIS 87812, *10 (E.D. N.C. 2015) (citing *EEOC v. Altec Indus., Inc.*, No. 1:10-CV216, 2012 U.S. Dist. LEXIS 83774, 2012 WL 2295621, at *1-2 (W.D.N.C. 18 Jun. 2012) (noting "'undue restrictions of discovery in Title VII cases are especially frowned upon'" and allowing plaintiff's motion to compel discovery for a period of almost 6 years, 1 year before the alleged discrimination and 5 years after) (quoting *Ardrey v. United Parcel Serv.*, 798 F.2d 679, 682 (4th Cir. 1986)).[13]

"In employment discrimination cases, courts have consistently held that discovery is even broader than that enjoyed in regular civil litigation, and that 'the imposition of unnecessary limitations on discovery is especially to be avoided in Title VII cases,' because of the nature of the proofs required to demonstrate unlawful discrimination may often be indirect or circumstantial.'"

---

[13] *See also Lyoch v. Anheuser-Busch Cos.*, 164 F.R.D. 62, 66-67 (E.D. Mo. 1995); *E.E.O.C. v. Kelly-Springfield Tire Co.*, No. 84-16-MISC-3, 1985 U.S. Dist. LEXIS 21867, 1985 WL 1302, at *3 (E.D.N.C. 12 Mar. 1985); *see also Smith v. Bayer Material Science*, LLC, No. 5:12-CV-171, 2013 U.S. Dist. LEXIS 86269, 2013 WL 3153467, at *5 (N.D.W. Va. 19 June 2013) ("Further, 'evidence of general patterns of discriminatory treatment by an employer is relevant even in the individual disparate treatment case.'" (quoting *Zahorik v. Cornell Univ.*, 98 F.R.D. 27, 31 (N.D.N.Y. 1983)).

*Smith v. Bayer Material Science, LLC*, 2013 U.S. Dist. LEXIS 86269, \*\*13-14 (N.D. W. Va. 2013)

(citing *Miles v. Boeing Co.*, 154 F.R.D. 117, 119 (E.D. Pa. 1994) (quoting *Robbins v. Camden City Bd. of Educ.*, 105 F.R.D. 49, 55 (D.N.J.1985)).[14]

### C. Discovery To The Present Is Also Necessary In Order To Be Able To Determine Class Members' Rightful Place

Discovery to the present is also necessary so that class members can establish the job they would have now occupied absent the pattern-or-practice and disparate impact challenged in this case. Class members employed before the cut-off dates proposed by Nucor have the right to prove the continuing effect of past discrimination on their careers and to seek instatement into their "rightful place" to the current date, not just instatement into the jobs they were discriminatorily denied years ago. *See e.g. Suggs v. ServiceMaster Educ. Food Mgt.*, 72 F.3d 1228, 1233 (6th Cir. 1996) ("Pursuant to the 'make whole' purposes of such relief, the general rule is to award back pay through the date of judgment."); *Thorne v. City of El Segundo*, 802 F.2d 1131, 1136 (9th Cir. 1986) ("[W]hen an employer has refused to hire an employee in violation of that employee's rights under Title VII, the court should compute the backpay award from the date of the discriminatory act until the date of final judgment."); *Patterson v. American Tobacco Company*, 535 F.2d 257, 269 (4th Cir.)

---

[14] *See also Pleasants v. Allbaugh*, 208 F.R.D. 7, 9 (D.D.C. 2002) ("[P]laintiffs have been permitted a very broad scope of discovery, extending to documents and information pertaining to so-called workforce data, i.e., information regarding non-party employees in plaintiff's workplace."). Moreover, the several Courts of Appeals that have addressed the issue have held the same. *See Sempier v. Johnson & Higgins*, 45 F.3d 724, 734 (10th Cir. 1995) ("[W]e frown upon unnecessary discovery limitations in Title VII, and hence ADEA, cases."); *Sweat v. Miller Brewing Co.*, 708 F.2d 655, 658 (11th Cir. 1983) ("[W]e note that liberal discovery rules are applied in Title VII litigation. Statistical information concerning an employer's general policy and practice concerning minority employment may be relevant to a showing of pretext, even in a case alleging an individual instance of discrimination rather than a 'pattern and practice' of discrimination."); *Trevino v. Celanese Corp.*, 701 F.2d 397, 405 (5th Cir. 1983) ("The imposition of unnecessary limitations on discovery is especially frowned upon in Title VII cases.").

(backpay extends until the date of judgment), *cert. denied*, 429 U.S. 920 97 S. Ct. 314, 50. L. Ed 2d 286 (1976); *EEOC v. Korn Industries, Inc.*, 662 F.2d 256, 262-263 (4ᵗʰ Cir. 1981); *Nord v. United States Steel Corp.*, 758 F.2d 1462, 1473 (11ᵗʰ Cir. 1985) ("Title VII claimants are also presumptively entitled to reinstatement under the "make whole" policy.").[15]

The Fourth Circuit has held that district courts cannot impose a cut-off date that precludes proof of the continuing effects of defendants' discriminatory practices into the present – that class members have a right to prove their "rightful place" that they would have held at the time of trial in the absence of such discriminatory practices. *EEOC v. Korn Industries, Inc.*, 662 F.2d 256, 262-263 (4ᵗʰ Cir. 1981). In the latter case, the district court was reversed for imposing a cut-off date that restricted relief to *the earlier* of class members' "promotion to the same level as the whites or until December 31, 1978, whichever came first." *Id.* The Fourth Circuit held that "we can find no justification in the record for cutting off the awards at an arbitrary date long prior to judgment." *Id.* at 263. It rejected such a cut-off date because "Title VII has two objectives, 'eradicating discrimination . . . and making persons whole for injuries suffered through past discrimination." *Id.* at 263. A cut-off date before the date of judgment or entry of injunctive relief was held to be inconsistent with such "make whole" relief. For this reason, the Court held that "the appropriate

---

[15] *See also EEOC v. Monarch Machine Tool Co.*, 737 F.2d 1444, 1451-53 (6th Cir. 1980); *Nord v. United States Steel Corp.*, 758 F.2d 1462, 1472-1473 (11th Cir. 1985) ("Here, the court granted back pay but ended the back pay period on the date of the court's oral findings, over four months before judgment was entered. *See* Fed.R.Civ.P. 58. This was contrary to the 'make whole' purpose of Title VII, and therefore constitutes error."); *Daniel v. Loveridge*, 32 F.3d 1472, 1477-1478 (10ᵗʰ Cir. 1994) ("In our view, the district court did not abuse its discretion in setting Daniel's back pay at $ 28,343.29. In arriving at that figure, the district court first found that Daniel's back pay from the date of her firing to the date of the first judgment on Daniel's Title VII claim would have been $39,114."); B. Schlei & P. Grossman, Employment Discrimination Law at 1432 (2d ed. 1983) ("Termination of the backpay period normally occurs when the discriminatee is unconditionally and in a bona fide fashion offered the employment, reinstatement or promotion at issue.").

means of determining the effects of discriminatory actions is to construct a 'hypothetical employee' and to follow him as he advances through the company's ranks based on "a reconstruction of the average progression in the company." *Korn Industries,* 662 F.2d at 263; *United Transp. Union, Local 974 v. Norfolk & Western Ry. Co.*, 532 F.2d 336, 341 (4th Cir. 1975), *cert. denied*, 425 U.S. 934 (1976); *see also White v. Carolina Paperboard Corp.*, 564 F.2d 1073, 1084 (4th Cir. 1977) ("The court should reconstruct the affected black employee's hypothetical employment history, compare it with his actual employment position, and award him the difference."). The Fourth Circuit reversed the cut-off date adopted by the district court because:

> The district court in this case awarded the amount of the starting pay differential between the black employee and the white counterpart and terminated the award at an arbitrary point a year and a half prior to judgment, or at the time the black employee was promoted to the same level as the white employee or was terminated, whichever came first. No effort was made to insure that the discriminatee's economic progress mirrored that of an average employee's: the calculations did not take into account any across the board pay raises that might have been granted or Korn's merit increases, which are granted so automatically that they are no more than time in grade increases.

> Moreover, the court allowed the awards to terminate when the black employee had reached the starting point of the white employee with similar qualifications hired at the same time; this failed to make adjustment for the relative disadvantage of the black employee with respect to the white employee. **Further, we can find no justification in the record for cutting off the awards at an arbitrary date long prior to judgment.** The date may have been one which the parties agreed to while attempting to work out a settlement or it may reflect the time when Korn's amended affirmative action program went into effect. Neither hypothesis would be sufficient to halt awards as of that date. This circuit has held that back pay must be allowed from the time an employee is denied an employment opportunity until he actually receives it. *See Patterson v. American Tobacco Co.*

> Accordingly, on remand the district court **shall apply** the principles expressed in *White v. Carolina Paperboard Corp.* and *Patterson* and shall construct a hypothetical employment history for each of the twenty-six discriminatees, against which it will compare the actual employment history of each; the back pay award will be the difference between the hypothetical employee's earnings and the individual's actual earnings. **Additionally, the award shall not be limited by an arbitrary cut off date but shall instead continue until the time the employee is promoted to the**

30

**job to which his qualifications and history indicate he is entitled.**

*Korn Industries*, 662 F.3d at 263-264 (emphasis added).[16]

Such a determination of the "average progression in the company" cannot be made without discovery of the jobs awarded to each race through the time of judgment or shortly before. To make the class "whole", there must be sufficient discovery and evidence to allow the factfinder to determine the positions that class members would have held at the time of trial in the absence of racial discrimination. *Korn Industries,* 662 F.2d at 263  To do less would freeze the effects of such past discrimination and reward the discriminating employer for violating Title VII. *Id.*[17]

_____

[16] *See also Worthy v. Biggers Brothers, Inc.*, 1988 U.S. App. LEXIS 19582, **5-6 (4th Cir. 1988) ("The calculation of the back pay award due [plaintiffs] requires a court to determine the pay of a hypothetical employee in [plaintiffs] sought-for position and to follow him as he advanced through the ranks. The court must determine the alternate course such an employee's employment with Biggers Brothers would  have followed but for the discrimination.") (citations omitted); *McKnight v. Circuit City Stores, Inc.*, 1997 U.S. Dist. LEXIS 5781, *4 (E.D. Va. 1997) ("In this Circuit, 'the appropriate means of determining the effects of discriminatory actions is to construct a 'hypothetical employee' and to follow him as he advances through the company's ranks. The employment history of the applicant who was actually hired instead of the victim usually provides the best guide in determining the hypothetical employment history for the victim.  Once the hypothetical career path is determined, the court compares the victim's employment history to that of the hypothetical employee and awards the victim any salary difference that existed during the relevant period.") (citations omitted); *Wells v. North Carolina Bd. of Alcoholic Control*, 714 F.2d 340, 342 (4th Cir. 1983) ("Under these circumstances, we conclude that the award of back pay accruing after September 22, 1975 to the date of judgment and the order of reemployment in a position of Sales Clerk were proper."); *Edwards v. School Bd.*, 658 F.2d 951, 954 (4th Cir. 1981) ("Under the Labor Act the back pay period for an unlawfully terminated employee commences with the date of discharge and continues until the employer makes a valid offer of reinstatement."); *Depaoli v. Vacation Sales Assocs., LLC*, 2006 U.S. Dist. LEXIS 22928, *24 (E.D. Va. 2006) ("'The back pay period of recovery commences from the time the discriminatory act causes economic injury, and terminates on the date of judgment.'") (citing *Wells v. North Carolina Bd. Of Alcoholic Control*, 714 F.2d 340, 342 (4th Cir. 1983)).

[17] Plaintiffs' "rightful place" may also extend into the future with front pay and an injunction to instate the plaintiff into the next available position. *White v. Carolina Paperboard Corp.*, 564 F.2d 1073, 1091 (4th Cir. 1977) (" Under *Patterson v. American Tobacco Co.*, 535 F2d 257 (4th Cir. 1976), back pay in Title VII cases may be supplemented, in the district court's discretion, 'by an

### D.   The Court Certified The Class To The Present, Which Was April 25, 2011 At That Time

The Court recognized in 2011 that the class should not be restricted to the 2003 or 2007 time periods argued by Nucor, but should extend at least to the present, which was defined as "the date of this Order" on April 25, 2011. *Order* entered April 25, 2011 at 12 (ECF #359, citing precedent); (" The cut-off date for the class in this case shall be the date of this order.") (ECF #359 at 13). Such cut-off-date of April 25, 2007 does not affect discovery because that date applies only class membership, not to proof of the claims challenged on behalf of class members who are already part of the class. The Court's Order on April 27, 2007 only cut-off class membership as of "the date of this Order" in order to be able to send out notice of the right to opt-out. *See Order* at 12 & 14 (ECF #359). That cut-off date became moot and no longer relevant once the Court stayed mailing such notice at Nucor's request.  The Court's stated reason for imposing such a cut-off date was to "define the class with precision and to ensure that potential class members will be able to determine whether they fall within the parameters of the class." *Order* at 12 (ECF #359).That purpose of "ensur[ing] that potential class members will be able to determine whether they fall within the parameters of the

---

award equal to the estimated present value of lost earnings that are reasonably likely to occur between the date of judgment and the time when the employee can assume his new position.' We see no abuse of discretion in the award of such supplement here."); *Patterson v. American Tobacco Co.*, 535 F.2d 257, 269 (4th Cir. 1976) ("Some employees who have been victims of discrimination will be unable to move immediately into jobs to which their seniority and ability entitle them. The back pay award should be fashioned to compensate them until they can obtain a job commensurate with their status."); *Nord v. United States Steel Corp.*, 758 F.2d 1462, 1473-1474 (11th Cir. 1985); *Thorne v. City of El Segundo*, 802 F.2d 1131, 1137 (9th Cir. 1986) ("Awards of front pay are appropriate when it is impossible to reinstate the plaintiff or when it would be inappropriate due to excessive hostility or antagonism between the parties."); *see also Fadhl v. City and County of San Francisco*, 741 F.2d 1163, 1167 (9th Cir. 1984); *EEOC v. Pacific Press Publishing Association*, 482 F. Supp. 1291, 1320 (N.D. Cal. 1979)(when effective employment relationship cannot be reestablished, front pay is appropriate), aff'd 676 F.2d 1272 (9th Cir. 1982).

32

class" will be better served by a new Order entered closer to the time of trial rather than an Order entered nearly five years ago on April 25, 2011.

The Court certified the class to "the date of this Order" only because the case was moving close to trial in April 2011 (the first appellate mandate had been entered in 2009) and notice was about to be sent to the class telling them that the cut-off date for class membership and the right to opt-out. *See* ECF ## 340, 345, 348, 349, 352, 357, 359, 360, 363, 378; *see also* Exhibits. That Notice and trial, however, never occurred in 2011 or for the next several years because Nucor repeatedly moved to decertify the class and to stay all proceedings and sending such notice. *See* ECF ## 373, 375, 381, 409, 426, 428, 454, 455. The plaintiffs opposed such stay or any delay in mailing the Notice of class certification and right to opt-out. ECF #375 at 13 ("The plaintiffs request that the Court continue to advance this case by giving class members notice of their right to opt-out before any further delay ensues."). The Court, however, granted Nucor's motion to hold the class notice in abeyance on July 6, 2011, and that notice has still not been sent as of today's date in 2016. *See Order* of July 6, 2011 (ECF #377). During that extended delay, Nucor repeatedly filed motions to alter or amend the hostile environment class, including repeated interlocutory appeals that were denied by the Court of Appeals through August 29, 2014. *See* ECF ## 359, 381, 409, 419, 428, 454, 455, 461, 464, 467.

Consequently, the "present" is no longer April 25, 2011. Class members hired after that date will be severely prejudiced if the Court limits the class to that date. Such class members' claims from 2011 to present will have expired through no fault of their own if the class membership date is left as April 25, 2011 or any redefined to the earlier dates proposed by Nucor. Nucor should never have obtained an Order to hold such Notice of such cut-off date to the class is adequate if it wanted

to cut-off class membership as of April 25, 2011.   Class members hired after that date naturally

relied upon this case to protect against expiration of their limitations period because no notice of the

April 25, 2011 cut-off was ever mailed to them at Nucor's request.

**IV.    PLAINTIFFS INCORPORATE THEIR BRIEF IN OPPOSITION TO NUCOR'S NEW MOTION TO ALTER OR AMEND THE CLASS CERTIFICATION ORDER**

Because defendants' response to the current motion to compel is largely based on their

parallel motion to alter or amend the Court's class certification order, plaintiffs rely upon and

incorporate their opposition to such motion which is due to be filed on or before February 4, 2016.

Respectfully submitted this 28th day of January, 2016.

s/Armand Derfner_____
Armand Derfner, Bar No. 502
Derfner & Altman LLC
Attorneys at Law
575 King Street, Suite B
Charleston, S.C. 29403
(843) 723-9804
(843) 723-7446 (facsimile)

Robert L. Wiggins, Jr., ASB-1754-G-63R
Ann K. Wiggins, ASB-7006-I-61A
Wiggins, Childs, Pantazis, Fisher & Goldfarb
The Kress Building, 301 19th Street North
Birmingham, Alabama 35203
205-314-0500
205-254-1500 (facsimile)

Counsel for Plaintiffs

**PLAINTIFFS' EXHIBITS IN SUPPORT OF THEIR**
**REPLY IN SUPPORT OF MOTION TO COMPEL**

1.     Quinton Brown Declaration
2.     Ray Roane Declaration
3.     Gerald White Declaration
4.     Sheldon Singletary Declaration
5.     Aaron Butts Declaration
6.     Ken Hubbard Declaration
7.     Bernard Beaufort Declaration
8.     Alvin Simmons Declaration
9.     Deposition Excerpts of Ray Roane
10.    Deposition Excerpts of Scott Clark
11.    Application for Transfer (Gerald White)
12.    Deposition Excerpts of Gerald White
13.    Roll Shop Crew Leader, 2/16/04 Application (Gerald White)
14.    Deposition Excerpts of Sheldon Singletary
15.    Jason Guy Declaration
16.    Robyn Spann Declaration
17.    Earl Ravenell Declaration
18.    Deposition Excerpts of Aaron Butts
19.    Deposition Excerpts of Jason Guy
20.    Byron Turner Declaration
21.    Deposition Excerpts of Bernard Beaufort
22.    Jacob Ravenell, Jr. Declaration
23.    Eric Conyers Declaration
24.    Joseph Cook Declaration
25.    Deposition Excerpts of Quinton Brown
26.    Deposition Excerpts of Kenneth Hubbard
27.    Deposition Excerpts of Robyn Spann
28.    Deposition Excerpts of Earl Ravenell
29.    Ladle Wall Helper posting, 2/24/16
30.    Ladle Wall Helper posting, 5/31/02
31.    Ladle Wall Helper Refactory posting, 2/12/01
32.    Bricker posting, 6/16/03
33.    Rev. Mill Exit Operator posting, 8/12/03
34.    Forklift/Crane Operator (4 positions) Coil Shipping posting, 7/31/02
35.    Taylor/Crane Operator (1 position) Coil Shipping posting, 7/5/02
36.    Forklift Taylor/Crane Operator posting, 8/9/02
37.    Deposition Excerpts of Paul Ferguson
38.    Tagger posting, 7/10/01
39.    Individuals applying for Tagger position
40.    Application for Transfer - Michael Bodony for Tagger position

41.    Application for Transfer - Robyn Spann for Tagger position
42.    Application for Transfer - Ray Messemer for Tagger position
43.    Change of Status - R. Waldron, 3/10/02
44.    Deposition Excerpts of Al Smith
45.    Joseph (Joe) M. Rider Application for Transfer for Reversing Mill #2 Utility, 6/4/02